IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ARTUR DAVIS, | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No.:  2:18-cv-00026-SRW** |
| | ) | |
| LEGAL SERVICES ALABAMA, INC.; | ) | |
| LAVEEDA MORGAN BATTLE; and | ) | |
| ALEX SMITH; | ) | |
| | ) | |
| **Defendants.** | ) | |

AMENDED COMPLAINT

Pursuant to Rule 15 of the Federal Rules of Civil Procedure and Rule 15.1 of the Local Rules for the Middle District of Alabama, Plaintiff Artur Davis amends his Complaint to add claims for Race Discrimination and Retaliation under 42 USCA 2000e *et seq.* and to better state his claims by substituting the following for the Complaint:

Plaintiff Artur Davis, by his attorney, brings this legal action against Defendants Legal Services of Alabama, Inc. ("LSA"), LaVeeda Morgan Battle, and Alex Smith. Davis brings claims for race discrimination, retaliation, conspiracy and defamation that stem from defendants' unlawful, willful and malicious actions against Davis during his tenure as Executive Director of LSA.

INTRODUCTION

1

1.     For eight months, plaintiff Davis, a well-respected veteran of Alabama politics as well as a former federal prosecutor and civil and criminal litigator, served successfully as the Executive Director of LSA. Davis inherited an organization with a history of turmoil and mismanagement, and affected a dramatic turnaround in a short time.

2.     Despite his leadership, which received acclaim from board members, employees, and stakeholders, Davis incurred the resentment of a small group of employees motivated by their own resentments of what they perceived as their diminished role in the organization. Rather than promote the good of the organization, defendants Battle and Smith chose to align with this small band of detractors and endeavored to force Davis to depart from the organization.

3.     Defendants Battle and Smith, acting without the consent of the board that hired Davis, organized a set of allegations that they knew had no factual basis, but would damage Davis' reputation and professional prospects. In so doing, defendants Battle and Smith ignored their own organization's rules and bylaws, intruded on the daily management of the organization, and subjected Davis to a double standard in comparison with how white executives at Legal Services had been treated.

4.     The Defendant's adverse actions and unlawful constructive discharge of Davis violated 42 USCA Section 1981 and 42 USCA 2000e *et seq*. and further constitute retaliation against Davis under the same statutes. These actions also amount to a willful and malicious defamation of Davis' reputation. Davis brings the claims detailed below to hold defendants accountable for their illegal and deceptive conduct.

<u>THE PARTIES</u>

5.     Plaintiff Artur Davis is an African-American of legal age, who is a resident and citizen of the state of Alabama. Davis served as Executive Director of Legal Services of Alabama from December 2, 2016 to August 18, 2017.

6.     Defendant Legal Services of Alabama, Inc. (LSA) is an Alabama Corporation with its principal place of business at 2567 Fairlane Dr., Montgomery, AL 36116. Its Registered Agent for Service is Jaffe S. Pickett at 2567 Fairlane Dr #300, Montgomery, AL 36116.  LSA is a statewide public interest law firm that provides low income and poor residents of Alabama with civil legal assistance and representation. Its central administrative office is located in Montgomery, Alabama.

7.     Defendant LaVeeda Morgan Battle is a resident and citizen of the state of Alabama and served as President of the Board of LSA during the events alleged in this complaint. Battle also simultaneously served as Chair of the Board's Executive Committee during the same time frame.

8.     Defendant Alex Smith is a resident and citizen of the state of Alabama and served as Vice President of the Board of Legal Services of Alabama during the events alleged in this complaint. Smith also simultaneously served as Vice Chair of the Board's Executive Committee during the same time frame.

<u>JURISDICTION AND VENUE</u>

9.     This action includes Davis' claims of employment discrimination and retaliation against the defendants under the Civil Rights Act of 1866 (42 USCA Section 1981) and race discrimination and retaliation under 42 USCA 2000e *et seq*. This court has subject matter jurisdiction over this claim pursuant to 28 USCA Section 1331.

10.     This court has supplemental jurisdiction under Davis' state law claims under 28 USCA Section 1367. Davis' state law claims arise from the same common nucleus of operative facts as the underlying federal claims.

11.     Venue is proper in this district pursuant to 28 USCA Section 1391(b) because unlawful employment practices occurred in Montgomery, Alabama and a substantial part of the events that give rise to the claims occurred in Montgomery, Alabama. Venue is also proper pursuant to 28 USCA 1391(c) because the location of the principal place of business and central administrative office of defendant Legal Services of Alabama is in Montgomery.

12.     Davis filed timely administrative charges of discrimination and retaliation before the US Equal Employment Opportunity Commission. On March 1, 2018, the EEOC issued Right to Sue letters. (Copies of the Right to Sue Letters are attached as Exhibits 1 and 2)

## FACTUAL ALLEGATIONS

13.     In the fall of 2016, LSA convened a search committee to choose a new Executive Director. Despite its vital public service mission of representing the poor, the organization had gone through several years of difficulty. The organization's primary grantor, the national Legal Services Corporation, had found evidence of poor accounting practices and weak financial management. One state funder, the Alabama Department of Economic and Community Affairs, had cited LSA for chronic late compliance reports.

14.     The problems at LSA included major internal morale issues. A round of lay-offs in 2015, which occurred because the leadership had drained its reserve account and needed to refurbish the account, left employees fearful. At least two former employees had filed discrimination suits that resulted in settlements. Several buildings where lawyers worked were infested with hazardous mold. Many employees were concerned about a stagnant pay structure.

4

15.     LSA's issues extended to concerns about misconduct by management. The Operations Director from 2007 to January 2017, Eileen Harris, a white female, had faced written complaints of creating a hostile environment for central office employees. The outgoing Executive Director, James Fry, a white male, had generated complaints, which the board ignored, of sexual harassment for making inappropriate remarks to female staffers.  Fry was also scrutinized for abusing mileage expenses and billing the program for personal travel: he was required as a result to obtain advance board approval of expenses. Fry spent the last two years of his tenure on a probationary period and was on the verge of termination when he resigned in late 2015.

16.     Despite these significant issues involving LSA's leadership, the Board took little to no real action. Harris was not subject to any investigation, much less disciplinary action, in the face of detailed allegations about her bullying of employees. Fry's probation was kept a company secret and was not disclosed to employees or funders. When Fry resigned to avoid firing, he was allowed a grace period of a year. At least one sexual harassment complaint against Fry was discouraged by a senior manager on the grounds "it would hurt LSA." The accounting staff was deliberately kept from knowing about the new restrictions on Fry's credit card use.

17.     Against this backdrop, in the fall of 2016, Plaintiff Davis emerged as the front-runner for Executive Director. Davis brought to the table extensive experience as a former federal prosecutor, a civil and criminal litigator, and as a four-term member of the US House of Representatives. Davis was also deeply familiar with board governance having served on various boards of directors himself, including the boards of Tuskegee University, the national service organization Points of Light, and Huntington Ingalls Industries, one of the largest employers in Virginia and Mississippi.

18.     Davis' selection still ran into strong opposition from Defendant Smith. Smith, an influential figure as Vice President of the Board, had contended that Davis' hire might boost Davis' profile as a political candidate in some future election cycle. Smith repeated to various Board Members that this was a prospect he found highly undesirable.

19.     Despite Smith's vigorous efforts to derail him, Davis was selected on December 2, 2016, to serve as Executive Director and began work soon after, on December 5, 2016.

20.     Davis immediately reviewed the Employee Handbook and board By-laws to develop a full understanding of the Executive Director's role. Davis also spoke extensively with Defendant Battle, the Board President, over the scope of his authority. In late December, 2016, Battle advised Davis that she held the strong view that the Board's task was to set broad company guidelines, to monitor spending through monthly financial reports, and to assist with outreach to various stakeholders. Battle specifically told Davis that she perceived hiring, firing, and employee discipline as solely within his purview as Executive Director, consistent with the Employee Handbook. These parameters matched Davis' own experience as a seasoned member of several national boards.

21.     Davis set about revitalizing LSA. In a span of seven months, Davis reeled off a number of successes. These accomplishments included the establishment of a High Impact Litigation Unit to file complex, precedent setting cases on behalf of poor people; the recruitment of a senior Chief Financial Officer with over 30 years of financial leadership experience; the adoption of a compensation/workforce retention plan; the establishment of an education practice group to represent low income children denied access to an education; the opening of a free legal service clinic at the Montgomery and Tuskegee VA branches; a systematic review of office technology;

an environmental cleanup of mold-infested unsafe buildings; and an initiative to assist ex-offenders with restoring their rights to vote under a new Alabama law.

22.     Each of Davis' advocacy initiatives were fully disclosed to the Board in written monthly reports and in the two Board meetings that occurred under Davis, in March and June of 2017. Each initiative was roundly applauded by various board members. There was no occasion prior to August 18, 2017, that Davis was informed that these initiatives required formal Board ratification.

23.     Davis supervised the hiring of a highly talented cadre of new lawyers, including the first African American male hired in six years. Davis hired the program's first full time communications staffer, which contributed to a dramatic rise in LSA's presence in both social and earned media.

24.     Davis' leadership reflected excellent financial stewardship of a program that had a history of weak financial management. From his hiring to his departure, LSA stayed closely on track with its 2017 budget, as board members knew well from monthly finance reports and two quarterly board briefings. Davis convened a monthly call with the finance committee, which praised him for his steering of the program's finances and his transparency. At no time were concerns raised about the cost of hiring, as all new hires were replacements for departures, reflected savings from cost reductions elsewhere, or were absorbed by new grant revenues that had not been anticipated. Even Davis' decision to slightly upgrade starting salaries to better reflect the Alabama non-profit legal market occurred without any adverse effect on the fiscal health of LSA, which maintained a robust, substantial cash balance each month of well over a million dollars after expenses.

25.     LSA does not provide mid-year evaluations for its Executive Director. But Battle in her role as Board President discussed the direction of the organization with Davis in several discussions that happened around the June 2017 Board Meeting. Battle effusively praised Davis, telling him that he was "truly doing an excellent job" and repeating the observation the next day. Davis specifically asked Battle if she was satisfied with the level of Board engagement, eliciting the reaction from Battle that the Board had never been better informed about the daily happenings of the organization.

26.     In the late spring of 2017, Davis began to encounter conflict between his Director of Development, Jaffe Pickett, a member of the senior executive team who was a longtime LSA employee and the individual he hired as Operations Director, Charlotte Rand. Pickett, an African American female, clashed with Rand, a white female, on several management issues, including the pay scale for certain administrative staff. Pickett, acting beyond the scope of her job description, started meeting with certain administrative staffers to field complaints about Rand. Pickett also complained that Rand was not "carrying her weight" and was not meeting certain obligations traditionally expected of the Operations Director. On one occasion in May, 2017, Pickett sent an incendiary email to the executive leadership team that she was having to compensate for their shortcomings and that "it is a bad work environment all over again." Pickett complained to administrative staffers that she was unhappy and might leave.

27.     During this same time frame, Pickett's own job performance started to suffer. She was increasingly submitting grant applications at the last minute and was slow to follow through on development initiatives suggested by Davis. Pickett started avoiding interactions with Davis and Rand. Despite the clear drop-off in her effectiveness, Davis continued to praise Pickett externally and to Board Members as a valuable contributor, all while hoping the situation would improve.

8

28.     In mid–summer 2017, Pickett became openly insubordinate toward Davis, rejecting his instructions on several office matters, ignoring messages and calls about assignments. When Davis issued a directive that all grant applications had to be formally approved by both Davis and Pickett, Pickett expressed to certain staffers that she was upset. Shortly after that, Pickett started challenging Davis in an aggressive manner, including sending a message to the board that it was her understanding that it was Board policy that LSA apply for all available grants, a patently inaccurate statement.

29.     As Pickett became more embittered, her primary assistant, Dorothy Graham, sent Davis an email alleging that she felt he was favoring white employees over black ones, that Davis had instituted "Jim Crow and how do you think this makes us black women feel," and that Davis was trying to destroy the development department. Davis did not discipline Graham for her insubordination and even took time to send her a lengthy and polite response.

30.     In early August, 2017, Pickett took her grievances confidentially to the executive committee of the Board. She sent an email detailing a list of concerns: that Davis had reduced her authority; was over-spending on staff salaries; hiring staffers who had worked in his political campaigns; and had launched advocacy initiatives departing from core LSA priorities. Pickett asked the Board to take action.

31.     The executive committee, which included finance chair George Craig, Battle, Smith, Phillip Mitchell, and Rev. BJ Richardson, all knew that Pickett's financial claims were false, either out of malice or a lack of understanding of the program's balance sheets.  They also knew that the very initiatives Pickett complained about had been explained to the Board, as well as discussed in Davis' monthly reports and in Board sessions, and had won their enthusiastic praise. These blatant inaccuracies should have reasonably led them to question her other charges, which

9

were just as false. Indeed, Richardson, an African American male, stated that he was very pleased with the direction of LSA and thought Davis should be given an immediate chance to respond.

32.     Rev. Richardson's defense of Davis caused him to be marginalized and left out of a series of conversations between executive committee members over the next several weeks. The group pointedly ignored the Reverend's assertion that Davis should be given notice of the charges and began to discuss with Pickett whether she would be prepared to become Executive Director. Smith was especially determined and expressed his strong support for removing Davis.

33.     During these weeks of back door sessions, the executive committee failed to do any of the things that would be an element of a legitimate internal investigation. They did not seek information from other department heads, including the Director of Operations, the Chief Financial Officer and the Director of Advocacy, although each of these individuals would have first-hand knowledge of the issues in Pickett's complaint.  They did not advise Davis of the allegations and therefore provided him no chance to respond. They did not convene a full Board session to gather broader input, although it was the full Board that hired Davis.

34.     There was discussion among the executive committee that removing Davis would be a relatively high-profile event given his status as a well-known political figure. There were concerns that Davis had won high marks from a number of stakeholders and that his sudden departure would need some public justification. Pickett expressed her belief to the committee that Davis would publicly denounce any firing or suspension and would criticize the program's board to the press. Upon information and belief, Pickett also communicated to them that Davis had expressed a willingness to take legal action if his role was diminished while prior white executives at LSA had been given a free rein over daily operations.

10

35.     As the executive committee, all except Rev. Richardson, maneuvered in private, the central office work climate deteriorated dramatically in a short time span. Pickett and her aide Dorothy Graham seemed emboldened, striking out at several of Davis' hires, including the CFO, the Director of Operations, and a white female whom Davis had hired as a grant manager. The grant manager ended up filing an official grievance with Legal Services Corporation that Pickett had harassed her and created a hostile work environment for her. Graham sent three more email diatribes to Davis in August, which resulted in her finally being given a written reprimand. Davis's own executive assistant Sylvia Mason, a close friend of Pickett and Graham, stormed out of the office on August 16, 2017, yelling that she hated Davis. Mason was put on two days administrative leave and informed in writing that she would be reassigned within the office, although at the same pay.

36.     A review of Mason's emails made it clear that on the evening of August 16, right after her suspension, she reached out to Battle, Yvonne Saxon, the head of the personnel committee, and an email address that appeared to belong to a local politician to complain about Davis' management. It appeared from a similar search that Graham was in email communication with Battle and may have made a similar complaint. As Battle had been informed of Mason's suspension and had learned of Graham's reprimand, it would have been apparent to her that these new complaints about Davis resulted directly from two individuals he had just disciplined.

37.     On August 18, 2017, Davis was asked to convene a conference call with the executive committee, with all members on the line except Rev. Richardson, who was attending a funeral. Davis was led to think the scope of the call was whether the Board had any oversight in reviewing his personnel action against Mason.  The call lasted approximately ten minutes, with Davis' review of the handbook and bylaws taking almost the entire time. Davis was still not

apprised of any employee complaints or informed that his termination was being considered. Even at this point, the committee raised no questions or performance issues regarding Davis.

38.     The executive committee convened again that afternoon, knowing that Rev. Richardson was unavailable, and voted to immediately suspend Davis and to replace him with Pickett as Interim Executive Director. In taking this step, the committee acted without obtaining board approval, although there is no precedent or permission under LSA bylaws for a subset of Board Members to remove an Executive Director.

39.     On August 18, 2017, Davis was presented by Battle and Smith a resolution of suspension and a letter from the executive committee containing the following allegations: (1) Davis "may" have made spending decisions that exceed the existing personnel budget and covered items "not traditionally included in the budget"; (2) Davis "may" have created new employment positions that were not advertised; (3) that new personnel spending "may" have an adverse budgetary impact; (4) that Davis received no advance board approval of initiatives and that these initiatives "may" have caused a reduction in traditional case priorities and (5) that there had been complaints that Davis created a hostile environment for "experienced staff and support staff."

40.     The executive committee knew when it made these representations that three of these complaints were flatly false. The committee knew from monthly financial reports that Davis' personnel spending tracked closely to projected personnel expenses and due to the timing of some departures, had even fallen behind those projections for most months. The committee knew that there was no spending that was an impermissible LSA expense (indeed, they knew that Davis had actually declined to accept reimbursement for mileage or work meals and had further saved money by scaling back conference travel for department heads). The committee knew it had knowledge of every initiative by Davis, and Battle in particular knew that she had

commended Davis for those very initiatives. The committee knew there was no process or precedent for the Board to pre-approve specific advocacy initiatives. The committee had also been briefed at the June Board meeting that after consecutive years of decline, LSA was actually experiencing an increase in its core case load.

41.     As to the other claims, the executive committee knew they were weak or suspect. As long-time veterans of the legal aid community, they knew or should have known that the governing federal regulations for LSA only require posting and advertising of attorney positions, a requirement Davis kept in place. A simple question to the Operations Director would have confirmed that she and Davis had changed the handbook to permit administrative positions to be filled without posting if the Executive Director or other supervisory personnel concluded that there was an immediate work gap that needed to be filled: it was well within Davis' authority and the authority of the Director of Operations to do so.

42.     As to the hostile environment claim, the committee knew the sources of the complaints were two staffers whom Davis had just disciplined, Mason and Graham. The committee knew well the context of these claims had nothing to do with sexual harassment. Yet the committee, under Battle and Smith's leadership, chose to characterize the claims in terminology that would lead a reasonable observer to conclude that Davis is among the large cohort of people accused of sexual harassment or misconduct during 2017. The committee also knew that as it cited these claims as grounds requiring Davis' immediate separation from the program that the Board had taken no adverse action whatsoever against the past Operations Director, who was the subject of detailed written complaints from multiple staffers that she had created a hostile environment.

43.     On Saturday, August 19, Battle sent an email informing personnel at Legal Services Corporation that Davis had been suspended. Battle made the claim that Davis had been

13

counseled about excessive spending prior to his suspension, a claim that she knew was completely untrue. Battle further represented that she had previously counseled Davis about launching initiatives without Board approval, a claim she knew was completely untrue. Battle represented that during the August 18 conference call that Davis had claimed that the board had no role in management, administrative or personnel matters, a claim that she knew was completely untrue.

44.     The executive committee, under Battle and Smith's leadership, knew that the act of suspending Davis was a public event in that it was being communicated to all staff and various funders by email and the contents would surely be shared. The inevitable publicity was also exacerbated by the fact that LSA had scheduled a public reception and press conference involving its Executive Director, the President of Legal Services Corporation and a United States Congresswoman a few days later. While the member of Congress backed out of the events, and the Corporation advised Battle of its willingness to reschedule, LSA continued with the event, knowing Davis' absence would subject him to speculation and rumor.

45.     The night of Davis' suspension on August 18, he informed the Board by email that he would be filing a charge of discrimination with the Equal Employment Opportunity Commission. Two days later, under the direction of Battle and Smith, an armed security guard was placed at the main office in a heavy-handed effort to portray Davis as a physical threat. Two of Davis' hires, the CFO and Operations Director, were effectively frozen out of the program and kept from performing their essential duties. While Davis resigned on August 23, LSA persisted in an internal investigation that was deliberately one-sided: neither the CFO nor Operations Director were ever interviewed. Davis was not asked to submit any defense or response or to sit down for an interview. In addition, Legal Services personnel or officials, upon information and

14

belief, pressured a female staffer to admit to being in an inappropriate relationship with Davis, in an effort to further damage his reputation and standing. There was no such relationship.

46.     After receiving notice that Davis would be pursuing legal action, the executive committee, under the leadership of Battle and Smith, retained a "crisis manager" to handle a crisis it had manufactured with the abrupt removal of Davis. This crisis manager is one of the leading political consultants in Montgomery and had managed a previous campaign against Davis. Upon information and belief, this consultant was provided copies of the suspension resolution, with its highly damaging assertions against Davis.

47.     On September 27, 2017, Battle issued an email message to the entire 79-member staff that included the representation that the internal investigation had found evidence that Davis sought to spend reserves without board approval, a claim that she knew was completely false. Battle represented that Davis had paid an improper sign-in bonus to an employee, when she knew that the arrangement Davis had entered with the employee in question was entirely permissible. Battle further represented that Davis had set salaries for new employees in some wrongful manner, which she knew was false. Battle further represented that "most of the allegations and more" against Davis had been confirmed, a claim that she knew was false and misleading.

48.     LSA ordinarily follows a practice of paying departed employees for earned but unused leave time upon their separation from the organization. LSA failed to issue such a check to Davis upon his official separation in late September 2017 and has never met its obligation to pay Davis for earned unused leave time.

49.     The actions of LSA since Davis' departure are telling. Although Davis' various new advocacy initiatives were supposedly unauthorized, not one of them was ended. In fact, the Legal

Services website heavily touted these initiatives through the end of 2017. One attorney whose compensation arrangement had been questioned in Battle's September 27 message to the board was allowed to continue the terms of the arrangement. And one staffer whose hire Pickett had complained about was given a promotion and raise under Pickett's leadership.

50.     Effective January 1, 2018, LSA appointed a white male as its new Interim Executive Director (long-term) to replace Davis.

51.     Davis received notices of right to sue from the EEOC dated March 1, 2018.


<u>COUNT I</u>
Racial discrimination, 42 USCA Section 1981
(Against Defendants Legal Services of Alabama, Battle and Smith)

52.     Davis re-alleges all paragraphs of the complaint as if set out here in full.

53.     Under 42 USCA Section 1981, it is unlawful to subject individuals to discrimination on the basis of their race and or color, in the creation and performance of employment contracts. An at-will employment relationship is considered a contract under the meaning of this statute, even if the Plaintiff did not enter a written contractual agreement with the Defendants.

54.     Defendant LSA is an employer within the meaning of this statute. Defendants Battle and Smith were at all times mentioned in this complaint, acting as the principle agents and officers of LSA, in their capacities as President and Vice President of the Board. All adverse employment actions were made, approved and ratified by Battle and Smith.

55.     Davis is a person of African American descent engaged in an at-will employment relationship with the defendants.

56.     Defendants intentionally discriminated against Davis in the performance of an at-will employment relationship. Defendants subjected Davis to a discriminatory double standard by

taking adverse job actions against him when it failed to take the same or similar actions against a prior white Executive Director who faced serious performance issues that unlike Davis', were real and had a genuine adverse impact on the organization. Defendants subjected Davis to a discriminatory double standard by taking adverse actions against him when they failed to take the same or similar actions against a white senior official at LSA who faced similar or identical allegations regarding treatment of staff.

57.     The unequal treatment to which Davis was subjected was so severe and pervasive that it altered the terms of his employment, and further made working at LSA so intolerable that Davis had no choice but to resign.

58.     The discrimination described in this complaint violates the Civil Rights Act of 1866 (42 Section 1981) and entitles Davis to all categories of damages, including but not limited to economic, non-economic, exemplary and punitive damages.

59.     As a direct and consequential result of the defendants' conduct, Davis has suffered and continues to suffer compensatory damages including loss of income, loss of insurance benefits, harm to reputation, loss of future career opportunities and earning potential, and demands compensatory damages of a fair and reasonable amount plus interest.

60.     As a direct and consequential result of the defendants' conduct, Davis has suffered injury to his mental and emotional well-being, including humiliation, anger, embarrassment and uncertainty. Davis demands general damages of a fair and reasonable amount plus interest.

61.     Because the defendants acted in a manner that was deliberate, malicious, cold, callous, deceptive, oppressive and intentional manger in order to injure and damage Davis, and with cold and callous disregard for Davis' rights, Davis demands punitive damages of a fair and reasonable amount plus interest.

62.     As a result of this discriminatory conduct, Davis has had to retain attorneys and bear the costs of litigation. Davis is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

<u>COUNT II</u>
Retaliation, 42 USCA Section 1981
(Against Defendants Legal Services, Battle, and Smith)

63.     Davis re-alleges all paragraphs of the complaint as if set out here in full.

64.     42 USCA Section 1981 prohibits retaliation for making complaints about or opposing conduct it prohibits. An at-will employment relationship is considered a contract under the meaning of this statute, even if the plaintiff did not enter a written contractual agreement with the defendants.

65.     Defendant LSA is an employer within the meaning of this statute. Defendants Battle and Smith were at all times mentioned in this complaint, acting as principle agents and officers of LSA. All adverse employment actions were made, approved and ratified by Battle and Smith.

66.     Davis is a person of African American descent engaged in an at-will employment relationship with the defendants.

67.     Soon after defendants Battle and Smith were warned that Davis might bring legal action alleging racial discrimination, they acted to publicly suspend him even though the complaints identified against Davis were weak and unsubstantiated, and more substantial performance issues and complaints about prior executive leadership produced no action in one case and limited action that was kept confidential in another case.

68.     After Davis provided written notice that he was in fact going to file legal action alleging race discrimination on August 16, 2017, the defendants took various steps to further damage or deter Davis from taking legal action including providing documents designed to damage Davis to

a political consultant; circulating a message to the Legal Services Corporation that described Davis in a negative and false light; pressuring a staffer to allege misconduct by Davis; limiting participation in an internal investigation to the point that it guaranteed the conclusion would be one-sided; and issuing a staff wide message that made negative and false representations about Davis.

69.    LSA continued its retaliatory conduct by failing to follow its customary practice by refusing to pay Davis upon his separation for the value of unused personal leave time.

70.    The retaliation described in this complaint violates the Civil Rights Act of 1866 (42 Section 1981) and entitles Davis to all categories of damages, including but not limited to economic, non-economic, exemplary and punitive damages.

71.    Because the Defendants acted in a manner that was deliberate, malicious, cold, callous, deceptive, oppressive and intentional manager in order to injure and damage Davis, and with cold and callous disregard for Davis' rights, Davis demands punitive damages of a fair and reasonable amount.

72.    As a result of this retaliatory conduct, Davis has had to retain attorneys and bear the costs of litigation. Davis is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

<u>COUNT III</u>
Race Discrimination, 42 USCA 2000e *et seq.*
(Against Defendant Legal Services of Alabama)

73.    Davis re-alleges all paragraphs of the complaint as if set out here in full.

74.    Title VII of the Civil Rights Act of 1964, 42 USCA 2000e-2(a) (1), makes unlawful conduct by and through an employer's agents and officers that discriminates against employees on the basis of race or color.

19

75.     Defendant LSA, acting through the executive committee of its board, discriminated against Davis by treating him differently from, and less favorably than, similarly situated white executives in the program's recent history, and by subjecting him to adverse employment actions in violation of Title VII. These adverse employment actions  included but are not limited to: subjecting Davis to a public suspension while providing him no opportunity to rebut or respond to internal claims by disgruntled employees; inviting and soliciting allegations of misconduct from employees without providing Davis an opportunity to address such allegations; devising a scenario to remove Davis as Executive Director based on claims that the leadership of the board of directors knew had no factual merit; constructively discharging Davis as Executive Director; engaging in a campaign to undermine Davis' reputation and professional standing among peers in the legal community, employees at LSA, and the national legal aid community; disseminating documents containing negative and damaging claims about Davis' work at LSA to a political consultant with the intent that those documents be disseminated publicly in the future.

76.     Similarly situated white executives at LSA were treated in a substantially different manner. Davis' predecessor, a white male, was permitted to remain in place despite subsequent poor performance reviews from the board that resulted in probation, a history of propositioning or making sexually suggestive comments to female employees, a record of poor financial stewardship, and suspected misuse of travel privileges and mileage accounts. When that same white executive director was subjected to mild restrictions, LSA and its board leadership acted in a manner that kept those limitations a closely held company secret, in contrast with the aggressive discrediting of Davis.

77.     Another similarly situated white executive, the Operations Director at LSA from 2007 to 2016, generated multiple written complaints of creating an abusive and hostile workplace and

received no sanction or suspension, in contrast with a decision to immediately suspend Davis over complaints from two employees he had just disciplined for insubordination.

78.     The conscious decision of LSA and its board executive committee to employ a double standard against Davis, LSA's sole black Executive Director in its 14 year history, was a racially discriminatory act under Title VII that affected the terms and conditions of his employment. LSA's conclusion that a black executive director merited worse treatment than white senior officials at LSA who faced internal complaints and claims of performance issues was a discriminatory act that affected the terms and conditions of his employment.

79.     As a direct and consequential result of the conduct of the defendant, Davis has suffered the damages as already set out in this complaint.

80.     As a result of the conduct of the defendant, Davis seeks all legal and equitable remedies as set forth in the prayer for relief, as available under 42 USCA 2000e *et seq*.

81.     Because the defendant's unlawful actions were intentional, willful, malicious, deceptive, and done with reckless disregard for Davis' rights, Davis seeks punitive damages to the extent available under Title VII.

82.     As a result of this discriminatory conduct, Davis has had to retain attorneys and bear the costs of litigation. Davis is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

<u>COUNT IV</u>
Retaliation, 42 USCA 2000e et seq.
(Against Defendant Legal Services of Alabama)

83.     Davis re-alleges all paragraphs of the complaint as if set out here in full.

21

84.     Title VII of the Civil Rights Act of 1964, 42 USCA 2000e et seq. prohibits an employer or its agents or officers from taking adverse actions against an employee for engaging in protected activity under the relevant provisions of Title VII.

85.     Prior to Davis' suspension, Davis engaged in protected activity by alerting senior staff that if he suspected that if LSA's board leadership subjected him to a racial double standard that he would take steps to oppose such racial discrimination. Upon information and belief, one of those senior staffers, Jaffe Pickett, warned Defendant Battle of this prospect.

86.     Upon being informed by a senior staffer of Davis' willingness to take steps opposing racial discrimination, LSA and its board's executive committee, led by  defendants Battle and Smith, suspended Davis within days, partly in retaliation for Davis' stated intentions.

87.     After Davis' suspension, he promptly notified the board of directors of LSA through email that he was in the process of filing an administrative charge of racial discrimination with the EEOC.

88.     After learning of Davis' plans to file an EEOC complaint of racial discrimination, LSA acting through the leadership of its board engaged in retaliatory acts that included disseminating documents that contained negative claims about Davis' record at LSA to a political consultant in Alabama; providing senior personnel at the Legal Services Corporation a misleading explanation of Davis' departure that contained assertions LSA knew to be false; conducting a deliberately one-sided internal investigation that excluded employees believed to be favorable to Davis, as well as Davis himself; pressuring at least one employee to allege misconduct by Davis; providing to various individuals a false and misleading account of Davis' record at LSA; disseminating a staff wide message that contained deliberately false claims meant to further damage Davis'

reputation; and failing to follow its customary practice by refusing to pay Davis upon his final separation from LSA for the value of unused leave time.

89.     LSA's various actions to damage Davis were a direct and proximate result of retaliation for protected activity under Title VII.

90.     As a direct and consequential result of the conduct of the defendant, Davis has suffered the damages as already set out in this complaint.

91.     As a result of the conduct of the defendant, Davis seeks all legal and equitable remedies as set forth in the prayer for relief, as available under 42 USCA 2000e *et seq*.

92.     Because defendant's unlawful actions were intentional, willful, malicious, deceptive, and done with reckless disregard for Davis' rights, Davis seeks punitive damages to the extent available under Title VII.

93.     As a result of this retaliatory conduct, Davis has had to retain attorneys and bear the costs of litigation. Davis is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action

<u>COUNT V</u>
Conspiracy
(Against Defendants Battle and Smith)

94.     Davis re-alleges all paragraphs of the complaint as if set out here in full.

95.     Defendants Battle and Smith conspired, acted in concert and developed a scheme for the unlawful purpose of falsely accusing Davis of financial mismanagement, violation of internal guidelines and other improper conduct.

96.     Defendants Battle and Smith intentionally and maliciously conspired to damage Davis' reputation; to place him in a false light with the public; to justify an unlawful and unjustified suspension, and to negatively influence any upcoming election involving Davis.

97.     As a result, Davis has suffered the damages as already set out in this complaint.

98.     As a result of the conduct of defendants Battle and Smith, Davis seeks all legal and equitable relief set forth in the prayer for relief, as available under Alabama law.

99.     Because the conduct of Defendants Battle and Smith was willful, malicious, in bad faith and was done to damage Davis and provide justification for an unlawful, unnecessary suspension, not to promote the cause of providing legal aid to low income Alabamians, Davis seeks punitive damages under Alabama law.

<u>COUNT VI</u>
(Defamation by Battle)

100.    Davis re-alleges all paragraphs of the complaint as if set out here in full.

101.    Defendant Battle maliciously published multiple false and defamatory statements about Davis' leadership, willingness to comply with internal rules and guidelines, treatment of employees, and financial management, all for the purpose of discrediting Davis to employees, the general public and the community of LSA stakeholders.

102.    As a result, Davis has suffered the damages as already set out in this complaint.

103.    Defendant Battle's statements were made with malice and with full knowledge of their falsity.

104.    Defendant Battle was partly motivated by her desire to punish Davis for personnel actions that affected employees with whom she was friendly and with whom she had long-standing personal relationships.

105.    Because defendant Battle's conduct was willful, malicious, in bad faith and was done to punish and damage Davis and provide justification for an unlawful, unnecessary suspension, not to promote the cause of providing legal aid to low income Alabamians, Davis seeks punitive damages as available under Alabama law.

## COUNT VII
(Defamation by Smith)

106.    Davis re-alleges all paragraphs of the complaint as if set out here in full.

107.    Defendant Smith maliciously assisted others in crafting and making false statements about Davis, and upon information and belief has repeated those false statements, including false claims of misconduct and mismanagement, for the purpose of discrediting Davis with the general public.

108.    As a result, Davis has suffered the damages as already set out in this complaint.

109.    Defendant Smith's statements were made with malice and full knowledge of their falsity.

110.    Defendant Smith was partly motivated by personal and political animosity toward Davis and partly by his desire to damage Davis in future election campaigns.

111.    Because defendant Smith's conduct was willful, malicious, in bad faith and was done to damage Davis and provide justification for an unlawful, unnecessary suspension, not to promote the cause of providing legal aid to low income Alabamians, Davis seeks punitive damages under Alabama law.

## COUNT VIII
(Defamation by Legal Services)

112.    Davis re-alleges all paragraphs of the complaint as if set out here in full.

113.    The suspension notice and board resolution handed to Davis on August 18, 2017, and later circulated to at least one individual outside the organization, a political consultant who could reasonably be expected to disseminate it, was issued under the authority of LSA by its agents and officers on the Executive Committee. The decision to defame Davis was therefore ratified by the Defendant LSA.

114.    In issuing the suspension notice and board resolution, defendants Battle and Smith, as principal agents and officers of LSA, were acting on behalf of Legal Services with respect to their actions, including their defamation of Davis.

115.    As a result, Davis has suffered the damages as already set out in this complaint.

116.    As a result of the conduct of defendant LSA, Davis seeks all legal and equitable relief set forth in the prayer for relief, as available under Alabama law.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment against Defendants as follows:

1.    Compensatory damages according to proof.

2.    General damages according to proof.

3.    Punitive damages according to proof, including punitive damages under 42 USCA Section 1981a.

4.    Attorney fees and costs according to 42 USCA Section 1988, 42 USCA 2000e *et seq* and any other applicable provisions under Alabama law.

5.    Injunctive relief in the form of an order restoring Davis to the position of Executive Director of Legal Services.

6.    Where appropriate, pre-judgment and post-judgment interest.

7.    Further relief as the Court may deem just and proper.

***DEMAND FOR JURY TRIAL***

Plaintiff Davis demands trial by jury of all issues triable by right to a jury.

_/S/ Kenneth J. Mendelsohn_____

Kenneth J. Mendelsohn (ASB 7113N64K)
Attorney for Plaintiff

**OF COUNSEL:**

**JEMISON & MENDELSOHN , P. C.**
1772 Platt Place
Montgomery, Alabama 36117
(334) 213-2323 (Telephone)
(334) 213-5663 (Facsimile)
Email: kenny@jmfirm.com

## CERTIFICATE OF SERVICE

I do hereby certify that on the 21st day of March, 2018, the foregoing was electronically filed and served on all parties of record via electronic filing pursuant to Local Rule 5.4 and by email to Albert L. Vreeland, II at avreeland@lehrmiddlebrooks.com.

/s/ Kenneth J. Mendelsohn_____
OF COUNSEL

27