**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF ALABAMA
 2                  NORTHERN DIVISION
 3
 4   ARTUR DAVIS
 5        PLAINTIFF,
 6
 7   VS.                      CASE NO.:
 8                            2:18-CV-00026-ALB-SRW
 9   LEGAL SERVICES ALABAMA,
     INC.; LAVEEDA MORGAN
10   BATTLE; AND ALEX SMITH
11        DEFENDANT.
12            * * * * * * * * * *
13        DEPOSITION OF ARTUR DAVIS, taken before Mary
14   Moore-Wynn, CCR #275, as Commissioner, on 3rd of
15   October, 2019 in the offices of Jemison & Mendelsohn,
16   PC, 1772 Platt Place, Montgomery, Alabama, 36117,
17   pursuant to stipulations set forth herein, commencing
18   at approximately 9:00 a.m.
19
              * * * * * * * * *
20
21
22
23
24
25
```

**Page 2**

```
 1
 2            * * * * * * * * * *
 3                  APPEARANCES:
 4
 5   FOR THE PLAINTIFF:
 6   Kenneth J Mendelsohn
     Jemison & Mendelsohn, PC
 7   1772 Platt Place
     Montgomery, Alabama  36117
 8   kenny@jmfirm.com
 9   FOR THE DEFENDANT:
10   Hon. Albert L. Vreeland, II
     Lehr, Middlebrooks, Vreeland & Thompson, PC
11   Post Office Box 11945
     Birmingham, Alabama  35202-1945
12   avreeland@lehrmiddlebrooks.com
13
14
15
16
17
18
19
20
21
22
23            * * * * * * * * * *
24
25
```

**Page 3**

```
 1               STIPULATIONS
 2        It is hereby stipulated and agreed by and between
 3   counsel representing the parties that the deposition of
 4   ARTUR DAVIS is taken pursuant to the Federal Rules of
 5   Civil Procedure, and that said deposition may be taken
 6   before Mary Moore-Wynn, CCR, #275, as Commissioner,
 7   without the formality of a commission; that objections
 8   to questions, other than objections as to the form of
 9   the questions, need not be made at this time, but may
10   be reserved for a ruling at such time as the deposition
11   may be offered into evidence, or used for any other
12   purpose by either party hereto, provided by the
13   Statute.
14        It is further stipulated and agreed by and between
15   counsel representing the parties in this  case, that
16   the filing of the deposition of ARTUR DAVIS is hereby
17   waived, and that said deposition may be introduced at
18   the trial of this case or used in any other manner by
19   either party hereto provided for by the Statute,
20   regardless of the waiving of the filing of same.
21        It is further stipulated and agreed by and
22   between counsel and the witness that the reading
23   and signing of the deposition by the witness is
24   hereby waived.
25              * * * * * * * * *
```

**Page 4**

```
 1                    INDEX
 2   ARTUR DAVIS
 3   Examination By Mr. Vreeland                    6
 4   Reporter's Certificate                       166
 5             INDEX OF EXHIBITS
 6   Exhibit No.        Description        Page No.
 7   Defendant's Exhibit 1   Defendants'          7
                   Request for Production to
 8                 Plaintiff
     Defendant's Exhibit 2   November 30, 2016    30
 9                 Harris, Caddel & Shanks Offer
                   Letter
10   Defendant's Exhibit 3   Legal Services       32
                   Alabama Employee Handbook and
11                 Consolidated Reference Manual
                   Receipt and Acknowledgment
12   Defendant's Exhibit 4   Legal Services       42
                   Alabama, Inc., Job Description,
13                 Executive Director
     Defendant's Exhibit 5   Davis/Mitchell       99
14                 E-mail Chain August 2017
     Defendant's Exhibit 7   August 17, 2017     113
15                 Davis to Mitchell, Battle,
                   Richardson, Saxon re: Conference
16                 Call
     Defendant's Exhibit 6   August 17, 2017     114
17                 Davis to Battle and Mitchell
                   E-mail
18   Defendant's Exhibit 8   August 18, 2017     126
                   Davis to Battle E-mail
19   Defendant's Exhibit 9   August 18, 2017     129
                   Battle to Davis Letter
20                 (Suspension Notice)
     Defendant's Exhibit 10  August 22, 2017     132
21                 Davis Resignation E-Mail
     Defendant's Exhibit 11  September 25, 2017  136
22                 Davis EEOC Charges
23
24
25
```



ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
5—8

Page 5

1          INDEX OF EXHIBITS (Continued)
2    Exhibit No.        Description        Page No.
3    Defendant's Exhibit 12  October 2, 2017      140
            Davis EEOC Charges
4    Defendant's Exhibit 13  August 25, 2017      146
            Artur Davis (Guest Arthur) AL.com
5            Article
     Defendant's Exhibit 14  November 24, 2017    149
6            Alabama Political Reporter Josh
            Moon Article
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1                ARTUR DAVIS
2        (Was thereupon called as a witness and, after
3    having been first duly sworn, was examined and
4    testified as follows:)
5        COURT REPORTER:  Usual stips?
6        MR. VREELAND:  That's fine with us.
7        MR. MENDELSOHN:  That's good.
8            EXAMINATION
9    BY MR. VREELAND:
10   Q     Mr. Davis, as you know, I represent Legal
11   Services Alabama in the lawsuit you have brought
12   against them.  Going to be asking you some questions
13   today to find out the basis of your lawsuit.
14       Since you are an attorney, and I presume
15   probably been through a fair number of depositions over
16   the course of your career --
17   A     Forty or 45.
18   Q     -- I will forego the usual instructions
19   about the deposition.
20   A     Thank you.
21   Q     But I would like to say if for any reason
22   you don't hear my question, don't understand my
23   question, if for any reason it's unclear to you, if you
24   will ask me to, I will be happy to ask the question
25   again.  Fair enough?

Page 7

1    A     I will most certainly do that.
2        (Whereupon, Defendant's Exhibit 1
3        was marked for identification and
4        is attached hereto.)
5    BY MR. VREELAND:
6    Q     Mr. Davis, showing you what's been marked
7    for identification as Defendant's Exhibit 1 to your
8    deposition.  Do you recognize those as our Request for
9    Production of Documents?
10   A     I do.
11   Q     And did you provide your attorney with any
12   documents you had that were responsive to Defendant's
13   Exhibit 1?
14   A     Well, we answered each one of your questions
15   individually.  I certainly consulted with
16   Mr. Mendelsohn in preparing the response.
17       I'm not quite sure how to answer your
18   question.  I have obviously provided Mr. Mendelsohn
19   numerous documents over the course of the litigation.
20   And it was his choice as to which one of those
21   documents were discoverable.  And his judgment as to
22   how to frame the answers to these questions.
23       Without trying to hide the ball in any way,
24   frankly, virtually all of the relevant documents in
25   this case are documents you have access to as the

Page 8

1    attorney for Legal Services.  Whether there were
2    documents that would have been e-mails, correspondence
3    on my Legal Services account, there were, I think with
4    precious few exceptions, virtually no documents that we
5    have, myself as the Plaintiff, and Mr. Mendelsohn as
6    Plaintiff's counsel, that you would not already have
7    had a copy of.  To the extent that there were and they
8    were relevant, they were produced.
9    Q     And that's exactly what I am getting at.  Is
10   any documents which you may have had which were
11   responsive, you have provided to your attorney?
12   A     (Witness indicating).
13   Q     And I believe I've seen the production of a
14   six-month evaluation that you drafted that's a memo to
15   Yvonne Saxon?
16   A     Not that I drafted.  That I sent.
17   Q     Okay.
18   A     Yes, that's correct.
19   Q     You did not draft that document?
20   A     I did draft it.  But I didn't just draft it.
21   I sent it and delivered it.
22   Q     Okay.
23   A     Forgive me for being an attorney.  But
24   I know if the words that were used are precise and
25   deliberate.  So you say "draft" to me, that implies



Page 9

1 that you created a document without necessarily sending
2 it. I sent the document.
3 Q        Did you maintain any personal notes during
4 your employment with Legal Services about Legal
5 Services?
6 A      I did not.
7 Q        Did you record any conversations with any
8 Legal Services employees or board members?
9 A      I did not.
10 Q        Now, you are a licensed attorney?
11 A      Yes.
12 Q        When did you graduate law school?
13 A      1993.
14 Q        And what bars are you a member of?
15 A      I am a member of the DC bar.  And I have a
16 special membership in Alabama.
17 Q        Is that sort of an inactive member?
18 A      It is.  Special membership, as I suspect you
19 are aware as an attorney, exists for people who are not
20 actively practicing.  I have maintained a special
21 membership since 2002, with the exception of one year,
22 the close to year that I was executive director of
23 Legal Services Alabama, I converted the license to a
24 full practicing membership.
25        The difference, as you may or may not be

Page 10

1 aware, is that a special membership means that you
2 don't have to pay the same fee.  And that you are
3 exempt from the continuing legal education
4 requirements, CLEs.  And, of course, it also means that
5 you cannot engage in the actual practice of law.  And
6 so that's why I choose to maintain a special membership
7 in Alabama.  That's what I have today.
8        The rules in DC are a little bit different.
9 In DC, because there are so many government employees
10 there who wish to have a law license that's active, the
11 only requirement is that you send them a check every
12 year.
13 Q        Have you ever been subject to disciplinary
14 action by any of the bars of which you are a member?
15 A      I have not.
16 Q        Now, when did you first interview for the
17 position at Legal Services?
18 A      My recollection is not specific, but
19 I believe it was, frankly, around this time in 2016.  A
20 position was posted, if I'm not mistaken, in September
21 of 2016.  Or at least that's when I noticed the
22 posting.  There were several sets of interviews.
23 I believe that most of them took place in the month of
24 October, 2016.
25 Q        Uh-huh.  Who -- do you recall who the first

Page 11

1 round of interviews was with?
2 A      Yes.  The first round of interviews was with
3 a search committee that the Board had appointed.  The
4 search committee was, in effect, a subcommittee of the
5 board.  There were no non-board members who were on the
6 search committee.  My recollection is that it was
7 approximately ten to 11 individuals.  And my
8 recollection of the process is that roughly ten to 11
9 people were invited to interview with the headquarters
10 of the state bar here in Montgomery.
11 Q        By ten, do you mean ten to 11 candidates?
12 A      Ten to 11 individuals who were invited to
13 interview.  Yes, candidates.
14 Q        And do you recall any specific people on the
15 board who participated in that interview?
16 A      Yes.  I'm not going to suggest to you it's
17 going to be exhaustive.
18 Q        Yes, just the ones you recall.
19 A      Phillip Mitchell was the chair of the search
20 committee.  LaVeeda Battle was a member of the search
21 committee, but I do recall that she was not present
22 during the first interview.  It was represented that
23 she had a court conflict.  She is a practicing
24 attorney, as well.
25        Other members of the group would have

Page 12

1 included a Mr. Broome, B-R-O-O-M-E, from Anniston;
2 Alex. Smith, who is one of the defendants in this
3 lawsuit.  Karen Jones, Ann Brown.
4        Correct one of the things I said.  I said
5 all of the members of the search committee are members
6 of the board.  That's not completely correct.  There
7 were staffers who were also on the search committee.
8        My recollection is that Jaffe Pickett, who
9 was the development director, and Sylvia Mason, who was
10 the executive assistant, and Ann Brown, who was the
11 managing attorney in Mobile were also on the search
12 committee.  So they participated in the first round of
13 interviews.
14        I also recall Merceria Ludgood,
15 L-U-D-G-O-O-D.  Merceria is M-E-R-C-E-R-I-A, was
16 present.
17        Seems there may have been a Mr. Bradley,
18 I believe, from the Huntsville area.  Seems as if
19 there were one or two more.
20 Q        How many other rounds of interviews did you
21 go through after that first one?
22 A      There were two formal rounds.  Candidates
23 were advised that, in effect, people would be filtered
24 out from one set of interviews to the other.
25        There was some expectation on my part based

ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
13–16

Page 13

1  on conversations with Mr. Mitchell before the interview
2  that roughly three to four people would be filtered out
3  to advance to the next round.
4          Approximately two weeks later, I learned
5  that the search committee decided to only filter out
6  two people, myself and one other candidate.  There was
7  a second round, there was a third round that was
8  scheduled back to back, I believe late October, perhaps
9  very early November.  I do recall it was before the
10  presidential election in 2016.
11          Second round of interviews, if I recall
12  correctly, included the full board, or at least the
13  full board was invited.  So there were people who were
14  present who were technically not part of the search
15  committee.  My recollection is that the entire board
16  was not there, but it was a larger group than the
17  search committee itself.
18          So the first interview included eight to
19  nine to ten people.  Approximately 20 people were in
20  the room at the second interview.  The third interview,
21  which was the next morning, included a group of
22  attorneys who had been selected from around the program
23  and may have included a few long-time administrative
24  aides as well.
25          That was the formal interview process as was

Page 14

1  presented to me.
2          I will say that there were two additional
3  meetings that I recall having with members of the
4  search committee in addition to the formal interviews.
5  Q       When were those meetings?
6  A       They would have been very soon after the
7  process I described within about a ten-day period.
8  I do recall one of them specifically was the day after
9  the election because we discussed the election.
10          The other one would have been a meeting with
11  Mr. Mitchell and Ms. Battle that took place after the
12  second interview, which was the interview which was, in
13  effect, staff conducted; the one where attorneys and
14  members of the program were present and asked
15  questions.
16          So that meeting would have taken place
17  literally right after the session ended with the staff.
18          And the next meeting would have taken place
19  approximately four or five days later.  My recollection
20  is that the meeting that was post election was myself;
21  George Craig, if I am recalling his name correctly, who
22  was at that time chair of the finance committee; and
23  Ms. Battle.  Mr. Mitchell was not present as I recall.
24  I believe it was represented that he was on a trip at
25  that time.

Page 15

1          And I should add that Mr. Craig was also a
2  part of the search committee, I believe.  He was
3  present at all of the interviews.
4  Q       So in addition to the three committee or
5  larger interviews, you had a meeting with Phil Mitchell
6  and LaVeeda Battle?
7  A       Yes.
8  Q       And then several days later a meeting with
9  George Craig and Ms. Battle?
10  A       Yes.
11  Q       Okay.  Is this all prior to you being told
12  that you were selected?
13  A       Yes.  Very much so.
14  Q       During any of these -- and I will just tell
15  you what I am referring to, I have read somewhere in
16  the many writings in this case that there were
17  discussions during the interview process about Legal
18  Services expectations for the new executive director?
19  A       Well --
20  Q       And what I am trying to do is not have to go
21  through each of the full interviews --
22  A       Sure, sure.
23  Q       -- but let's just hone in on which in any of
24  these that there were discussions about what their
25  expectations were for the new executive director.

Page 16

1  A       That's fair to say.
2  Q       Can you tell me in which of these meetings?
3  A       Well, I'm not trying to quibble with you,
4  but my understanding of the whole interview process for
5  any job is that you are having discussions about your
6  expectations of the position.  If you are trying to
7  fill an admin position at Lehr Middlebrooks, every
8  discussion you have is a discussion of what your
9  expectations are of this position.
10          So, again, I'm not trying to be tendentious
11  with you.  But I am trying to understand what you are
12  asking other than the obvious.  Every single one of
13  those meetings turned on the discussion of the role of
14  the executive director and the organization's hopes and
15  goals.  And there were some questions on my part about
16  the organization's hopes and goals and expectations.
17  Q       What were the questions on your part?
18  A       Oh, goodness.  You are asking about
19  conversations that were literally three years ago.  And
20  there were five sets of them.  I can't answer that in
21  detail.
22          But, again, for the sake of being helpful,
23  these were robust exchanges.  All three of the formal
24  discussions were robust discussions.  They were
25  open-ended discussions.



ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
17–20

Page 17

1        I do recall that in the first interview
2  there was a set of questions.  And, apparently,
3  different members of the search committee had been
4  given different questions to ask.  It was a little bit
5  more free-flowing.
6        And, of course, the individual meetings
7  which were private sessions, in effect, with me and
8  Craig and Battle, and me and Mitchell and Battle, those
9  were conversations.  We were sitting across the table
10  much like this.  And we were discussing the
11  organization.  We were discussing obstacles that they
12  felt were in place to my selection.
13        Happy to answer any specific questions about
14  what we talked about.
15  Q        What obstacles did they tell you they
16  thought might impede your selection?
17  A        Both Ms. Mitchell and Ms. Battle shared with
18  me there were political objections in some quarters to
19  my being Executive Director, Legal Services Alabama.
20  I asked them what they meant by that.
21        Again, for sake of context, this would have
22  been the meeting between the three of us.  And both of
23  them said that they had spoken to individuals who are
24  politically connected in the city of Montgomery, state
25  of Alabama, who had voiced concerns about my being

Page 18

1  Executive Director of Legal Services.  And I asked them
2  who those individuals were, and they declined to answer
3  the questions.  I asked what the nature of the
4  objections were.  I do recall asking if they were
5  ethics or character based, and that was my phrase.  And
6  they said, no, nothing of that sort.  Again, I don't
7  recall which one of them said that.  But I recall one
8  of them saying "nothing of that."
9        One of them may have said that you have got
10  some republicans who are mad that you ran against Todd
11  Strange.  You've got some democrats who are mad that
12  you left the Democratic Party.  And I do remember
13  saying to them, my understanding is that this is a
14  nonpartisan position.  And it's a position that
15  receives a significant federal grant that requires
16  nonpartisanship.
17        So I do remember saying that I'm
18  disappointed to hear that partisan political concerns
19  are being raised.  That was something that was frankly
20  of concern to me.  And I did express that concern.
21  Q        Did they indicate any of those concerns were
22  coming from board members?
23  A        I don't -- that's a fair question.  And
24  I don't recall whether they did or did not.  I don't
25  recall pursuing that because the way it was -- those

Page 19

1  conversations -- because the way it was couched to me
2  is that the concerns were coming from people outside of
3  the Legal Services organization.
4        And, Mr. Vreeland, I recall that because
5  I do remember pointedly saying to them -- and I'm being
6  blunter with you than I was with them; I was more
7  polite with them -- but I did ask them:  Why are you
8  letting people who are not part of your organization
9  dictate or interfere with your selection process?
10  Q        Uh-huh.
11  A        Again, I was not as blunt in my terminology.
12  But I do recall feeling that.
13        I knew that Ms. Battle was very politically
14  involved in Birmingham.  I had never heard of Phil
15  Mitchell before, so I knew nothing of his background.
16        I will say that he shared that he was very
17  good friends with a republican senator in north
18  Alabama.
19        So that's my recollection of those
20  conversations.
21  Q        In any of these interviews, were there
22  discussions about how they expected you to interact
23  with the board?
24  A        There were no discussions of that nature
25  whatsoever.  The closest to it would be the very first

Page 20

1  formal interview, the one where they were kind of
2  selective questions that different members asked.
3        I do recall toward the end of the interview,
4  Mr. Broome asked a question that I thought was very
5  interesting.  He said -- and I'm paraphrasing, but I'm
6  paraphrasing very closely -- Mr. Broome said, what if
7  we made you the executive director, and we came to you,
8  and we said, there is someone in that organization that
9  we think is a problem.  And we think this person is bad
10  for the organization.  And we want you to fire this
11  person.  What will you do?
12        I thought that was a very interesting
13  question, because in my experience, questions like that
14  are unusual during the selection process.  And they
15  usually -- when a question that pointed and that
16  surprising is asked, in my experience, it usually says
17  there is some specific issue within the organization
18  that that board member is speaking to, or search
19  committee member in this case.
20        So I did make a mental note of that
21  question.  And I did think it was very interesting.
22        I do recall my response very vividly.
23  I said, Mr. Broome, if you hire me to be the executive
24  director of this organization, you will be making a
25  statement that you trust my leadership.  You will be



ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
21–24

Page 21

1  making the statement that you trust my capacity to lead
2  and to supervise people.  So I will tell you now, if
3  there is someone in this organization who is a problem,
4  you won't have to come to me and tell me to fire that
5  person; I will do it first.  If there is someone that
6  you tell me is a problem, and I don't share your
7  assessment of that, then I am going to tell you as
8  executive director I disagree.  And, of course, it will
9  then be your decision how you want to deal with that.
10       Now, what I hope will happen is that if you
11  give me the chance to be your executive director, is
12  that we will sit down and have a candid conversation as
13  an organization and as a board on what are the problems
14  in this organization, what are the very specific
15  challenges.  And that we will have that very candid
16  conversation in a manner that obviously is not possibly
17  during this selection process.
18       But I -- and I remember repeating, but if
19  you make me the executive director, I consider my task
20  to be one of hiring and firing people.  That's what
21  I have seen in every organization that I've been
22  involved in as a board member.
23       So I do very much remember that coming up
24  during the first meeting.
25       I will say that neither the smaller private

Page 22

1  conversations, if you will, with Craig and Battle and
2  with Mitchell and Battle, none of that.  The spirit of
3  the conversation with Mitchell and Battle, to be
4  perfectly honest with you, was:  We would like to do
5  this.  We would like to go with you, but there are
6  these objections outside of the organization.
7  Q       How did you learn that you were getting the
8  offer?
9  A       Well, here's something that you are possibly
10  not aware of.  A member of the search committee called
11  me, Karen Jones.  She had my number because she was
12  politically active and had been in the city of
13  Montgomery.  And we had met during my campaign for
14  mayor in 2015.  Ms. Jones, as I indicated earlier, was
15  a member of the search committee.  And she said that
16  she wished to speak to me, as she put it, one-on-one,
17  off the record.  And I told her, well, if you would
18  like to speak with me, Karen, I'm not comfortable with
19  a meeting.  But you have got me on the phone; what's on
20  your mind?
21       This conversation happened, I believe, after
22  these other meetings that I have alluded to.  I believe
23  it happened over the next several weeks.  It was a
24  lengthy conversation.  And I remember that because
25  I made a mental note of how long it was lasting.  It

Page 23

1  was more than an hour.  She shared with me that she had
2  become very frustrated with the search committee
3  process.  She shared with me that within the search
4  committee she felt there was something of a racial
5  divide that had developed.  She said -- and if you know
6  Karen Jones, she is very blunt and very opinionated.
7  Karen was thrown out of a city council meeting for
8  calling the mayor of Montgomery a son of bitch.  Pardon
9  my language, but that speaks to her bluntness.
10       But Karen said to me that her concern is
11  that, as she put it, you were far and away the best
12  person we talked to.  Everybody came away saying, this
13  is the guy.  But for some reason, a bunch of the white
14  folks on the search committee are backing this white
15  guy.  I think she indicated he was a partner in the
16  firm Sirote Permutt.  For some reason, that was the one
17  thing she seemed to feel that she couldn't tell me
18  during the conversation.  Because she kept being
19  cryptic about the firm.
20       Something that she said, though, led me to
21  think it was Sirote Permutt.  And I don't recall
22  specifically why today because, as you know, there are
23  many firms in Birmingham, so I certainly didn't pull it
24  out of the hat.
25       I remember her saying to me the African

Page 24

1  American members of the organization felt that there
2  had been a real history with Legal Services with
3  African Americans being excluded from promotions, the
4  organization being slow to promote African Americans.
5  And that a lot of African Americans felt that there
6  were some racial issues on the part of a woman named
7  Eileen Harris, who was the operations director.
8       And what Karen Jones said to me is:  We --
9  she made it clear she was referring to the black
10  individuals on the search committee -- really think you
11  are the candidate.  And I remember she said, make no
12  mistake; some of the white folks are with you.  But
13  it's some of them, no matter what we say, they are
14  determined that it not be you.
15       And she mentioned Alex Smith as an example.
16  Of course, as you are aware, he's one of the
17  Defendants.  She said that Smith has made it very clear
18  that he does not like you.  He's made it very clear
19  that he did not support you politically when you ran
20  for governor.
21       And, you know, she said that Smith had made
22  a comment, there is a reason this guy is in politics.
23  And there is a reason people won't vote for him.  And
24  we need to pay attention to that.
25       And she said that Smith had passed on some



Page 25

1  completely ridiculous rumor that after I lost the
2  governor's race that I had squirreled away $1 million
3  of money that I didn't spend in that campaign.  And had
4  lived on that money for the next several years.
5          And she remembers one of the African
6  American members of the search committee taking umbrage
7  at that statement and asking if he had any proof.  And
8  she told me that Smith said something to the effect,
9  well, that's just the rumor in Birmingham.  And
10  apparently someone said, well, how do you know; you
11  live in Cullman?  I'm not sure that's accurate.
12  I thought he lived in Oneonta.  But, anyway, just
13  relating what he said.
14          She said that Smith had raised the concern
15  that if we make this guy as executive director all we
16  are doing is kind of setting him up for a future
17  political race.  So she said that she had reached the
18  point where if I were not selected, that she was
19  probably going to withdraw from the search committee
20  process.
21          And it was a lengthy conversation.  So
22  I can't tell you that in the five minutes I have spent
23  reciting I have captured an hour.  But that was the
24  spirit of it.
25  Q      Okay.  But I think my question was how you

Page 26

1  learned that you were being selected.
2  A      Well, she said, you are far and away the
3  favorite if we can get by Alex Smith.
4          And she mentioned another woman, Mary Pons.
5  Mary Pons is a white female in Montgomery who I know
6  from the political world is politically active.  Jones
7  expressed the frustration that Mary Pons had just
8  joined the board.  That literally Pons had not even
9  attended a formal board meeting, but that she had
10  weighed in that she had questions about whether picking
11  someone who switched parties was a good idea and
12  whether that may be in some way representative of my
13  having a hard time making a decision or something of
14  that nature.
15          Jones -- the reasons I'm giving you this
16  answer because, A, I think that's information you don't
17  have.  I do think part of this process is to frankly be
18  informative with counsel.  I'm reasonably confident you
19  did not know about that conversation until this moment.
20          But, second of all, that was the first
21  indication I got that they were very close to voting to
22  make me the executive director.
23          Now, I certainly felt encouraged after my
24  conversation, particularly with George Craig and
25  LaVeeda Battle that I was the frontrunner.

Page 27

1          But your question was:  When did you learn
2  that you had been selected?  The conversation with
3  Jones was the one that sort of led me to think that
4  I was on the verge of being selected.  But I did
5  certainly have hopes in that regard, strong hopes in
6  that regard, after the conversation with Craig and
7  Battle.
8  Q      And when you were you told you actually were
9  selected?
10  A      Formally or informally?
11  Q      Either.
12  A      Well, informally, LaVeeda Battle called me
13  after the Jones conversation and said that I think we
14  are very close to being in position to have the votes
15  to move you.  And she said to me that her goal was a
16  unanimous vote.  And I did ask her point blank what the
17  breakdown was.  Of course, I did not share with her the
18  conversation with Jones because Jones had asked me not
19  to share that.
20          I told -- so I did ask Battle what the
21  division was.  Battle's response was something to the
22  effect of, there is a strong preference for you within
23  the search committee.  She said that it was not
24  unanimous.  And that her goal was to get to unanimity.
25  I did ask her if there was a requirement for it to get

Page 28

1  to unanimity for the offer to be made.  And she paused.
2  I do recall her pausing.  And she said no.
3          And in terms of when I specifically learned,
4  Phillip Mitchell called me in late November and told me
5  the search committee had just unanimously voted to put
6  me forward as executive director.
7  Q      That was over the telephone?
8  A      Yes.
9  Q      Let me back up a second to your conversation
10  with Karen Jones.  You said she told you that there had
11  been racial issues with Eileen Harris?
12  A      She said there had been racial issues within
13  the whole organization.  She said that Harris had been
14  a focal point.  But she made it very clear in her
15  conversation that it went beyond Eileen Harris.  She
16  said to me that the organization had a history of not
17  promoting African Americans.  She said to me that Jaffe
18  Picket had to essentially get them to mandate that the
19  organization make her a department head.  She said that
20  there had been lawsuits involving the organization.
21  She said that African American lawyers were rarely
22  hired and were quickly fired.  She said that she felt
23  there was an insensitivity towards African American
24  clients on the part of certain attorneys in the
25  program.



ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
29–32

Page 29

1        Now, I don't know Karen Jones well.  But
2  I knew Karen well enough to know that she is very
3  passionate about issues that relate to race.  So I did
4  take some of Karen's observations to be a function of
5  how Karen is about these issues.  But you didn't ask me
6  my interpretation.  You asked me what she said.
7  Q      Specific to Eileen Harris, did she say what
8  these racial issues were?
9  A      She described, as I just said to you a
10  minute ago, a lengthy history of racial problems at
11  Legal Services.  She would not be the last employee --
12  not to jump forward, but in some hope of moving beyond
13  the month of November 2016 -- she would not be the last
14  person in the organization to make that suggestion to
15  me.
16  Q      But what I want to know, though, in your
17  conversation with Karen Jones, did she tell you about
18  any specific issues with Eileen Harris?
19  A      She said that Harris was, as she put it,
20  despised within the program.  I believe that was her
21  word.  She said there was a belief that Harris did not
22  want blank attorneys in the program.  There was a
23  belief that Harris was quick to find fault with black
24  employees.  And, again, Karen uses the word "racist"
25  much more loosely than I do.  But she certainly -- my

Page 30

1  recollection is she may have used the term.  She may
2  have used the caveat there was a belief on the part,
3  some people's part, that Harris was quote, unquote, a
4  racist.
5        But, again, that's not a word that I use
6  loosely.  Karen uses it more loosely than I do.
7        (Whereupon, Defendant's Exhibit 2
8          was marked for identification and
9          is attached hereto).
10  BY MR. VREELAND
11  Q      Show you what's been marked for
12  identification as Defendant's Exhibit 2.  Do you
13  recognize that as the offer letter you received?
14  A      Yes, I do.
15  Q      Is that your signature on the last page?
16  A      Yes, it is.
17  Q      At the time you were interviewing for the
18  executive director position, were you employed
19  elsewhere?
20  A      I was not.
21  Q      When was your last previous employment?
22  A      I worked for a law firm in DC from
23  January 2011 until December of 2011.  I resigned from
24  that organization because I was -- or from that law
25  firm because I was unhappy, frankly, with the amount of

Page 31

1  work I was receiving.  I felt there was a lack of
2  vision as to what my role would be for the program.
3        I was a member of the board of directors on
4  a firm, at a factory, manufacturing company in Virginia
5  called Huntington Ingalls Industries.  As director,
6  I was paid $120,000 a year.  And after 2012, I made the
7  decision to return to the political world, became a
8  very active political surrogate.  I did a lot of
9  television commentary.  And, frankly, for a period of
10  several years, I didn't actively seek conventional
11  employment.  I received income from being on the board,
12  and the income was generous.  And that --
13  Q      How long were you on that board?
14  A      Four years.
15        I also received some compensation from
16  speaking fees.  And that was enough to pay for my wife
17  and myself.
18        Then I made the decision to return to
19  Montgomery, Alabama to run for mayor.  That was a
20  nine-month process.
21  Q      What year was that?
22  A      That was 2015.  So there had been a period
23  of time when my income sources were primarily speaking
24  fees and serving on the board of directors.  Because
25  I was actively contemplating a return to politics

Page 32

1  during that time, I made the decision not to seek what
2  I would characterize as conventional employment of the
3  kind that would have had specific expectations in terms
4  of hours or in terms of my commitment to that kind of
5  work.
6        (Whereupon, Defendant's Exhibit 3
7          was marked for identification and
8          is attached hereto).
9  BY MR. VREELAND
10  Q      Show you what I have marked for
11  identification purposes as Defendant's Exhibit 3 to
12  your deposition.
13        Do you recognize this as a handbook
14  acknowledgment you signed when you went to work for
15  Legal Services?
16  A      I do.
17  Q      Is that your signature?
18  A      Yes.
19  Q      You raised it, so we might as well dive
20  right in.  You said that there were other -- or at
21  least implied that there were other people at Legal
22  Services who expressed issues to you about Eileen
23  Harris?
24  A      Uh-huh.
25  Q      Who were those other people?

ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
33–36

Page 33

1  A      Well, I was selected by the board of
2  directors to be executive director on December --
3  I believe it was December 2nd.  It was the first Friday
4  in December.  After the selection, which occurred on
5  the physical facilities of Legal Services, I asked if
6  I could sit down with Jaffe Pickett, who was the
7  development director.
8        Let me -- actually before that, the day
9  before I was selected, LaVeeda Battle called me and
10  asked how I was doing.  She told me that they were
11  feeling very good about the process and about the end
12  of the process, and that she was hoping and expecting a
13  unanimous vote of the board the next day.
14        She did say that she and Phillip Mitchell
15  wanted to meet with me right after the selection.  And
16  I made it clear, I was happy to do that.
17        So after being selected, my recollection is
18  there was a reception for the outgoing executive
19  director, James Fry.  After that reception, Phillip
20  Mitchell, LaVeeda Battle, and myself sat down in a room
21  of Legal Services and had the conversation that she had
22  requested the day before.  During that conversation,
23  they were very forthcoming about the fact that, to use
24  Phillip Mitchell's phrase, some dissension,
25  D-I-S-S-E-N-S-I-O-N, that you're going to have to deal

Page 34

1  with.  And he quickly added, not about you.  People
2  very happy about you.  But -- don't remember the exact
3  phrase he used, but that is the first time Eileen
4  Harris' name was brought up to me by either Mitchell or
5  Battle.  I don't recall either one of them mentioning
6  her name prior to that point.  I knew she existed
7  because of the Karen Jones conversation and because
8  I had gone to the website and seen that she was
9  operations director.
10        Mitchell and Battle shared with me during
11  that conversation what I already knew; that she applied
12  for the position; that she was unhappy that she was not
13  selected.
14        And they indicated that there had been a
15  number of complaints that had been made about her as
16  operations director, and that she was a point of
17  dissension or division within the program.
18        Now, it so happens that Eileen Harris had
19  made a big show of walking in that morning and
20  presenting her letter of resignation to the board.
21        So the spirit of the conversation was, we
22  are kind of glad that you won't have to deal with
23  Eileen.  And it's kind of a positive thing, we think,
24  that she is leaving.
25        I did ask them what was the nature of the

Page 35

1  problems.  They were a bit cryptic.  They said,
2  management style, personality.  There had been
3  complaints about the way she deals with people and
4  employees.  But, it's not your problem.  Not our
5  problem as an organization many.
6        And so that would have been the first time
7  after my officially being selected that Eileen Harris'
8  name came up.
9        Now, after all that, there was still a
10  number of people in the building.  I noticed that Jaffe
11  Pickett was still there.  I know that Jaffe Pickett had
12  been on the search committee.  I had been told by Karen
13  Jones that she had been an advocate of my being
14  selected.
15        So I said to Jaffe Pickett, would it be okay
16  if you and I just sat down this afternoon and just had
17  a conversation?
18        We did, and she -- I recall her closing the
19  door.  She asked if we could sort of speak directly.
20  And she shared with me her great feeling of relief that
21  Eileen Harris was departing the program.  And I said,
22  you know, you are not the first person to say something
23  like that to me.  And I had in mind the conversation
24  with Mitchell and Battle right before.
25        She said to me that there had been very

Page 36

1  serious complaints about Eileen Harris.  And I asked
2  her what those complaints were.  She said that there
3  were complaints that Harris had bullied staffers.  That
4  she had intimidated people.  She had been verbally
5  abusive.  And I asked if the complaints were in
6  writing.  And she told me, they are; they were in
7  writing.  And I asked her if she had a copy of them.
8  And she said, yes; I'm getting a packet together to
9  present to you next week.  I'm going to include them in
10  the packet.
11        And then she reiterated, I'm just so glad
12  that she's leaving because I think she would have tried
13  to undermine you at every turn if she had been here.  A
14  lot of us were very concerned about that.  She tried to
15  do that with Jimmy.  She was almost certainly going to
16  try to do that with you.
17        That was the spirit of the reference to
18  Eileen Harris.
19  Q      So Jaffe -- in this conversation, Jaffe
20  Picket told you that Eileen Harris had tried to
21  undermine Jimmy Fry?
22  A      Yes.
23  Q      And he was the prior executive director?
24  A      Yes.  I think she also said that she had
25  tried to undermine her, Jaffe Pickett.  That she had



ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
37—40

Page 37

1  tried to undermine Larry Gardella, the previous
2  director of advocacy.
3        She was very negative towards Eileen Harris.
4  She made it very clear that she did not at all like
5  Eileen Harris.  She made it very clear that many people
6  in the program did not like Eileen Harris.
7        And I do remember asking, well, did the
8  board take any steps after these written complaints?
9  She paused for a moment, and she said, that's a good
10  question.  And I did not follow up.
11  Q      Did she, in fact, give you this packet of
12  information that contained the complaints she was
13  referring to?
14  A      She did.  I reported to work that Monday,
15  which I believe was December 5th, the day I signed this
16  employee handbook.  And true to her word, Ms. Pickett
17  did present me a number of documents, including the
18  Eileen Harris complaints.  My recollection is there
19  were three or four individuals who had written out
20  complaints about Eileen Harris.
21        And when I physically took possession of the
22  documents, I certainly didn't have time at that moment
23  to read them.  But I skimmed them.  I would read them
24  later.  At the moment, I skimmed them.  And it did
25  confirm what Jaffe Pickett had said.  One staffer used

Page 38

1  the term "bullied," I think.  Another staffer said that
2  she had made her cry -- that Harris had made the
3  staffer cry.
4        I would characterize the complaints as very
5  clear-cut allegations of a hostile work environment.
6  That tends to be a term that lawyers use and not a term
7  that ordinary people use.  So I don't recall the term
8  "hostile environment" being used in the complaints.
9  I recall it being more plainspoken than that.
10        But it was -- there were three to four
11  complaints.  And they were detailed.
12  Q      Who were they from?
13  A      One was from Christine Davis I recall.
14  Christine Davis was in the accounting department.
15        One I recall was from Jessica Hathcock, who
16  was in the IT department.
17  Q      Hathcock?
18  A      H-A-T-H-O-C-K, who was in the IT department.
19        I recall I believe another one may have been
20  from Desiree Jones, who was in the accounting
21  department.
22        And it's possible that one was from Dorothy
23  Graham, who was Jaffe Pickett's primary assistant.
24        That's my recollection; that it was -- I'm
25  100 percent certain it was Davis and Hathcock.  I'm

Page 39

1  80 percent certain that Desiree Jones was the third
2  one.  Probably around 60 percent on Dorothy Graham.
3        My recollection, obviously, is not as strong
4  today as it was three years ago.  So if during the
5  course of earlier documents I have been more specific
6  about the representation, I would defer to what I have
7  said earlier.
8        Sitting here today, I recall there were four
9  sets of complaints, and they were from the people that
10  were mentioned.  Pretty confident -- 100 percent
11  confident there were at least three.
12  Q      What was the format of the complaints?  Were
13  they e-mails --
14  A      They were e-mails.
15  Q      -- correspond -- they were all e-mails?
16  A      They were printed out e-mails.
17        To anticipate your next question, I don't
18  actually recall who they were addressed to.  I should
19  have noted that, but for some reason, that did not
20  catch my attention whether they were addressed to board
21  or they were addressed to whom it may concern, I
22  honestly do not recall who any of them were addressed
23  to.
24        But they were detailed.  They were
25  single-spaced printouts from what appeared to be Gmail

Page 40

1  accounts or Legal Services accounts.  Again, I do not
2  recall if they were from Gmail accounts from these
3  individuals or from their Legal Services accounts.
4        But as someone who is an attorney, and
5  someone who does have an understanding of the term
6  "hostile environment," there is no question that these
7  were detailed allegations of complaints that Eileen
8  Harris had created a hostile environment verbally, in
9  terms of her demeanor, and in terms of specific
10  management decisions.
11        I do recall there were also complaints of
12  just arbitrary unfair actions on her part.  I recall
13  that one person complained that Eileen Harris refused
14  to approve her leave time and wouldn't tell her why.
15        And I can't tell you that everything
16  I reviewed was something I would view as being a
17  legitimate complaint.  I can't tell you that every line
18  constituted something that I would view as a hostile
19  environment.
20        I can tell you that the spirit of the
21  complaints was that there were strong allegations that
22  matched Jaffe Pickett's description of bullying.  And
23  that matched what I would call a hostile environment
24  set of complaints.
25  Q      Do you recall the timeframe when these



ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
41—44

Page 41

1  complaints were made, when they were sent?
2  A       My recollection is that they had all been
3  generated during calendar year 2016.  Now, again, as
4  you know, we have had an issue recovering these
5  complaints.  And we can talk about that if you want to.
6  And that would obviously be dispositive on that.
7        But my best recollection is that they were
8  all generated in 2016.  I can't absolutely vouch to
9  that.  But that's my best recollection as opposed to
10  2015 or 2014.
11  Q       When you assumed the position of executive
12  director, what did you understand your job
13  responsibilities to be?
14  A       I understood them to be what I have always
15  understood the job of CEO or executive director to
16  entail.  I have served on three previous boards.
17  I served on the Board of Trustee of Tuskegee
18  University.  The relevant position there would have
19  been president.  I served on the Board of Directors of
20  Huntington Ingalls Industries.  The relevant position
21  would have been CEO.  I served on the board of a
22  non-profit organization, Points of Light, which was
23  a --
24  Q       But I'm just asking you what your job
25  responsibilities --

Page 42

1  A       Well, I'm answering the question best I can.
2  I'm trying to answer your questions completely.
3        My understanding is that the job description
4  was what I always understood it to be.  Executive
5  director slash CEO slash president runs a program from
6  day to day.  That individual reports to the board
7  typically in the form of quarterly meetings.
8        That individual is evaluated by the board.
9  That individual can be fired by the board.  The board's
10  task is to formulate a broad agenda particularly for a
11  nonprofit.  And it's the executive director's role to
12  carry out that agenda on a day-in/day-out basis.
13        I will tell you on all three of the
14  organizations on which I served on the board of
15  directors, there was never any questions or ambiguity
16  or confusion over what the division of the
17  responsibility or labor was vis-a-vis the leader of the
18  organization and the board of directors.
19        So I understood the job description to be
20  the standard job description for an executive director.
21  I was provided a job description that matched what
22  I understood to be the standard job description for
23  executive director.
24              (Whereupon, Defendant's Exhibit 4
25              was marked for identification and

Page 43

1        is attached hereto).
2  BY MR. VREELAND:
3  Q       You just referred to a job description.  Let
4  me show you what I am marking for purposes of
5  identification, Defendant's Exhibit 4.  Is that the job
6  description you were just referring to?
7  A       This is a job description of executive
8  director at Legal Services.
9        Without making this more confusing than it
10  has to be, I will tell you that during the course of
11  the selection process, I was given a copy of two
12  different job descriptions.  I was told that there was
13  some flux as to the job description.  And I was told
14  that there might be some minor amendments that were
15  made.  To my knowledge, those amendments never
16  happened.
17        But this is certainly one of the job
18  descriptions.
19        Now, again, I will be perfectly honest with
20  you.  This is an organization that was not always
21  precise or meticulous in its record keeping of job
22  descriptions.
23        There was yet another job description of
24  executive director that I think I saw at some point.
25  I don't recall the context.  Just in the context of my

Page 44

1  looking at files and documents in the office.
2        But to answer your question, this is a
3  document that is job description, executive director.
4  And it appears to be, as I sit here and read it, one of
5  these three descriptions.
6        I'm not trying to make more of this than it
7  is.  I understood the job description of executive
8  director.  I didn't base that understanding on
9  necessarily having to look at a piece of paper that was
10  put in front of me.  I understood very well what the
11  job entailed.
12        I will tell you there was one conversation
13  that added a bit, I will say, to my understanding.
14  That's not fair, but it may be relevant to what you're
15  getting at.  In December of 2016, LaVeeda Battle --
16  shortly after my selection, LaVeeda Battle called me.
17  I recall it was around Christmas.  Purpose of the call
18  was to check in, wish me happy holidays.  For her to
19  tell me how pleased she was, in her words, with my
20  first three weeks as executive director.
21        We did have occasion to discuss Eileen
22  Harris.  Because even though Eileen Harris had
23  submitted her resignation, she had been a source of
24  difficulty in my first three weeks.  She had decided
25  to, as people often do when they resign, she had

ESQUIRE
DEPOSITION SOLUTIONS

ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
45–48

Page 45

1  decided to take all of her leave time.  So she did not
2  come in for the next two and a half weeks.  When she
3  did come in, we met for two hours.  She was extremely
4  negative toward the organization.  Up to the point of
5  being caustic, C-A-U-S-T-I-C.  And that really made an
6  impression on me in a negative way.  She was very
7  negative about several people in the organization.  She
8  made it very clear that she felt that she had been
9  treated unfairly.  People had lied about her and
10  schemed about her, to use her phrase.
11       She was failing to cooperate with several
12  people in the office regarding the transition of the
13  operations functions.
14       So say all this to say that I talked with
15  Harris about the fact that Pickett -- I talked to
16  Battle about the fact that Harris had been a source of
17  difficulty.  And Battle said, you know, I'm so glad
18  that woman is leaving.  Her phrase, not mine.  That was
19  her phrase.
20       And she said to me, look, one of the things
21  I want to make very clear to you is I expect you to
22  handle personnel issues.  And I appreciate you sharing
23  with me these things about Eileen.  I appreciate you
24  discussing this with me.  But she said it as someone
25  who had been involved with Legal Services for a long

Page 46

1  time that one of her frustrations was that the board
2  did not always understand fully the autonomous nature
3  of the executive director's position.
4       She shared with me that Jimmy Fry had
5  occasionally avoided decisions within the organization
6  by deflecting to the board and telling people, I have
7  got to go to the board and see if they will let me do
8  that.  And she said that it created a little bit of a
9  culture within the organization of people believing the
10  board had a management role that the board really
11  didn't have.
12       And I said, LaVeeda, I have seen and heard
13  of that within organizations.  I think you are right.
14  That is a problem some organizations have.  And she
15  says, I want to be very clear to you:  I expect you to
16  handle personnel issues in this organization.  And
17  I think this board understands that.  I will make sure
18  this board understands that.  So you don't need to seek
19  guidance from me or approval from me.
20       I think she felt that I was seeking some
21  level of guidance from her as to how to deal with some
22  of the challenges that Harris was posing during that
23  final three weeks when she was making the transition
24  difficult.  And she made it very clear that she was
25  saying, do with it as you see fit.  And I said, well,

Page 47

1  fair enough.
2       So that was a conversation that I do think
3  was relevant and important simply because it was the
4  only time that LaVeeda Battle and I really had a
5  separate side conversation about the duties of
6  executive director.  You did ask me earlier the duties
7  or the relationship between the ED and the board had
8  come up in earlier meetings.  It had not other than the
9  first conversation -- other than that first question
10  I alluded to in that first interview.
11       It did come up in this late December
12  2016 conversation.  Everything that Battle said was
13  consistent with what I would agree with and was
14  consistent with my understanding of the role.
15       But I do recall expressing appreciation to
16  her as to her expressing her viewpoint on the subject.
17  Q       That was a phone call in late December
18  of 2016?
19  A       Yes.
20       MR. VREELAND:  Let's take a quick break.
21       (Brief recess.)
22  BY MR. VREELAND
23  Q       What's your date of birth?
24  A       10/9/67.
25  Q       Your Social Security number?

Page 48

1  A       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.
2  Q       What is your home address?
3  A       5301 Cluster Oak Court, Montgomery, Alabama,
4  36116.
5  Q       How long have you lived there?
6  A       Since December 2015.
7  Q       Are you married?
8  A       Yes.
9  Q       What's your wife's name?
10  A       Tara.
11  Q       Do you have any adult children?
12  A       We do not.
13  Q       Does Tara work outside the house?
14  A       Yes.
15  Q       What does she do?
16  A       She is Executive Director of Friendship
17  Mission, which is a homeless shelter in Montgomery.
18  Q       Have you been married to anyone other than
19  Tara?
20  A       No.
21       MR. MENDELSOHN:  Is that the one down in
22  Chisholm?
23       THE WITNESS:  Yes.
24       MR. MENDELSOHN:  I represent them.
25       THE WITNESS:  Okay.

ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
49–52

Page 49

1       MR. MENDELSOHN:  They had that busted pipe.
2       THE WITNESS:  I referred you to them,
3  I think.
4       MR. MENDELSOHN:  I didn't realize she was
5  there.
6       Sorry.  My bad.
7       MR. VREELAND:  Kenny, can we have an
8  agreement that if we go to trial I can get a list of
9  his relatives?
10       MR. MENDELSOHN:  Sure, sure.
11  BY MR. VREELAND:
12  Q       Have you ever had your deposition taken
13  before today?
14  A       I don't think so.
15  Q       Have you ever been convicted of a crime?
16  A       No.
17  Q       Have you ever pled guilty to a crime other
18  than minor traffic violations?
19  A       No.
20  Q       Are you currently employed?
21  A       No, I am not.
22  Q       Are you running for mayor again?
23  A       I was unsuccessful.
24  Q       Oh, I'm sorry.  Montgomery, so I don't know.
25       Was that recent?

Page 50

1  A       It was a few weeks ago.
2  Q       Show you how unconnected I am.
3  A       I'm sure your clients are aware.
4  Q       Did you have any employment after Legal
5  Services?
6  A       I had an independent contractor relationship
7  with an entity called the Institute for Justice, which
8  is a national public interest law firm.  I served as a
9  contract lobbyist and consultant on legislative affairs
10  from January 2018 until November 2018.
11  Q       Why did you -- why did that end in November?
12  A       It was a contract.  The purpose of the
13  contract was for me to lobby various legislative
14  bodies.  Legislatures tend to meet in the first seven
15  to eight months of the year.  Many in the first five
16  months of the year.
17       Candidly, they had run out of work for me to
18  do.  So the final months of the contract, the amount of
19  hours I was able to generate was very limited.  So they
20  understandably elected not to continue it.  And it had
21  been my expectation that that would be a contract that
22  would only last for eight, nine, ten months.
23  Q       Did you have any contractor or employment
24  relationships after that?
25  A       No, I have not.

Page 51

1  Q       When did you begin your mayoral campaign,
2  the most recent one?
3  A       January 2019.
4  Q       And I assume you did that full-time up until
5  the election?
6  A       Yes.  Yes.  I am currently actively seeking
7  employment.
8  Q       Have you been in contact with any current or
9  former Legal Services employees since your employment
10  ended?
11  A       I had occasional contact with various
12  employees of the program in the immediate weeks after
13  my suspension as executive director.
14       For the past year, that has been much more
15  intermittent.  I have not spoken to anyone who is
16  currently employed at Legal Services in the past two
17  years, with the exception of running into one attorney,
18  Jim Smith, at political debates and political forums.
19  He is fairly active in the community, and I would see
20  him on the campaign trail.  That is the only current
21  employee I have spoken with since the fall of 2017.
22  Q       How about former employees since the fall --
23  A       Spoken occasionally with former employees.
24  Q       Have you spoken with any of them about your
25  case, your lawsuit, pending lawsuit we are here for?

Page 52

1  A       Well, I would need more specificity in terms
2  of the questions about that -- about my case.  I mean,
3  I -- in the immediate days and weeks after I was
4  removed as executive director, I think it's fair to say
5  there was a good deal of consternation and churn in the
6  program.  During that time, there was no lawsuit.  But
7  there were people within the program who reached out to
8  me.  I didn't reach out to them.  They reached out to
9  me to ask me what happened.  To share with me various
10  things.  And in one case, to seek legal advice of me.
11  I was a licensed attorney at the time it.  So those
12  conversations would be privileged because of the
13  request to render legal advice.  So I can't talk about
14  the content of those conversations.
15       But for a period of time in the immediate
16  months and weeks after my removal as executive
17  director, I would have had occasion to talk to people
18  in the program.  That period of time came to an end.
19       So as far as former employees go, I have had
20  only intermittent contact for the last year, year and a
21  half with former employees.  And no contact with
22  current employees since the fall of '17 other than the
23  occasional chit chat with Jim Smith at political
24  events.
25       And I have seen Karen Jones at a political



Page 53

1   forum since then.

2         Karen Jones, after my departure, texted me,
3   and I texted her back that I did not think it was
4   appropriate for us to speak because I was going to be
5   filing a lawsuit against the program.  So I told her
6   I did not think it was appropriate for us to speak.
7   And Jones and I have not spoken about Legal Services
8   since that text conversation.

9         And, again, the only relevance of it would
10   have been for me to tell her, Karen, you and I should
11   not talk at this point, so please don't call me or text
12   me.

13   Q        Did she abide by your request?

14   A        Yes.  She did.

15        MR. VREELAND:  Let me try one more time.

16        (Brief recess.)

17   BY MR. VREELAND

18   Q        Ready?

19   A        Yes.  Let me clarify one thing that I said
20   earlier.  With regard to Eileen Harris complaints, I do
21   want to make it clear that I did, at some point, read
22   the complaints.  I know earlier I made a point of
23   saying that the day I received them, I didn't have time
24   to read them.  But whether or not, on the off chance
25   that you may not come back to it, at some point, I did

Page 54

1   take the time to read all of them.  I just don't recall
2   when in the sequence of time I did.  The first day
3   I received them, I skimmed them.  At some point, I did
4   read them all.  So my characterizations of them were
5   based on my eventually reading them.

6   Q        Did you discuss those specific complaints,
7   those three or four written complaints, with anybody on
8   the board?

9   A        I honestly don't recall if they ever came
10   up.  Now, remember that Mitchell and Battle told me
11   there had been complaints about Harris.  Now, when they
12   said that to me, honestly, I took them to be oral
13   complaints.  Until the conversation with Jaffe Pickett,
14   it was not clear to me that they were written
15   complaints.

16        Obviously, if I had known how important an
17   issue it would become in this case, I would have
18   pressed Mitchell and Battle on whether they were
19   written complaints and what they did about them.  I
20   took them as being oral complaints.  Now, Pickett made
21   it clear they were written complaints.  And then when
22   I saw them, they were written complaints.

23        In terms of the next eight months, the
24   subject of Eileen Harris kept coming up, because she
25   had been a very contentious figure in that program.

Page 55

1   LaVeeda Battle believed Eileen Harris was going to sue
2   Legal Services over her non-selection as executive
3   director.  Battle did share with me, I believe in that
4   same conversation in late December her -- fear is not a
5   correct word -- she was very dismissive of the
6   viability of the suit.  So "fear" would not be the
7   word.  But she did express to me her conviction that
8   Eileen Harris might sue the program.

9        It is possible that there was a reference to
10   the fact that the complaints would have been used
11   against her in that context, but I don't recall.
12   Remember, I would have known that Battle knew about the
13   complaints.  Battle perhaps did not know that I know
14   about them.  But I would have had no reason to shy away
15   from the topic.

16        But on the other hand, LaVeeda Battle and
17   I certainly did not have occasion to speak on a regular
18   basis.  We would speak before and after board meetings.
19   She would occasionally call me if there were particular
20   things that she wanted input on.  I would call her for
21   things I wanted input on.  I don't want to imply that
22   we had regular conversational contact.  We certainly
23   did not.  I cannot sit here and say to you that LaVeeda
24   Battle and I never discussed the existence of those
25   complaints, of the written complaints.  But I don't

Page 56

1   recall the context or conversation where we did,
2   either.

3        Jaffe Pickett and I regularly referenced and
4   discussed those complaints because Eileen Harris was a
5   constant frame of reference in that office.  Anytime
6   there was a reference to morale issues in the office,
7   the subject would tend to double back to how bad things
8   were under Eileen, quote, unquote.

9        So the existence of the complaints, the
10   substance of the complaints, the fact that there had
11   been complaints, that was a topic that came up on a
12   regular basis in conversation with me and Jaffe Pickett
13   and Charlotte Rand, the operations director.

14   Q        In your complaint, which I believe you have
15   in front of you.

16   A        I do.

17   Q        I'm looking at the Amended Complaint,
18   actually.

19        First of all, let me ask you -- did -- and
20   I don't want to know about any conversation with your
21   attorney, but did you have a role in drafting the
22   complaint?

23   A        Well, it's impossible to draft a complaint
24   without getting information from the plaintiff.  So
25   obviously.



ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
57—60

Page 57

1  Q       And did you approve it before it was filed?
2  A       My role is not to approve it.  That's
3  Mr. Mendelsohn's job.  My role would have been to
4  review it for accuracy and for completeness and to make
5  sure it captured my best recollections.
6        So, yes, I would have participated in that
7  process.  I would not use the word "approve."  That
8  would have been Mr. Mendelsohn's job.
9  Q       Do you believe it's accurate and complete?
10  A       As best we could make it.  Keeping in mind
11  the fact that this complaint was drafted.  Of course,
12  as you know, the amended complaint is essentially a
13  do-over the original compliant.  The original complaint
14  was filed in January 2017.
15       So if you are asking me if my memory of
16  events was better today -- was better two years ago
17  than it would have been today, I'm certain it would
18  have been.
19  Q       I don't think that's what I was asking, but
20  let's move on.
21       You state in the complaint that you
22  "incurred the resentment of a small group of employees
23  motivated by their own resentments of what they
24  perceived as their diminished role in the
25  organization."

Page 58

1        Who are those small group of employees?
2  A       Jaffe Picket.  Sylvia Mason.  Dorothy
3  Graham.  To a lesser degree, Christine Davis.
4  Q       And do you believe that their complaints
5  about you were because they perceived their role as
6  being diminished in the organization under your
7  leadership?
8  A       Yes.
9  Q       So let's talk about your claims in the case.
10  And, hopefully, this will be easier since you are an
11  attorney.  I can ask you directly.  I understand you
12  have a claim for race discrimination, a claim for
13  retaliation, and then claims for defamation?
14  A       Yes.
15  Q       With regard to race discrimination, what are
16  you claiming Legal Services did to you that was
17  motivated by race?
18  A       Well, without being legalistic, of course,
19  I first and foremost refer to the complaint.  This
20  complaint was drafted was much closer to the events
21  than we are today.  I can certainly sit here and make
22  my best effort to walk you through the things that I
23  think constitute a race discrimination.  I do frankly
24  think that my deferring to the complaint would be a
25  better way to answer that question.

Page 59

1        If you would like to ask me to elaborate on
2  something in the complaint, I'm happy to do that.  But
3  as best we could, the complaint lays out the elements
4  of disparate treatment.
5        To the extent there was anything that
6  I think that I would add, it might be the following --
7  think of the most succinct way to put this --
8  I mentioned to you that beginning with the conversation
9  with Karen Jones that there were a number of times when
10  references were made by Legal Services employees to
11  racial tensions within the program.
12       And, again, I don't want to keep us here all
13  day, but I do want to be as responsive as I can be.
14  And, certainly, it's in our interest to be as
15  exhaustive as we can be to make sure that you're on
16  notice of everything that we're saying particularly
17  when our discovery deadline is essentially here.
18       Jaffe Pickett, particularly in the early
19  months of the program, we had a very good working
20  relationship.  Jaffe Pickett often spoke about the
21  history of Legal Services of Alabama.  She was a
22  long-time employee there.  She is, from what I
23  understand, no longer an employee I have heard from
24  people.  But she was an employee at the time of long
25  standing.  My recollection is that Pickett came to that

Page 60

1  program 2003, 2004.  So that would have been 13, 14
2  years.  Very clear to me she was quite knowledgeable
3  about the program, at least with respect to
4  personalities.
5        And she made it very year to me in numerous
6  conversations that there had been what she
7  characterized as a history of racial problems.  She
8  frankly confirmed a lot of what Karen Jones had said.
9  She said that there had been a belief in the program
10  that African American attorneys had not been treated
11  well.  There had been a reluctance to hire African
12  American attorneys.
13       We often talked about the fact that one of
14  the first issues I dealt with, an African American
15  female had been hired by Jimmy Fry the week before
16  I was selected.  Well, Eileen Harris attempted -- now
17  mind you, she was on leave virtually all of December,
18  but she came in for a couple of days in mid December.
19  She spent part of that couple of days trying to undo
20  the hiring of this employee.
21       There was a very technical provision in
22  Legal Services Alabama, that if you were given an
23  offer, that if you did not accept the offer in the
24  terms which it was presented, then you had made a
25  counteroffer.  And you had, in effect, countermanded



Page 61

1  the offer.  I don't remember enough contract law to
2  know if that's the case or not.  But certainly, that is
3  not how most organizations work.
4        So my recollection is that Eileen Harris
5  went to the managing attorney in Montgomery and said,
6  we don't have to hire this young lady, because when we
7  offered her this salary and asked her if she could
8  start, she came back and said the salary was fine, but
9  she couldn't start for another two months.  So I think
10  that rescinds the offer.
11        I did not agree with that.  And the
12  counterproposal the young lady made was that she come
13  on board in mid January and not the first week in
14  January.  That was a distinction without a difference
15  to me.
16        Pickett and I talked about that.  And
17  Pickett said, well, that's, in her phrase, par for the
18  course.  Eileen never wanted to hire black lawyers.
19  And was always trying to find an excuse not to hire
20  black lawyers.  And she would -- again, to quote Jaffe
21  Pickett, Jimmy would let her get away with this stuff
22  all the time.
23        So Jaffe Pickett would on regular
24  occasions -- and when I say "on regular occasions,"
25  I mean between December 2016 and August 2018, virtually

Page 62

1  the entire time that I was there -- Jaffe Pickett would
2  regularly bring up Legal Services history and her view
3  of racial problems.
4        When we made the first round of hires that
5  we did as executive director, the subject came up.  Of
6  course, Eileen Harris had to be replaced.  We also
7  needed to hire a finance person.  Because early on,
8  I made the decision that there was no senior finance
9  person in the organization.  Eileen Harris had been
10  playing that role.  Eileen Harris did not have an
11  accounting degree.  Eileen Harris did not have a
12  business degree.  Eileen Harris had no background to be
13  the responsible financial person at an organization
14  with a $7 million budget and a staff of 80.
15        So I strongly felt that we needed to bring
16  in a finance person.  And the board had agreed with
17  that because they had budgeted for a finance person to
18  be brought on.
19        So when we filled the finance position, and
20  we filled the operations position, so happens that the
21  two finalists for operations, African American female,
22  Caucasian female.  Two finalists for finance, African
23  American male, Caucasian male.
24        I do remember Jaffe Pickett to me saying
25  very strongly that if you hire the two white people,

Page 63

1  there's going to be a perception that you are
2  continuing the whitewashing of the central office.  And
3  that's her phrase, whitewashing.  And I did ask her --
4  I don't remember, I don't think I said, what do you
5  mean by that?  But I do recall eliciting from her why
6  she used that very vivid term.  And she said, well,
7  there is a belief that Eileen and Jimmy just wanted the
8  central office to become white.
9        And she talked about how she had had to push
10  very hard to become a member of the executive team.
11        She did not directly confirm for me what
12  Karen Jones had said; that she had gone to -- Jaffe
13  Pickett had gone to the Legal Services Corporation and
14  had, in effect, lobbied them make Legal Services
15  Alabama add her to the executive team.  But she did
16  make it clear that she had shared with the review team
17  from Legal Services Corporation that there had not been
18  an African American member of the executive team.  And
19  that LSC expressed surprise at that.  And magically a
20  few weeks later, Jaffe Pickett was named development
21  director.  She had previously been director of the call
22  center, which was not considered an executive team
23  position.  So she clearly seemed to be, without saying
24  so, suggesting that right after I complained, I was
25  named to the executive team.  Karen Jones had said that

Page 64

1  very directly.
2        We ended up hiring the two whites.  We ended
3  up -- I say "we," it was a collective decision.  Since
4  Jaffe Pickett and I talked about it, I should say I.
5  It was obviously my choice to make.  I made the
6  decision to hire the two white candidates because
7  I believed they were the two best candidates.
8        The African American female I thought was a
9  strong candidate.  Not quite as strong as the Caucasian
10  female.
11        The African American male, I did not think
12  was as strong a candidate compared to the Caucasian
13  male.  I do remember discussing that with Jaffe because
14  she had raised the concern about whitewashing.  I said
15  to her, you know, Jaffe, I just don't think we can go
16  wrong hiring the two best people.  And these are my
17  first two hires.  And I do want to get this right.  And
18  we are talking about two key roles:  Money and direct
19  operations of the office.  And she said she agreed.
20  And she said that after the interviews, she was
21  persuaded those were the two best candidates.  So as
22  she put it, she says, so I will support those hires.
23  I thought it was a little bit unusual that a
24  subordinate was referring to her supporting a decision.
25  I wasn't aware that it was a vote.  But, of course,



ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
65–68

Page 65

1  I didn't convey that to her.  I just made a mental note
2  of that.
3          As the months progressed, I felt that there
4  was a racial element to some of the tensions between
5  Jaffe Pickett and some of her white colleagues.
6          Several occasions, Jaffe Pickett made
7  comments about Charlotte Rand, the operations director,
8  that suggested that Charlotte was quote, unquote,
9  entitled.  That Charlotte as a white female was
10  entitled.
11         I can tell you as an African American that
12  it is a common frame of reference among African
13  Americans to talk about whether a white person has a
14  sense of privilege or entitlement.  That is a common
15  theme that some of the people in the black community
16  worry about.
17         I will say that Jaffe did express the views
18  her relationship with Charlotte Rand deteriorated; that
19  Charlotte was quote, unquote entitled.  She very
20  strongly expressed that view in the final meeting that
21  we had before my removal as executive director.
22         But there is another white female who
23  I hired to be the grants manager.  Her name was Mary
24  Aplin.  Mary Aplin was brought on board in June -- late
25  May or early June of 2017.  Mary Aplin was, in my

Page 66

1  opinion, subjected to a deliberate campaign of racial
2  harassment for two months.  Jaffe Pickett; her
3  assistant, Dorothy Graham, African American; my
4  executive assistant, Sylvia Mason, African American
5  female, in my opinion went out of their way to make
6  things difficult for Mary Aplin.  It reached the point
7  Mary Aplin was unable to come to work.  Where was she
8  complaining that she was under stress.  She shared with
9  me and Charlotte Rand that she had been to see a doctor
10  because of the stress.
11         It was clearly affecting her ability to
12  concentrate.  And I felt that, without getting too much
13  in the weeds, that the three of them; Pickett, Mason,
14  and Graham took steps to undermine Aplin to make it
15  hard for her to succeed in the office.  I felt that
16  that was racially motivated.
17         And I did feel in my final months with the
18  program that the tensions between Jaffe Pickett and
19  Charlotte Rand, the tensions between Pickett, Mason,
20  and Graham and Mary Aplin had a racial element.  That
21  there was a belief on the part of the three black
22  females that they didn't want these two white women in
23  the program.
24         I'm pretty certain you have a copy of an
25  e-mail that Dorothy Graham sent me where frankly she

Page 67

1  made no bones about it.  She accused me of instituting
2  what she called reverse Jim Crow.  She said that I was
3  favoring the white people.  And how do you think we as
4  black women feel about that?
5          And she alleged -- she called me Donald
6  Trump at one point, which as you may not know -- I
7  don't know what your politics are -- but them's
8  fighting words among black people.
9          She very specifically said that she felt
10  I was favoring white people in the program.
11         So I very much felt in the final months that
12  I was dealing with a situation where two white
13  employees were being subjected to something of a
14  harassment/intimidation campaign by several black
15  employees in the program.  That was of great concern to
16  me.  And extremely unpleasant as an African American
17  male to have to referee and have to deal with that.
18         And I will note that LaVeeda Battle, African
19  American female, head of the personnel committee,
20  Yvonne Saxon were the two people that Sylvia Mason
21  lodged her complaint with the day before I was removed
22  as executive director.
23         So to the extent it's not clear in the
24  Amended Complaint -- and I haven't had time enough to
25  look at it enough to firmly answer this -- but to the

Page 68

1  extent that it's not clear, we can make it clear that
2  I do think the decision that Battle made to remove me
3  was in part motivated by her sympathy with African
4  American females who were raising a concern about my
5  quote, unquote, favoritism of white females.  And to
6  make it very clear, there was no favoritism of the
7  sort.  But I do believe that that affected Battle's
8  willingness to, in effect, take their side of this
9  controversy and remove me as executive director.
10  I consider that to be an element of racial
11  discrimination.
12         So, again, to the extent that that's not
13  completely reflected in the complaint, I would add
14  that.
15         Other than that, I really think for time's
16  sake, Mr. Vreeland, I will defer to the Amended
17  Complaint.
18  Q       Okay.
19  A       Rather than taking you through an
20  eight-month recitation.
21         Now, if you want to ask me about something
22  specific, I'm happy to talk about it with respect to
23  the race claim.
24  Q       You said in the beginning your working
25  relationship with Jaffe was good?



1  A      Yes.

2  Q      When did that change?

3  A      It was a slow, steady deterioration.  For
4  the first couple of months, I felt that Jaffe Pickett
5  was exceptionally competent.  I felt that Jaffe Pickett
6  was exceptionally dedicated.  I felt that Jaffe Pickett
7  had the program's best interests firmly at heart.  And I
8  thought that she was very, very effective in that
9  program.

10       In fact, I went to her in January before we
11  filled the operations director position, and said,
12  Jaffe, I'm going to ask you directly, would you like to
13  stay the operations director?  You have been doing that
14  role since Harris made it clear she was leaving.  You
15  have been the interim operations director.  I know we
16  posted this position.

17       She told me she wanted to think about.  And
18  I told her, well, no pressure.  You think about it.
19  I'll continue the process.  You have up until I extend
20  an offer to somebody else.

21       She came back a few days later and said she
22  had thought about it, she appreciated the chance.  But
23  that she felt that the day-in/day-out duties of
24  operations director were so time consuming she felt she
25  had more of a chance, in her description, to sort of

1  have a balance of work and family if she were
2  development director.  I told her I completely
3  understood that.

4       But I thought enough of her the first few
5  months to give her the option of being the operations
6  director herself.  And I will add that at that
7  organization at that time, operations director is a
8  fairly pivotal key position.

9       I started to develop very mild concerns
10  about Jaffe Pickett as we moved into the spring.
11  I started to notice that she was very slow on
12  follow-through.  I started to notice that if you asked
13  her to reach out to an organization, if you asked her
14  to reach out to a stakeholder, that it tended to not
15  happen, and that you had to do a lot of waiting a week
16  and sending an e-mail asking how that conversation
17  went in the hopes that that would trigger the vibe
18  that the conversation needed to happen.  That didn't
19  bother me a great deal at first.  Eventually, it
20  became a thing.  But it did not bother me as much as at
21  first.  But I did notice that that was sort of the
22  first thing that led me to think that her level of
23  ability was not quite what I initially thought.

24       Then I started to notice that her constant
25  frame of reference was how well she had done

1  something.  And I know that's not clear, so I'll give
2  you an example.  Jaffe Pickett would often point out
3  things that she had done that she felt reflected well
4  on her.  She would often point out that she had won --
5  that she had gotten some national recognition for
6  having one of the most productive call centers program
7  in terms of number of calls answered.

8       She would often point out that during the
9  search committee process, people had said to her,
10  Jaffe, you should be executive director, and that she
11  had turned it down because she, again, didn't like the
12  work/family imbalance that would result from that.

13       I thought that she talked a lot about
14  herself in settings that I didn't think that was quite
15  appropriate.  She made it very clear that she had been
16  a strong advocate of my being executive director.  She
17  made the claim at one point, that to this day I don't
18  know if it's true or not, because, obviously, I have
19  come to have so many deep doubts about her
20  credibility -- she said that during the search
21  process, it had come down to me and another
22  individual, a white male.  She said that during the
23  search process that black female employees at that
24  individuals' law firm had sent a set of written
25  complaints to Legal Services saying, please, don't

1  hire this guy.  He doesn't respect black women, and we
2  want to make sure that you know that.

3       I thought that was very unusual because
4  Karen Jones had never mentioned that.  And she was
5  very forthcoming about mentioning everything else.
6  And, candidly, use your common sense:  If there was a
7  guy who is at your law firm, and the black women don't
8  like this guy, they would have been ready to hold a
9  party for him when he left.  They wouldn't have been
10  trying to stop him from getting a job someplace else.

11       Also I know that from comments that Phillip
12  Mitchell made that this individual went to great
13  lengths to make sure that no one in his firm knew that
14  he was trying to leave because apparently he was also
15  going to make a run to be managing attorney, managing
16  partner in his firm if he didn't get the LSA job.

17       So I found it a little bit unlikely that the
18  African American admins at a Birmingham firm would have
19  found out that the guy was leaving when the partners
20  weren't able to find it out.  I also know enough,
21  frankly, about Birmingham firm culture to know how few
22  African American females there are working at firms
23  there to this day.

24       So the notion there would have been a group
25  of African American females at a large Birmingham firm



ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
73–76

Page 73

1  struck me as implausible.  I didn't think that story
2  held together.  But she told it constantly.  And the
3  only point of the story seemed to be that you might not
4  have gotten it if not for these complaints that came in
5  about the other guy.
6         As the months went on, I thought that Jaffe
7  Pickett, that her focus on her own role, and her focus
8  on her own elevation within the program started to
9  become not only just mildly irritating, but started to
10 become very problematic.
11        I remember an incident that seems trivial,
12 but it came up in her deposition.  Came up Michael
13 Forton's deposition.  We did an orientation for new
14 lawyers.  And the new lawyers were asked to fill out an
15 evaluation.  And in typical new lawyer form, they
16 dinged everybody in the evaluations.  One of the guys
17 thought I should have been more substantive and less
18 anecdotal and rambling in my comments.
19        One of them commented that he thought that
20 Jaffe Pickett did not answer his question.
21        One of them commented that she was bored the
22 whole time.
23        So I received the comments, and I just sent
24 them with a cover message to Jaffe Pickett, Michael
25 Forton, the advocacy director, and Charlotte Rand, the

Page 74

1  development -- the operations director.  And it was a
2  lighthearted, well, it looks like we have all got room
3  for great improvement since clearly we're not the best
4  at presenting an orientation session.  And I included
5  myself in that category.  Sent it out saying, hey, for
6  what it's worth, here's what they said.  A few things
7  that we probably do need to tinker for the next time.
8  Thought nothing of it.  I think Charlotte may have sent
9  back a smiley face or something like that.  It was a
10 lighthearted response.  Michael's response, I believe,
11 was very lighthearted.  Jaffe Pickett didn't respond.
12 The next morning, I get up, open my e-mails, there is
13 this lengthy diatribe from Jaffe Pickett saying that if
14 she hadn't been given all the duties at the last minute
15 of putting the orientation program together, and if
16 Michael and Charlotte had stepped up to the plate and
17 done their job, she would have had more time to
18 organize it.  And that -- it was very clear she was
19 very upset.  But more importantly -- people have a
20 right to get upset -- I thought it was problematic that
21 she was very openly blaming two of her colleagues for
22 not doing their part.  And she made a reference to, so
23 we're back to having an awful work environment all over
24 again.
25        I just thought that the tone was completely

Page 75

1  wrong to take toward her colleagues.  Got in to work.
2  Asked her to come to my office.  And I said, you know,
3  Jaffe, those comments in the evaluation were not a big
4  deal.  I certainly hope you don't think I took them as
5  a big deal.  I was trying to be lighthearted when I
6  said, all of us obviously have room for improvement.
7  I thought that was making it clear that I really did
8  not take seriously what a lawyer for months thought
9  about our presentation problems.  By why take these
10 jabs at Michael and Charlotte?  I mean, I don't get
11 that.  So I said to her, look, it's no big deal, but if
12 I were you, I would just send out an e-mail, or just
13 pick up the phone and say, hey, I was a little bit
14 frustrated, had a bad day, sent this out without
15 thinking about it.
16        Instead of doing that, she went to one of
17 the people in the IT department and tried to get the
18 document deleted from the server so it would no longer
19 show up in the system, which I certainly did not tell
20 her to do, which I certainly would not have advised.
21 And which I think, A, was incredibly counterproductive.
22 You can't make people unsee something.  So that said a
23 lot to me about her judgment.  That said a lot to me
24 about her tendency to personalize something that was in
25 no way personal.  And it really rubbed me the wrong way

Page 76

1  that she just lashed out at two people who I thought
2  were very good colleagues.  And who worked hard to
3  support her and were incredibly complimentary of her.
4         As the months went, the insubordination
5  issues started to emerge.  We were struggling to fill a
6  hire in the domestic violence department.  I very
7  strongly feel, then and now, you can't just hire any
8  lawyer to represent victims of domestic violence.  You
9  have to hire someone whose got genuine experience and
10 empathy in that area and demonstrated experience and
11 empathy.
12        In other words, you get someone with a
13 history of being a family lawyer.  We were struggling
14 to fill this one position.  Everybody we wanted to hire
15 wanted too much money, or weren't willing to leave
16 their practice, or blatantly unqualified.
17        We finally filled the position after much
18 effort.  Longest search process we have been through.
19        Well, the organization came back to us and
20 said, we want to fund yet another position.  I told
21 Jaffe Pickett, Jaffe, we struggled like heck to fill
22 that one.  I don't think adding yet another domestic
23 lawyer in Montgomery is the best play right now because
24 it was so hard filling that position.  She said she
25 understood that.



ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
77—80

Page 77

1     A few days later, I'm out of town.  I see an
2  e-mail chain on which I'm copied that talked about our
3  agreeing to bring on another DV lawyer at the request
4  of this organization, the One Place Family Justice
5  Center.  I immediately e-mailed Jaffe because I was out
6  of town.  I e-mailed her, and I said, Jaffe, maybe I am
7  misunderstanding this, or maybe Jim's uninformed, but,
8  remember, we are not going to go forward with that
9  second hire.  She ignored the e-mail.
10        Business I was involved in prevented me from
11  getting back for another two hours.  I e-mailed, Jaffe,
12  I just wanted to make sure that you got the e-mail that
13  I sent, and we were 100 percent clear.  No response.
14        I called.  I was told she was busy working
15  on a grant.  I called again.  I actually called Sylvia
16  Mason and said, Sylvia, I think Jaffe -- my executive
17  assistant -- and I said, Sylvia, can you just knock on
18  her door and tell her -- make sure she at least sees
19  the e-mail because I want to make sure we're not making
20  a commitment that I don't want to make.  Could just be
21  a matter of loose language in the e-mail.
22        Jaffe Pickett never responded, at least not
23  within the life of that day.  Finally, two days later,
24  I think I either walked in her office or got her to
25  come to mine.  And she wrote it off to, I was extremely

Page 78

1  busy.  And I said, Jaffe, I get that, but on something
2  that's time sensitive, I would have been happy if you
3  just sent me a message saying, hey, super busy day, but
4  I got it.  Yeah, I get it.  We are not doing that.
5  That's would have been sufficient.  Jim's out of the
6  loop.  Jim doesn't know.  Whatever would have corrected
7  that e-mail chain.
8        Then after that, it became very clear to me
9  in a number of ways that she had developed a pattern of
10  literally just ignoring the instructions that I gave
11  her.  Because of that, I informed her, Jaffe, going
12  forward, let's just have an explicit protocol.  That
13  any time we apply for a grant, the grant has to be
14  formally requested by the attorney in the program whose
15  office wants that potential attorney slot.  You have to
16  formally sign off on it.  And then you have to send it
17  to me for final approval.  I think that would sort of
18  give us a little bit more consistency and avoid some
19  communication chain problems.  She said, I understand.
20  I asked her if she had any issue with that.  She said,
21  I do not.
22        It later became very clear she was extremely
23  unhappy about being told that she had to get final
24  approval from the executive director before she applied
25  for grants.  It became very clear to me that she felt

Page 79

1  her position was autonomous.  It became very clear that
2  she felt she was the only person in the program who was
3  knowledgeable about grants.  It also became clear that
4  she had this odd obsession that the program was about
5  to run out of money at any given time, which was a
6  complete misunderstanding of the organization's balance
7  sheet.  And that she seemed to think and seemed to
8  believe that if we did not get every single grant that
9  existed that the program would not be able to continue
10  to operate.  That was just accurate.
11        I did realize that she was not financially
12  knowledgeable.  I had early on figured out that she did
13  not know how to read the accounting ledger that came
14  out.  I did very quickly come to understand that she
15  did not understand the organization's finances.  But
16  because that wasn't her role, I just, again, made a
17  mental note of that.  I wasn't terribly troubled by it.
18  But for whatever reason, she seemed to feel that she
19  had a mission and imperative.
20        At one point, she made a decision to apply
21  for yet another grant, which I never heard of, saw no
22  need for, and questioned whether we could fill.
23  Whether that was the best use of our resources.  I sent
24  her an e-mail, Jaffe, not to beat a dead horse or
25  something to that effect, but this grant is news to me,

Page 80

1  too.  Remember, we have a process in place now.  I'm
2  happy to look at it.  But do need you to kind of send
3  me a written request for this grant.
4        Her response was to then copy the board,
5  individually, there was no board Listserv in Legal
6  Services.  You had to literally write out the board.
7  Her response was to copy the board and to state that
8  she understood the mission of Legal Services Alabama to
9  seek all available grant funding to ensure our
10  financial survival.
11        I took that as a very clearly challenge that
12  she would respond to an e-mail to me by copying the
13  board, laying out this understanding imperative.
14  I thought it was incredibly disrespectful.  I thought
15  it was wrong as a matter of policy.
16        Not a single member of the board responded
17  to it, at least not in a way that I could see.  But
18  that struck me that at that point, and I remember
19  discussing with Charlotte Rand -- I should point out
20  that as operations director, she was also in charge of
21  HR, Human Relations.  So in that capacity, I discussed
22  with Charlotte Rand the fact that I thought -- I think
23  we may be crossing the lines to deliberate
24  insubordinate conduct by Jaffe Pickett.
25        So over the course of eight months, the



Page 81

1  relationship rapidly deteriorated once she was told
2  that she needed to formally get approval from me to
3  initiate grants.  It slowly slipped away before that.
4        I apologize for the monologue, but I do
5  think it's important to make sure that all the facts
6  are on the table here.
7  Q       When was this issue over the grant and grant
8  approval?  Like timeframe --
9  A       It would have been like July, late July of
10  2017, right before she complained to the board about my
11  leadership.
12  Q       Let me ask you, going back to your claims in
13  the case.  Talked about the race discrimination claim.
14  For the retaliation claim, if you want to defer to the
15  complaint that's fine, but I'm going to ask you the
16  same question:  Are you claiming anything else was
17  retaliatory other than what you've alleged in the
18  complaint?
19  A       I defer to the complaint.  But, again, I did
20  not have a chance to look at it in detail.  So just to
21  clarify for purposes of answering your question, the
22  night I was suspended, I sent a e-mail to the board of
23  Legal Services.  Again, there was no all board
24  Listserv.  So you had to literally send something to
25  every member of the board.  I can't 100 percent

Page 82

1  represent that I captured all 24 of them.  But
2  I certainly captured the leadership of the board.  I
3  stated that this is to put you on notice that I will be
4  filing an EEOC complaint alleging race discrimination.
5        I don't think there is any dispute in this
6  case the fact that the Board received that complaint
7  that night.  There is a dispute that LaVeeda Battle
8  received that complaint and saw it.
9        After that, the following events happened in
10  no particular order in terms of time sequence.  While
11  I was on paid leave, I was not given the opportunity to
12  recoup my unclaimed leave upon my departure from the
13  program.  The typical practice of that program was to
14  cut people a check for unclaimed leave.  I remember we
15  cut Eileen Harris a rather significant check for her
16  unclaimed leave.  That was the practice followed for
17  all employees.  That practice was not followed with me.
18  I was never given a check.  And I took no leave from
19  the time I was executive director.  None.
20        So while I was only there for nine months, I
21  certainly accrued some leave, worth, I believe, several
22  thousand dollars.  I was not given a check for that.
23  Apparently, the organization either just flat out
24  refused to do it, or they took the position that was
25  somehow covered by that period while I was on

Page 83

1  administrative leave.  I was kept on payroll until
2  I think early October of 2018.  I think that the
3  treatment of my leave was retaliatory.
4        The decision to do -- to go out and hire
5  David Mowry, a well-known Montgomery political
6  consultant to advise Legal Services was remarkable.
7  Legal Services is an apolitical organization.  If you
8  know Montgomery politics, you know that David Mowry is
9  one of the leading political operatives in this
10  community.  He ran Todd Strange's campaign for mayor in
11  2015.  He ran a candidate's campaign this time.
12        David Mowry worked for me in 2010 until
13  I fired him for nonperformance as a consultant.  It is
14  well known it Montgomery politics that David Mowry
15  despises me.  It is well known in Montgomery politics
16  that I will never hold political office again.
17        To hire David Mowry to advise Legal Services
18  guaranteed that he would have a copy of the suspension
19  documents.  Guaranteed that he would have a copy of any
20  negative information that Legal Services could produce
21  or obtain.  And I could not imagine that a legal aid
22  organization would respond to a personnel situation by
23  hiring a political consultant who had a history with
24  the person you are dealing with unless that was meant
25  to be an act of vendetta or an act of retaliation.

Page 84

1  I do not think that would have happened other than my
2  making it very clear I was going to be filing a
3  lawsuit.
4        Third of all, hiring Delores Boyd to conduct
5  an investigation that was astonishingly one-sided.
6  Delores Boyd is an experienced federal magistrate
7  judge.  And in an organization of 80 people, the
8  internal investigation that she conducted, by her own
9  admission, consisted of conversations with the
10  following:  Jaffe Pickett, Sylvia Mason, Dorothy
11  Graham, Christine Davis, and Jessica Hathcock
12  volunteered to talk to her.  Jaffe Pickett had been the
13  source of the complaint that eventually led to the
14  board removing me.
15        Sylvia Mason I had suspended for throwing a
16  temper tantrum had also filed a complaint based on
17  that.
18        Dorothy Graham had sent the reverse Jim Crow
19  e-mail.  And I disciplined her because of another
20  insubordinate act after that.
21        Christine Davis had attempted to get
22  promoted into the chief finance position several times.
23  She was not given a chance to interview because
24  Christine Davis lacked a college degree and was not
25  remotely qualified to be a chief financial officer.



Page 85

1          To interview four people, three of whom had
2   made a written complaint against me, and one of whom
3   had been passed over for promotions and complained
4   about that, to make that the people you set out to
5   interview during an internal investigation is
6   astonishingly inept to me.  And I don't believe Delores
7   Boyd is that incompetent.  I think she was given that
8   instruction.
9          When you have 80 people in an organization,
10  and you are investigating a claim of hostile
11  environment, and you only choose to interview the
12  people who complained.  When you are investigating
13  other ancillary issues, whether I complied with program
14  protocol and whether I had received adequate approval
15  for actions.  Why wouldn't you talk to the director of
16  advocacy?  Michael Forton was never spoken to during
17  the process.
18         Why wouldn't you talk to the director of
19  operations who is in charge of administering the
20  handbook and in charge of HR and personnel and people
21  relations, if you will?
22         If you are investigating hostile
23  environment, why wouldn't you talk to the seven
24  managing attorneys who actually ran the individual
25  offices?  If you are investigating hostile environment,

Page 86

1   why are wouldn't you talk to a single attorney within
2   the program?  Why would you limit your investigation
3   only to people who you knew had already made a
4   complaint?
5          I have never had heard of a
6   characterization -- or I have never seen in terms of my
7   knowledge of public events or matters I have
8   experienced as an attorney, I have never seen an
9   internal investigation that was so deliberately
10  one-sided.  And I cannot imagine that Delores Boyd's
11  confidence level is such that she would have done
12  that -- competence level.
13         So I firmly do believe that Boyd was
14  instructed to do a deliberately one-sided investigation
15  as act of retaliation.
16         In addition to that, the next morning after
17  receiving my notice that I was going to be filing an
18  EEOC complaint, LaVeeda Battle communicated with Legal
19  Services Corporation and told them a number of
20  statements that were deliberately untrue.  That I had
21  been admonished for spending reserve funds.
22  Astonishingly false.  Executive director had no
23  authority to spend reserve funds.  That would have been
24  grounds to call the DA's office.
25         For her to say that, to suggest that I had

Page 87

1   been admonished for not getting board approval for
2   initiatives.  A complete lie.
3          And there was yet a third statement that was
4   referenced in the Amended Complaint.  She made three
5   representations to Legal Services Corporation that she
6   knew would be extremely unflattering and detrimental
7   toward me.  But that she knew were completely factually
8   false.  That was an act of retaliation.
9          And then finally to respond to the EEOC that
10  I had created a hostile environment for female
11  employees -- and, again, I can't -- since LaVeeda
12  Battle is not forthcoming about how many people she
13  talked to or to whom she made representations, but
14  I don't know the scope of the lie.  But in at least one
15  incident that we have documented, LaVeeda Battle made
16  the explosive claim that I had been removed for
17  creating hostile environment for female employees.
18         Mr. Vreeland, this happened to be 2017,
19  after the "Me Too" movement had come to prominence,
20  when every few days men were removed from leadership
21  positions over allegations of sexual misconduct.  The
22  term "hostile environment for female employees" is
23  typically used to refer to harassers or to people who
24  pursue relationships with women in the office.
25         LaVeeda Battle is an experienced employment

Page 88

1   lawyer.  For her to deliberately use the term "hostile
2   environment for females employees" when she knew that
3   nothing of the sort had been alleged, much less
4   happened, I believe was an act of retaliation.
5          So, again, I would defer to the Amended
6   Complaint.  But to the extent that it does not capture
7   those things following events or the preceding events
8   were all evidence of retaliation.
9   Q          With regard to the unclaimed leave, did you
10  make any request to Legal Services to be paid that?
11  A          I do not recall.  If I did, it would be a
12  document they have access to.  I would have known it
13  was the pattern and practice of the organization.  And,
14  frankly, I did not realize it had to be requested.
15  Eileen Harris did not make a request to be paid her
16  unused leave.  Other employees who left the
17  organization had not submitted such request.  So
18  I wouldn't have known that I needed to.
19         Frankly, I fully expected to receive that
20  check until we got to a point where it was obvious it
21  wasn't coming.  That was around November of 2017.
22  Q          My only question, though, was whether you,
23  after you were on leave, made any request to be paid
24  that?
25  A          I honestly do not recall.



ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
89–92

Page 89

1  Q      And I believe you just testified that you
2  were paid through October?
3  A      I was -- yes.  I was put on paid
4  administrative leave.  So my recollection is that my
5  last check was around September 30th.
6  Q      And when did you resign?
7  A      August 23rd.
8  Q      Now, with regard to David Mowry, are you
9  aware of him using any of the information that Legal
10 Services provided him as part of that contract in any
11 way negative to you?
12 A      Let put it this way:  When we were
13 attempting to hire a staff for my campaign for mayor,
14 multiple people said that they had talked to
15 individuals ranking from the mayor of Montgomery to
16 other people in the political world who had said, well,
17 do you know what happened to him with Legal Services?
18 Do you know he got in trouble with creating hostile
19 environment?
20        The only way that anyone would know of the
21 allegations of Legal Services -- since there was never
22 any press coverage of what the allegations were, the
23 only way would be if you have seen a copy of the
24 suspension document.
25        So I am 100 percent confident that David

Page 90

1  Mowry, who is a political operative, would have used a
2  document against someone who by that time he knew was
3  going to be an opponent of his in the mayor's race.
4        All through the mayor's campaign, we ran
5  into constant instances of people declining to
6  contribute to my campaign.  In part, because they had
7  heard that there was something out there that was going
8  to come out.  There was something about my work in
9  Legal Services.  And, oh, once that comes out, that
10 will be the end of his campaign.
11        Montgomery is a small town, and there
12 certainly could have been other ways that that gossip
13 and innuendo could have been disseminated.  But the
14 organization's making the decision to hire Mowry and to
15 give him access to the document containing these
16 allegations, I believe it could be inferred that that
17 was a deliberate act of retaliation.
18        Certainly could be inferred that Mowry could
19 have shared the complaint -- not the complaint, I'm
20 sorry, but the suspension document that listed all of
21 these various claims against me, including the
22 reference to hostile environment.
23 Q      You also mentioned Battle's response to the
24 EEOC and the reference in that to hostile environment?
25 A      For females.

Page 91

1  Q      For females.  Are you aware of her sharing
2  that allegation with anyone else?
3  A      It is inconceivable to me that LaVeeda
4  Battle did not share that allegation.  LaVeeda Battle
5  sat here during her deposition and repeated the
6  allegation.  Since LaVeeda Battle declined to answer
7  the question in discovery as to how many people she had
8  discussed this matter with, it has made it impossible
9  to have the requisite proof that we would need.  But --
10 Q      I'm asking what you are aware of.
11 A      I'm aware that there was constant rumor and
12 innuendo in Montgomery about the circumstances of my
13 departure from Legal Services.
14        Mr. Vreeland, when you have a forum in the
15 mayor's race, and the question that's posed to the
16 candidacy is:  "What have you been doing in the last
17 two years?"  And when I get up, the room bursts into
18 the laughter, and people start to snicker, I think it's
19 save to say that they've heard something.
20        That is sort of normally not considered a
21 gotcha question.  And I was the only candidate I
22 believe that there was laughter and snickering in the
23 room as to the question "What you have been doing the
24 last two years?"
25        So, again, if you are asking me if I can

Page 92

1  prove the moment, time, and place that the suspension
2  document was shared, it's impossible for me to do that
3  because your clients candidly have not been candid
4  about straightforward questions about who they shared
5  documents with.
6        It is remarkable about the two individual
7  clients in this case, Ms. Battle and Mr. Smith, claim
8  they have -- either have never or have no recollection
9  of discussing the circumstances of my departure with
10 any human being.
11        I find that impossible to believe.  I simply
12 do not believe it.
13 Q      With -- well, let's talk about the
14 defamation claim.  With regard to Mr. Smith, what are
15 you claiming he communicated that defamed you?
16 A      Well, I have sued the organization for
17 implicitly condoning the release of the documents that
18 contains defamatory information about me.  And that's
19 the suspension document.  That document contains -- and
20 the accompanying board resolution, which more or less
21 mimics that document -- contains very specific
22 representations that I spent funds in an inappropriate
23 manner.  That I spent funds on inappropriate
24 activities.  That I spent funds excessively.  That I
25 created a hostile environment.  That I instituted

Page 93
1  proposals without having adequate authority within the
2  program.
3        I don't know about your world, but in my
4  world, when someone says that you have misspent funds
5  and created hostile environment, those are very
6  damaging allegations.  Those are very damaging
7  allegations.  And I would submit that if you had any
8  individual who was publicly accused of misspending
9  funds and creating a hostile environment, that it would
10 be extremely damaging to that person's reputation.
11       The suspension document contains claims that
12 as I have laid out in the complaint are false.  That
13 were deliberately framed to be detrimental to my
14 reputation, to be detrimental to me professionally and
15 politically.  That's the only conclusion I can reach
16 when someone chooses to say that you did things they
17 know for a fact that you did not do.  I believe that
18 the whole suspension document was frame with the goal
19 of damaging me politically.
20       So Mr. Smith would have been a part of that
21 process.  Mr. Smith was the vice chair of the board.
22       When I was presented the suspension notice,
23 LaVeeda Battle and Alex Smith met me in the parking lot
24 and handed me the document.  At that time -- I have no
25 idea who is what now -- but at that time, Battle was

Page 94
1  chair, and Smith was vice chair.  So Mr. Smith, acting
2  in his capacity as vice chair, would have participated
3  in that defamation.
4        I will also mention the point earlier that
5  Jones made it clear in the selection process Smith made
6  his own views about me very clear.  And that he
7  constantly made references to politics.
8        So if you are asking me if I believe that
9  someone who constantly raised political concerns and
10 had made a point of saying he had not been a political
11 supporter and had made a point of saying that he was
12 concerned about quote, unquote, rehabilitating my
13 political career, the idea that that individual would
14 not have shared a document that was highly damaging to
15 me, over the course of the last two years, I find that
16 flatout inconceivable.
17 Q     Are you aware of any specific incident in
18 which Mr. Smith communicated the allegations outside
19 the organization, the Legal Services organization?
20 A     I will give you the same answer I gave with
21 respect with Ms. Battle.
22 Q     That you believe it's inconceivable?
23 A     Yes.
24 Q     I'm asking if you're aware of any --
25 A     Give the same answer because of the

Page 95
1  deliberately unresponsive nature of the responses -- of
2  the deliberately unresponsive nature of the discovery
3  responses, I can't give you date, time, and place.
4  Q     Why did you resign?
5  A     It was very clear to me when I read the
6  document of suspension that every single element was
7  false.  When you realize an organization has removed
8  you because of things that are demonstrably false, you
9  have no reason whatsoever to think that you are going
10 to get a fair shake from any investigative process.
11       If the suspension document had been vague,
12 if it had been something to the effect that we have
13 received serious concerns about your leadership as
14 executive director, and we feel the need to suspend you
15 until we investigate, I would have viewed that as
16 something that was worth contesting.  But when someone
17 takes the trouble to lay out in great detail a set of
18 claims, chapter and verse, and every single one of them
19 is false, that tells me all I need to know about the
20 good faith or bad faith of the people I'm dealing with.
21       Mr. Vreeland, I remind you that one of the
22 claims in the suspension document was that I had not
23 informed the board about initiatives.  A few weeks
24 earlier, we had had a board meeting where we had spent
25 a solid hour discussing every initiative in the

Page 96
1  program.  I submitted monthly reports, and I'm sure you
2  have reviewed in detail every initiative in the
3  program.  For an organization that has received those
4  documents and sat through that briefing to then claim
5  to be unaware, that was clear to me there wasn't just a
6  matter of a rush to judgment.  This was a matter of, we
7  know we are lying, but we are going to do it anyway.
8  Want you to look as bad as you can.
9        When the document suspending me made the
10 claim that I had taken steps that were financially
11 detrimental to the organization, and we had a monthly
12 call with the finance committee and a monthly report
13 that literally had a place within the accounting
14 document to describe every single variance from
15 projected budget expenses to where we were, and when we
16 were actually performing under budget -- when you
17 realize that you are performing under budget, spending
18 less money than you are expected to spend, and a
19 document is generated saying you are spending excessive
20 funds, you don't view that as something that we can
21 kind of clear up if we have a chance to sit down and
22 talk about it.  You view it as a lie.
23       And when you receive a document that
24 contains a set of baldfaced lies, at that point, it was
25 very clear to me, there was no fairness or justice to



ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
97–100

Page 97

1  me in this process.  I knew what their end game was:
2  For there to be a lengthy period where I am under
3  investigation but under a gag order.  And then at the
4  end of that period, for them to announce that after a
5  lengthy investigation, we have terminated Artur Davis.
6       I knew what their game was, and I wasn't
7  going to play that game.  I knew that for my
8  reputational purposes, I had to separate myself from
9  that program so that I could defend myself.
10      It was also clear when I saw that document
11 that they were lying.  And you don't trust people that
12 make it clear they're prepared to lie.
13 Q      Is that the end?
14 A      Yes.
15      I should add one other thing that I think is
16 responsive.  May not be in the record.  The day that
17 I was removed as executive director of Legal Services,
18 which was Friday August 18th, I had occasion to make a
19 phone call to Bobby Segall.  Bobby Segall, as you
20 probably know, is a very well-respected member of the
21 Montgomery Bar, former president of the Alabama State
22 Bar, leading figure at the firm Copeland Franco.
23      It was very clear to me that conditions at
24 Legal Services were rapidly deteriorating.  I called
25 Bobby Segall because I knew he had been on the board.

Page 98

1  And I knew that he was part of the community that was a
2  stakeholder in Legal Services.
3       Segall said to me at the very beginning of
4  the call, I think I know what you are calling about.
5  And I said, well, Bobby, do you?  And he said, yeah,
6  they called me yesterday, and they are trying to
7  suspend you.  And they asked me if I would lead the
8  investigation.  And he said, I told these folks that
9  everything I have heard says you have been a great
10 executive director; that they need to really take their
11 time and think about this; that they need to call the
12 full board in session.  And they need to give you a
13 chance to answer whatever it is that they are claiming
14 is going on.  I told them that I did not feel
15 comfortable based on what they told me of moving
16 forward.  That I did not view the complaints as such
17 that I wanted to get involved in this.  But you need to
18 hire a lawyer because they are planning to suspend you.
19      Now, that's meaningful, Mr. Vreeland,
20 because there is a representation that's been made by
21 LaVeeda Battle that the decision to suspend me was made
22 after a conference call the morning of August 18th.
23 There was a representation somewhere in her various
24 representations that it was clear from that call that
25 I was not going to respect the board's authority over

Page 99

1  personnel disputes, and that they had decided that they
2  had to remove me.
3       Bobby Segall received a call the day before.
4  Was told that I was going to be suspended.  And he was
5  asked to lead the internal investigation.  There were
6  so many things that contradict LaVeeda Battle and
7  Jones -- a Bible out here, or at least a book in the
8  Bible.  But I do want to make sure the record at least
9  contains that.  That is yet another representation that
10 Battle made that can be contradicted by a witness in
11 this case.  Her claim that the decision was made after
12 a call.  Well, a very prominent attorney in this city
13 says that he was called the day before that call
14 occurred and told that I was going to be suspended.
15 Q      Did Bobby Segall tell you who called him
16 with that request?
17 A      He did not.  But LaVeeda Battle was
18 president of the board.  So I will let me make the
19 inference.
20 Q      Let me show I what I have marked for
21 purposes of identification as Defendant's Exhibit 5.
22 A      Okay.
23      (Whereupon, Defendant's Exhibit 5
24      was marked for identification and
25      is attached hereto).

Page 100

1  BY MR. VREELAND:
2  Q      An E-mail chain.  The second page appears to
3  start with an e-mail from you to Phil Mitchell.
4  A      Yes, that's correct.
5  Q      Then does it say you are seriously
6  considering departing Legal Services of Alabama?
7  A      Yes.
8  Q      And this is on August 17?
9  A      Yes.
10 Q      First of all, do you recognize the e-mail?
11 A      I do.
12 Q      And why are you advising Mr. Mitchell on
13 August 17th that you were considering leaving?
14 A      Thank you for giving me the chance to talk
15 about this because I know it came up in Mitchell's
16 deposition.
17      If I recall correctly, this would have been
18 the day after the incident with LaVeeda Battle -- with
19 Sylvia Mason.  Without taking you too far into the
20 weeds, Sylvia Mason had had a major temper tantrum in
21 the office.  She was my executive assistant.  Sylvia
22 Mason literally blew up.  Went on a tirade.  Was
23 yelling that she hated me.  She hated Legal Services.
24 Was yelling, I quit, I quit -- I think it was actually,
25 I resign, I resign, I resign.  She stalked out of the



Page 101

1  building.  Walked by a group of lawyers yelling,
2  I resign, I resign, I resign.  I hate it here.
3        She had a history of temperamental behavior.
4  If you read the personnel evaluation of Jimmy Fry, you
5  will see that that was a peer-review section -- there
6  was a peer-reviewed component to the ED evaluation
7  process.  One of the reviews from Eileen Harris of
8  Jimmy Fry was that he had been way to tolerant towards
9  Sylvia Mason's history of temper tantrums in the
10 office.
11        That was the first one I had seen her throw.
12 I have been in the workforce since Judge Thompson hired
13 me in 1993.  That's 26 years.  I have never seen an
14 employee become as belligerent as Sylvia Mason did.
15        Candidly, if she had been a male, I would
16 have been frightened.  I hope that doesn't come across
17 as sexist.  But if she had been -- there was a level of
18 venom there that that if she had been a male, I would
19 believe that she was going to physically attack me.
20 Q       What was she mad about?
21 A       She was mad about the fact -- again, I don't
22 want to take this so far into the weeds that it becomes
23 incomprehensible.  But the program was about to host
24 the president of Legal Services -- Legal Services
25 Corporation, James Sandman.  The state bar, we

Page 102

1  believed, was going to pay for a luncheon for
2  Mr. Sandman and Congresswoman Roby, who was going to
3  attend the session.
4        Well, a week before, I found out that the
5  state bar did not know that it was going to pay for
6  this reception.  So I talked to the guy, who was at
7  that time chief of staff to the president of the state
8  bar.  And I said, we have got a communications problem
9  here.  And he said, yeah, somebody in your office just
10 called here basically asking how many seats we were
11 covering and wanting to make sure that we had all the
12 names and all of seats.  And we didn't know we were
13 covering anything.
14        That's a problem.
15        So I said to him, well, do you know who
16 called?  And he said, I'm just told it was a lady in
17 your office.  I said, can you find out who the lady
18 was?  He said, hold on a second.  Then he got back.
19 Lady in your office.  I think it was a black lady.
20        Well, my first thought was Jaffe Pickett
21 because she had been involved with the process of
22 preparing for this event.  I picked up the phone,
23 called Jaffe.  Said, Jaffe, by any chance, have you
24 called anybody at the state bar about the reception?
25 She said, no, I absolutely did not.  Okay.  Fair

Page 103

1  enough.
2        I literally went through the process of
3  asking every black female in the central office who was
4  working on any aspect of this program if they had
5  called the state bar.  That was five people.  Four of
6  them said, no, it wasn't me.  Okay.  Sorry I asked.
7        The only person who took umbrage was Sylvia
8  Mason.  Sylvia Mason, first of all, hid for about an
9  hour when she heard that I was making the calls.  And
10 we literally could not find her.  You don't realize how
11 big the building is until you are looking for somebody
12 who is ducking you.
13        When we finally found Sylvia Mason -- by
14 that time, we actually found her in the hallway.  So
15 Charlotte Rand walked her into my office.  And I said,
16 Sylvia, by any chance did you call the state bar about
17 the reception next week?  And I used exactly the tone
18 I just used with you.  She immediately started to shake
19 and said, I am tired of being blamed for everything
20 around here.  I am tired of this bullshit.
21        Pardon my language.
22        No, she said with great force.  Stormed out.
23 Her office was next to mine.  Slammed the door.  And
24 I could hear her going, I hate you, I hate you, I hate
25 you in that tone.  And then that shifted to, I hate it

Page 104

1  here.  I don't want to be here anymore.  Then that
2  shifted to the walking out the door and storming down
3  the hall; I hate it here.  I resign, I resign, I
4  resign.
5        I felt that is the single most
6  unprofessional bit of conduct I have ever personally
7  observed.  I knew that if I didn't take some step to
8  address that, I had nobody but myself to blame for the
9  deterioration going forward.
10        So I sent Sylvia Mason an e-mail saying,
11 Sylvia, I have no choice but to put you on
12 administrative leave.  Please do not come in to work
13 the next two days.  You are on paid leave the next two
14 days.  Your conduct today was unacceptable.
15        I sent an e-mail to LaVeeda Battle because
16 I knew they were personally close friends.  I sent an
17 e-mail to Yvonne Saxon, the personnel head, because I
18 knew they were personal friends.  So, honestly, I did
19 that just to advise them I had to do something that I
20 wish I hadn't had to do regarding a friend of yours.
21        The response from LaVeeda Battle I initially
22 thought was very encouraging.  In the e-mail I sent to
23 Battle, I said, LaVeeda, hate that this happened.  But
24 Sylvia just lost it today.  Had this incredible temper
25 tantrum.  Stormed out of the office.  Did it in front



Page 105

1 of several lawyers. Just unacceptable behavior. I put
2 her on leave for two days. I also have to tell you,
3 I'm not comfortable with her being my secretary going
4 forward. I have met with Jaffe and Charlotte this
5 afternoon after the tantrum. I think what I am going
6 to need to do is to reassign her to be Jaffe's
7 assistant. I am going to take this other person who is
8 sort of a catchall assistant and make her my executive
9 assistant.
10      So I'm going to physically move her office
11 to be next to Jaffe's. We are going to basically do
12 that.
13      Again, hate to have to put this on your
14 plate. We're trying to get ready for a big event.
15 LaVeeda's response was, this is really
16 unfortunate. Could you hold on off moving the offices
17 until after the reception? Don't want to create any
18 disruption around the reception.
19      I responded, LaVeeda, thank you for the
20 understanding response. I'm happy to do that. She's
21 going to be off for the next two days. We'll just get
22 through the next three days next week and move offices
23 after that. But thank you for your understanding of
24 this matter.
25      Five minutes later, LaVeeda's response was,

Page 106

1 just to make clear, the only thing I'm agreeing with is
2 waiting until next week.
3      That response and the terseness of it made
4 it very clear that I had mistakenly construed her
5 initial response as supportive.
6      I e-mailed Yvonne Saxon. Yvonne Saxon's
7 response was, I can't discuss this with you because if
8 Sylvia raises a complaint, I would hear it as the head
9 of the personnel committee.
10      Well, it became very clear to me that these
11 two individuals were possibly prepared to rescind the
12 actions I had taken with Mason. And I don't mind
13 telling you, Mr. Vreeland, I don't see how anybody
14 could be an effective executive director or effective
15 manager of any organizations if you can't discipline an
16 assistant who says they hate you and throws a temper
17 tantrum in front of other people in the office. Pretty
18 sure Lehr Middlebrooks doesn't run that way. I've
19 never been in an organization that runs that way.
20      I discussed it with Charlotte Rand, the
21 operations director. I also discussed with her
22 something else. I said, Charlotte, the way Jaffe is
23 acting, the way Sylvia is acting, people don't act the
24 way these folks have been acting unless they think they
25 have impunity.

Page 107

1      THE WITNESS: I-M-P-U-N-I-T-Y.
2 A      Unless they think that they are protected in
3 some way. I think they have gone to the board, or they
4 have at least gone to Battle. And if that's the case,
5 this program may decide it wants to have two executive
6 directors, but I'm not going to be one of them. I'm
7 not going to co-run this program with Jaffe Pickett.
8      It was very clear by Thursday that we were
9 dealing with a climate of deliberate insubordination
10 and a climate where a group of people in the office had
11 decided that essentially they did not have to respect
12 my leadership of the program. I knew I could not
13 function in that manner. Phil Mitchell had run the
14 search committee. So out of courtesy to Phil because
15 I felt we had a good, cordial relationship, limited
16 though it had been -- we had barely talked to each
17 other in nine months -- I attempted to call him to
18 share with him the deterioration that was going on.
19 Phil ignored all of my phone calls. My recollection is
20 I called him four times.
21      So at 2:10, I felt that I needed to send him
22 something that might get his attention; that I was
23 considering departing Legal Services of Alabama.
24 Forty-five minutes later he responded by saying, let's
25 have a conference call tomorrow.

Page 108

1      Now, mind you, at no point was I told that
2 there had been a complaint against me by anyone. When
3 that called occurred the next morning, I believed the
4 only purpose of that call was to discuss the incident
5 with Sylvia Mason.
6 Q      Let me stop you here. Who was on the call?
7 A      Me, Alex Smith, LaVeeda Battle in their
8 capacity as vice chair and chair. The rest of the
9 executive committee; Phil Mitchell, George Craig, and
10 Yvonne Saxon.
11      Notably, the only African American male on
12 the executive committee, Reverend BJ Richardson, was
13 not present. He had told them apparently -- based on a
14 conversation I had with Ann Brown, who talked with him,
15 he had told Ann Brown that he had a funeral that
16 morning.
17      Magically, they decided to schedule a call
18 at a time when they knew that Reverend Richardson was
19 preaching a funeral.
20      So we get on the call. I started by
21 discussing, in the same tone I'm using with you right
22 now, what I felt was some ambiguity in different
23 versions of the personnel manual over who had ultimate
24 authority over disciplining an employee. I did think
25 there was some ambiguity in one of the drafts of the



ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
109–112

Page 109

1    personnel manual as to whether the board had any review
2    authority or not.
3         So I had taken the trouble of writing a
4    lengthy memo the night before discussing the elements
5    of the handbook relevant to the question of whether the
6    board can second-guess a disciplinary decision. I knew
7    that the board could hear a complaint about the
8    executive director. That is a very different question
9    to whether the Board has authority to second-guess an
10   executive director's decision to terminate or suspend.
11        So I laid out what the ambiguities were, in
12   I thought very lawyerly way. And I said, but at the
13   end of the day, I am happy to work with however you all
14   want to interpret this. If there is some kind of
15   complaint by Sylvia Mason eventually, I'm happy to work
16   through that process. And I'm happy to -- but I thank
17   you all for giving us the chance to have a discussion.
18        And, frankly, if we had had a discussion,
19   I would have then raised the broader issues of the
20   deterioration of the work climate involving Pickett and
21   involving Mason and Graham.
22        So after I made my piece -- I spoke for
23   about five minutes. There was silence. I asked Yvonne
24   Saxon, the personnel chair, I said, Yvonne, may I ask
25   you a question: Can you tell me if there has been an

Page 110

1    incidence of the board ever or the personnel committee
2    ever reviewing a termination or suspension decision by
3    the executive director? Has that ever happened before?
4    LaVeeda Battle jumped in and said, I'm going to
5    instruct her not to answer that question. And I said,
6    well, do any of you have any questions of me? Silence.
7         And I said, well, this is concerning to me,
8    folks. I think I said "folks." I find it interesting
9    that we started this call with LaVeeda in a very formal
10   way saying that we have our executive director, Artur
11   Davis, on the line, and we have the following people on
12   the line, and the call is being recorded. I find it
13   interesting that all of a sudden this call has switched
14   to Mr. Davis instead of Artur. And I find it
15   interesting that when I ask a question, one of you is
16   being instructed not to answer it. That's something
17   that's a real concern to me when I look at the
18   relationship between myself as executive director and
19   this group of people who are the executive committee.
20   And I sincerely hope that we can move past this because
21   we have had such great success in this program. And
22   I would hate for it to be derailed over a few folks who
23   are unhappy with their role in this office.
24        No response.
25        I was then told by LaVeeda Battle that

Page 111

1    I would receive a response. And I said, will I have an
2    opportunity to respond to the response? Pause. She
3    said, yes, certainly. So I said, well, I will eagerly
4    await your response to this call.
5         And I called Bobby Segall after that. Not
6    immediately, but shortly after that.
7         So I mention all that, Mr. Vreeland, because
8    it's remarkable to me, again, whether or not the people
9    you are dealing with are acting in good or bad faith is
10   always relevant when you are deciding how to proceed
11   with folks. If the people you represent were acting in
12   any measure of good faith, that call would have been
13   the time to say, Davis, we have to inform you that
14   there have been concerns that have been raised from
15   several quarters about your leadership. And we think
16   they are serious concerns. We do want to give you a
17   chance to respond to them. And we're weighing how to
18   do that and how to go forward.
19        It would have been entirely appropriate for
20   them to say, we're going to ask you to basically take a
21   week off. Nobody has to know why you are doing it for
22   us to essentially schedule a meeting with you and a
23   meeting with the others. They would have been
24   perfectly within their rights to do that.
25        It would have been perfectly within their

Page 112

1    rights to actually say to me, Mr. Vreeland, you know
2    what, Mr. Davis, we've decided we like them, and we
3    don't like you, and we're removing you. Would have
4    been in their rights to do that.
5         What they are not in their rights to do was
6    to generate a suspension document that contained a set
7    of fabricated claims that had the immediate effect of
8    destroying my reputation beginning that day.
9         That's ultimately what this lawsuit is
10   about. They have the right to remove as executive
11   director. They didn't have a right to do it in an
12   unlawful manner. They didn't have the right to suspend
13   me over complaints from two people when they had taken
14   no action against Eileen Harris for putatively the same
15   behavior; creating a hostile environment.
16        If you want to accept Jaffe Pickett, Sylvia
17   Mason, and Dorothy Graham's representations that my
18   actions toward them constituted a hostile environment,
19   that would still be on par with the very specific
20   claims about Eileen Harris. No action was taken
21   against Harris. Nothing was done to damage her
22   reputation. Nothing was done to damage her financial
23   standing.
24        I was treated very differently. I don't
25   think the law allows that.



ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
113–116

Page 113

1              (Whereupon, Defendant's Exhibit 7
2        was marked for identification and
3        is attached hereto.)
4  BY MR. VREELAND
5  Q       You mentioned in there that you had sent a
6  memo explaining your analysis, I guess, of the
7  executive director's authority in terms of personnel
8  decisions.
9         I'm showing you what's been marked for
10  purposes of identification as Defendant's Exhibit 7.
11  Is that the e-mail or memo you are referring to?
12        MR. MENDELSOHN:  Did I miss 6?
13        MR. VREELAND:  I haven't done it yet.
14        MR. MENDELSOHN:  I thought I missed it.
15        MR. VREELAND:  I'm capable of it.
16        MR. MENDELSOHN:  I thought I missed part of
17  the deposition.
18  A     This appears to be the document that I sent
19  to the executive committee and Yvonne Saxon.  I would
20  have drafted this on the evening of August 17th.
21  I would have sent it out on the same evening of
22  August 17th.
23        And, yes, I agree with your characterization
24  of it.  Exhibit 7 contains a fairly detailed analysis
25  of the relevant provisions with respect to an executive

Page 114

1  director's authority in dealing with personnel.
2              (Whereupon, Defendant's Exhibit 6
3        was marked for identification and
4        is attached hereto.)
5  BY MR. VREELAND
6  Q       Let me show you what I am marking for
7  purposes of identification as Defendant's Exhibit 6.
8        MR. MENDELSOHN:  Thank you.
9  A     This is an e-mail that was sent on the
10  afternoon of August 17th.  Shortly after Phil Mitchell
11  informed me that there was a wish to have a call with
12  the executive committee.
13        I will note the context of Exhibit 6 is that
14  Battle had been ignoring calls from me.  And Mitchell
15  had been ignoring calls from me.
16        So, again, the document speaks for itself.
17  But my purpose in sending this -- I had actually
18  forgotten about it until you put it in front of me --
19  my purpose in sending this was to point to, again, the
20  earmarks of a badly frayed relationship.  The need to
21  convert an informal engagement between the ED and the
22  board to a formal conference call struck me as an
23  earmark to a fraying relationship.
24        And there is a reference -- frankly,
25  I believe that the issue, quote, unquote was Sylvia

Page 115

1  Mason.  I was not aware at that time that Jaffe Pickett
2  had made a complaint.  Intuitively, I believed it was
3  likely.  But at that moment, I didn't know it.
4         I was pretty sure Sylvia Mason had made a
5  complaint after she got suspended.  Again, intuitively,
6  I was pretty certain of that.  And I believe that was
7  the precipitating event that was causing this lack of
8  response from Mitchell and from Battle as they were
9  trying to figure out what to do.
10  Q       When you were executive director, at any
11  point, did you or someone at your direction access
12  Jaffe Pickett's e-mail account to read her e-mails?
13  A     On August 18th -- I know this is something
14  that's come up, so I'm going to give you a fully
15  responsive answer.  On August 18th, after the
16  conference call that morning that we just talked about,
17  Charlotte Rand walked in my office and said, I can't
18  tell you how I know this, and I don't want to tell you
19  who I'm getting it from, but Jaffe's complained to the
20  board.  And I said, surprise, surprise.  How do you
21  know that?  I don't recall the specific words that she
22  used, but it was very clear to me that someone -- from
23  her answer, one of the two IT people, Tommy Hayes or
24  Jessica Hathcock, had accessed Jaffe Pickett's Legal
25  Services account and shared that with Charlotte Rand.

Page 116

1         I didn't direct in advance that that
2  happened.  Charlotte Rand did not direct in advance
3  than that happened.  For whatever reason, that was
4  something -- or at least, I don't think that she did.
5  I didn't tell her to.  She didn't say that she did.
6  And we never discussed doing that.
7         I said, do you have a copy of it?  And she
8  showed me a set of -- a set of printed out pages that
9  clearly was not a unified, coherent document.  There
10  were big spaces.  There were logical gaps.  It looked
11  cut and pasted as if someone had cut portions of a
12  document from some other document.
13        Start that over.  Someone had cut sections
14  from a document and pasted it in yet another document.
15        It was clear that it was Jaffe Pickett
16  complaining about various things that I had done as
17  executive director, almost all of which ended up being
18  mimicked with the exception of hostile environment.
19  She never used that term.  Made no reference to that,
20  to anything that would constitute a hostile
21  environment.  But all of the other elements of the
22  suspension document sort of ended up lining up with
23  what Jaffe Pickett's complaint had looked like.
24        It was clearly a draft.  Earlier we had back
25  and forth on what the word "draft" means.  It was not

ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
117—120

Page 117

1   messaged to anyone.  Again, it was sections of a
2   document that had been cut and pasted elsewhere.
3          But the only way these individuals could
4   have obtained it would have been if it was Jaffe
5   Pickett's account.
6          So it was very clear at that point --
7   remember, I shared with you that a daily earlier I had
8   had a conversation with Charlotte Rand if these
9   individuals are acting with impunity, it means they had
10  reason to.  And I bet they have complained to the
11  board.
12         It was very clear to me that that intuition
13  was correct at that point.  I picked up the phone.
14  Called Jaffe Pickett.  She did not answer.  I asked
15  Charlotte to go knock on her do.  Charlotte came back
16  and said, Jaffe's door is locked.  Car is outside.  But
17  appears she is locked up in her office.
18         So I said, you know what, let's not even
19  have another conversation with her today; you or me.
20  I think it's clear where this is going.
21         Half an hour, 45 minutes later, she walked
22  in and said, by the way, Sylvia has been communicating
23  with Battle and Saxon, too.  I said, well, I find that
24  very interesting when Saxon told me last night she
25  couldn't respond to my e-mail because she couldn't

Page 118

1   communicate unilaterally with one party in a potential
2   dispute.  And Rand literally rolled her eyes and said,
3   well, that's not the policy she's taking with Yvonne
4   Saxon should we say.
5          I did not see those e-mails.
6          Was given a copy of the --
7   Q       You did not see --
8   A       The Mason e-mails.
9   Q       -- Mason e-mails?  You saw --
10  A       Yes.
11  Q       You physically saw the Pickett e-mails?
12  A       Well, I saw the document that had been
13  retrieved from Picket's account.
14  Q       Okay.
15  A       It was not clear from the presentation of
16  that document that it had been e-mailed to anybody.
17  Q       Okay.
18  A       So at that time, we did entertain the
19  possibility that she had actually written it but not
20  sent it; that it was a draft.  We did entertain the
21  possibility because there was no "to" anybody.  It was
22  not even on -- in a signature format.  It clearly was
23  cut sections of a document pasted into another
24  document.  It appeared to be someone's effort to
25  organize their thoughts if they were drafting a

Page 119

1   complaint.
2          So we did entertain the possibility in
3   conversation that Jaffe had not sent it.  Later on that
4   evening when I had a chance to review the suspension
5   document, I could literally almost line up portions of
6   what Pickett said to what they said.
7          The notable difference was at no point in
8   her document did Pickett suggest there had been a
9   hostile environment.  At no point did Pickett suggest
10  there had been anything that might constitute a hostile
11  environment.  She didn't use the term.  She made no
12  reference to demeaning, belittling behavior.  She just
13  complained that all of a sudden her grants had to be
14  reviewed.
15         So that is when I saw the document that
16  eventually we learned when we sat across this table,
17  I learned for the first time that Jaffe Pickett
18  actually -- well, beyond intuition, it was confirmed --
19  well, actually, it wasn't across this table.  Across
20  this table, she said that she didn't remember the
21  document.  It didn't look like something she sent.
22         That afternoon, I got an e-mail from
23  Mr. Mendelsohn from you saying, oh, by the way,
24  Ms. Pickett has just given me a copy of this document.
25         And I appreciate the position you were in.

Page 120

1   I have been a lawyer.  And I've once been in that
2   position, myself.  It's not a good position.
3          But I recall Jaffe Pickett sitting right
4   here when handed the excerpts of that document saying,
5   none of this looks like what I wrote.  I don't think
6   I sent this.  I don't think this is me.
7          A few hours later, the formal, collected,
8   organized version of that document from Jaffe Pickett
9   to Phil Mitchell and LaVeeda Battle.  A few hours after
10  saying that she didn't think she had sent it.
11         I'm just going to leave that at that.
12  Q       Okay.  Did you on that day when you had been
13  looking for Jaffe, and she -- her office was locked,
14  did you speak to her?  Did you ever --
15  A       Never spoke to her.
16  Q       Did you ever have any conversations with
17  Jaffe Pickett about whether she had made a complaint to
18  the board?
19  A       Haven't spoken with Jaffe Pickett since she
20  and Charlotte Rand and I sat down on Wednesday --
21  I think we may have had some brief conversations on the
22  17th.  By my recollection is that on Wednesday, the
23  16th, after Mason's temper tantrum, that the three of
24  us sat down, as we should have -- Pickett is a leader
25  in the organization.  Rand is the HR person in the

ESQUIRE
DEPOSITION SOLUTIONS

ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
121–124

Page 121

1  office. The three of us sat down to analyze and
2  develop a response to Sylvia Mason's temper tantrum.
3  That is the last time I recall speaking to Jaffe Picket
4  of any substance.
5       On Thursday the 17th, I think she hid in her
6  office most of the day. We may have had some limited
7  exchanges about the event that was coming up with the
8  state bar. Pretty perfunctory limited exchanges.
9  Nothing of substance.
10      The 18th, we did not talk at all. And I did
11  not see Jaffe Pickett until she sat across this table
12  for a deposition.
13  Q      Did you ever question her -- I'm not putting
14  any time limitations on this --
15  A      Didn't have --
16  Q      Let me finish.
17  A      The one time I've done that today.
18  Q      Did you ever question Jaffe Pickett about
19  whether she had made any complaints about you to the
20  board?
21  A      Ah. That's a different question than what I
22  thought you would ask. That's why it's good we do it
23  this way.
24      When we had the meeting, there was another
25  meeting that we had. It was that Monday. Pull out a

Page 122

1  calendar, whatever that Monday would have been. I met
2  with Jaffe Pickett and Charlotte Rand. During the
3  course of that meeting, I did suggest to Jaffe Pickett
4  that I believed that she had complained to the board.
5  And I will tell you the context, I told her, Jaffe, I'm
6  dealing with insubordination at this point. That's why
7  Charlotte is sitting here, by the way, in her capacity
8  as HR director, as director of operations. I have to
9  feel I'm dealing with insubordination from you. And
10  that's astonishing to me because I never would have
11  thought that would happen. But I have to say, I think
12  that's what I'm dealing with. And I think that there
13  is something that's emboldening you to do that.
14      And I did say, so -- I did use the phrase to
15  her -- look, we are not going to have two executive
16  directors here. I used the exact tone I'm using with
17  you. I said, and if we do, I won't be one of them. As
18  simple as that.
19      So -- and I did tell her, and I hope you
20  convey that message to whoever you feel you need to
21  convey it to.
22      It was a lengthy meeting. Charlotte Rand
23  and I mistakenly felt that the meeting was a positive
24  turning point. Because that stretch I just described
25  for you was the lowlight of the meeting. But we met

Page 123

1  for another 45 minute after that. We felt -- Rand
2  I felt by the end of that two-hour meeting -- which
3  took place after hours, about 5:30 to 7:30 -- we felt
4  that maybe we had stabilized this free fall. And that
5  maybe things were going to get better.
6  Q      When you said that you thought you were
7  dealing with insubordination, what were you referring
8  to?
9  A      Things I referred to earlier. Applying for
10  grants I specifically told her not to apply for. That
11  had happened on three occasions. I think I recounted
12  two of them. It turned out it happened three times.
13      That may sound like a sort of a minor little
14  thing sitting here two years later. But it's a big
15  deal in the life of a program where a major part of
16  what you do is seek funding and grants. And then once
17  you get the funding, you have got to hire lawyers to do
18  the work. As executive director, I knew the challenges
19  we were finding hiring good quality people.
20  Q      But were you referring to anything other
21  than the grants?
22  A      There had been a pattern of not responding
23  to e-mails. There had been a pattern of -- there had
24  been another meeting that we had with sort of the whole
25  central office staff. During that meeting, been about

Page 124

1  a week or two earlier, Jaffe Pickett had made a show of
2  walking into the meeting, putting her arms forward as
3  I'm looking off to the side, like I am not looking at
4  you. Sort of doing that the whole time I was talking.
5      I have been in the work world since Myron
6  Thompson hired me in 1993. That's the only meeting
7  I have been in where a subordinate literally looked off
8  into the air to make a show of, I'm not even listening
9  to you right now.
10      That's -- the chief finance officer came up
11  to me after that meeting, and he basically -- I hate to
12  joke about this. But if you are a Star Trek fan, you
13  know the "permission to speak freely" that occasionally
14  resorted to on the bridge.
15      My finance officer was a Star Trek fan.
16  I believe he said, permission to speak freely. And we
17  sort of joked about that. I said, sure. Close the
18  door. And he said, I've never been in a meeting like
19  that. I have been CFO in three organizations. I've
20  never been in a meeting like that. I don't know what's
21  going on here.
22      I became concerned he was going to leave.
23  So we did have a discussion about that.
24  Q      In the after-hours meeting with Picket, did
25  you tell her that if she went to the board you would



ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
125–128

Page 125

1  find out about it?
2  A       No, I would not have used those terms.
3  I don't recall saying that.  That strikes me as
4  unlikely that I would have said that.
5        I certainly may have said, I think you have
6  already gone to them.  May very well have said that.
7        And I will give you some more context.  That
8  meeting I mentioned had highlights and lowlights.
9  Beginning of the meeting, Jaffe Pickett informed me she
10 did not feel comfortable with Charlotte Rand being
11 present.  And I said, well -- frankly, I had decided
12 that I was not going to meet with Jaffe Pickett alone
13 at that point.
14        So I said, well, Jaffe, Charlotte is here as
15 operations director.  And Jaffe Picket made the
16 comment, no, she is here as your supporter.  And I
17 said, well, I don't know what you mean by that.  She is
18 here as operations director.  This isn't a political
19 contest.  She is not here as my supporter.  She is here
20 as operations director.
21        It was a meeting -- there is no question, it
22 was a contentious meeting.  There were very contentious
23 moments during the meeting.
24        During the meeting, Charlotte -- Jaffe
25 Pickett made the allegation that I was favoring

Page 126

1  Charlotte because she was a white female.  And I told
2  her I found that offensive.  I told her as an African
3  American male, I found that offensive.  And I did ask
4  her, what would even be your basis to say something
5  ridiculous as that?
6        So it was -- now, the tone that I used is
7  the same tone I'm using with you because I'm not a
8  yeller or shouter.  But it was certainly a meeting that
9  was contentious in the sense that it was serious and
10 silent.  And the purpose of that meeting was the
11 rapidly deteriorating environment in the central
12 office.  And the fact that I had a department head who,
13 in effect, seemed to have declared war on me.
14 Q        And by department head you are referring
15 to --
16 A        To Pickett.
17 Q        -- to Pickett?
18        (Whereupon, Defendant's Exhibit 8
19        was marked for identification and
20        is attached hereto.)
21 BY MR. VREELAND
22 Q        Show you what I have marked as Defendant's
23 Exhibit 8 to your deposition.  Do you recall what the
24 content -- first of all, do you recognize the e-mail?
25 A        Yes.  And thank you for providing it because

Page 127

1  it would also been an element of the retaliation.  And
2  it's very important that you have shown it to me
3  because I had forgotten were.
4        Friday August 18th, at 3:07, an e-mail.
5  Since it's short, I'll read it into the Record:
6  "LaVeeda, I find it suspicious that e-mail will not
7  suffice and view this as further deterioration.  I am
8  beginning, sadly, to question your motives and have
9  sought legal counsel."
10        At some point on Friday, Charlotte Rand came
11 back in again and said, oh, and you also need to know
12 that LaVeeda has reached out to ask if the IT
13 department would send her a copy of the organization's
14 letterhead because she doesn't have a peg file that has
15 the letterhead in it.
16        So it was very clear to me that LaVeeda
17 Battle was going to try to address the organization in
18 some way.
19        Also, I had had the conversation with Bobby
20 Segall at this point.  So the impression that I had
21 after the morning conference call was that they were
22 going to e-mail a response to this whole issue of scope
23 of authority to review an ED's suspension decision of
24 an employee.  I expected to get an e-mail.  I expected
25 to respond to it.

Page 128

1        I suspect -- don't fully recall the
2  circumstances of this.  But I suspect that what led me to
3  refer to e-mail not sufficing is my learning that there
4  was going to be some extra communication that was going
5  to happen.
6        I may also have gotten some word from
7  Charlotte Rand that she had heard that they were coming
8  to present me a document.  That's my best memory
9  sitting here; that she had heard somewhere in the
10 office -- at this point, frankly, you can imagine how
11 the rumors are just flying I believe all over the
12 place.
13        So somewhere there was a rumor that they
14 were coming to present me a document.  I had no lawyer
15 for a little while.  I did think it was important to
16 make it clear that I had sought legal counsel.  And
17 were considering legal action if this matter played out
18 in a certain way.
19        So you asked earlier about elements of
20 retaliation.  I put LaVeeda Battle on notice at 3:07 on
21 Friday that I had sought legal counsel.  That happens
22 to be before I was presented with the suspension
23 document.
24 Q        And you thought it important to let
25 Ms. Battle know that you had sought legal counsel



ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
129–132

Page 129

1  because you wanted her to know that you had engaged in
2  protected activity?
3  A       Well, I think, frankly, that it's important
4  for an employer to know when an employee is engaged in
5  protected activity.  And I believe in dealing with
6  people in good faith.
7  Q       Had you engaged an attorney or consulted
8  with an attorney at that point?
9  A       I don't specifically recall whether I had
10  consulted with an attorney.  I do know plenty of
11  attorneys.  So I can't sit here with precision and say
12  to whom I had talked to.
13         I have mentioned earlier that I had talked
14  to Bobby Segall earlier and had the exchanges that
15  I had mentioned.
16              (Whereupon, Defendant's Exhibit 9
17               was marked for identification and
18               is attached hereto.)
19  BY MR. VREELAND
20  Q       Let me show you what I have marked for
21  purposes of identification as Defendant's Exhibit 9.
22  A       Yes, sir.
23  Q       Do you recognize this as the letter that
24  Ms. Battle gave you putting you on leave?
25  A       Yes.  Defendant's 9 is what I have been

Page 130

1  somewhat inelegantly referring to as the suspension
2  notice or suspension document.  Heretofore, it's
3  Exhibit 9.
4  Q       How did you receive Defendant's Exhibit 9?
5  A       LaVeeda Battle and Alex Smith were waiting
6  in a van parked next to my car.  When I left the
7  building, they physically presented it to me, the
8  afternoon of August 18th, 2017.
9  Q       Were you all in the parking lot?
10  A       Yes.
11  Q       Was there a conversation when they presented
12  it to you?
13  A       Very brief.  LaVeeda Battle said to me, in a
14  sort of odd sort of way, but I do remember the exact
15  phrase.  She said, so you're suspended.  Somewhat odd
16  formulation.  So, you're suspended, she said with a
17  little bit a smirk.  And then she said to me, you were
18  told not to move Sylvia's office.  And I said, LaVeeda,
19  what are you -- remember, I hadn't read the document.
20  I literally was handed it.  Had no chance to read it,
21  know what its contents were.  So I said, LaVeeda, we
22  haven't touched Sylvia's office.  We certainly haven't
23  moved the offices.  Is that what this is about?
24         And she said, read the document.
25         It was extremely brief.  It was certainly

Page 131

1  not conversation.  I hadn't had a chance to read the
2  document.  So I didn't know what I was responding to.
3         And I should make this point, while I had
4  seen Jaffe Pickett's document earlier, there was no
5  proof it had been sent.  Some of the things in it were
6  so blatantly ridiculous; some of the things in it were
7  so blatantly disprovable, that I did have some doubt as
8  to whether she had sent it.  Because it would have
9  struck me as a reach to think that they could have
10  acted on something as nebulous as some of the things
11  that she was saying.  I did find it hard to believe
12  that an organization would suspend an executive
13  director because he asked the development director to
14  run grants by him.
15         That struck me as even a reach for people
16  acting under bad faith.  So I did want to review the
17  document.
18         I will tell you very candidly, I just
19  assumed that Ms. Pickett had alleged far worse than she
20  alleged because what she -- what was contained in her
21  notes to herself, whatever it was we were reviewing
22  earlier, struck me as non-explosive, as trivial.  It
23  would have been hard for me to see a board acting based
24  on that.
25         So I candidly wasn't sure what we were

Page 132

1  dealing with, or what I was dealing with.
2         Now, once I got home and read the document,
3  it became very clear what I was dealing with was a
4  board that was more concerned about assassinating my
5  character than resolving this matter.
6         I shouldn't say a board.  Let me actually
7  correct that.  They had not gone to the board.  Later
8  on, it was established, and I don't think it's in
9  dispute, that that issue was not presented to the board
10  of directors.  That the directors, other than the group
11  on the executive committee, had no knowledge of this
12  action.  And, in fact, two board members resigned from
13  Legal Services because they thought it was
14  inappropriate for the board to remove a director -- for
15  a subcommittee of the board to remove a director.  And
16  that they thought the executive committee lacked the
17  authority to do what it did.
18              (Whereupon, Defendant's Exhibit 10
19               was marked for identification and
20               is attached hereto.)
21  BY MR. VREELAND
22  Q       Showing you what's marked for identification
23  purposes as Defendant's Exhibit 10.
24  A       Okay.
25  Q       Do you recognize that as your resignation?

ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
133–136

Page 133

1  A      Yes, I do.

2  Q      Between the time that Ms. Battle and
3  Mr. Smith gave you the letter, which is 9, Defendant's
4  Exhibit 9, and your submission of Defendant's
5  Exhibit 10, did you have any communication with anybody
6  on the board?

7  A      On Friday after I received the suspension,
8  it so happened that my home is only five minutes from
9  Legal Services then and now.  So it didn't take me long
10  to get home.  That afternoon, I sent a message that
11  obviously you would have access to, to the board.
12  Again, no board Listserv.  You have to do as happens in
13  16 -- you have to literally lay out -- what is this --
14  this is -- is this 16?

15  Q      Ten.  Just bad handwriting.

16  A      Oh, my.  Okay.  As you see in Exhibit 10,
17  there is no board Listserv.  You have to literally
18  write out the names of the board members.  I did send
19  an e-mail that night, in effect telling them that
20  I believe you have essentially had an internal coup.
21  I think I may have used that phrase.  That a small
22  group of disaffected people are trying to seize control
23  of the program.  And I did ask the directors to take
24  some steps to reverse this.

25      I did not have any other communication with

Page 134

1  the board until the resignation letter, which is
2  Exhibit 10.

3  Q      And by "small group of disaffected people,"
4  who are you referring to?

5  A      Referring primarily to Pickett and Mason.
6  Can't completely rule out that I didn't have Battle in
7  mind because I did not believe that Battle's response
8  to this was consistent with how the majority of the
9  board would have handled it.  I did not name the
10  individuals, though, so not terribly meaningful or
11  relevant.

12  Q      Did you listen to -- whether just in person
13  or on another extension, any phone calls between Sylvia
14  Mason and LaVeeda Morgan Battle?

15  A      Absolutely not.  Wouldn't have known how to.
16  Now, I did overhear -- that's very different
17  from what you asked about.  There was a point in the
18  Spring of 2017 or it could have either been -- there
19  was only two boards meetings I was there.  March and
20  June.  I can't recall which one.  May have been the
21  June Board meeting.  But I do not recall which one.
22  Mason's office was next to mine.  Mason does not
23  whisper well.  I heard her saying the day before a
24  board meeting -- in fact, you know what; it was June.
25  It absolutely would have been June because of the

Page 135

1  content of the whispering.  I overheard Mason saying to
2  someone, she's not happy at all.  I would suggest that
3  you talk to her yourself because I don't really want to
4  get in the middle of it, but she is not happy at all.

5      I immediately believed that that was a
6  reference to Jaffe Pickett because I knew that Mason
7  was on the phone with Battle.  She said, let me call
8  LaVeeda about this matter that's related to the board
9  meeting.  Should note that Mason is the board
10  secretary.  Most of the call is completely innocuous.
11  Certainly no way problematic.  It was a substantive
12  call.  It was not a problematic call from my
13  standpoint.

14      Then it appeared from trying to reconstruct
15  the conversation from the standpoint of the office next
16  door that Sylvia had said to her, what's wrong with
17  Jaffe?  Or is there something going on I need to know
18  about with Jaffe because there was some something I
19  picked up from her earlier.  And then we shift to the
20  whisper, the not very good whisper, of Sylvia Mason
21  saying that she is very unhappy, but you need to talk
22  to her directly.

23      And then there was something that she did
24  manage to whisper well enough that I could hear it.
25  Not immediately after, at some point after that

Page 136

1  conversation when I was talking to Mason about the
2  board meeting, and we were preparing the agenda, I did
3  say, Sylvia, by the way my preference would be that you
4  not discuss anything that you see as an issue within
5  the office with LaVeeda as opposed to talking about it
6  to me.  That would be my preference.  And she said, you
7  must have overheard me.  And I said, not a big deal.
8  And she made some observation that LaVeeda and I have
9  been friends for a long time.  And I said, fully
10  understood.  I said all I needed to say.  And hope you
11  will take it into account.  And I did it again with the
12  same tone I just used with you.

13      But if you are asking if I listened in to a
14  phone call, absolutely not.

15  Q      Did you listen to any of the teleconferences
16  in which the board discussed Judge Boyd's findings, or
17  Judge Boyd presented her findings?

18  A      Absolutely not.

19      (Whereupon, Defendant's Exhibit 11
20      was marked for identification and
21      is attached hereto).

22  BY MR. VREELAND:

23  Q      Let me show you what I am marking as
24  Defendant's Exhibit 11.  Do you recognize that as one
25  of the EEOC charges that you filed in this case?



Page 137

1  A      Yes, I do.

2  Q      Did you draft this?

3  A      Yes.

4        The point Defendant's Exhibit 11 was

5  created, I was not represented by counsel.

6  Q      In it, you refer to issues with the prior

7  executive director, Jimmy Fry.  How are you aware of

8  those?

9  A      Are you referring to -- help me out and tell

10 me what paragraph you are --

11 Q      The second paragraph.  It begins, "There

12 were a myriad of problems at LSA under Fry's watch."

13 A      Okay.  I'm sorry.  I was missing page 1, but

14 I see it.

15        Yes.

16 Q      It says "Fry was the subject of internal

17 concerns that he made sexually inappropriate comments

18 to at least two female staffers."

19 A      The source of that observation was Jaffe

20 Pickett and Ann Brown.

21 Q      And what did they tell you he had said to

22 the two female staffers?

23 A      Ann Brown, the managing attorney in Mobile,

24 said that one of her attorneys had complained that

25 Jimmy Fry had made what she viewed as sexually

Page 138

1  suggestive comments.  Jimmy Fry would often work out of

2  the Mobile office because he actually lived in Baldwin

3  County.

4        So he would drive up to Montgomery during

5  the week.  And then on the weekends, he would drive

6  back to Baldwin County.  Often on Friday work out of

7  the Mobile office.  And they maintained a physical

8  office for him in the Mobile location.

9        So he would have had an occasion to have

10 interacted with the attorneys.  Ann Brown stated to me

11 that Marie Davis, a female attorney in that office, had

12 said that Fry made comments to her that she viewed as

13 being inappropriate and that she had gone to Ann Brown

14 with those concerns.

15        Jaffe Pickett said that Fry had a reputation

16 in the office to the point that female employees would

17 not -- were essentially of the belief you shouldn't

18 ride in the car alone with him.  That there were times

19 he would say he's going to an event, and he would ask

20 female staffers, well, why don't you just ride with me.

21        Pickett said that on several occasions she

22 had ridden with Fry, and he had made comments that she

23 thought were unbecoming.  That he had commented on how

24 he wasn't sure he was going to be able to make it down

25 the road with her wearing a dress like that.

Page 139

1  That on another occasion that he had made a

2  comment that is odd, but she took as being offensive,

3  that she looked like a flight attendant.

4  Q      Did Ann Brown tell you what the comments

5  were that he had made to the Mobile staffer?

6  A      I don't recall if she told me what they

7  specifically were, no.

8  Q      You also state that he was placed, in

9  quotes, on probation for at least two years.  How were

10 you aware of that?

11 A      Jaffe Pickett.

12 Q      Did anybody else tell you that?

13 A      Sylvia Mason may have alluded to it as well.

14        Just to be crystal clear, Mr. Vreeland,

15 Jaffe Pickett was very talkative about the history of

16 Legal Services.  Jaffe Pickett was the sort of person

17 who talked about other people a lot.  We all have those

18 in our offices sometimes.  She liked sharing negative

19 information about people.  She liked sharing negative

20 information about other members of the leadership.  And

21 she did that beginning with the very first conversation

22 that we had on December -- that December day what I was

23 selected, pretty much all of the way through the course

24 of our interaction.  She was one who was regularly

25 critical of other people at Legal Services in Alabama.

Page 140

1  She was extremely critical of Jimmy Fry and Elaine

2  Harris.

3        (Whereupon, Defendant's Exhibit 12

4        was marked for identification and

5        is attached hereto).

6  BY MR. VREELAND:

7  Q      Show you what I have marked for

8  identification purposes as Defendant's Exhibit 12.  Do

9  you recognize this as another charge of discrimination

10 that you filed?

11 A      I recognize it as a charge of retaliation.

12 Q      Did you draft this one as well?

13        MR. MENDELSOHN:  What number is this?

14        MR. VREELAND:  The current one is 12.

15        MR. MENDELSOHN:  Okay.  Thanks.

16 BY MR. VREELAND

17 Q      In it, you state that staffers were informed

18 that LSA actually had reason to believe that I posed a

19 physical danger to the building.  How are you aware of

20 that?

21 A      Charlotte Rand told me that the next Monday

22 after my suspension that armed security guards were

23 posted at the building.

24 Q      But how about the staffers being informed

25 that they had -- actually had reason to believe I posed



Page 141

1  a physical danger?

2  A      What specific sentence are you referring to?

3  Q      If you look at the Bates 10, top of the
4  page, about four lines down.

5  A      I see.  "A security guard was placed at
6  central office, and staffers were informed that LSA
7  actually had reason to believe I posed a physical
8  danger."

9       Well, I will tell you that I drafted this at
10 a time much closer to events than today.
11 October 4th, 2017 was when they received it.  And,
12 apparently, I signed it October 2nd.  So I'm very
13 confident that what I said on October 2nd was more
14 inclusive than anything I could recall today.

15      October 2nd would have been a few months
16 after these events.  So I would very much defer to what
17 I say --

18 Q      Well, my question is:  How are you aware of
19 it?  If you don't recall --

20 A      Oh, Charlotte Rand.

21 Q      Charlotte Rand is the one that told you
22 about the staffer --

23 A      Possibly Gary Gilmore, the chief financial
24 officer, did as well.  But, certainly, Charlotte Rand
25 did.

Page 142

1       I was physically barred from coming to the
2  office and was told that I was physically precluded
3  from coming to the office when I was handed the
4  suspension documents.  I would have no way to see or
5  observe anything.  I have not been to that office since
6  the afternoon I was suspended.

7  Q      Down, at the bottom, last paragraph, it
8  says, "A female staffer conveyed to me --

9  A      Which Bates Stamp?

10 Q      Ten.  Same page.

11 A      Okay.  Okay.

12 Q      Last paragraph, second sentence.  "A female
13 staffer conveyed to me that during the week of
14 August 21st, she was personally confronted about a
15 personal relationship between us."

16      Who is that female staffer?

17 A      Female staffer Desiree Taylor sent an e-mail
18 to me, which I thought was a bit odd.  I have no idea
19 if she still works there.  But at the time, she was a
20 communications staffer who worked on press and
21 marketing issues.  She had been hired in February.  And
22 she sent me an e-mail, I believe that was from her
23 Legal Services account, at some point the next week
24 essentially asking me what's going on.  As frankly a
25 number of people in the program did.  So that was not

Page 143

1  unusual.

2       What made her e-mail a little bit unusual
3  was that she said that -- try to reconstruct this.  She
4  said, I've heard the rumors myself.  And today, I was
5  personally confronted about them.

6       My reading of what she was saying was that
7  someone was spreading rumors of some connection between
8  me and her because I can't imagine what other rumors
9  that anyone would have confronted her about.  She was a
10 very low-level staffer in the office.

11      She was clearly very concerned in the
12 e-mail, and I think very flustered by everything that
13 was going on.  And, again, I will say during that first
14 week, eight, nine, ten people in that program e-mailed
15 me.  She was one of them.  But that was the basis for
16 an observation.

17 Q      Did she indicate who confronted her about
18 rumors?

19 A      She did not.  And to anticipate the obvious
20 question, I did not -- I think I responded to her
21 that -- I'm not even sure that I responded to her
22 because I thought it was an odd message.  I thought it
23 was an odd message, and I didn't think it was
24 productive to engage with her in a back and forth.  So
25 I'm not certain I responded to her at all.  I do not

Page 144

1  remember at all what I said.  But I frankly don't think
2  that I responded to her.

3       I just know -- I'm giving you -- or this
4  particular document contains my interpretation of what
5  she was saying.  She was clearly very flustered.  She
6  said she had heard the rumors herself, and she was
7  confronted about them today.  She did not say who
8  confronted her.

9  Q      Next sentence, "On September 22, an LSA
10 staffer falsely representing that she was my assistant,
11 that I was still an employee of LSA contacted a hotel
12 I had stayed in during a regional director's conference
13 to obtain information about telephone numbers that
14 I called while at the hotel."

15      Who was that LSA staffer that --

16 A      Sylvia Mason.

17 Q      And --

18 A      The reason I know about this, the hotel
19 called me.  And said, Mr. Davis, your secretary just
20 called us from Legal Services and wanted a copy of all
21 expenses, including phone records from when you were at
22 this conference that you attended over the summer.  And
23 I said, well, ma'am, I'm actually not employed at that
24 organization.  I don't currently have a secretary.
25 There was a pause, and she was like, oh, I hope I'm not



ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
145–148

Page 145

1  getting somebody in trouble.  But someone just called
2  said they were your secretary.  And I wanted to verify
3  with you before I sent them the information because I'm
4  not showing that you made any calls on here.  I thought
5  it was a little bit unusual.
6         I wasn't born yesterday, Mr. Vreeland.
7  I know that they were working with David Mowry.  My
8  recollection tells me also this may have been around
9  the time that the Mississippi coach ran into some
10  issues about calling escort services using company
11  credit card.  I've known David Mowry long enough to
12  know that that's the kind of crap and garbage he looks
13  for.  And I'm sure that in their effort to put me in as
14  negative a light as they possibly could, he told them,
15  check and see what phone calls he made at conferences.
16  We might be able to get him for making improper calls
17  and charging it to LSA.
18         I have been around the political business
19  long enough to know how those kind of tactics work.
20  Q       How do you know that it was Sylvia Mason who
21  made the call to the hotel?
22  A       Well, the lady said that she said she was
23  your executive assistant.  I cannot recall sitting here
24  if she said Sylvia Mason.  But I only had one executive
25  assistant.  So that's the basis for my concluding that

Page 146

1  it was Sylvia Mason with a high level of confidence.
2             (Whereupon, Defendant's Exhibit 13
3             was marked for identification and
4             is attached hereto.)
5  BY MR. VREELAND
6  Q       Show you what I have marked for purposes of
7  identification as Defendant's Exhibit 13.  Do you
8  recognize that document?
9  A       I do.
10  Q       Is this a guest article you wrote for
11  AL.com?
12  A       It is.
13  Q       What was the purpose of you drafting or
14  submitting this?
15  A       Well, it was drafted and submitted and
16  published.  All three possibilities.
17  Q       Yeah.
18  A       I drafted this right after my departure from
19  the program because I felt it was very important for me
20  to address a number of rumors that I knew were moving
21  around the community about my departure.
22         Put this in full context, Mr. Vreeland,
23  remember, Legal Services was hosting the head of the
24  national Legal Services program.  Legal Services was
25  also hosting Congresswoman Roby at an event that was

Page 147

1  supposed to be a celebration of Legal Services
2  luncheon.  Press were noticed and invited to attend the
3  program.
4         Obviously, my not being there caught
5  people's eye.  It became very clear, you don't have to
6  have much of a network for rumors to make it back to
7  you in Montgomery.  There were pervasive rumors that
8  were moving around the city.  That I had been fired
9  from Legal Services.  That I had been removed as
10  executive director.  And that quote, unquote, their
11  really hush-hush about it.  And as you know, when there
12  was a lack of information, people fill it with lies and
13  speculation.
14         There were rumors of everything from my
15  being arrested to my being accused of sexual harassment
16  because that was the going thing at that time.  It was
17  happening every few days in the national media that a
18  figure was being accused of sexual harassment or
19  misconduct.  There was a common rumor that was moving
20  around because I was a male who had just been removed
21  from the leadership of a program.  And with every few
22  hours, you were seeing people in the same category.  It
23  would have been natural for people to think, well, this
24  must be that.
25         There were rumors that -- there was another

Page 148

1  rumor out there that I was -- that I had been caught
2  somehow using company material for political purposes,
3  or -- yeah, that was another version of a rumor; that
4  I was misusing Legal Services material for political
5  purposes.
6         Every manner of speculation that ranged from
7  the lurid to the ridiculous.  I thought it was very
8  important for me reputationally to make some attempt to
9  set the record straight.  I did not believe it was in
10  my reputational interest to sit back and let this
11  process play itself out.
12         Now, I had been told by Battle and Smith --
13  you asked about the content of this conversation.  One
14  thing I forgot was that Battle was very emphatic that,
15  you are not to discuss this matter with the press or
16  anyone else.  I knew that if I publically addressed the
17  circumstance of my departure while I was still an
18  employee, that they were going to use that as a basis
19  for termination.
20         I also knew that for me to say "no comment"
21  was unacceptable.  I was already getting phone calls
22  from at least one reporter asking me what's the
23  on-the-record and off-the-record of what's going on
24  here.  For me to have said, I can't address that, or
25  I can't comment would have in my mind have given

ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
149–152

Page 149

1  credence to some of the rumors that were moving around.

2  Q      Who is the reporter that contacted you?

3  A      Josh Moon.

4          (Whereupon, Defendant's Exhibit 14

5          was marked for identification and

6          is attached hereto.)

7  BY MR. VREELAND

8  Q      Show you what I have marked as Defendant's

Exhibit 14.  Have you seen that document before?

10  A     Yes.

11  Q     And did you provide Mr. Moon information for

12  his article, which is Exhibit 14?

13  A     Dated Friday, November 24th, I had certainly

14  spoken with Mr. Moon, yes.

15      I don't believe this date is accurate.  In

16  fact, if you actually look at the bottom of it, it is

17  Bates Stamped -- not Bates Stamped -- but the insta

18  link is August 31st.  If you look at the top, you will

19  see a reference to Friday, November 24th, 2017.

20  I believe the August 31st date is the accurate one.

21      I suspect this is an archive, and that the

22  archive had a date of November 24th.  But I am pretty

23  confident that this article was written very close in

24  time to my departure.  So the August 31st date, I

25  believe, is when this was actually published.

Page 150

1  Q      This references a bar complaint.  Did you

2  file a bar complaint against Ms. Battle?

3  A      Yes, I did.

4  Q      And did you provide Mr. Moon a copy of the

5  bar complaint?

6  A      I cannot recall if I did or did not.

7  Q      What was the basis of the bar complaint?

8  A      The bar is a key stakeholder with Legal

9  Services Alabama.  Most of the board members, including

10  Ms. Battle, are bar appointed.  In fact, of the 24

11  slots on the board, 22, 24, at that time, I think 18 of

12  them are direct appointments made by the state bar.

13  The state bar works very closely with Legal Services in

14  its mission to provide resources to low-income folks

15  who need civil help but can't afford it.

16      And I believe that when a lawyer takes on a

17  duty of being chair of a board of a legal organization,

18  she is, in effect, acting in her capacity as a legal

19  spokesperson and legal steward.  I think all of us have

20  a duty of honesty as a lawyer.  I think all of us have

21  a duty when we are acting in our duty as lawyers, or

22  for acting in a role that's sort of on the edge of our

23  capacity as lawyers, like chairing the board of a Legal

24  Services organization.  That all of us have a duty of

25  honesty.  And I think our profession doesn't exist if

Page 151

1  we are selective about when we tell the truth.  We make

2  the best case, the best inferences, the best arguments.

3  Where the line is always drawn is lying, or putting

4  deliberately false information forward.

5      I was and am confident that LaVeeda Battle

6  deliberately lied about my conduct and my actions at

7  Legal Services.  That she knew she did not have a

8  strong factual basis to remove me as executive

9  director.  That the factual basis that she had would

10  not have stood any test of analysis or observation by

11  the Board or any other stakeholder so that she devised

12  a scenario and a narrative that was designed to crush

13  my reputation.

14      I think that she resorted to dishonest

15  tactics.  We've talked about the things that she

16  represented to people the day after I left that she

17  absolutely knew were not accurate.  We have talked

18  about the representation of a hostile environment for

19  female employees.

20      Because I believe that Ms. Battle was

21  violating her duty of truth telling as a lawyer,

22  I thought the bar should have had an interest in her

23  conduct.  That's why I filed a complaint.

24  Q      You have seen the George Merriam e-mail?

25  A      Eventually.

Page 152

1  Q      Did you send that e-mail?

2  A      I did not.

3  Q      Do you know who sent that e-mail?

4  A      I do not.

5      I was sent a copy of the e-mail by four or

6  five or six different people within the program after

7  they received it.  So I saw it.  I saw the afternoon or

8  evening, whenever it went out, all of a sudden a bunch

9  of e-mails from folks at Legal Services popped up.

10  I did -- I was copied.  Some of them had turned it into

11  an attachment.  Some of them had forwarded it.  In

12  various forms.

13      I did what everybody does now.  I Googled

14  George Merriam.  Saw there were two.  There was one guy

15  who was the cofounder of the dictionary.  And I did

16  find another one who was a student at Auburn who was an

17  active member of the college Democrats.  That caught my

18  attention because we had an intern in the program, who

19  I had met when he was waiting tables one night, waiting

20  on me and my wife.  I invited him to be an intern.  He

21  was active in college democrats.

22      So it did momentarily occur to me that he

23  had gotten a copy of the document and that he had

24  shared it with his Mr. Merriam.

25      I did see the dictionary reference.  And



Page 153

1 I did read Michael Forton's testimony. I did obviously
2 read the document from Jaffe Pickett. And I did note
3 in it that there were some misuses of words.
4        So when I saw Michael Forton's -- sort of
5 jogging my memory, which I honestly had not thought
6 about it again, about the dictionary, it occurred to me
7 that someone may have had a sense of humor, and that
8 was a jab at her for using the word voices.
9        There were two or three times I remember at
10 the time when I read it thinking, wait a minute.
11 That's not . . .
12        But I did think that's what I saw what I
13 George Merriam. It was very clearly the document that
14 I received.
15        And I don't mind telling you, I have
16 provided that document to a number of people within the
17 organization and outside the organization.
18        So, again, not here to speculate, but
19 clearly someone who had a copy of that document chose
20 to mail it to the organization, and four or five or six
21 people who received it, then promptly sent it to me.
22 Q     Who did you share that document with?
23 A       It would have been a number of people,
24 Mr. Vreeland. Obviously, Charlotte Rand, I believe, is
25 the one who presented it to me. The IT people gave it

Page 154

1 to her. So that's three people who would have had
2 access to it or two. There were two IT people. Don't
3 know that both of them would have had access to it or
4 would have seen it. But one of them would have seen
5 it.
6        And by the way, Charlotte Rand would have
7 had no capacity to capture a document from Jaffe
8 Pickett's account without an IT person doing it. It
9 would have had to have been done by the IT people.
10 I wouldn't have known how to do it. Charlotte Rand
11 wouldn't have known how to do it, wouldn't have had
12 capabilities or access authority to do it.
13        So I shared it with a political consultant
14 in Birmingham. I shared it with Josh Moon, I believe.
15 I shared it with family members. I shared it with
16 friends. I shared it with people in the organization.
17        And the reason is very simple, people inside
18 and outside of the organization were saying to me, what
19 happened? And I was telling them, well, this is what
20 appears to have happened.
21        And I will be very candid with you, several
22 people said, that's not possible. What you are saying
23 doesn't make sense. So there has got to be something
24 that we are missing.
25        At least one very senior person in the

Page 155

1 program called and said, everybody assumes this was
2 about sex or money because there is no other
3 explanation for why you would suddenly, immediately,
4 and swiftly be removed as executive director. So which
5 was it?
6        It was very clear to me that I was being
7 dealt a reputational death of a thousand cuts by people
8 not really knowing what happened even after the AL.com
9 piece, which was certainly not one crafted to get in
10 the weeds of Legal Services.
11        Even after the APR piece, as you noted
12 Alabama Political Reporter piece. Both of these pieces
13 speak in general terms. They sort of frame the
14 conflict. They don't really get into the weeds of what
15 happened. Nobody reading them had any clarity on what
16 was happening within that organization. Or that's the
17 refrain that I heard over and over.
18        At some point, early September, late August,
19 someone in the organization said to me, a group of us
20 went to Jaffe and said, Jaffe, did you go to the board
21 and complain about Artur Davis? And I said, what did
22 she say? She swore that she was shocked when she got
23 the call from LaVeeda Battle. That she said, I don't
24 want to be executive director. I have no interest in
25 this. Is this about what Sylvia did? Absolutely no

Page 156

1 not suspend him over that. Sylvia was in the wrong.
2 I am as much at a loss as anyone else. And they
3 said -- this individual said, the group of us
4 confronted her -- was this person's phrase -- and she
5 said, I had nothing to do with this. I was as stunned
6 as anybody else.
7        I knew that was an absolute abject lie.
8 Q     Who told you that?
9 A       Felicia Pickett and Ann Brown may have both
10 said that. There may have been others.
11 Q       And who within the organization did you
12 disseminate the document to?
13 A       In addition to the people I mentioned
14 earlier who provided it to me?
15 Q     Yes. Well, they obviously already had it.
16 I'm asking who you gave it to.
17 A       Right. I think I sent a copy to Michael
18 Forton. I believe I sent a copy to Gary Gilmore, the
19 finance officer. I believe I sent a copy to Jonathan
20 Blocker, who -- I don't believe is there now, was there
21 then. An attorney that I had brought into the program,
22 or recruited into the program to fill a vacancy in
23 Birmingham. I believe there may have been Jim Smith,
24 domestic violence, senior domestic violence lawyer.
25        You have to remember, Mr. Vreeland, I was



ARTUR DAVIS
DAVIS vs LEGAL SERVICES ALABAMA

October 03, 2019
157–160

Page 157

1 not selective, frankly, on who I shared it with.
2 Anybody who asked me what's going on, I sent it to
3 them.
4        Obviously, someone who received it felt the
5 need to then -- obviously, I didn't say to the people I
6 sent it to, by the way, you are one of several people
7 receiving this.  And I do think some of them probably
8 inferred that they were receiving information that
9 others didn't have.
10        And I will say, I can't remember who, but
11 several people did say to me, does everybody know about
12 this?  And my answer to that would have been, of course
13 not.
14        So, again, I don't want to waste time
15 speculating here.  But it's very clear someone who
16 received it sent it to a fairly large group.  I have
17 sent it to family members, too.  I sent it to my
18 mother.  I sent it to other friends who have had
19 dealings with Legal Services.
20        You have to remember, this was a document
21 that I believed was relevant.  It certainly was not
22 illegally obtained.  It was obtained from her work
23 account.  Just as I am 100 percent sure my work account
24 was closely scrutinized in the days after I left Legal
25 Services.  The leadership of a program has every right

Page 158

1 to scrutinize the work accounts of the people in their
2 program.
3        I'm sure you remind your employees all the
4 time, if this has Lehr Middlebrooks on it, it doesn't
5 belong to you.  It belongs to us.
6        Now, again, I didn't give the order or give
7 the request to look to see if Jaffe Pickett had
8 communicated.  But it happened.  And I saw nothing
9 wrong with receiving the communication or sharing it.
10        Now, what I do kind remarkable is that
11 apparently at some point Jaffe Pickett caused this
12 organization to spend several thousand dollars to hire
13 some kind of a security company to come in and
14 investigate whether her e-mail had been hacked in some
15 way.  I mean, that's extraordinary.  But on one hand,
16 you claim to people you didn't generate a document, and
17 then spend thousands of dollars of resources to
18 investigate a hacking that you know didn't happen.
19 This document didn't come from any hacking.  It came
20 from legitimate access to her work account.
21        Now, it's possible she didn't know.
22 Q        Mr. Davis, I just asked you who within the
23 organization you shared it with.
24 A        But you also understand that at some point
25 you are going to file a motion for summary judgment.

Page 159

1 And I would rather talk to you than sit down and write
2 an affidavit.
3 Q        Did you tell anybody within the
4 organization, did you threaten that you could burn the
5 place down, or would burn the place down?
6 A        No, I did not threaten to burn the place
7 down.
8 Q        Did you tell Michael Fornton that you would
9 sue for race discrimination because "It's the case
10 I can file."
11 A        I don't remember discussing legal theories
12 with Michael.  I did speak with Michael after the EEEC
13 complaint.  I think he did ask me -- Michael is a
14 lawyer.  And I say this with affection, he's also a
15 legal geek.
16        I mean, Michael and I would talk about legal
17 theories and all manner of things that had nothing to
18 do with Legal Services.  I'm very confident that when
19 Michael and I talked at some point, he would have said
20 to me, what's your legal theory?  That's would happen
21 if Michael and I saw a story on the news, he and I
22 would talk about it.
23 Q        Did you tell him you were going to sue Legal
24 Services out of existence?
25 A        No.

Page 160

1 Q        Did you tell anybody that you were going to
2 file a complaint with LSC, and it would shut down Legal
3 Services in Alabama in a couple of weeks?
4 A        I did file an OIG complaint with Legal
5 Services Corporation because they are the primary
6 grantor, or at that time they were for Legal Services
7 Alabama.
8        I did not say what you said I said.
9 I certainly would have pointed out that Legal Services
10 Corporation has the authority to dramatically intervene
11 in this program.
12        And by the way, that's what they did.  Jaffe
13 Pickett was named the executive director.  Legal
14 Services sent in a team.  They recommended that she be
15 replaced.  They sent in a guy named Guy Lescault or
16 Lescault.  Made him executive director.  That was done
17 at the direct instruction of Legal Services
18 Corporation.
19        There is at least one member of that board
20 who has told people that he believed the Legal Services
21 Corporation very much considered sort of doing a formal
22 intervention and sending in a whole new management
23 team.  Replacing the board, the whole nine yards.
24 People have come and gone of their own accord,
25 including Jaffe Pickett, so that didn't happen.



Page 161

1     But I certainly would have said to somebody
2  somewhere, what possible events could flow out of the
3  OIG making a negative finding?
4     But I'm not someone who really goes around
5  throwing out threats and saying, I'm going to do this.
6  That's not -- I have been engaging with you for two
7  hours now.  I engage with people -- well, close to four
8  hours now.  That's actually not how I talk to
9  people, Mr. Vreeland.  Certainly not how I talk to
10  people who I know would run right back around and tell
11  someone.
12  Q     Other than lost salary, how have you been
13  damaged by what happened at Legal Services?
14  A     Mr. Vreeland, when I was 50 years old, I was
15  unemployed.  My 50th birthday, I was a fired -- well,
16  suspended employee who had a significant cloud hanging
17  over him.  To this day, that cloud is hanging over me.
18  I'm actually in the process of seeking employment.
19  I have had to go to the trouble of asking -- getting
20  Mr. Mendelsohn to draft a document for employers
21  explaining that he's investigated this case, and that
22  there are no allegations of sexual harassment or
23  anything of that nature.
24     People see in your resume that you ran an
25  organization for nine months, and then you didn't leave

Page 162

1  that to become a federal judge or an elected official,
2  or to make a $1 million a year, people naturally assume
3  the worst.  For the rest of my career, I will have to
4  explain why I didn't last at Legal Services of Alabama.
5     I just finished a political campaign where
6  I had to constantly deal with the innuendo that your
7  clients created.  Especially a political campaign where
8  I couldn't raise the money that I needed because people
9  heard that there was something out there that was going
10  to come out.  And people weren't willing to invest in a
11  campaign that was going to blow up in a run-off.
12     I have had to, for two years -- you know,
13  one -- you didn't ask me at the beginning of this
14  deposition a question I would always ask when I took
15  depositions.  I would often ask people, is this the
16  first time you have sat down to discuss this case with
17  anyone?  I thought you might ask me that today.  The
18  answer would have been, I have been discussing this
19  matter since 4:00 o'clock on August 17th, 2017.
20  Because for a very long time, hardly a day went by when
21  I didn't have to explain to somebody why I'm not there.
22     Including by the way, my own mother because
23  I didn't have the gumption to tell her I had been
24  fired.  I didn't tell her.  And she doesn't read
25  AL.com.  One day she showed up to bring me a gift for

Page 163

1  my birthday, which happens to be October 9th.  So
2  literally that's an event that I think would cause
3  great distress to anyone, your mother presenting at a
4  job thinking you are there, and finding out that you
5  are not.
6     You asked the question, how have I been
7  damaged by it?  Without being any way flip, what do you
8  think the damage would be to your career if you got
9  back to your workplace today, and you found out that
10  you had been suspended and accused of creating a
11  hostile environment at Lehr Middlebrooks?
12     I strongly think you would feel that your
13  reputation was damaged.  There were connections I had
14  access to as the executive director of Legal Services,
15  who haven't dealt with me since that day.
16     I have a colleague who I essentially played
17  an integral role in his becoming a US attorney.  He
18  refused to contribute to my campaign.  He told people
19  because he wants to be a federal judge if the Dems win
20  2020.  And he doesn't want to be asked by judiciary
21  investigators why he contributed to a guy who was
22  accused of hostile conduct in a workplace.
23     There are people who are part of the broader
24  Legal Services network in Washington who could have
25  been very helpful to the future of my career,

Page 164

1  particularly now that politics has ended for me by the
2  voters of Montgomery.  I can't call these people.
3     I had developed a very good reputation as an
4  innovative, effective executive director.  It is a big
5  deal when the president of Legal Services comes to
6  visit your program.  The president of Legal Services
7  came to visit this program and walked right into this.
8     Think I could pick up the up phone now and
9  call him and say, Jim, I'm trying to relocated to DC;
10  will you be a reference for me?  You think he'd take
11  the call?
12     There were numerous executive directors I
13  met in the two conferences I attended.  Think I could
14  call those folks now and say, give me a reference or
15  put me on to a lead?
16     So without being melodramatic, I don't think
17  it takes a reach to answer the question of how being
18  suspended from a job and being accused of very serious
19  things affects you reputationaly in every possible way.
20  Q     Are you done?
21  A     I am.
22     MR. VREELAND:  That's all I have got.
23     (Whereupon, at approximately, 12:45
24     p.m. on the 3rd day of October,
25     2019 the proceedings were



Page 165

1      concluded.)
2
3      * * * * * * * * *
4      FURTHER DEPONENT SAITH NOT
5      * * * * * * * * * *
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 166

1                    REPORTER'S CERTIFICATE
2      STATE OF ALABAMA
3      MONTGOMERY COUNTY
4          I do hereby certify that the above and foregoing
5      transcript of the deposition of ARTUR DAVIS was taken
6      down by me in machine shorthand on the 3rd of October,
7      2019, and the questions and answers thereto reduced to
8      writing under my personal supervision, and that the
9      foregoing represents a true and correct transcript of
10     the proceedings given by said witness upon said
11     hearing.
12         I further certify that I am neither of counsel nor
13     related to the parties to the action, nor am I any wise
14     interested in the results of said cause.
15         Dated this 15th day of October, 2019.
16
17     _____
18     Mary Moore-Wynn
       Certified Court Reporter
19     ACCR # 275 Expires 09/30/2020
20
21
22
23
24
25



IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

```
DEFENDANT'S
EXHIBIT
    |
```

| | |
|---|---|
| ARTUR DAVIS, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No.: 2:18-cv-00026-SRW |
| | ) |
| LEGAL SERVICES ALABAMA, INC.; | ) |
| LAVEEDA MORGAN BATTLE; and | ) |
| ALEX SMITH; | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' REQUEST FOR PRODUCTION TO PLAINTIFF

1.      Any and all records, documents, writings, recordings and physical evidence of any and all kinds, including, but not limited to, correspondence, notes, memoranda, tape recordings or cassettes that show or relate in any way to Plaintiff's job duties and obligations while an employee of Defendant.

**RESPONSE:**

**Plaintiff objects to this request as overly broad, ambiguous, and not tailored to lead to the discovery of admissible evidence. Without waiving this objection, plaintiff responds that the defendant Legal Services of Alabama (LSA) has within its possession the job description of the role of Executive Director.**

2.      Any and all records, documents, writings, recordings and physical evidence of any and all kinds, including, but not limited to, correspondence, notes, memoranda, tape recordings or cassettes that show or relate in any way to communication by and between Plaintiff and the employer, Legal Services Alabama or any of its employees, representatives, agents, or anyone else connected with Defendant, relating in any way to Plaintiff's employment or any aspect thereof, including but not limited to, the incident(s) and event(s) which are the subject of Plaintiff's Amended Complaint.

**RESPONSE:**

**Plaintiff objects to this request to the extent it seeks information that is privileged attorney work product. Plaintiff further objects to the request as overly broad and not tailored to lead to the discovery of admissible evidence. Without waiving these objections, plaintiff responds**

that all email communications between the plaintiff and the defendants or LSA employees are already within the possession of LSA.

3.     Any and all records, documents, writings, recordings and physical evidence of any and all kinds, including, but not limited to, correspondence, notes, memoranda, tape recordings or cassettes not herein specifically described or requested which relate in any way to any aspect of Plaintiff's employment with Defendant, Legal Services Alabama, or the incident(s) and event(s) which are the subject of Plaintiff's Amended Complaint.

**RESPONSE:**

**Plaintiff objects to this request to the extent it seeks information that is privileged attorney work product. Plaintiff further objects to the request as overly broad and not tailored to lead to the discovery of admissible evidence. Without waiving these objections, plaintiff responds that all email communications between the plaintiff and the defendants or LSA employees are already within the possession of LSA.**

4.     Any and all records, documents, writings, recordings and physical evidence of any and all kinds, including, but not limited to, correspondence, notes, memoranda, tape recordings or cassettes that Plaintiff or Plaintiff's attorney contends, or might contend, support, or might support, any of the allegations of Plaintiff's Amended Complaint.

**RESPONSE:**

**Plaintiff objects to this request to the extent it seeks information that is privileged attorney work product. Plaintiff further objects to the request as overly broad and not tailored to lead to the discovery of admissible evidence. Without waiving these objections, plaintiff responds that all email communications between the plaintiff and the defendants or LSA employees are already within the possession of LSA.**

5.     Any and all records, documents, writings, recordings and physical evidence of any and all kinds, including, but not limited to, correspondence, notes, memoranda, tape recordings or cassettes that show or relate in any way to Plaintiff's employment with Defendant Legal Services.

**RESPONSE:**

**Plaintiff objects to this request to the extent it seeks information that is privileged attorney work product. Plaintiff further objects to the request as overly broad and not tailored to lead to the discovery of admissible evidence. Without waiving these objections, plaintiff responds that all email communications between the plaintiff and the defendants or LSA employees are already within the possession of LSA.**

6.     Any and all records, documents, writings, recordings and physical evidence of any and all kinds, including, but not limited to, correspondence, notes, memoranda, tape recordings or cassettes that show or relate in any way to the subject matter of Plaintiff's Amended Complaint.

**RESPONSE:**

**Plaintiff objects to this request to the extent it seeks information that is privileged attorney work product. Plaintiff further objects to the request as overly broad and not tailored to lead to the discovery of admissible evidence. Without waiving these objections, plaintiff responds that all email communications between the plaintiff and the defendants or LSA employees are already within the possession of LSA.**

7.      Any and all records, documents, writings, recordings and physical evidence of any and all kinds, including, but not limited to, correspondence, notes, memoranda, tape recordings or cassettes that will or might be relied upon by Plaintiff or Plaintiff's attorney at the trial of this case.

RESPONSE:

**Plaintiff objects to this request to the extent it seeks information that is privileged attorney work product. Plaintiff further objects to the request as overly broad and not tailored to lead to the discovery of admissible evidence. Without waiving these objections, plaintiff responds that all email communications between the plaintiff and the defendants or LSA employees are already within the possession of LSA.**

8.      Any and all records, documents, writings, recordings and physical evidence of any and all kinds, including, but not limited to, correspondence, notes, memoranda, tape recordings or cassettes which were furnished by Plaintiff or any agent, attorney, or other representative of Plaintiff, to the Equal Employment Opportunity Commission.

RESPONSE:

**Upon information and belief, the Equal Employment Opportunity Commission has provided to defendant LSA all material, including affidavits and charging documents, which were furnished by the Plaintiff to the Equal Employment Opportunity Commission.**

9.      Any and all records, documents, writings, recordings and physical evidence of any and all kinds, including, but not limited to, correspondence, notes, memoranda, tape recordings or cassettes which Plaintiff has ever received or which are in Plaintiff's possession and/or control which relate in any way to the Equal Employment Opportunity Commission, including, but not limited to, those records which Plaintiff did not submit but which were relied upon to establish Plaintiff's position with the Equal Employment Opportunity Commission or of which Plaintiff submitted summaries or compilations rather than the actual documents.

RESPONSE:

**Plaintiff objects to this request to the extent it seeks privileged attorney work product. Without waving this objection, plaintiff responds that to the extent there are documents responsive to this request, they include items submitted by the plaintiff to the Office of Inspector General of Legal Services Corporation and to the Alabama State Bar, and upon information and belief, such items have been provided by the aforementioned entities to the defendant.**

10.     Any and all records, documents, writings, recordings and physical evidence of any and all kinds, including, but not limited to, correspondence, notes, memoranda, tape recordings or

cassettes which support or relate in any form or fashion to any aspect of Plaintiff's complaint of discrimination or retaliation during employment with Legal Services Alabama.

**RESPONSE:**

**Plaintiff objects to the request as overly broad and not tailored to lead to the discovery of admissible evidence. Without waiving this objection, plaintiff responds that the defendant has in its possession written complaints by multiple employees regarding Eileen Harris's creation of a hostile work environment during her tenure as Operations Director, and that said documents are responsive to this request. Plaintiff also responds that LSA has within its possession email correspondence from the plaintiff dated on or about August 17, 2017 to defendant Battle in which he specifically refers to seeking legal counsel for advice related to actions by the defendants.**

11.     Any and all records, documents, writings, recordings and   physical evidence of any and all kinds, including, but not limited  to, correspondence, notes, memoranda, tape recordings or cassettes which relate to any record of  receipt  of income or money received by Plaintiff during the years 2016 through the present, including, but not limited to, W-2 forms, tax returns, and any other documents or forms filed with the Internal Revenue Service or State of Alabama relating to income taxes.

**RESPONSE:**

**Plaintiff objects to this request as overly broad and not tailored to lead to the discovery of admissible evidence. Without waiving this objection, plaintiff will produce completed tax returns regarding the plaintiff's income in 2016 and 2017 at a mutually agreeable time and place, subject to the entry of a protective order.**

12.     Any and all records, documents, writings, recordings, and physical evidence of any and all kinds, including, but not limited to, correspondence, notes, memoranda, tape recordings or cassettes which relate to or reflect communications between or among any employees or representatives of Defendants.

**RESPONSE:**

**Plaintiff objects to this request as overly broad, ambiguous, and not tailored to lead to the discovery of admissible evidence. Without waiving this objection, plaintiff responds that all email correspondence between employees at LSA conducted using their work email account is within the control of LSA.**

13.     Any and all records, documents, writings, recordings, and physical evidence of any and all kinds, including, but not limited to, correspondence, notes, memoranda, tape recordings or cassettes which relate to or reflect any documents accessed or copied from any of Defendant's information technology systems.

**RESPONSE:**

Plaintiff objects to this request as overly broad, ambiguous, and not tailored to lead to the discovery of admissible evidence. Without waiving this objection, plaintiff has not had capacity to access any information from LSA's information technology systems since he was denied access to the system upon his suspension on August 18, 2017. Without waiving this objection, in his capacity as Executive Director, prior to the end of business on August 18, 2017, plaintiff routinely accessed and printed documents related to his job responsibilities.

/s/ Kenneth J. Mendelsohn
KENNETH J. MENDELSOHN (MEN001)

OF COUNSEL:
JEMISON & MENDELSOHN, P.C.
1772 Platt Place
Montgomery, Alabama 36117
Phone: (334) 213-2323
Fax:    (334) 213-5663
kenny@jmfirm.com

## CERTIFICATE OF SERVICE

I do hereby certify that on the _____ day of December, 2018, the foregoing was served on all parties of record via the Court's electronic filing system.

/s/ Kenneth J. Mendelsohn
KENNETH J. MENDELSOHN (MEN001)

Albert Vreeland
Whitney R. Brown
Lehr Middlebrooks Vreeland & Thompson, PC
P.O. Box 11945
Birmingham, AL 35202-1945
Email: avreeland@lehrmiddlebrooks.com

/s/ Kenneth J. Mendelsohn
OF COUNSEL



DEFENDANT'S
EXHIBIT
_2_



## HARRIS, CADDELL & SHANKS, P.C.
ATTORNEYS AT LAW
P. O. BOX 2688
DECATUR, ALABAMA, 35602-2688

JULIAN HARRIS (1904-1994)
NORMAN W. HARRIS (1907 - 1998)
PHILIP T. SHANKS, JR. (1911 - 2002)
JOHN A. CADDELL (1910 - 2006)
JON H. MOORES (1933 - 2009)
ROBERT H. HARRIS (1930-2012)
THOMAS A. CADDELL
WILLIAM E. SHINN, JR.
GARY A. PHILLIPS
DOW M. PERRY, JR.
BARNES F. LOVELACE, JR.
JEFFREY S. BROWN
DAVID W. LANGSTON
PHIL D. MITCHELL˙
STEPHEN F. BROWN
ZACHARY H. STARNES

http://www.harriscaddell.com

NOVEMBER 30, 2016

214 JOHNSTON STREET, S.E.
DECATUR, ALABAMA 35601
TELEPHONE (256) 340-8000
FACSIMILE (256)340-8039

RETIRED
CHARLES L. MURPHREE

˙ Registered Mediator with the
Alabama Center for Dispute Resolution &
Alabama Appellate Mediation Center

WRITER'S INFORMATION

DIRECT DIAL: (256) 340-8037
E-MAIL: pmitchell@harriscaddell.com

Mr. Artur G. Davis
5301 Cluster Oak Court
Montgomery, Alabama 36116
via email to: arturgdavis@gmail.com

Dear Artur:

Legal Services Alabama's 2016 Executive Director Search Committee appreciates your interest in serving as Executive Director of LSA. The Search Committee has voted to submit your name as our Committee's recommended candidate to fill this position. As Chairman of the Committee I will report to the full Board of Directors of LSA, which will consider the Committee's recommendation at its December 3, 2016 Board Meeting. We would propose that the LSA Board of Directors approve offering you the position of Executive Director at the following salary and benefits, if you choose to join LSA:

1.    **Duties and Responsibilities.**  Under the broadest spectrum, as LSA Executive Director you will be responsible for the overall day-to-day management and oversight of this nonprofit law firm's offices, employees, and operations throughout all 67 counties in Alabama. You will work with a diverse and dedicated Board of Directors, management team, and staff to carry out the mission and direction of the organization as determined by the Board. You will serve as the public face of LSA. You will be responsible for nurturing effective collaborative relationships between the organization and its clients, funders, social services organizations, bar associations, business, and political communities. You will be expected to grow and diversify resources to support LSA's work. You will be charged to lead advocacy within LSA and the community to benefit low income clients and to enhance the use of technology to improve client services and staff effectiveness.

2.    **Compensation.**  Your initial annual salary would be $110,000, payable in equal biweekly installments. In addition, LSA provides its staff with twelve paid holidays. LSA currently reimburses employees for mileage at the IRS-approved standard mileage rate.

Mr. Artur G. Davis
November 30, 2016
Page 2 of 3

3. **Health, Life, & Disability Insurance.** Presently, LSA provides 100% employee healthcare and 50% of dependent healthcare coverage. Further, LSA maintains a $20,000 group life/AD&D policy on all regular full-time employees. Employees may participate in supplemental insurance plans offered, such as long-term disability, short-term disability, dental, vision and voluntary term life insurance, critical illness, accident and cancer.

4. **Retirement.** LSA offers a tax-deferred retirement plan which employees may make their own contributions for their retirement. Subject to the availability of funds, LSA may make employer contributions to the individual accounts in an amount to be determined by the Board of Directors.

5. **Malpractice/License Fees, CLE, etc.** LSA pays all malpractice insurance premiums, licenses fees and all other similar expenses necessary for its attorney employees to practice law.

6. **Support, Office Furniture and Equipment.** LSA will furnish you with the support of an executive assistant, office furniture, a computer and other office equipment that you will need in your position as Executive Director and to practice law.

7. **Employee Manual.** LSA maintains an Employee Handbook with further office policies, procedures and other information. A copy is available for review and will be furnished to you upon your commencement with LSA as its Executive Director.

8. **At-Will Employment Status.** Nothing in this Letter shall be construed as providing for a definitive term of employment, or otherwise changing the nature of your prospective employment from anything other than as an "at-will" employee of Legal Services Alabama serving at the direction and discretion of its Board of Directors.

9. **Commencement Date.** It is expected that you would start as soon as mutually convenient, upon approval of the LSA Board to offer you the position upon the terms outlined in this Letter.

Please feel free to call me if you have any questions about any of the above items. If you would like to review LSA's insurance coverage, the LSA Employee Handbook, or other documents mentioned above, please let me know and we will make arrangement for this to be accomplished.

If you agree to these terms, please acknowledge the same by signing below and returning a copy to me. As Search Committee Chairman, I will make this letter a part of the Search Committee's Report and recommendation to the full LSA Board on December 3rd for the Board's consideration.

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

Mr. Artur G. Davis
November 30, 2016
Page 3 of 3

Should you decide to accept an offer of employment made by the Board, we would look forward to a mutually beneficial and long lasting relationship. With warmest personal regards, I am.

Sincerely,

Phil D. Mitchell, As Chairman of
Legal Services Alabama's 2016
Executive Director Search Committee

Accepted:

Artur G. Davis

cc:    Ms. LaVeeda Battle, LSA Board President via email

U:\pdm\Public\Data\LegalServicesAla\Executive Director Search - 2016\Applicants\Artur Davis\Artur Davis ltr 11-30-16.wpd

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

D00420

 **LEGAL SERVICES** ALABAMA



DEFENDANT'S
EXHIBIT
3

## EMPLOYEE HANDBOOK AND CONSOLIDATED REFERENCE
## MANUAL RECEIPT AND ACKNOWLEDGEMENT

I acknowledge receipt of my personal copy of the Legal Services Alabama, Inc. Employee Handbook and Consolidated Reference Manual. I agree to read the handbook and abide by the standards, policies and procedures defined or referenced in the handbook.

The information in the Legal Services Alabama, Inc. Employee Handbook is subject to change. I understand that changes may supersede, modify or eliminate the information contained in the handbook. As Legal Services Alabama provides updated policy information, I accept responsibility for reading and abiding by the changes.

I understand that no modifications to contractual relationships or alterations of at-will relationships are intended by this handbook.

I understand that I have an obligation to inform Legal Services Alabama/Administrative Services of any changes in personal information, such as phone number, address, etc. I accept responsibility for contacting my supervisor of Legal Services Alabama/ Administrative Services if I have any questions or concerns or need further explanation.


_____
Signature of Employee

_____12-5-16_____
Date


_____ARTUR DAVIS_____
Printed Name of Employee


_____Central_____
LSA Office


OPR:  LSA/Administrative Services
Date:  July 2006

CONFIDENTIAL -  Legal Services Alabama - Artur Davis - Docs Produced by Defendant



**Legal Services Alabama, Inc.**
**Job Description**

**Job Title:**

    Executive Director

**Principal Functions:**

    The Executive Director is the chief executive officer of Legal Services Alabama (LSA), reports to LSA's Board of Directors and is responsible for the administration, supervision, and direction of Legal Services Alabama as well as maintenance of LSA's positive image and relationships with the general public, the media, funders, client communities, other entities and stakeholders.

    The Director manages the strategic planning process and is responsible for administration of all policies, all personnel decisions, financial management, management of organizational systems, and the provision of high-quality legal services to low income persons. The Director provides leadership and articulates the vision established for LSA to staff and to the broader community.

**Accountability:**

    Directly accountable to the LSA Board of Directors.

**Duties and Responsibilities:**

1) **LSA Board**

    a) Works with the President of the Board, and its committee chairpersons to plan and prepare for Board and Board committee meetings.

    b) Develops and presents to the appropriate Board committee or to the Full Board, matters of overall statewide program policy and direction.

    c) Assures that the Board is informed, both about the legal needs of poor people in Alabama and about the work being performed by LSA practice groups, regions and offices

    d) Provides necessary staff work for the Board preparation and distribution of all necessary reports

    e) Implements the directions and policies of the Board.

**2) Planning**

    a) Assures the organization has a strategic plan arrived at through an inclusive process that includes: involvement of the board and executive team, input from the management team and feedback from staff, clients and community groups and other stakeholders.

    b) Monitors, evaluates and assures updating of strategic plan goals, objectives, strategies and tactics.

**3) External Relations**

    a) Serves as the primary spokesperson for LSA and establishes and maintains effective media relations.

    b) Establishes and maintains effective relations with the private bar, organized statewide bar groups, local bars, the judiciary, the Alabama Law Foundation and the Alabama State Bar.

    c) Establishes and maintains positive relations with the client communities LSA seeks to serve, including developing and strengthening relations with client groups and other groups or entities which serve low-income individual and communities.

    d) Establishes and maintains effective working relationships with the Legal Services Corporation and other federal funders such as the Department of Justice (DOJ) and Housing and Urban Development (HUD).

    e) Establishes and maintains effective relations with the following group of entities: Alabama law schools; national, state, regional and local funding sources; state government and Alabama's business and faith-based communities.

    f) Fosters respect for LSA and its mission in the general community.

**4) Advocacy**

    a) Provides leadership for and direction to Director for Advocacy, practice groups and local offices that encourages aggressive, high-quality representation of low-income people.

    b) Establishes, in conjunction with Director for Advocacy and Practice Group Advocacy Directors, practice standards and guidelines for the operation of local offices and programs and for the provision of aggressive, high quality legal services for clients.

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

c) Reviews and approves, in conjunction with Director for Advocacy each Practice Group's annual work plan.

d) Manages, with the assistance of the Director for Advocacy, the process of annually evaluating practice group progress against their work plan goals and objectives and monitors and evaluates LSA's local offices against the practice standards and guidelines.

e) Aids, with the assistance of the Director for Advocacy, practice groups and local offices in addressing identified needs and achieving necessary programmatic changes and development.

f) Assures, with the assistance of the Director for Advocacy, ongoing professional and/or leadership development and training for advocates.

g) Investigates and responds, with the assistance of the Director for Advocacy, to client or potential client grievances and/or complaints per the policies and protocols established in the LSA client grievance policy and is responsive to the LSA Board and its Client Relations Committee when the Executive Director's decision regarding client grievances and/or complaints are appealed.

## 5) Operations

a) Develops, with the assistance of the Director of Operations, budgets for presentation to and adoption by the LSA Board, monitors program expenditures against that budget, and proposes periodic revisions to the budget to the LSA Board and its Finance Committee.

b) Oversees, with the assistance of the Director of Operations oversees fiscal management including the development, maintenance and evaluation of accounting and finance related policies and protocols.

c) Oversees, with the assistance of the Director of Operations oversees human resource and facilities management including the development, maintenance and evaluation of personnel policies.

d) Oversees, with the assistance of the Director of Operations information services and technology systems and provide leadership and direction in the utilization of technologies to support the sharing and exchange of information in a way that supports and encourages aggressive, high-quality representation of low-income people.

e) Investigates and responds, with the assistance of the Director of Operations to employee grievances and/or complaints per the policies and protocols established in the LSA employee and is responsive to the LSA Board and its Personnel Committee when the Executive Director's decision regarding employee grievances and/or complaints are appealed.

f) Assures, with the assistance of the Director of Operations, ongoing professional and/ or leadership development for LSA employees who do not have case handling responsibilities and training for all staff as regards administrative and/or operational policies, protocols and responsibilities.

6) **Resource Development**

a) Develops, implements and evaluates, with the assistance of the Director of Development and Communications and in conjunction with the Board of Directors and Board Resource Development Committee, fundraising plans including annual donor and/or capital campaigns, public and private grants, events and/or

b) Assures, with the assistance of the Director of Development and Communications, understanding of and professional development for board and staff regarding their role in resource development and oversees, encourages and evaluates board and staff participation in resource development activities.

7) **Central Office**

a) Manage and oversees, with the assistance of the Director of Operations, operation of the LSA Central Office.

b) Assures, with the assistance of the Director of Operations, that Central Office staff has an understanding of a commitment to the mission of LSA and that they work together as a team to provide appropriate management, administrative, and support services to the program.

c) Hires, fires, and generally directs the personnel administration of the Central Office staff, subject to delegation of responsibilities to others.

8) **Supervision**

a) Supervises the Director of Operations in overseeing the management of LSA's fiscal and personnel systems, protocols and policies in order to foster and maintain efficient, effective and accountable which assures the provision of aggressive, high quality legal services to poor people.

b) Supervises the Director for Advocacy in overseeing the management of LSA's advocacy and efforts to foster and maintain effective legal work management which assures the provision of aggressive, high quality legal services to poor people.

c) Supervises the Director of Development and Communications in overseeing the development and implementation of annual fundraising plan and all other activities designed to secure, retain, increase and diversify resources available to LSA.

d) Supervises the Executive Assistant.

<u>Qualification Requirements</u>:

J.D. Member in good standing of the Alabama Bar or eligible to become a member within an appropriate amount of time upon hiring. Excellent organizational, communications, strategic planning, relationship and coalition building skills are required. Senior or executive management experience with non-profit or legal services organization and demonstrable commitment to low-income individuals or communities is required.

<u>Working Conditions</u>:

The Executive Director performs office-related work. The Director works out of Montgomery but needs to be able to travel throughout the state of Alabama, the Deep South and nationally as needed.

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant



DEFENDANT'S
EXHIBIT
5

8/31/2017                                      Gmail - RE: Your Email

 Gmail                                      LaVeeda Battle <laveedab@gmail.com>

## RE: Your Email

**Phil Mitchell** <pmitchell@harriscaddell.com>                     Thu, Aug 17, 2017 at 2:55 PM
To: "Artur G. Davis" <agdavis@alsp.org>

Artur,

Thank you for emailing me regarding your consideration of departing LSA.  I do want to hear your concerns, but I will be
tied up all this afternoon on another matter. I believe your consideration of leaving LSA should be discussed with the
entire Executive Committee of the Board.  We have availability Friday, and I have scheduled a conference call for us at 11
a.m. tomorrow to discuss this.

The call in number for the call will be: 1-866-802-1177

The conference code will be: 2563408037.

I look forward to speaking with you then, and addressing your consideration of departing LSA with the other members of
the Executive Committee.  Unfortunately, this is my first available time. Please confirm your availability for the call Friday.

With warmest personal regards, I am,

Phil D. Mitchell

Harris, Caddell & Shanks, P.C.

Attorneys at Law

214 Johnston Street, S.E.

Post Office Box 2688

Decatur, Alabama 35602-2688

(256) 340-8037

Fax (256) 340-8039

pmitchell@harriscaddell.com

Cell (256) 566-3854

www.harriscaddell.com

CONFIDENTIALITY; ATTORNEY-CLIENT PRIVILEGE; ATTORNEY WORK PRODUCT NOTICE:

The information in this e-mail is confidential, may be privileged, and is only for the use of the recipient named above.  If
you are not the intended recipient, you are hereby notified that receipt and distribution of this e-mail is neither authorized
nor permissible.  If you have received this e-mail by error or mistake, please notify the sender immediately by telephone,
e-mail, or fax and destroy all printed and electronic copies of this e-mail together with any attachments.

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant                                      D00127

**From:** Artur G. Davis [mailto:agdavis@alsp.org]
**Sent:** Thursday, August 17, 2017 2:10 PM
**To:** Phil Mitchell <pmitchell@harriscaddell.com>
**Subject:**

Phil, I want to advise you that I am seriously considering departing Legal Services of Alabama. Please call if you wish to discuss.

Artur G. Davis, Executive Director

Legal Services Alabama

2567 Fairlane Drive, Suite 300

Montgomery, Alabama  36116

334.223.5120

www.legalservicesalabama.org

Scanned by **Trustwave SEG** - Trustwave's comprehensive email content security solution. Download a free evaluation of Trustwave SEG at www.trustwave.com

| **Total Control Panel** | | | Login |
|---|---|---|---|
| To: pmitchell@harriscaddell.com | Message Score: 50 | High (60): Pass | |
| From: agdavis@alsp.org | My Spam Blocking Level: Medium | Medium (75): Pass | |
| | | Low (90): Pass | |
| | Block this sender | | |
| | Block alsp.org | | |

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant                          D00128

8/31/2017



Gmail - (no subject)



LaVeeda Battle <laveedab@gmail.com>

## (no subject)

**Artur G. Davis** <agdavis@alsp.org>                                                                          Thu, Aug 17, 2017 at 3:31 PM
To: LaVeeda Battle <LaVeeda@battlelawfirm.com>
Cc: Phil Mitchell <pmitchell@harriscaddell.com>

Laveeda, I received the invitation from Phil and I candidly responded that I am very troubled by his unwillingness to engage me directly. I am even more bothered that an Executive Director cannot talk to a board president without a formal structure being put around it. These are the earmarks of a badly frayed relationship.

I should also add that you have apparently shown a willingness to talk to other people in this organization today, and that this is an element of your having been being tied up. You are concerned about one insubordinate staffer; I have numerous other staffers including department heads telling me they are ready to leave if this organization cannot refrain from interfering with an Executive Director's authority to reassign or terminate personnel.

I would like to see in advance of a call the written, documented provisions of LSC's bylaws that relate to the process of board engagement with internal personnel matters. I would also like to assess whether I should have my own legal counsel on this call or seek LSC mediation.

Of course, if you simply wish to stay out of the management of the organization, and follow the normal process for handling employee grievances, that is an option too. I have been pretty clear what my public and internal response would be if at the end of the process, the Board does not support my ability to manage the daily affairs of this organization.

Artur G. Davis, Executive Director

Legal Services Alabama

2567 Fairlane Drive, Suite 300

Montgomery, Alabama  36116

334.223.5120

www.legalservicesalabama.org

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant                          D00125

8/31/2017                                    Gmail - See attached document

 **Gmail**                                LaVeeda Battle <laveedab@gmall.com>

## See attached document

**Artur G. Davis** <agdavis@alsp.org>                     Thu, Aug 17, 2017 at 10:43 PM
To: Phil Mitchell <pmitchell@harriscaddell.com>, LaVeeda Battle <LaVeeda@battlelawfirm.com>, LaVeeda Battle
<laveedab@gmail.com>, gtc <gtc729@aol.com>, "pastorrichardson2@yahoo.com" <pastorrichardson2@yahoo.com>,
Yvonne Saxon <yvonne.saxon@gmail.com>

I have prepared the following document, after a review of board by-laws, the employee handbook,
and LSC regulations. I have elected to participate in the 11 AM call, and ask that all participants
review this document in advance. I do not have an email for Alex Smith and ask someone to
forward it to him in advance of the call.

**From:** Phil Mitchell <pmitchell@harriscaddell.com>
**Sent:** Thursday, August 17, 2017 2:55 PM
**To:** Artur G. Davis
**Subject:** RE: Your Email                                

Artur,


Thank you for emailing me regarding your consideration of departing LSA. I do want to hear your
concerns, but I will be tied up all this afternoon on another matter. I believe your consideration of
leaving LSA should be discussed with the entire Executive Committee of the Board. We have
availability Friday, and I have scheduled a conference call for us at 11 a.m. tomorrow to discuss
this.


The call in number for the call will be: 1-866-802-1177

The conference code will be: 2563408037.


I look forward to speaking with you then, and addressing your consideration of departing LSA with
the other members of the Executive Committee. Unfortunately, this is my first available time.
Please confirm your availability for the call Friday.


With warmest personal regards, I am,

Phil D. Mitchell

Harris, Caddell & Shanks, P.C.

Attorneys at Law

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant                        D00129

8/31/2017                                    Gmail - See attached document

**334.223.5120**


www.legalservicesalabama.org


Scanned by **Trustwave SEG** - Trustwave's comprehensive email content security solution. Download a free evaluation of Trustwave SEG at www.trustwave.com

| Total Control Panel | | Login |
|---|---|---|
| To: pmitchell@harriscaddell.com | Message Score: 50 | High (60): Pass |
| From: agdavis@alsp.org | My Spam Blocking Level: Medium | Medium (75): Pass |
| | | Low (90): Pass |
| | Block this sender | |
| | Block alsp.org | |

*This message was delivered because the content filter score did not exceed your filter level.*


Scanned by **Trustwave SEG** - Trustwave's comprehensive email content security solution. Download a free evaluation of Trustwave SEG at www.trustwave.com

**Board personnel letter.docx**
22K

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant                                    D00131

To:     Executive Committee of Board of Directors of LSA

        Yvonne Saxon, Chair of Personnel Committee, LSA

From:   Executive Director Artur Davis

RE:     LSA policies and procedures for Board engagement with management
decisions

I have prepared the analysis below of LSA's rules and procedures for addressing
personnel demotions, terminations, and reassignments.

### My views on the scope of ED Responsibilities

I begin with a reference to my initial interview in October 2016 for the position of
Executive Director. Bill Broome, a member of the search committee, asked me a
pointed question, to the effect of whether I would terminate an employee "if the
Board told you to." I recall it vividly because it struck me as a meaningful hint at
past struggles at LSA and because I felt so strongly about my answer.

I stated that morning, that if selected, I would welcome the chance to engage the
Board on its view of personnel problems, but I added very specifically that I
viewed personnel matters as the province of the Executive Director. I added that I
would refuse any instruction or guidance to dismiss an employee I did not wish to
dismiss. I stated that the organization should trust its ED to make daily hiring and
firing decisions, and that if a doubt existed as to whether I had the judgment to
do that, that I should not be selected.

After that interview, I participated in two more full interview sessions, a 30
minute meeting with the head of the search committee and the Board President,
a 45 minute session with the Board President and the chair of the finance
committee, and a lengthy one hour Saturday morning call with the Board
President. I was asked no follow up questions about my strongly stated views on
the Executive Director's role as the ultimate decision-maker on matters of

hiring/firing. While I was questioned about a wide range of mattes, including future political ambitions, fundraising strategies, expected length of tenure, stakeholder relationships, and broad organizational vision, my views on ED responsibility for hiring and firing were never re-visited; nor was it suggested that they were unacceptable or contradicted LSA guidelines.

In mid-to-late December, in my first weeks on the job, the scope of ED responsibility for personnel flared up. The departing Operations Director had taken a number of steps contrary to LSA's best interests, and was behaving in an obstructionist manner. I discussed with the Board President my concern that the matter might escalate, and was told very emphatically that her opinion was that it was up to me to make personnel choices, that she viewed the Board's role as one of broad program policy and governance. She added that she had seen too many boards wade into personnel issues and was determined that LSA not be one of them.

Despite this reassurance of a free hand, I have taken a very transparent approach to hiring decisions. I have included in my monthly reports updates on hiring and departure. When high-level departures have happened, such as with the finance officer we hired, and the Managing Attorney in Selma, I have briefed the Board President in writing. I even provided a six month written update to the Personnel Committee about all personnel changes in the organization. I have done all of this with the mindset that an informed board is a better board.

**Factual background**

On two prior occasions, I have contemplated dismissing employees: an attorney employee for poor performance and a central office staffer for insubordination in a written message to me personally. The attorney employee voluntarily resigned in advance of a six month probationary review; the other employee was handed a "notice of reprimand and major infraction" with no consequences in terms of role, salary, or assignments. Neither was a direct report of mine.

In the last several days, I have addressed the issue of an explosive temper tantrum from a central office employee, an eruption that stopped and stared over an hour and a half and was witnessed by numerous LSA employees. That individual happens to be a direct report of mine and is my executive assistant. After convening a meeting with the directors of Operations and Development, I

decided that Sylvia Mason is not a good fit for me as Executive Assistant and that her actions in full view of her colleagues also merited a reassignment to a different role as an administrative assistant with no reduction in pay. (Mason will be the highest paid administrative assistant by $10,000 and will be providing help to one employee when other admins are serving up to ten employees). Mason was told by email that since the administrative assistant's option was the only other role available for her, that she needed to choose between resignation and reassignment. She was also placed on two days of administrative leave, the 17th and 18th. Mason was given until 5:00 p.m. on the 18th to decide whether departure or reassignment was her choice. As of this writing, she has yet to give an answer.

I will add the additional fact that within 13 minutes of the written notice of personnel action to Mason, the President of the Board and the Chair of the Personnel Committee were informed by email, since Mason has the extra, uncompensated role of Board Secretary. My reassignment does not affect this role, since it is an appointment made by the Board President and is outside my scope of authority.

### LSA policies and procedures for addressing dismissal

LSA has terminated or laid off numerous employees in the past decades, by one long-time staffer's estimate, perhaps 40 to 45 since 2007. Several long-time employees, by the way, have stated to me that the particular employee slated for dismissal or reassignment, Sylvia Mason, has faced the threat of termination from the past two executive directors for aggressive displays of temper.

The LSA employment manual has a surprisingly convoluted history on the subject of board intervention in personnel decisions. The 2006 employee handbook remains the governing document for employee personnel matters, but it has been amended numerous times and different iterations of the handbook differ on important points. LSA posts a version of the handbook on its portal for employees. That posted documents contains, on pg. 3-4, under Grievance Procedures, the assertion that

"The Executive Director shall make the final decision concerning matters involving probations. *Matters involving demotion, suspension without pay or termination may be appealed finally to the Personnel Committee of the Board of Directors.*

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

*Such appeal must be made in writing within three (3) working days of the decision of the Executive Director. The Personnel Committee's review shall be limited to whether or not the Executive Director acted in an arbitrary and capricious manner. This appeal shall be the final appeal for matters involving demotion, suspension without pay or termination."*

This provision is clear that the standard for reversal is not de novo, or an independent judgment, but the very heightened standard of "arbitrary and capricious", which various precedent defines as "without any articulated reason", or for reasons motivated by bias against a protected class, or "for reasons that defy logic." The provision is very clear that the full Board is not only absent from the review process, but there is a firm declaration that "this appeal" to the Personnel Committee shall be the final appeal.

Note that there is no elaboration of time frame, or outline of procedure. There is certainly no provision staying a decision or leaving status quo in place until a decision is made.

There is also another interesting wrinkle. The prior Operations Director generated a printed document labeled employee handbook much more recently, in 2016. This document was described to me by the prior Operations Director, Eileen Harris, as the version of the handbook that includes amendments made in "recent years."[1] *The 2016 handbook contains its own section marked "Grievance Procedures" that contains a very meaningful difference from the version on the portal. On pg. 3-10, it states simply that "The Executive Director shall make the final decision concerning matters involving probation, demotion or suspension without pay." In other words, the reference to potential review by the Personnel Committee is deleted altogether.*

The fact that the most recent in time iteration of the employee handbook returns final personnel authority to the ED suggests strongly that LSA has at some point altered its earlier policies. It would make sense, given the strong trend in board governance over the past decade toward focusing boards on ED performance and not internal organizational management or personnel decisions. Certainly, it is an

---

[1] It has been asserted by the Board President that the board must approve changes to the employment manual. The Board's nine page bylaws contain no such references, and the amendment to those bylaws relate solely to director appointments and filling director vacancies.

elementary principle of document construction that when there are two statements in plain contradiction, the more recent one prevails.

It is always relevant to examine other governing documents to resolve a tension between contradictory rules. I have examined the Amended and Restated ByLaws of Legal Services Alabama. The ByLaws define the Board's responsibility in this manner: the Board shall "set policies for the Corporation and the Officers of the Corporation shall be charged with carrying out such policies." There is absolutely no reference to Board engagement in daily management of personnel.

Lastly, LSC regulations contained in CFR Section 1607.4, which involves functions of LSC governing bodies says only this:

(b) In addition to other powers and responsibilities that may be provided for by State law, a governing body shall establish and enforce broad policies governing the operation of a recipient, but neither the governing body nor any member thereof shall interfere with any attorney's professional responsibilities to a client or obligations as a member of the profession or interfere with the conduct of any ongoing representation.

The reference to "broad policies" seems at odds with a role in program management, as opposed to governance. 16 CFR 1621 also spells out LSC grantee grievance procedures but limits the scope to clients complaining about quality of service.

So, while there is a persistent belief among some LSA employees and even some board members that "the Board" can set aside employment decisions, there is literally no textual support for full Board action, and even the support for Personnel Committee action is an earlier version of a handbook that was crafted 11 years ago.

As Executive Director, it is my belief that under the 2016 version of the Operations Director's employee handbook, there is, perceptions aside, no room for review of an ED's personnel decisions. I have asked by email for the specific documented provisions that any Board member relies on to invoke such oversight. As of this writing I have received no answer.

This is not to say that a Board lacks authority to dismiss an Executive Director for any grounds it sees fit, including an employee firing. But as the responsible officer

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

for the organization, I would advise that such an act would raise the obvious legal question of how the full Board could dismiss based on an executive action that the full Board has no jurisdiction over; to say nothing of disparate treatment allegations regarding the Board's dealings with its past ED.

## Conclusions

I do not devote major space in this document to the actual personnel decision in controversy, since no version of the employee handbook confers jurisdiction of personnel matters on the Executive Committee. I will only make the observation that in all of my previous places of employment, from the US District Court to the US Attorney's office, to the largest law firm (at that time) in the world, to the United States Congress to Harvard University, an employee meltdown against the leader of the organization would have been grounds for instant termination, much less reassignment along generous terms.

I do believe this episode has crystallized the need to clarify what if any role the Board has in the content of the personnel handbook and in personnel decisions. These are valid topics for the strategic plan process or the October 6th board meetings. I am happy to work with a designated set of board members to adopt best practice recommendations.

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

8/31/2017                                                Gmail - Response from Executive Committee

                                                                LaVeeda Battle <laveedab@gmail.com>

## Response from Executive Committee

**Artur G. Davis** <agdavis@alsp.org>                                    Fri, Aug 18, 2017 at 3:07 PM
To: LaVeeda Battle <laveedab@gmail.com>

Laveeda, I find it suspicious that email will not suffice and view this as further deterioration. I am beginning, sadly, to question your motives and have sought legal counsel.



Artur G. Davis, Executive Director
Legal Services Alabama
2567 Fairlane Drive, Suite 300
Montgomery, Alabama  36116
334.223.5120

www.legalservicesalabama.org
[Quoted text hidden]
###############################################################################
Scanned by the Trustwave Secure Email Gateway - Trustwave's comprehensive email content security solution.
Download a free evaluation of Trustwave SEG at www.trustwave.com
###############################################################################

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant                    D00126





DEFENDANT'S
EXHIBIT
9

August 18, 2017

Mr. Artur Davis
Executive Director
Legal Services Alabama
2567 Fairlane Drive
Montgomery, AL  36116

Dear Mr. Davis:

This letter follows a meeting of the Executive Committee of the Board of Directors of Legal Services Alabama today wherein the Executive Committee considered your remarks, and several serious issues and allegations that have arisen during your tenure as Executive Director, and the Executive Committee has adopted the enclosed resolution.

Upon hiring you as Executive Director of Legal Services Alabama, in December, 2016, the Board sought to provide full support for your success. You established a process to keep the Board informed through monthly reports that highlighted your work for the previous month. The Executive Committee noted from reviewing the monthly reports, and other Board sources, concerns that there may be significant spending decisions made by you that are outside of the budget approved by the Board for additional staff positions not included in the budget, and other items not traditionally included in the budget. The Executive Committee discussed budgetary concerns with you at the last Executive Committee meeting, especially your desire to spend down reserves.

Even though LSA has established policies regarding the recruitment and selection of staff, which include policies to provide notice of a position vacancy to LSA staff and advertising for positions, it appears that you may have created new employment positions, that are not included in the budget and that have not been noticed or advertised according to LSA's policies. You have informed the Board about these hiring decisions after the fact.

The Board is concerned about creating and filling new positions, because it appears that you may have created new employment positions, with salaries for such positions that may have a budgetary impact that exceeds the LSA budget as approved by the Board.

As you are aware, the Board is responsible for establishing all policies which govern the operation of LSA, including the priorities for the delivery of LSA's services. You have chosen to create new initiatives which have been communicated to the Board only after implementation, without prior Board input or approval. Though the initiatives may have merit, these new initiatives may be outside of the priorities previously established and approved by the Board. The environment created by these decisions may have had an impact on the core case work of LSA as the number of cases being reported within the Board established priorities may have diminished.

LSC

2567 Fairlane Drive • Suite 300 • Montgomery, AL 36116
T 334.223.0240 • F 334.264.1474 • www.legalservicesalabama.org

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

We now turn to our concerns about your management of LSA's staff.  LSA's adopted Equal Opportunity Policy and Procedures strictly prohibits all forms of harassment of LSA's employees, which includes but is not limited to the creation of a hostile work environment, offensive, intimidating, threatening, demeaning or vulgar language, and unprofessional actions. As you are aware LSA's Equal Opportunity Policy and Procedures applies to all LSA officers, supervisors, managers, and employees. LSA maintains a "zero tolerance" policy for all types of harassment and for inappropriate, unprofessional, or offensive conduct.  LSA policy prohibits all intimidation or threats against any LSA employee.  A violation of LSA's policy against harassment can lead to disciplinary action, up to and including discharge, as appropriate in the circumstances.

It has come to my attention that you have stated that management of staff is strictly under your domain.  However, the Board has the overall responsibility for LSA's Equal Opportunity Policies and is ultimately responsible for the employment decisions regarding the Executive Director.

LSA's Equal Opportunity Policy and Procedure provides that an LSA Employee may notify the President of the Board directly when the complaint pertains to the Executive Director.  LSA's policy requires that all complaints of harassment or other conduct prohibited by LSA's Equal Opportunity Policy and Procedure, must be promptly and thoroughly investigated, and LSA must take appropriate action, including disciplinary action if necessary, based upon the results of the investigation.

As President of the Board I have received confidential communications from LSA staff regarding complaints of harassment and the creation of a hostile work environment by your unprofessional treatment of LSA employees when you have been informed by them about existing LSA protocols and procedures; demeaning support staff; intimidating and threatening staff with retaliation unless they agree to keep the Board uninformed about matters involving LSA. LSA's policy prohibits retaliation against any employee who in good faith brings any harassment allegation to the attention of LSA management or the Board.

It is also the policy of LSA that all LSA employees must refrain from any action and avoid public announcements that might reflect adversely upon LSA.  I have received reports that you have stated that you would "destroy LSA if challenged by the Board on any of your decisions."

These serious allegations must be investigated by the Board according to the LSA protocols and procedures as contained in the LSA Employee Handbook.

I have communicated these complaints to the Board's Executive Committee, which has authorized the commencement of LSA's required investigation into these complaints. Additionally, upon receiving notice of these allegations and issues, the Board's Executive

2

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

Committee has determined it is in the best interest of LSA to insure that the budget, the LSA program and LSA's staff do not incur irreparable harm prior to the completion of the Board's investigation.

The Executive Committee has therefore taken the following actions and adopted the following policies upon its authority to act upon behalf of the full LSA Board, between regularly scheduled meetings of the Board:

1. You are instructed to immediately vacate LSA's Central Office and you are not authorized to return, visit, or report to any LSA facility or LSA office, LSA function or LSC event pending the completion of the investigation of these matters and pending such further action by the Board upon review of the findings of such investigation; and

2. The complainant(s), the allegations of the complaint(s) and the investigation shall be kept as confidential as possible, subject to LSA duty to investigate fully and take appropriate action. Further all employees, including you, are expected and encouraged to participate fully and freely in such investigation. There will be no retaliation against any employee for truthfully participating in such investigation. Notwithstanding, all requests for information shall be handled in accordance with LSA's Public Relations Guidelines.

3. While on administrative leave, with pay, you shall have no access to any LSA facilities, property, functions, activities, or records, including but not limited to electronic access to LSA's computer systems. In addition, while you are on administrative leave, with pay, he shall have no authority to take any actions upon behalf of LSA as its Executive Director or otherwise. You shall turn in all keys and other entry devices to LSA; and

4. While on administrative leave, with pay, the President of the Board shall serve as the only official media and public relations spokesperson for LSA under LSA's Public Relations Guidelines and any notification you are required to provide as an LSA under LSA's Public Relations Guidelines must be provided to the Board President.

Please carefully review each of the items provided in this letter. Any questions you may have may be directed in writing me.

The Executive Committee of the Board also reminds you that LSA's policies provide that all LSA employees must refrain from any action and avoid public announcements that might reflect adversely upon LSA.

3

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

Any violation of the policies and directives provided by this letter and in the enclosed Executive Committee resolution shall be grounds for further investigation and appropriate action or discipline by the Executive Committee or the Board up to and including termination.

Sincerely,

LaVeeda Morgan Battle
Board President

Enclosure
cc: Personnel File

4

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

D00066

LaVeeda Battle <laveedab@gmail.com>

## My future at LSA

**Artur Davis** <arturgdavis@gmail.com>                            Tue, Aug 22, 2017 at 10:11 PM
To: "pastor Bennie Richardson, II" <pastorrichardson2@yahoo.com>, "Adams, Cassandra E." <ceadams@samford.edu>,
gtc729@aol.com, jsaxon@saxonattorneys.com, katy_campbell@bellsouth.net, LaVeeda Battle <laveedab@gmail.com>,
lwh@henderson-esq.net, mludgood@mobile-county.net, nbradley@bellsouth.net, Phil Mitchell
<pmitchell@harriscaddell.com>, Richard Davis <rdavis@maynardcooper.com>, broomenotguilty@aol.com, Yvonne Saxon
<yvonne.saxon@gmail.com>
Cc: michael forton <mforton@alsp.org>

I write to announce my resignation as Executive Director of Legal Services of Alabama and my departure from the
program effective September 23, 2017. While I am deeply proud of the lawyers who work every day to advance the
cause of poor Alabamians, and of the dramatic strides LSA has made in nine months, my vision of the job of
Executive Director and the future of this organization is fundamentally at odds with the leadership of your board.
That has led to an impasse that cannot be resolved as long as the current Board leadership is in place.

My personal compass leads me to go where I can make the greatest difference, and I eagerly look forward to
continuing the fight for a fairer, better Alabama on another field.

**DEFENDANT'S
EXHIBIT
16**

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

D00052

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this

| AGENCY | | CHARGE NUMBER |
|---|---|---|
| | FEPA | 470-2017-02742 |
| ✓ | EEOC | |
| | | and EEOC |

| State or local Agency, if any | S.S. No. | 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 |

| NAME (Indicate ✓ Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Artur G. Davis | Cell: 202-441-3089 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 5301 Cluster Oak Ct. | Montgomery, Alabama 36116 | 10/09/1967 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Legal Services Alabama, Inc. | 15-100 | 334-223-0232 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 2567 Fairlane Dr. | Montgomery, Alabama 36116 | Montgomery |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE EARLIEST (ADEA/EPA) | LATEST (ALL) |
|---|---|---|

| [X] RACE | [ ] COLOR | [X] SEX | [ ] RELIGION | [ ] AGE | 8/18/2017 |
| [ ] RETALIATION | [ ] NATIONAL ORIGIN | [ ] DISABILITY | [ ] OTHER (Specify) | [ ] CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

See attached sheets

DEFENDANT'S EXHIBIT
1

RECEIVED

OCT - 2 2017

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| 9/25/17 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE |
| Date   Charging Party (Signature) | (Day, month, and year) |

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

I encountered immediate personnel challenges that required changes within the organization. The Operations Director at LSA, Eileen Harris, voluntarily resigned in late 2016. Harris had been accused in three separate written complaints of creating a hostile, intimidating environment for administrative staffers, and office relationships were strained. LSA's central office staff was not well structured, and there were significant gaps in major areas, including finance, management of grant compliance reports, and external outreach and communications.

I also learned in the first weeks of my tenure that LSA had been experiencing significant racial tensions for several years under Fry's tenure. Development Director Jaffe Pickett, an African American female, was the sole minority department head at LSA, and shared a number of her views about the office's racial climate. Among other things, she stated that she had won her promotion to a leadership position partly through internal complaints to the national Legal Services Corporation that there were no black department heads at LSA. Pickett expressed that racial tensions between black and white staffers in the central administrative office were commonplace at LSA. Early on, she expressed a strong opinion that two important open positions in the program, Finance Officer and Operations Director, should not both be filled with white individuals. Pickett stated to me in February 2017 that the black employees in the central administrative office would consider it "whitewashing" to fill these two jobs with whites and that she "could not support" such a move.

Despite Pickett's advice, I strongly believed that LSA should emphasize experience and qualifications over race in hiring and that diversity would be achieved without setting quotas for particular positions. Pickett's judgment notwithstanding, I hired a white female, Charlotte Rand, to run the Operations Department and a white male to handle finance operations, both of whom had superior credentials and references as compared to two black finalists.

Over the course of my tenure as ED, LSA made substantial strides that won widespread accolades from board members, stakeholders outside the organization, and rank and file employees. The accomplishments included (1) unanimous board approval of comprehensive pay raises and a bonus plan for employees; (2) a surge in employee morale, as described by numerous employees; (3) stabilizing a pattern

2

of declining caseloads after three straight years of reduced client service; (4) the creation of a High Impact Litigation Unit, an Education Practice group, a veterans' outreach initiative in the Montgomery office, and a campaign to assist ex-offenders with restoring their rights to vote under a new Alabama law; and (5) replacing departing personnel with a pool of diverse, highly qualified new attorneys, including two experienced lateral attorney hires.

I also strengthened the performance of the central office by replacing a minimally performing administrative staffer with a highly qualified replacement, adding a veteran Chief Financial officer to oversee LSA's long troubled financial operations, adding a communications staffer to improve organizational visibility, and hiring an experienced grant manager. All of these hires remained well in line with LSA's personnel budget for the FY 17 fiscal year.

Over the course of the spring and summer of 2017, LSA continued to struggle in one area: tensions and animosity among central office employees, which seemed often to split along racial lines. After Rand raised the pay of two white accounting clerks under her supervision, Pickett complained that two African American administrative staffers should have received raises too (although both were already the highest compensated administrative staffers in the program and were set to receive raises as part of the new compensation plan).

Pickett became an increasingly disruptive and insubordinate force, complaining to various employees that I was siding with Rand over her. Pickett became openly hostile to a white female grant manager, Mary Aplin, including making belittling remarks about her in at least one staff meeting, conduct that caused Aplin to file a hostile environment claim with the Office of Inspector General at the national Legal Services Corporation. Pickett's own assistant, Dorothy Graham, a black female, sent me a racially charged message that I had reinstated "Jim Crow" and was forcing "black people" in the central office to be subservient to the "whites". Graham and the program's Executive Assistant, Sylvia Mason, a black female, became openly hostile to Rand and increasingly to my leadership as well. In early August, 2017, Pickett confidentially approached the leadership of the board, including LaVeeda Battle, a black female, with a variety of deliberately false claims about the program's direction and my leadership (I learned of this event through internal sources in my final hours in the office).

3

On August 18, 2017, rather than ask my side of Pickett's claims, LaVeeda Battle notified me that the Executive Committee of the Board of Directors of LSA was going to conduct an "internal investigation" of my leadership, and that I would be placed on administrative leave during that investigation. I was ordered to vacate my office and barred from having any access to LSA facilities, properties or records. I was also instructed that, as an LSA employee, I must "refrain from any action and avoid public announcements that might reflect adversely upon LSA." Pickett, although the source of the complaints about my leadership, was named Executive Director, pending the completion of the investigation.

Prior to being suspended, I was given no notice whatsoever of either board concerns about my leadership or of Pickett's complaint. Battle did not advise me of the allegations being made against me nor give me any chance to respond to them before placing me on administrative leave. To the contrary, Battle and other board members had effusively praised my work and the new direction in the program, which had incidentally been detailed exhaustively in my monthly reports, in two board meetings in 2017, and in numerous email informational exchanges with Battle in her role as board president. Battle had said to me in mid-June that I was "doing an excellent job".

In addition, Battle failed to seek any corroboration of Pickett's claims from other department heads, including the director of advocacy, the director of operations, and the chief financial officer. Battle deliberately took the word of one self-interested staffer as gospel, without consulting any other leaders of the organization. Battle also included in the document suspending me numerous statements that were demonstrably false, easily subject to being disproved, or that entirely misstated the scope of board authority under the organization's bylaws.

Because of the high visibility of the role of Executive Director of LSA in both legal circles and the social services community, the Board's decision to place me on administrative leave injured and continues to injure my reputation and unfairly labeled me as someone who has engaged in improper conduct. The administrative leave triggered numerous false rumors regarding improprieties, some of which Battle and Pickett may have sought to foment to damage my professional standing. Indeed, Battle even hired at a $7500 expense to LSA a political consultant who managed a campaign against me two years ago, whose specialties include negative

4

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

reputational attacks, in an effort to gather or disseminate negative information about me. Because of the pervasive negative rumors, and the need to separate myself from the organization to adequately defend myself, I had no other option but to resign as Executive Director. I resigned in an email to the staff and board on the evening of August 23, 2017.

I believe that LSA discriminated against me because of my race, African American, and my sex, male, in violation of Title VII of the Civil Rights Act as amended. One basis for this belief is that LSA's treatment of me is in stark contrast to the manner LSA treated my white predecessor Jimmy Fry, and another high ranking staffer, former Operations Director Eileen Harris, a white female. Despite Fry's documented history of poor performance, despite serious issues around his character in the workplace, and despite a record that would have merited termination by any reasonable standard, Fry was never subjected to the damaging event of an administrative suspension. When Fry's issues finally placed him in jeopardy of termination, he was given the face saving opportunity of a year-long transition and "voluntary" retirement. In Harris' case, she was the subject in late 2016 of documented written complaints by three staffers that she had subjected them to verbally abusive, bullying behavior. The Board launched no internal investigation, took no actions to discipline Harris, and generated no documents accusing Harris of harassment or creating a hostile environment.

I also believe that LSA discriminated against me because of my race in violation of Title VII of the Civil Rights Act as amended, in that the Board President rewarded an invidious double standard that as an African American executive, I should have aligned myself in favoritism with black employees clashing with their white counterparts. Ordinary exercises of executive discretion were seen as favoritism for whites. Reliance on racial stereotypes or norms is a violation of Title VII. *See Kimble v. Wisc. Dep't of Workforce Development*, 690 F. Supp.2d 765 (E.D. Wisc. 2010).

In addition, I believe that the extreme weakness of the factual grounds LSA cited to take adverse actions against me are strong evidence of pretext, and therefore circumstantially probative of a discriminatory intent. I believe that LSA's choice to rely on flimsy, easily disprovable charges without even a pretense of fact finding to suspend me would enable a jury to infer a hidden discriminatory intent, based on either the Board President's desire to punish me for not siding with black

5

employees or for improper favoritism on the Board President's part toward Jaffe Pickett for reasons of gender bias. *See Reeves v. Sanderson Plumbing Products Inc.*, 530 US 133, 147 (2000) ("it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation".) Therefore, I believe that a reasonable jury could conclude that LSA discriminated against me because of my race or gender in violation of Title VII of the Civil Rights Act as amended.

I declare under penalty of perjury that the foregoing is true and correct.

*Artur Davis*

Artur G. Davis

9-25-2017

Date

6

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

D00007

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this

| AGENCY | | CHARGE NUMBER |
|---|---|---|
| ☐ FEPA | | 420-2018-0207 |
| ☐ EEOC | | and EEOC |

| State or local Agency, if any | S.S. No. |
|---|---|

**NAME** (Indicate ☑, Ms., Mrs.)

Artur G. Davis

HOME TELEPHONE (Include Area Code)

Cell: 202-441-3089

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 5501 Cluster Oak Ct. | Montgomery, Alabama 36116 | 10/09/1967 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Legal Services Alabama, Inc. | 15-100 | 334-223-0202 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 2567 Fairlane Dr. | Montgomery, Alabama 36116 | Montgomery |

| NAME | | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ AGE
☒ RETALIATION   ☐ NATIONAL ORIGIN   ☐ DISABILITY   ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA)       LATEST (ALL)

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

See attached sheets

RECEIVED
OCT - 4 2017
U.S. EEOC
Birmingham District Office

DEFENDANT'S
EXHIBIT
1

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct

SIGNATURE OF COMPLAINANT

| 10-2-2017 | Artur Davis | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |
|---|---|---|
| Date | Charging Party (Signature) | |

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant                    D00008

Affidavit to Charge of Retaliation: Artur G. Davis[1]

On August 14, 2017, I met with Jaffe Pickett, Development Director, and Charlotte Rand, Operations Director regarding the deterioration of the central office work environment at Legal Services of Alabama. During that meeting, in response to an outburst from Pickett, an African American female, to Rand, a white female, that "in this world, you will always be right and I will always be wrong", I made the observation that if LSA had a racial issue, it involved the organization's treatment of African American men. I observed that the Board of Directors had been extremely deferential to its previous white Executive Director on internal matters including personnel, that the organization had an extremely poor history of hiring and promoting black men, and that I hoped to not have to raise this subject publicly. I made it clear that I would do so and would take legal action if I believed I faced any action by the Board that constituted discriminatory treatment.

On August 17, when the President of the Board, Laveeda Battle, and another member of the executive committee, Phil Mitchell, informed me that the executive committee wished to schedule a call with me on August 18, I informed them by email that I had consulted legal counsel. The next day, August 18, 2017, I was handed a notice of administrative leave and suspension. The notice included an assurance that any subsequent internal investigation and allegations against me would be "kept as confidential as possible." It was also stated in the notice of suspension that "all employees, including [me], are expected and encouraged to participate" in any subsequent investigation.

On the evening of August 18, I sent a one sentence email to Battle: "This constitutes notice of my intent to file a claim of race discrimination against LSA based on Title VII."

---

[1] I have filed by separate document a charge of discrimination against Legal Services of Alabama on grounds of race and gender discrimination. This affidavit incorporates by reference the declarations and facts contained in that separate charge, mailed on September 29, 2017.



The week of August 21, fully on notice of my intent to file a Title VII claim, LSA took a series of steps that not only injured and defamed my reputation but reversed the promise of confidentiality regarding any allegations against me: a security guard was placed at the central office, and staffers were informed that LSA actually had reason to believe I posed a physical danger to the building. A political consultant in Montgomery, Alabama who I had previously fired and who had managed a campaign against me was hired to advise the organization and was provided copies of the documents suspending me: upon information and belief, hiring this specific consultant was done both to gather damaging "opposition research" about me and to facilitate the sharing of documents with someone likely to disseminate them in a future election campaign. In addition, upon information and belief, this consultant was also tasked with generating negative online commentary about me, which is a known specialty of this consultant.

Upon information and belief, after learning of my intent to file an EEOC charge, LSA leadership verbally conveyed to a number of individuals outside LSA that I was "under investigation" or "facing serious internal matters", in direct contravention of its promise of confidentiality, all in an effort to inflict professional damage within legal and professional circles.

After LSA learned of my participation in EEOC protected activity, it changed its stated plans regarding its internal investigation. LSA's month-long internal investigation deliberately made no effort to interview me, or for that matter, any staffer at LSA other than a small group of individuals whom I had taken some disciplinary action against, and a development director who had already complained to the board leadership about the direction of the organization. This same development director was also self-interested in that she had been appointed to succeed me.

After learning of my intent to file and EEOC complaint, LSA sought to uncover evidence that would inflict even more reputational damage. A female staffer conveyed to me that during the week of August 21, she was for the first time "confronted" about "rumors" of a personal relationship between us. On September 22, an LSA staffer falsely representing that she was my assistant and that I was still an employee of LSA contacted a hotel I had stayed in during a regional director's conference to obtain information about telephone numbers I called while at the hotel, in an apparent but failed effort to gather evidence I had engaged in improper conduct while on the organization's dime.

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant



In mid-September, 2017, Battle sent to all 78 LSA employees an email disclosing the results of its one-sided internal investigation, including an observation that "most" claims against me had been confirmed; that I had damaged the organization in numerous ways; and that I had been an imprudent manager of the organization's finances.

In addition to my previous claims submitted to the EEOC, I believe that LSA's decision to suspend me was also based on retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended. I believe that a factfinder could infer that Pickett communicated my statements about being a subject of racially discriminatory treatment and my willingness to litigate the issue to at least President Battle; that my own reference in an email to Battle and Mitchell about consulting legal counsel confirmed these comments; and that the abrupt suspension was motivated by a desire to retaliate against me for opposition to racially discriminatory activity prohibited by Title VII.

I also believe that LSA's decision to exclude me and other employees favorable to me from its internal investigation; its continuing efforts to damage my reputation and to develop additional damaging information about me; its collaboration with a political consultant; and its publication of defamatory findings that I was given no opportunity to rebut were also based on retaliation against me for opposition to racially discriminatory activity prohibited by Title VII.

I declare under penalty of perjury that the foregoing is true and correct.

_Artur Davis_

Artur G. Davis

_10-2-17_

Date

11/24/2017                                Artur Davis, LSA in legal standoff - Alabama Political Reporter

DEFENDANT'S
EXHIBIT
14



                                                                                                    Search

# ALABAMA POLITICAL REPORTER

### Friday, November 24th 2017

HOME    NEWS    FEATURED COLUMNISTS    GUEST COLUMNISTS    OPINIONS    ARCHIVES    ABOUT    CONTACT

Alabama Political Reporter > News > In Case You Missed It > Artur Davis, LSA in legal standoff

## Artur Davis, LSA in legal standoff



**By Josh Moon**
Alabama Political Reporter

Legal Services Alabama is in an uproar.

Last week, Artur Davis, the former Alabama gubernatorial candidate, resigned as LSA's executive director and wrote a scathing op-ed about his decision on his way out. In it, and in a subsequent complaint to the national Legal Services office and an Alabama Bar Association complaint, Davis alleged he resigned after LSA's board president, LaVeeda Battle, placed him on leave over trumped-up charges and a personal vendetta.

Battle, of course, denies this and contends that there was valid cause to place Davis on leave and that she had the backing of her board on the decision.

The spat has created a rift in the LSA office, with a majority of the employees coming down on Davis' side. Three employees, who wished to remain anonymous, said they believed the situation stemmed from Davis being brought in to run LSA and making changes that didn't sit well with longtime employees.

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant                                        D00049

"These people had their routines and he upset that to a degree," said one employee. "I didn't agree with every decision (Davis) made, but I had a pretty good handle on what happened in the office, and I never saw anything improper on his part."

According to a portion of the bar complaint Davis filed, Battle listed three reasons for placing Davis on suspension: he damaged LSA with improper hiring practices, created a hostile working environment and failed to follow LSA guidelines and rules when implementing initiatives.

In his complaint, Davis notes that staff salaries are well under budget, that all initiatives implemented by him were approved beforehand by the board and that the majority of employees would agree that the working environment is fine.

Battle wouldn't comment on the bar complaint because she said she hasn't seen it yet. However, she said she had ample cause to place Davis on leave.

"It's a shame that Mr. Davis chose to resign and is now speaking so poorly of the organization that does so much good for the people of this state," Battle said.

LSA provides legal services and guidance to impoverished people, aiding in situations such as foreclosures and land disputes. Battle said her office, which aided Louisiana residents in the aftermath of Hurricane Katrina, is currently preparing guidance for the City of Houston in order to help that city's legal services deal with insurance companies and other problems.

But while no one disputes LSA's good deeds, some do question the money spent to fight this battle with Davis. They said that an investigator and a new security officer have been hired, and earlier this week they discovered that a public relations consultant was involved.

The employees said they learned of the consultant when the new interim executive director sent out an email to all staff purportedly written by Battle, however, the email mistakenly left political consultant David Mowery's signature and photo at the bottom.

"It just seems like it's been blown way out of proportion and it's not worth this," one employee said. "We have a hard enough time serving our people. This isn't helping our purpose."

It doesn't appear as if either side is prepared to back down. Battle and LSA are moving forward with an investigation of the allegations against Davis, and Davis is pushing both the bar complaint – which alleges Battle has been purposefully dishonest – and his complaint to the national Legal Services Corporation.


CATEGORIES: IN CASE YOU MISSED IT   NEWS

TAGS: ARTUR DAVIS  LEGAL SERVICES ALABAMA

---

© Copyright 2017 Alabama Political Reporter

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant                    D00050

Alabama



DEFENDANT'S
EXHIBIT
13

# Why I left Alabama's legal services program



Artur Davis (File)

 **By Guest Voices**
on August 25, 2017 at 2:22 PM

**By Artur Davis,** *who represented Alabama's Seventh District in the U.S. House of Representatives from 2003 to 2010 and until recently served as executive director of Legal Services Alabama.*

A few days ago, I resigned from the leadership of Alabama's legal services program. It came at the end of a turbulent several weeks where I was expending more time clashing with a board president and a few dissident employees than I was spending on devising strategies to serve Alabama's low income families.

And the clashes turned very petty: after I had the nerve to reassign a longtime administrative aide who pitched a tantrum, I suddenly found myself served with an out-of-the-blue suspension notice.

I haven't exactly taken it lying down and have asked the national Legal Services Corporation to take a hard look at the integrity and future of the Alabama program, which desperately needs an intervention.

But I chose resignation rather than a protracted fight to regain authority, even though lawyers have told me I would have won. I have other plans for my life, including a return to the public arena sooner or later. And maybe I had hit the wall on what I could do at Legal Services.

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant                    D00047

You see, my role in leading a non-profit recipient of federal funds required me to wear a muzzle: I could espouse the value of free legal service to the poor, but couldn't breathe a word about the Trump Administration's willingness to gut programs that protect ordinary people while it calls itself populist.

I could launch an education practice at my organization but couldn't enter the discussion of how Montgomery has negligently mishandled its public schools. I could sponsor clinics to help ex-offenders recover their voting rights but had to be silent on the unfairness of Alabama still calling a bad check a crime of moral turpitude while a political corruption violation isn't.

And then there are the limitations of leading a legal aid program. I took pride in every single lawyer on the payroll, but I felt demoralized every time I read our monthly data on case load and saw that we were not fundamentally different from our legal aid counterparts around the country: we spent 80 percent of our time on short-term representations and even our best lawyers hardly ever sued corporate wrongdoers.

There was no shortage of people who called our hotline needing help: 90 percent of them we either turned away or gave only limited-scope advice.

I also wanted very ambitiously to lead a mission to use legal tools to reduce poverty, in a culture where modest client service was what our very conservative board prided itself on. One of my detractors observed in my final days that I was an activist and that we were pushing too far: if the poor don't deserve activism, I don't know who or what does.

I do know better now than I did before that the poor deserve a comprehensive legal strategy. For one thing, there is an economic engine called the subprime economy that makes its money off people with bad credit: it finances short term loans that trap poor folks in debt; it tells a family striving to own a home that they can get there through rent-to-own, which is almost always a racket; it sells cheap cars to people with bad credit then sells the debt on the collections market after it has rigged the payment schedule to break the customer. Subprime is the ultimate casino where the house always wins.

Had I stayed, I had some dynamic goals for the fall. We were about to sue Alabama for its latest campaign to score political points by trimming the food stamp rolls in poor communities. My last major act was signing off on a case to re-start the business education curriculum in a South Alabama county, where a vocational track is essential to an 18 year old's job prospects.

We were about to launch a statewide effort to assist former inmates with all aspects of reentry to community life. If that work lives--and legal aid lawyers, that depends on you--Alabama's poor will be better off.

As for me, 49 is still a little too young to retire (thank you, Alabama's 70ish year-old politicians, for making mid-life look perpetually young). I am about to put some of the energy I just described into Montgomery's future, and into being another constructive voice in Alabama. I'm still the grown version of a child who rose out of the poorest side of Montgomery, Alabama on the force of dreams.

Registration on or use of this site constitutes acceptance of our User Agreement and Privacy Policy

© 2017 Alabama Media Group. All rights reserved (About Us).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Alabama Media Group.

Community Rules apply to all content you upload or otherwise submit to this site.

▷ Ad Choices

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant                    D00048