

Deposition of:
# Delores Rosetta Boyd

*March 4, 2019*

In the Matter of:

# Davis, Artur Vs. Legal Services Alabama, Inc.

Freedom Court Reporting

800.808.4958 | calendar-freedom@veritext.com  | 205-397-2397

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2         FOR THE MIDDLE DISTRICT OF ALABAMA

3               NORTHERN DIVISION

4

5   CIVIL ACTION NO.: 2:18-cv-00026-SRW

6   ARTUR DAVIS,

7            Plaintiff,

8            vs.

9   LEGAL SERVICES ALABAMA,

10  INC.; et al.,

11           Defendants.

12

13           S T I P U L A T I O N

14          IT IS STIPULATED AND AGREED by and

15  between the parties through their respective

16  counsel, that the deposition of Delores Rosetta

17  Boyd may be taken before Angela Smith McGalliard,

18  CCR, at the offices of Jemison & Mendelsohn, at

19  1772 Platt Place, Montgomery, Alabama 36117, on

20  the 4th day of March, 2019.

21

22          DEPOSITION OF DELORES ROSETTA BOYD

23

Page 2

1         IT IS FURTHER STIPULATED AND AGREED
2   that the signature to and the reading of the
3   deposition by the witness is not waived, the
4   deposition to have the same force and effect as
5   if full compliance had been had with all laws
6   and rules of Court relating to the taking of
7   depositions.
8         IT IS FURTHER STIPULATED AND AGREED
9   that it shall not be necessary for any
10  objections to be made by counsel to any
11  questions except as to form or leading
12  questions, and that counsel for the parties may
13  make objections and assign grounds at the time
14  of the trial, or at the time said deposition is
15  offered in evidence, or prior thereto.
16        IT IS FURTHER STIPULATED AND AGREED
17  that the notice of filing of the deposition by
18  the Commissioner is waived.
19
20        * * * * * * * * * * * * *
21
22
23

Page 4

1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE MIDDLE DISTRICT OF ALABAMA
3           NORTHERN DIVISION
4   CIVIL ACTION NO.: 2:18-cv-00026-SRW
5   ARTUR DAVIS,
6       Plaintiff,
7       vs.
8   LEGAL SERVICES ALABAMA,
9   INC.; et al.,
10       Defendants.
11  BEFORE:
12      Angela Smith McGalliard,
13      Commissioner.
14  APPEARANCES:
15      KENNETH J. MENDELSOHN, ESQUIRE, of
16  JEMISON & MENDELSOHN, at 1772 Platt Place,
17  Montgomery, Alabama 36117, appearing on behalf
18  of the Plaintiff.
19      ALBERT L. VREELAND, II, ESQUIRE, of
20  LEHR, MIDDLEBROOKS, VREELAND & THOMPSON, 2021
21  3rd Avenue North, Birmingham, Alabama 35203,
22  appearing on behalf of the Defendant.
23        * * * * * *

Page 3

1         * * * * * * * * * * * * *
2             I N D E X
3           EXAMINATION
4                    PAGE LINE
5   By Mr. Mendelsohn...................  6    3
6         PLAINTIFF'S EXHIBITS
7                    PAGE LINE
8   Exhibit 18 - Bates 626...   8    18
9   Exhibit 19 - Executive
10      Summary prepared by D. Boyd  12   16
11  Exhibit 20 - Detailed
12      report by D. Boyd with
13      exhibits..................  12   17
14  Exhibit 21 - LSA Handbook  27   21
15  Exhibit 22 - Six-month
16      report....................  86    8
17        * * * * * * * * * * * * *
18
19
20
21
22
23

Page 5

1      I, Angela Smith McGalliard, CCR, a
2   Court Reporter of Pike Road, Alabama, acting as
3   Commissioner, certify that on this date, as
4   provided by the Federal Rules of Civil
5   Procedure and the foregoing stipulation of
6   counsel, there came before me at the offices of
7   Jemison & Mendelsohn, 1772 Platt Place,
8   Montgomery, Alabama 36117, beginning at 10:01
9   a.m., Delores Rosetta Boyd, witness in the above
10  cause, for oral examination, whereupon the
11  following proceedings were had:
12      DELORES ROSETTA BOYD,
13  being first duly sworn, was examined and
14  testified as follows:
15      COURT REPORTER:  Usual
16  stipulations?
17      MR. VREELAND:  That's fine with
18  us.
19      MR. MENDELSOHN:  Sure.  If you
20  want to read and sign, want to let us know
21  later, that's just up to you, so you tell us
22  when --
23      THE WITNESS:  Whatever expedites

2 (Pages 2 - 5)

Page 6

1 it for you. I'll trust the court reporter.
2            EXAMINATION
3 BY MR. MENDELSOHN:
4    Q.    Tell us your full name, please,
5 ma'am.
6    A.    Delores Rosetta Boyd.
7    Q.    And I know a lot about your
8 background, but when did you step off the
9 bench? Help me out.
10   A.    The end of 2006.
11   Q.    And since that time you have
12 been, I know, doing mediations.
13   A.    A combination of mediation work,
14 investigative administrative adjudication; I
15 think that I -- in 2007, I recall participating
16 in a fairly extensive investigation for the
17 Jefferson County Personnel Board, and it
18 related to alleged cheating on promotional
19 exams.
20   Q.    Okay.
21   A.    I've done workplace
22 investigations and extensively involved into
23 family estates.

Page 7

1    Q.    Okay.
2    A.    I have not resumed practice of
3 law deliberately.
4    Q.    Good for you. Let me make sure
5 we're straight on a couple of things because I
6 don't want to step over any bounds about
7 attorney-client privilege. I know when our
8 emails exchanged to set up the deposition,
9 there was some concern about it.
10         Are you free to talk about this
11 investigation?
12   A.    If Mr. Vreeland, who is here with
13 Legal Services, says I'm free, then I am free.
14 It was my understanding that my work was to be
15 confidential, and you probably got that glimpse
16 in my emails.
17   Q.    Yes.
18   A.    Because until that email, I knew
19 nothing about this and certainly did not
20 believe that I was free because the -- all of
21 the contractual documentation underscored the
22 confidentiality. But my understanding is, and
23 I'll let him speak for the agency, is that

Page 8

1 there has been a waiver by the client. And if
2 there has been, I believe that that binds me to
3 participate.
4         I don't know how free I am, so
5 I'll let him speak to that.
6         MR. VREELAND: That's correct.
7 We're not claiming work product or
8 attorney-client privilege.
9         MR. MENDELSOHN: Okay. Yeah.
10 Because what -- I'm not even going to try to
11 take the position that you waived it by
12 producing the documents, but I still respect
13 the attorney-client so --
14         MR. VREELAND: Sure. We are not
15 asserting the privilege or work product.
16         (Off-the-Record discussion
17          was held.)
18         (Whereupon, Plaintiff's
19          Exhibit 18 was marked for
20          identification purposes.)
21   Q.    If you would take a look at
22 Exhibit 18. We do have a Bates stamped number
23 on that, and that would be 626.

Page 9

1         And I'll ask you if you're
2 familiar with it.
3    A.    Plaintiff's Exhibit 18 is an
4 engagement letter I sent to LaVeeda Battle in
5 her capacity as president of the board of
6 directors; it is dated from me on August 21,
7 signed by her on August 25; and it is a
8 confirmatory letter for my agreement to
9 undertake a workplace investigation for Legal
10 Services in Alabama, pursuant to the board's
11 August 18 resolution for an independent
12 investigation of specified issues and concerns
13 arising from management decisions by executive
14 director Artur Davis.
15         I do recall this and identify it
16 as such.
17   Q.    When were you first contacted
18 about this, if you know?
19   A.    I cannot give you a precise date.
20 If this is dated August 21, my best
21 recollection is perhaps a few days before; it
22 may have been the day before.
23         My recollection of the

Page 10

1 circumstances is that I received either an
2 email or a phone call from LaVeeda Battle
3 inquiring about my availability. I made
4 inquiries about the parties. I recall
5 specifically indicating familiarity with Mr.
6 Davis.
7         And I recall specifically
8 relaying my service on the very first Legal
9 Services board, and advising that I did not
10 think that either my familiarity with Mr.
11 Davis, my prior support, financially, for some
12 of his campaigns, or my former acquaintance
13 with -- I believe it was Sylvia Mason, at some
14 point after I got on the board, would prevent
15 me from handling the investigation.
16         And I recall being asked to send
17 a proposal that outlined my availability and
18 what I said by phone.
19     Q.    Okay. When were you on the
20 board?
21     A.    The very first time we had the
22 good fortune of having a Legal Services in
23 Alabama, it was called the Legal Services

Page 11

1 Corporation of Alabama. And I had the honor of
2 serving on the founding board of directors.
3         My best recollection is 197- --
4 somewhere between '76, '78. I can only do it
5 by reference to my own tenure. I returned here
6 in '75, I began law practice around August of
7 '76. Whenever the record shows Legal Services
8 got started here in Alabama, it could have been
9 '78, somewhere in that area.
10     Q.    Okay. How long did you serve on
11 it, do you know?
12     A.    Now you've got me. I recall
13 serving longer than I had intended. Best
14 guess, I know I served for -- let me see if I
15 can relate it to anything.
16         I was on the board through the
17 late '70s. I recall being on the board when
18 Marvin Campbell was the executive director; I
19 recall being on the board for a short period
20 when Winston Durant was executive director. I
21 could not give you a year; maybe into the
22 mid-'80s, I just don't know.
23     Q.    Okay. Was Ms. Battle on the

Page 12

1 board at any time while you were on it?
2     A.    I do not recall that she was.
3 This was a very large board. I don't recall
4 that she was. There are some board members who
5 stand out, but I do not recall her being on the
6 board.
7     Q.    Right. Okay. And so after --
8 Let's see if I -- I know the dates aren't
9 exactly right, but you get a phone call asking
10 if you're available --
11     A.    Either phone or email.
12     Q.    Or an email. And then at some
13 point, Exhibit 18 would have been sent to Ms.
14 Battle?
15     A.    Uh-huh. Sure.
16         (Whereupon, Plaintiff's
17         Exhibits 19 and 20 were
18         marked for identification
19         purposes.)
20     Q.    And then I have for you to
21 identify for me, please, Exhibits 19 and 20.
22     A.    I do recognize Plaintiff's
23 Exhibit 19. It is an Executive Summary that I

Page 13

1 prepared after I completed my investigative
2 analysis; I prepared it as a confidential
3 report; and I recall distributing it at a board
4 meeting and discussing it.
5         Plaintiff's Exhibit 20 is, in
6 fact, the actual detailed report, submitted
7 with exhibits that I don't see, but they were
8 tabbed and they're referenced in the report.
9 There were a good number of exhibits.
10         That is the detailed report
11 concluding my investigation.
12     Q.    I do plan on going over parts of
13 those with you. But, of course, if you need to
14 refer to any of it during the course --
15     A.    I will if I feel the need to.
16     Q.    Yeah. Please help yourself.
17         Did you, before starting your
18 investigative process, talk to anybody involved
19 in this matter other than Ms. Battle, I mean it
20 may have involved any witnesses, anybody on the
21 board?
22     A.    Before I undertook the report?
23     Q.    Yes, ma'am.

Page 14

1    A.    No, I did not.
2    Q.    And all I was making sure of was
3  whether anybody representing the board or Legal
4  Services contacted you around the same time
5  that Ms. Battle did?
6    A.    No.  Ms. Battle, as board
7  president, was my contact.
8    Q.    Okay.  Can you recall what Ms.
9  Battle told you in the first conversation about
10  the circumstances, what the investigation would
11  be about?
12    A.    What I recall is that she either
13  emailed or shared with me a resolution
14  outlining subjects to be investigated.
15    Q.    Okay.
16    A.    Today, I don't recall anything
17  more particular.  But apparently either the
18  board, or it may have been an executive
19  committee, had authorized the investigation I
20  was to undertake; and that resolution, I
21  recall, specified subjects for investigation.
22          And perhaps my letter will
23  refresh my memory.  I recall that I did not

Page 15

1  have the time constraints to investigate all of
2  those subjects.  Let me see if it's referenced
3  here.
4          No.  This initial letter was more
5  of a request that I confirm availability, lack
6  of conflict, and my billing hours.
7    Q.    If you look at Exhibit 20 for me,
8  on page five of it, Bates stamp number 160.
9    A.    Uh-huh.  Oh, yes.
10    Q.    And that may help me and you
11  communicate a little bit better.
12    A.    Uh-huh.
13    Q.    That appears to lay out the six
14  allegations that the board was asking you to
15  investigate?
16    A.    Yes.
17    Q.    Okay.  At the bottom of it, it
18  shows, the very last sentence, that the board
19  president did advise you that Davis had
20  resigned and the urgent need for a completed
21  report within three weeks.
22    A.    Yes.
23    Q.    Did she express to you what the

Page 16

1  urgency was?
2    A.    I believe the urgency was as
3  stated, the fact that he had resigned and they
4  had desired to have the investigation done
5  before he resigned, so that -- They still
6  wanted to have the issues resolved, because my
7  recollection is there were specific complaints
8  involving employees who were still on board,
9  notwithstanding his resignation, so that the
10  board wanted quickly to resolve all issues and,
11  I presume, to take some action.
12    Q.    Okay.  As far as any action, was
13  there anything that was alleged that could, in
14  your mind, have been any kind of criminal
15  action by Mr. Davis?
16    A.    I have no idea what's stated
17  beyond what's stated on the board resolution.
18  I did not involve myself in what actions the
19  board might undertake in response to my
20  investigation.  Instead, I limited my concerns
21  to what was expressed in the resolution.
22    Q.    Okay.
23    A.    But I do recall that there was

Page 17

1  more at stake than Mr. Davis's resignation or
2  continued employment.  There were specific
3  workplace complaints and an allegation of a
4  workplace that was hostile or intimidating.
5  And my understanding is that there were
6  employees still there, so there was an urgent
7  need, expressed to me, to investigate the
8  matters outlined in that resolution.
9    Q.    But as far as the accusations of
10  the hostile environment, that was accusations
11  against Mr. Davis?
12    A.    That's what it says in paragraph
13  four.  Complaints from LSA staff of harassment
14  and the creation of a hostile work environment
15  by the executive director, yes.
16    Q.    Right.  So if you don't know,
17  that's fine, I'm still trying -- Well, let me
18  ask it this way --
19    A.    I would not know why the board
20  perceived an urgent need to complete the
21  investigation.
22    Q.    That's why I asked you did she
23  express that to you.

5 (Pages 14 - 17)

Page 18

1    A.    I would purely be speculating.
2    Q.    Okay.  So when she said that they
3  needed it in three weeks, there was no further
4  discussion about why or what was urgent or what
5  they were planning?
6    A.    I do not recall any discussion.
7    Q.    Okay.  And I believe y'all had
8  some discussions about the inability for you to
9  complete this within three weeks?
10    A.    I don't know that we had
11  discussions.  I made it clear what I felt I
12  could and could not do, and that's what's
13  stated in the report, that I -- I made it very
14  clear, that all of the six items listed posed a
15  tremendous difficulty for any forum.
16          I believe that the board had used
17  the words a careful and full investigation; and
18  when I looked at them, it was clear to me I
19  could not do that within a three-week span of
20  time.  And I think that I stated -- I gave my
21  opinion as to why I could not do that and
22  recommended some more limited scope for any
23  completion within the three-week period.

Page 19

1          Having done workplace
2  investigations before, I was fully aware of the
3  time involved, and, unfortunately, also how
4  sometimes the investigation itself lends itself
5  to other directions that perhaps may not have
6  been anticipated or more time needed.
7          And I just knew it was impossible
8  for me, as an investigator, to focus on each of
9  these issues.  I don't recall discussing that
10  with Ms. Battle.  I do recall reporting to her
11  that, no, I can't do this, here's a suggested
12  focus; I can deal with these, and here's why I
13  can't deal with all the rest.
14    Q.    How did -- And, again, I'm trying
15  to save time and not go through line by line,
16  and the parts that I remember, or if we need to
17  refer to them I will.  But I recall reading
18  something in here that you and Ms. Battle
19  decided to limit it to three areas instead of
20  the six?
21    A.    No.  I recommended, as is
22  indicated on page six.  I made a recommendation
23  that she accepted; I believe the sentence

Page 20

1  that's relevant is in the first paragraph:  The
2  board president accepted the investigator's
3  recommendation to focus comprehensively only on
4  issues numbered one, two, and four.  So that
5  was my recommendation.  And I recall, and there
6  may be some reference here, as to why I did not
7  think the others could be also completed.  I'd
8  have to look for it.
9          But I can look at them now and
10  tell why I knew that I could not
11  comprehensively and fully and fairly deal with
12  each and every one of these issues within the
13  three-week time period.
14    Q.    All right.  Help explain this to
15  me.  The selections of numbers one, two, and
16  four were that you believed -- was that because
17  you believed you could get those done in three
18  weeks?
19    A.    Yes.  Yes.  Yes.
20    Q.    Okay.  And not the other three?
21  And I guess what I'm trying --
22    A.    That's true.  That's true.  If
23  you look at number three, for example, whether

Page 21

1  new initiatives which have been communicated to
2  the board, only after implementation, without
3  prior board input or approval, may be outside
4  of the priorities previously established and
5  approved by the board; and whether the
6  environment created by these decisions may have
7  had an impact on the core casework of LSA as
8  the number of cases being reported within the
9  board, established priorities, may have been
10  diminished.  That, in and of itself, in my
11  opinion, probably warranted weeks of
12  investigation.
13          I had no prior familiarity with
14  LSA operations.  I did not know what core
15  priorities were, and I knew that that would
16  have to be investigated.  Each new initiative
17  referenced here needed to be investigated.  No.
18  I knew that was a bit much.  And I recommended
19  that that not be a part of my investigation, if
20  my investigation needed to be completed within
21  a three-week time period.
22          Let's see another one.  Number
23  five I thought inevitably -- Number five

1 relates to confidential communications from LSA
2 staff members which indicate that a hostile
3 work environment may have been created by the
4 executive director's management style of
5 terrorizing experienced staff when informed
6 about LSA protocols and procedures, demeaning
7 support staff, intimidating and threatening
8 staff with retaliation, unless they agreed to
9 keep the board informed -- uninformed, excuse
10 me, uninformed, about matters involving LSA.
11        Again, my understanding was that
12 the LSA staff was rather large, spread in not
13 only the central office but other offices.  I
14 considered that a time consuming undertaking,
15 that in order to be fair to all involved, I
16 could not undertake analytically, along with
17 everything else, within the three-week period.
18        So, again, yes, I suggested, give
19 me something that I can do, and that's why I
20 focused on those issues.
21        I'm, frankly, looking through
22 here to see -- I thought that I had described
23 my reasoning in here.  If you give me a moment,

1 maybe I can find it.
2        Well, I don't see it immediately.
3 But I do know that page seven, that even the
4 allotted time for the investigation didn't
5 extend to personal interviews that I would have
6 preferred to take.  And that, alone, lets us
7 know that I could not have done everything,
8 because I did not have the opportunity to
9 conduct the kind of fulsome investigation I
10 would have done otherwise.
11    Q.    Was there any discussion with Ms.
12 Battle about coming back later and completing
13 the investigation of the three that you didn't
14 have time to do at first?
15    A.    No.  No.  Not with Ms. Battle.
16 When I met with the board, and somewhere in,
17 maybe, the Executive Summary, I made a
18 reference to my willingness to examine other
19 issues if they desired, but I had no further
20 discussion with her about completing any of
21 that.
22    Q.    Did they ever hire you or ask you
23 to follow up with the --

1    A.    No.
2    Q.    Not the three specific ones that
3 you didn't investigate, they never asked you --
4 or Ms. Battle never did --
5    A.    Did not.  Neither Ms. Battle nor
6 any other member of the board or anyone else.
7 My recollection is that I had a meeting with
8 the board of directors; those not present were
9 by phone, my recollection is; and it was for
10 the specific purpose of answering questions,
11 presenting orally my Executive Summary.  And I
12 don't recall any further communications.
13    Q.    Do you recall when that board
14 meeting was, by any chance?
15    A.    I can relate it by date.  Looks
16 like the report is completed September 14.
17        THE WITNESS:  Do you have -- Are
18 my time sheets in -- Have they been shared?
19        MR. VREELAND:  I didn't see them.
20    A.    Without that, I couldn't give you
21 the exact date.  I do know that it was on a
22 Saturday, I recall that.  And if you have a
23 calendar and can tell me when September 14 was,

1 I can tell you that.  It was the Saturday after
2 completing the report.
3    Q.    Okay.
4    A.    Because I made a delivery of the
5 reports -- It all happened within this --
6 within a very short time period.
7    Q.    And just to make sure that I'm
8 right on this; the ones you did investigate
9 would be on this big report, numbers one, two,
10 and four, which came from the board resolution,
11 about spending decisions, new employment
12 positions, and then complaints of harassment
13 and the creation of a hostile work environment?
14    A.    Yes.  Those numbered one, two,
15 and four.
16    Q.    Okay.  I know from reading the
17 report there's some exhibit numbers listed, so
18 I'm assuming that you were provided with
19 documentation?
20    A.    Yes.  Yes.  Yes.
21    Q.    Okay.  Who --
22    A.    I created the exhibits that are
23 referenced -- I mean, I prepared the exhibits;

1 but the actual records, I secured during the
2 course of the investigation.
3     Q.    Okay.  Were there any documents
4 furnished to you at the outset -- I'm assuming
5 that the board resolution was -- and I'm kind
6 of jumping ahead, but I'm assuming there may
7 have been times that you asked for more
8 documentation, but I'm just trying to figure
9 out at the outset if you recall what was
10 furnished to you?
11     A.    I do not.  I'm looking at the
12 report to see if it refreshes my memory.
13         I do recall the resolution.  I
14 believe that I may have requested the handbook.
15         Give me a moment to look through
16 here to see if I can otherwise answer that.
17         At page seven I cite:  The
18 investigator combed hundreds of supplemental
19 emails and assorted records produced throughout
20 the period set for analytical deliberation and
21 preparation of this report; supplemental
22 interviews by phone, text, and email were also
23 required to clarify analytical questions.  All

1 exhibits cited in this report derived from
2 investigative records, and they are submitted
3 in a tabbed attachment.  That's all I recall.
4         My recollection is that I did
5 secure, at the outset, the handbook because I
6 -- I know that I did, because I needed to be
7 governed by standards specified therein.  If
8 you have the handbook, that might even refresh
9 my memory.
10         I recall wanting to ascertain as
11 quickly as possible, for example, how the
12 handbook defined hostile workplace, that it had
13 been my experience that employers, to varying
14 degrees, define it sometimes narrowly,
15 sometimes more liberally.
16         So I'm confident that I got the
17 handbook early on.  But if you were to ask how
18 did I get it, did I pick it up, did Ms. Battle
19 give it to me, I must honestly tell you, I do
20 not recall.
21         (Whereupon, Plaintiff's
22           Exhibit 21 was marked for
23           identification purposes.)

1     Q.    Just to make sure, let's -- I'm
2 going to mark as Exhibit 21, which has been
3 represented to me to be the handbook.
4     A.    That definitely looks like the
5 handbook.  I recall it being 2006.  Let me take
6 a quick look here at the table of contents.
7         I believe that this is the
8 handbook that was provided and certainly among
9 the documents I referenced.
10    Q.    You mentioned something a minute
11 ago, and I saw it in the report, about exhibits
12 being tabbed?
13    A.    Uh-huh.
14    Q.    Would that have been -- And to
15 tell you where I'm coming from, I have not seen
16 the exhibits --
17         MR. VREELAND:  They were
18 produced.
19    A.    I tabbed -- As part of my
20 report I --
21         MR. VREELAND:  They follow Bates
22 numbers, the report itself.
23         MR. MENDELSOHN:  After -- Which

1 Bates numbers do you have?  With the mass of
2 documents I've got, I'm trying --
3         MR. VREELAND:  I show the report
4 itself ending on page 64, the report, Bates
5 number 219, and then 221 begins the exhibits.
6         THE WITNESS:  Let me see that a
7 second.
8     A.    Yes.  These are all the exhibits
9 I prepared as far as my report.  And when I say
10 I prepared them, I chose to tab them as
11 Exhibits 1, 2 -- I forgot how I tabbed them.
12 Yeah.  Exhibit 1, 2, those are my markings.
13    Q.    Okay.  Here's what I'm just
14 trying to figure out, just for future
15 references, what you would have looked at.  And
16 would that have been -- Would all the documents
17 that you went through, would they be contained
18 as exhibits?
19    A.    Oh, no.  No.  No.  No.  I was
20 supplied a number of records.  Some I received
21 from the various persons interviewed; I recall
22 going to the workplace where I personally
23 looked through personnel files; I recall a host

8 (Pages 26 - 29)

1 of fiscal records provided by people in
2 finance, whose names I don't recall. And, as
3 is my usual course, when it was time to analyze
4 the issues, I made the decision which of those
5 writings and records were analytically
6 relevant.
7          And to the extent that I relied
8 on any of them and referenced them in writing
9 my report, I attached them as exhibits to the
10 report for the convenience of the reader.
11    Q.    Do you recall whether you were
12 furnished copies of the monthly reports that
13 Mr. Davis prepared?
14    A.    Yes, I do recall. I do recall
15 that specifically because he was unavailable
16 for my interview. By the time I began the
17 investigation, he had resigned, and I recall
18 specifically asking for any writings responsive
19 to the allegations against him; I recall
20 specifically asking for any reports made to
21 either the board, the executive committee; I
22 recall requesting email exchanges between him
23 and the board president. So, yes, I do recall

1 that I received and read a number of monthly
2 reports. It was apparently his pattern to
3 communicate in writing, as well as through
4 other means, to the board. But I felt it
5 important that I examine his monthly reports.
6    Q.    And I may have misunderstood the
7 word right, and if -- I'm just listening and
8 talking back, but you mentioned something about
9 him being unavailable for an interview?
10    A.    Unavailable because he had
11 resigned when I undertook my investigation.
12    Q.    And I want to make sure I
13 understand your meaning of unavailable. Are
14 you looking at it from the standpoint that the
15 board couldn't force him to give one?
16    A.    I don't know whether the board
17 could have compelled him to do it. In either
18 my Executive Summary or my report, I reference
19 that the board's president and I spent
20 considerable time weighing the pros and cons of
21 trying to compel his cooperation with the
22 investigation by interview. And in either the
23 Executive Summary or the confidential report, I

1 referenced our ultimate conclusion that because
2 his post-resignation communications had been
3 rather hostile to the board, it was unlikely
4 that he would voluntarily agree to participate
5 by interview, and that I would have the
6 benefit, at least, of whatever he was saying
7 and had said.
8          So did I call him? No. I never
9 was provided contact. I believe a decision was
10 made that he was lacking interest, shall we
11 say, in participating in the investigation.
12    Q.    Okay. And I'm referring to page
13 seven, because I think that's what you're
14 talking about, about the --
15    A.    Yes. Right.
16    Q.    Let me ask you this way: Was any
17 attempt made, first, by you, to contact Mr.
18 Davis?
19    A.    No.
20    Q.    Okay. Do you know whether Ms.
21 Battle contacted Mr. Davis?
22    A.    I do not.
23    Q.    All right. So just to make sure

1 I'm right on the Record, when you say he was
2 unavailable, it was a decision that you and Ms.
3 Battle made not to try contact him?
4    A.    It was just as I said, the
5 investigator and board president deliberated
6 earnestly. Their ultimate decision was not to
7 seek an interview or other investigative input
8 from the executive director after his
9 resignation.
10          Now, what follows that, is the
11 explanation: Critical to that decision were
12 his continuing and divisive communications
13 within LSA networks, as well as the strident
14 tone and text of his published communications.
15          What I recall there is that even
16 attendant to his resignation, I was provided
17 emails or copies of writings that he continued
18 to send, explaining himself, his resignation.
19 So I did receive those as evidence of whatever
20 his feedback was. And he rather cogently, as I
21 state thereafter, outlined his position on the
22 disputed issues and his defense of specific
23 allegations in several memoranda reports and

Page 34

1 many emails that I did examine.
2     Q.    And to be clear, the reason why
3 I'm asking this is because you had said that he
4 was unavailable.  And that's what I'm trying --
5     A.    That's what I mean by
6 unavailable.
7     Q.    Okay.  But it wasn't like he was
8 out of the country or refused --
9     A.    I have no idea whether physically
10 he was here.  And my choice of unavailable was
11 solely to emphasize what appears at paragraph
12 two on page seven, that a decision was made not
13 to make an effort to compel his interview.
14    Q.    Right.  And I get that --
15    A.    Uh-huh.
16    Q.    -- and I respect that.  But I'm
17 just having to clear up, when you say he wasn't
18 available, he never refused to talk to you?
19    A.    Well, he had no opportunity to
20 refuse since I didn't contact him.
21    Q.    Exactly.
22    A.    So I have no idea whether he
23 would have participated.

Page 35

1     Q.    Right.
2     A.    I can say under oath that I made
3 no attempt to call him.
4     Q.    That's what I'm trying to make
5 sure of.
6     A.    Sure.
7     Q.    Okay.  With respect to the actual
8 handbook that we're talking about, this 2006
9 handbook, do you know how that came about?
10    A.    How what came about?
11    Q.    The handbook, whether it was --
12 Well, let me tell you what I know and see if
13 you knew this.  It's my understanding that this
14 was pretty much adopted from a handbook that
15 was used with a Legal Services agency in
16 Maryland.
17    A.    Okay.
18    Q.    Do you know one way or the other?
19    A.    I may have known then.  Sitting
20 here today, I don't recall ever being advised
21 that this handbook originated from a handbook
22 in Maryland.  I really don't know.
23    Q.    Okay.

Page 36

1     A.    I'm not certain if the history of
2 that handbook was something I independently
3 investigated.
4     Q.    That's all I'm asking, if you
5 know anything about the background of the
6 handbook.
7     A.    Sure.  I do not.
8     Q.    Do you know -- There was
9 something that came up, and I'm going to get at
10 this later, but while it's on my mind about a
11 2016 handbook, do you recall that?
12    A.    Today, I do not.  Is that
13 something I referenced in my report?
14    Q.    Yeah.  And we may get to it
15 later.  I don't know if it's on the top of your
16 head if you didn't know.
17    A.    I'd have to look at something.  I
18 don't have an independent recollection.
19    Q.    Before I get to the details of
20 this, I want to ask you this kind of general
21 question that will cover probably a lot of
22 these things.
23          There was some mention of things

Page 37

1 about whether he was spending money outside of
2 the budget or hiring people outside of the
3 budget -- and I'm talking in general terms, not
4 specific.  But with any of those, did you find
5 any evidence to believe that Mr. Davis had
6 committed any kind of crimes?
7     A.    I do not recall identifying any
8 possibly criminal conduct.  I tried to make my
9 conclusions in a summary fashion as to the
10 hiring and compensation decisions I
11 investigated.
12          Today, I don't recall that, and
13 it certainly would be something that would
14 stand out to me if I had found something that I
15 thought to be criminal.  But frankly, I'm not
16 sure that I would have had the qualifications
17 to rule definitely on that.
18          So it's a qualified I don't
19 remember that.  I think, though, that if I did,
20 I would have referenced it -- I'm looking now
21 at the table of contents for the extended
22 report.  If I found anything to be criminal
23 about the conduct attributed to him, that I

10 (Pages 34 - 37)

1 investigated, I certainly would have stated it
2 in my summary conclusions.
3   Q.   Sure.
4   A.   And it certainly would have been
5 stated in the Executive Summary, because that
6 is what I reviewed with the board of directors.
7 And as I am looking through those conclusions
8 in the shorter Executive Summary, Mr.
9 Mendelsohn, I don't see any reference to a
10 finding I made of criminal conduct.  I don't
11 see the adjective or the noun used here.  And
12 surely that's something I would have
13 highlighted had I uncovered it.  I've gotten to
14 the last page of the Executive Summary, and I
15 still don't see crime or criminal or any
16 synonym.
17       So I feel confident in responding
18 that I do not recall making any analytical
19 conclusions or findings attributing to Mr.
20 Davis crime or criminal behavior.
21       I may have made recommendations
22 that matters be investigated further.  But as I
23 review the Executive Summary today, I do not

1 see that I attributed to him any crime or
2 criminal conduct.
3   Q.   Let me say this:  I didn't see
4 any in there, and I didn't even see any
5 accusations of it.  But I'm just trying to just
6 make clear, like, under number one that there
7 may have been significant spending decisions
8 made by the executive director outside of the
9 budget.
10       Was there ever any accusation, or
11 do you find any evidence, that if there were
12 these expenditures outside of the budget that
13 they were being expended on him personally,
14 where he was misappropriating money for his own
15 personal use?
16   A.   I do not recall that today.
17   Q.   Okay.
18   A.   If I had made such a finding, it
19 would be in my report.
20   Q.   Okay.  And the fact that it's not
21 in your report would indicate there was no
22 indication that he was trying to pad his own
23 wallet with this?

1   A.   That's true.  Had I made such a
2 finding, for sure, I would have included it in
3 my report, in both the Executive Summary and
4 the detailed report.
5   Q.   And as far as any of the spending
6 requirements, did you have any reason to
7 conclude that Mr. Davis was making those
8 expenditures for any reason other than what he
9 believed to be in the best interest of Legal
10 Services?
11   A.   I don't know that I can answer
12 that apart from saying whatever I concluded as
13 to those spending decisions is recited in my
14 report.
15   Q.   Okay.
16   A.   Today, I have no independent
17 recollection for any conclusion I made
18 attributing a bad motive to him, or a motive
19 that was independent of his allegiance to the
20 best interests of Legal Services.
21       Again, had I uncovered a bad
22 motive or evidence suggesting a bad motive, I
23 would have put it in the report.

1   Q.   Okay.  The same thing with the
2 number two, where he may have created new
3 employment positions that were not included in
4 the budget:  Do you recall whether you found
5 any evidence that Mr. Davis did that for any
6 personal financial benefit to himself?
7   A.   Had I made such a conclusion, it
8 would be in my report.  Sitting here today, I
9 have no independent recollection that I did.
10 And just glancing through the Executive
11 Summary, I see no reference to a conclusion
12 that any decision-making by him was motivated
13 to benefit him personally or financially, if I
14 understood your question clearly.
15   Q.   On these budgetary-type issues,
16 did you ever look at any financial records to
17 determine whether Mr. Davis's action did, in
18 fact, hurt the budget.
19   A.   No.  As a matter of fact, I
20 believe that's among those matters that I said
21 I did not have time to investigate.  Or --
22 Let's see if I'm accurate here.
23       I'm pretty sure that I concluded

11 (Pages 38 - 41)

1 that as to any impact on LSA funding and
2 budgetary matters, the time frame for my
3 investigation would not permit me to analyze
4 that accurately and independently.
5     Q.    And I didn't see anything in the
6 report, but I just want to ask you if you have
7 a different recollection.  I didn't see where
8 you contacted Warren Averitt, the accounting
9 firm.
10     A.    I do not recall speaking to
11 anybody at the accounting firm.  I do recall
12 speaking to people in finance, their names
13 escape me.  But I do recall that there were
14 people involved with finance, and I recall
15 receiving a number of fiscal records.  But as
16 to independent contact with Warren Averitt,
17 their financial -- their accountants, I know
18 that I did not speak with anybody directly
19 there.
20     Q.    And I need to clear up in my mind
21 about -- because there were certain things you
22 said you didn't have time to investigate, and
23 there are certain things you did.  I guess the

1 best way to ask it is:  Did you do any
2 investigation to determine whether any actions
3 by Mr. Davis had an adverse financial impact to
4 Legal Services?
5     A.    I did not.
6     Q.    Okay.  What do you call this
7 little one, this report?
8     A.    Executive Summary for
9 Confidential Report.
10     Q.    Okay.  And help me out with this.
11 This is probably confusing on my part.  And I'm
12 not trying to be critical of it, I'm really
13 not, I'm just trying to get it straight in my
14 mind.
15         You didn't do, like you said
16 here, a meaningful analysis of budgetary
17 effects.  But on page three -- And I know
18 there's a logical explanation, I just need it
19 in my mind. -- it says:  The investigation
20 disclosed continuing effects from Davis's
21 policy revision and his hire and pay decisions.
22         I'm assuming that that last part
23 that I read has nothing to do with budgetary

1 amounts; am I right?
2     A.    Where are you?  Page three?
3     Q.    I'm on page three, under summary
4 conclusion, that first paragraph.
5     A.    Okay.  And your question again?
6     Q.    Yeah.  I'm trying to make sure
7 those two provisions don't conflict with each
8 other.  And the only way I can conclude it, and
9 if I'm wrong, I'd just like to know, that when
10 you say investigated and you determined that
11 that there's continuing effect from Davis's
12 policy revision and his hire and pay decisions,
13 that that doesn't have to do with budgetary
14 impacts?
15     A.    Sure.  That statement relates
16 only to hiring and compensation decisions.  And
17 if you will look at page twenty-eight of the
18 detailed report, the summary conclusions there
19 should reference the impact to which I
20 referenced.  I was not focused on budgetary
21 impact, that was not the issue that I dealt
22 with.
23         But to the extent that I

1 concluded with that sentence, it is supported
2 by my summary conclusions on hiring and
3 compensation decisions, all of them that appear
4 at twenty-eight and continue through
5 twenty-nine.
6     Q.    And in your bigger report, the
7 number twenty-eight -- on page twenty-eight,
8 you're talking about how that the year before
9 they had had staff layoffs, office closings,
10 budgetary constraints.
11     A.    Uh-huh.
12     Q.    But during Mr. Davis's tenure, he
13 was able to hire more people, pay higher
14 salaries, without any financial impact or
15 adverse financial impact to Legal Services?
16     A.    Your question?
17     Q.    Isn't that correct?
18     A.    I don't know that that is
19 correct.  If I analyzed that issue, I would
20 just have to stand by whatever my conclusions
21 were there.  I can't take issue with your
22 analysis, except to say to the extent that I
23 analyzed his hiring and compensation decisions,

Page 46

1 my summary states at twenty-eight, twenty-nine,
2 and the foundational elements for my conclusion
3 continue through -- let's see, twenty-nine
4 through, appears to be forty-four -- forty-four
5 for attorney hires and forty-five through
6 fifty-seven for nonattorney hires.
7        And reasonable minds can disagree
8 on the impact of the hiring and compensation
9 decisions, as you've just advanced with your
10 question.  But my conclusions I stand by, and
11 that's the foundation for them.
12    Q.    Okay.  Let me ask it the opposite
13 way, just to make sure we're clear.
14    A.    Uh-huh.
15    Q.    If you had found any adverse --
16 And you may not have investigated it, but if
17 you had found that there was anything in any of
18 the spending decisions that Mr. Davis made that
19 caused LSA to go over budget or to borrow money
20 or to shut down something, you would have put
21 that in your report?
22    A.    Well, let me make clear, and
23 perhaps I did not:  I did not undertake an

Page 47

1 analysis of the LSA budgets for the period
2 either preceding Mr. Davis's term or during the
3 term.  That is a matter I did not believe I
4 could independently investigate in a fair and
5 thorough manner.
6        I recall specifically when I made
7 my report to the board indicating to them that
8 fiscal issues relating to the budget seemed
9 more appropriately investigated by a committee
10 I understood that they had.  And I freely
11 acknowledged my lack of expertise in analyzing
12 budgets and denied any effort to review and
13 compare budgets.
14        So as it relates to the budgetary
15 impact of those decisions, no, I neither
16 investigated nor made an effort to analyze.
17 Instead I said, here is what I have found based
18 upon the files and the records I have looked
19 at.
20        And my intent was to say:  To the
21 extent the board has need to investigate
22 further what impact all of this had, that's up
23 to you.  I just laid out the facts for what I

Page 48

1 had uncovered.
2    Q.    And I'm not going to be able to
3 go through line by line and question you like
4 that.  But the way I understand, everything
5 that you found of significance would be
6 reflective in this bigger report and the
7 exhibits; correct?
8    A.    It would.  And that bigger report
9 is one that addresses solely the issues that
10 are outlined in my prefatory description of the
11 scope of the investigation; which is to say, I
12 do not wish to be misunderstood for
13 investigating the budget or any other matter I
14 did not.
15    Q.    Okay.
16    A.    So to the extent that the scope
17 of the investigation is defined, then you can
18 rely on whatever is in my detailed report as
19 inclusive of anything I found significant as to
20 those issues.
21        Stated differently, if there's
22 nothing there that pinpoints a finding, that
23 means that to the extent that I investigated

Page 49

1 it, I found nothing meriting a report to the
2 board.
3    Q.    Okay.  It may not be a fair way
4 to go about this, but let me give it a shot.
5 If not, you can object, and Al can object too.
6        As I look at things often, it's
7 back to the old basic concept of, you know,
8 having a breach of a duty and having a
9 proximate causative effect.
10        There are numerous things in
11 here, and I'm looking on page four of the
12 shorter -- the Executive Summary.  Okay?  And
13 there, on page four, about unnecessary,
14 incompetent, or preferential hirings, salary
15 and salary adjustments, and disregard of pay
16 scales, salary adjustments, or materially
17 impermissible motivations.
18        To make clear on this, with those
19 conclusions that you make, you still are not
20 going to testify or don't want your report to
21 be read as that any of those actions by Mr.
22 Davis caused financial harm to LSA?
23        I'm just kind of cause and

Page 50

1 effect. I understand and see what you say in
2 this --
3     A.    Well, I'm not certain that I can
4 make a declaration that they did, because I did
5 not investigate that link.
6     Q.    Right.
7     A.    I did not thereafter look at the
8 budget to see what impact a particular hiring
9 or compensation decision had on the budget. I
10 reported those facts that I did find, confident
11 that the board would thereafter be in a better
12 position than I either to investigate budgetary
13 impact or financial harm, or to undertake
14 another investigation, whether they did so by
15 an independent investigator or through its own
16 committee.
17     Q.    Okay. You wouldn't want your
18 report to be used to say that Judge Boyd
19 concluded that Artur Davis caused financial
20 harm to LSA?
21     A.    Honestly, I want my report to be
22 construed just as it is written. I tried to
23 state my conclusions succinctly. I gave

Page 51

1 foundational facts which could form the basis
2 for any reasonable conclusion if other factors
3 were woven in.
4         So it's difficult to answer that
5 question yes or no, and I will give you an
6 example. When I was making my presentation to
7 the board, I learned that the board had some
8 type of committee, I don't recall if it was
9 called a finance committee or a fiscal
10 committee. I do recall that regularly there
11 were phone meetings with that committee.
12         My guess is that some people on
13 that board were probably more illiterate than I
14 about the board's budgetary status before Mr.
15 Davis and during his tenure; which is to say,
16 that upon receiving the foundational evidence I
17 provided from my fact finding, they were free
18 and may have had a basis for reaching
19 conclusions that I could not have.
20         But as for me, I could not make
21 that leap to say, and as a result of what I've
22 told you at page twenty-eight, this caused LSA
23 to lose X dollars or talk in percentages. I

Page 52

1 did not go that further step.
2     Q.    And I'm just trying to make it
3 clear, because you understand, I'm looking at
4 possibilities of motions for summary judgments,
5 trying the case, stuff like that. And I just
6 want to make sure that I have it documented
7 that Judge Boyd did not make any determinations
8 about the financial impact of any of these
9 accusations against Mr. Davis?
10    A.    Whatever conclusions and
11 investigative findings I made are reported.
12 Now, can they be fairly construed by either
13 side in a manner that is not stated there? I
14 suspect they can. As to what my intention is,
15 it is nothing more or less than what I've
16 stated in my summary conclusions.
17    Q.    Did you know Sylvia Mason before
18 this?
19    A.    I did. You might recall that
20 early on I said that when I was contacted by
21 Board President Battle, I disclosed to her a
22 prior acquaintance with both Ms. Mason and with
23 Mr. Davis. And I then expressed my view that I

Page 53

1 did not feel any conflict of interest because
2 of that. And to refresh your memory, what I
3 said was, when I was on the initial board of
4 directors, the founding board of directors, I
5 don't recall when, but at some point she was an
6 employee of Legal Services. And at some point,
7 I recall that she was employed when Mr. Durant
8 was executive director, possibly when a
9 predecessor director was there. So the extent
10 of my acquaintance was, I knew that she was an
11 employee.
12    Q.    Did you, by any chance, look at
13 her personnel file?
14    A.    I did. I did.
15    Q.    Did you see any complaints about
16 her in the past by other executive directors?
17    A.    I do not recall. And had I --
18 Well, I don't know that I would have included
19 that. Because if you recall, in my report, I
20 did not give a fulsome analysis of the hostile
21 workplace complaint that she asserted, because
22 by the time of my interview with her, she had
23 reported her decision not to advance it. She

14 (Pages 50 - 53)

Page 54

1 believed that Mr. Davis himself was the source
2 of her problems.
3         And my recollection today is that
4 she reported that one or two other people in
5 the workplace, of a supervisory status, had
6 also contributed to her complaints. And she
7 did not -- They were no longer in the
8 workplace, my recollection is, and she did not
9 wish to continue advancing her claim.
10        So you will note that in my
11 completed report -- Let me see if I can
12 reference it -- I do not give an analytical,
13 fulsome investigation as it relates to her
14 hostile workplace complaint; which is to say, I
15 do not recall today what else would have been
16 in the personnel file that I reviewed for her,
17 but I surely do recall reviewing it.
18        It is at page fifty-nine is when
19 I describe my ultimate disposition of her
20 hostile workplace complaint.
21    Q.    Twenty-nine?
22    A.    Fifty-nine, according to the
23 table of contents.

Page 55

1    Q.    Help me out with this to
2 eliminate my confusion. And I know that we
3 were just talking about Sylvia, but was one of
4 the issues that you were investigating was
5 hostile workplace complaints caused by Mr.
6 Davis?
7    A.    Correct.
8    Q.    All right. And as far as
9 complaints by Ms. Mason, did you investigate
10 those?
11    A.    I did.
12    Q.    Okay. Did you make a conclusion?
13    A.    The conclusion is reported at
14 page fifty-nine.
15    Q.    Okay. In here you noted about
16 Graham and Mason, confirm that the employee
17 departures, especially Davis's, had completely
18 restored a productive workplace.
19        Okay. I guess -- I know it's in
20 your report, or we need to rely on the report.
21 But did you make a determination that Mr. Davis
22 created a hostile workplace environment?
23    A.    I did not report a finding. I

Page 56

1 did not report a finding because neither
2 complaining witness desired to advance the
3 claim. By then, I had investigated, and the
4 decision for me was, do I continue to bill
5 Legal Services in the preparation of my report
6 with findings that are irrelevant because they
7 do not intend to advance them.
8        So sitting here today, I cannot
9 tell you what my ultimate conclusions were.
10 I'd have to probably go back and look at my
11 work product. I deemed it irrelevant to report
12 to the board my findings; and I specifically
13 recall when I made my oral presentation to the
14 board, advising that if anyone just wanted to
15 know what I found, I'd be happy to go back and
16 supplement the report, but I did not believe it
17 a prudent use of LSA funds to write a long,
18 involved explanation of findings on a claim
19 that would not be advanced.
20    Q.    Okay.
21    A.    Now, if you're asking me if today
22 I recall what I would have found, is that the
23 question?

Page 57

1    Q.    No. It's really what you did
2 find. Let me try to explain what my confusion
3 is or where I'm trying to go -- not to go
4 anywhere, but to get what I need for purposes
5 of today and to get information.
6        Whether you agree with this or
7 don't agree with it, Mr. Davis and I have
8 positions about the complaints that were made,
9 talking about Ms. Mason at first. And what our
10 position is, her background, about having been
11 reprimanded before about misconduct in the
12 office, and other things that would relate to
13 the fact that he had disciplined her before she
14 made this complaint, all the facts surrounding
15 those is stuff that if that is used against Mr.
16 Davis, I'm prepared to defend.
17        What I'm trying to determine is
18 whether you made a complete investigation of
19 all the facts concerning her complaint to delve
20 into her background, look into it a lot more,
21 or was this something that as you were looking
22 at it, when she said she was satisfied, that
23 that was the end of it?

15 (Pages 54 - 57)

Page 58

1      A.      Once Ms. Mason and Ms. Graham,
2  independently, in separate interviews, made
3  clear to me their lack of interest in advancing
4  their claims, I made the investigative decision
5  that it would not be a prudent use of time and
6  resources to continue investigating their
7  claims to the end of making final analytical
8  conclusions.  And that is why I opted not to
9  include anything in my report.
10      Had either said, yes, here's what
11  supports my claim and I do want to proceed,
12  there would have been more work to be done
13  before I could have reached a final analysis.
14      Q.      Sure.
15      A.      I don't have a recollection today
16  on who was interviewed first and whether I had,
17  up to that point, interviewed everybody
18  relevant to that claim.  I don't think I had.
19  I believe that at the point when I determined
20  that hostile workplace as a complaint would not
21  be one that I would make conclusions on, I
22  stopped at that point making further inquiries
23  during the course of my investigation or

Page 59

1  looking further into their background.  I
2  surely don't recall doing anything further on
3  that particular complaint.
4      Q.      Let me ask you this, we'll move
5  to a different subject.  Did you know Jaffe
6  Pickett before this?
7      A.      No, I did not.  I had never met
8  her.
9      Q.      Were you provided the email that
10  she had sent to Ms. Battle in August of 2017
11  that was complaining about Mr. Davis?
12      A.      I have no recollection.  I may
13  have.  I do recall being provided a host of
14  email exchanges that were relevant.  And if it
15  happened during the August term, I'm confident
16  that I probably was because I specifically
17  requested any email exchanges or other writings
18  that triggered all of the complaints.
19      Q.      Let me see if I can pull it up
20  for you.
21      Well, let me ask you this, if you
22  recall:  Do you recall Ms. Pickett discussing
23  anything with you about that email of hers?

Page 60

1      A.      I have no independent
2  recollection of what I discussed.
3      Q.      Okay.
4      A.      I do recall securing several
5  writings and exchanges of emails involving Ms.
6  Pickett, involving the board president,
7  involving the executive director.  And I'm
8  confident, because I interviewed Ms. Pickett,
9  that I discussed with her all of those
10  writings.
11      Q.      If you would look at Plaintiff's
12  Exhibit 6, and this is the email that I was
13  referring to, just see -- as they say, refresh
14  your recollection.
15      A.      You want me to look at it for
16  what purpose?
17      Q.      This is the email I was talking
18  about.  And I'm just wondering if by looking at
19  this, this reminds you that you did see it or
20  that you went over this?
21      A.      I'll take a look at it.
22      Mr. Mendelsohn, I am not going to
23  be able to say I did or did not.  I'm looking

Page 61

1  at this, and it is directed to LaVeeda and
2  Phil, and that doesn't ring a bell to me right
3  now.
4      I must tell you that part of my
5  inability to recall things specifically is that
6  for the past three weeks I've been engaged in
7  another workplace investigation, and my brain
8  is full of emails and writings that relate to a
9  totally different agency.
10      These matters occurred two years
11  ago.  My best response is, I could have, I just
12  -- nothing here -- nothing that I'm looking at
13  now rings a bell one way or another.
14      Q.      Okay.
15      A.      If I had to guess, I just don't
16  know.  This does not look like something that I
17  got, but I may have; I just don't remember.
18      Q.      Okay.  And the -- Let me ask you
19  a follow-up question with that that you may not
20  recall either.  Did you ever have any
21  discussion with Ms. Pickett about an email that
22  she claimed that she did not send out?
23      A.      I don't know.  I don't know.  I

16 (Pages 58 - 61)

Page 62

1 mean, I don't recall discussions with that
2 degree of specificity. My recollection is that
3 my extended interviews with her were on the
4 issues that I was investigating.
5       And as I am wont to do, when I'm
6 interviewing anybody, I recall asking her to
7 share with me anything in writing that remotely
8 related to the subjects of my investigation.
9       So to the extent I may have
10 inquired about an email she didn't send, I
11 don't know the context. I would have had to
12 have known that the email existed, number one,
13 or received it, to even raise with her the
14 authenticity. So I'm afraid I can't help you
15 with that. I don't know.
16    Q.    Did anything come up in a
17 conversation with her about an allegation that
18 she made that somebody had breached the
19 security of her emails?
20    A.    I don't recall.
21    Q.    Okay.
22    A.    That is to say, I just simply
23 don't remember. It may have, I just don't

Page 63

1 remember today.
2    Q.    Well, did anything come up, not
3 just with Ms. Pickett, but in any of your talks
4 with Ms. Battle, or anybody else, about the
5 fact that they had hired a company called Sword
6 and Shield to investigate potential compromise
7 of the email system?
8    A.    I would not remember today and I
9 do not remember today.
10    Q.    And just so -- In the event it
11 helps any, there has been -- this email that
12 kind of launched everything that was shown in
13 Exhibit 6, Ms. Pickett claims that she didn't
14 send these. I'm just trying to come --
15    A.    I have no idea.
16       MR. VREELAND: Object to the
17 form.
18    A.    I have no idea. Just -- I am not
19 -- Just to be clear, I am wont to forget
20 investigations once they are concluded, unless
21 I have prior notice if there is a reason to
22 remember.
23       In 2017, when this investigation

Page 64

1 was undertaken in August, it may have stayed
2 with me through that year. But I promise you,
3 when 2018 rolled around, I had far too many
4 other things on my mind.
5       So I am -- I'm just sorry, I
6 don't remember the specifics of discussion or
7 specifics of a particular email. And looking
8 at this Plaintiff's Exhibit 6 just does not
9 refresh my memory.
10    Q.    I was just making sure.
11    A.    Sure.
12    Q.    I didn't see anything in there
13 about it, but it may be significant down the
14 road for us about this email and about the
15 alleged breach of security with it. And I was
16 just wondering if any of that had come up in
17 any conversations?
18    A.    I just don't know. I don't
19 remember.
20    Q.    Okay. I didn't see -- And,
21 again, I can't remember everything I read last
22 night or the day before about this, but I do
23 not remember seeing anything about you

Page 65

1 interviewing Michael Fortin?
2    A.    Michael?
3    Q.    Fortin. He's the Director of
4 Advocacy.
5    A.    The name doesn't ring a bell. I
6 do not remember interviewing him.
7    Q.    Okay. Did you interview any of
8 the regional managing attorneys?
9    A.    I cannot recall interviewing any
10 of them.
11    Q.    Okay.
12    A.    Those were clearly people to be
13 interviewed for the item I opted not to
14 investigate. You recall there was an item on
15 the board resolution that related to purported
16 dissension in the workforce among staff
17 members.
18    Q.    Right.
19    A.    Surely, had team permitted,
20 interviewing all regional lawyers might have
21 been something I would have undertaken.
22    Q.    Uh-huh.
23    A.    But sitting here today, I don't

17 (Pages 62 - 65)

Page 66

1  recall that being a subject that I did
2  investigate.  So, no, I do not remember a Mr.
3  Fortin or any other regional attorney.
4      Q.     Okay.  Any of the people that Mr.
5  Davis hired, any of the attorneys he hired, did
6  you interview them?
7      A.     I do not recall.  And I don't
8  have -- Only my time sheet would show the
9  people I interviewed.  But I do not recall
10  meeting -- Let me take a look at the people
11  that I reference that he hired, and I can state
12  that conclusion with greater confidence.
13          And for the Record, I'm looking
14  at a table of content under hiring and
15  compensation decisions.  I'm looking at the
16  subtitles for the names of the people who are
17  referenced here.
18          And now I can answer your
19  question with certainty.  I did not interview
20  any of the people hired by Mr. Davis, I do not
21  recall.
22      Q.     Did you interview, as far as
23  interview, not just casual talk with them, did

Page 67

1  you interview any of the board members?
2      A.     Did not.
3      Q.     Did you talk to any of the board
4  members, other than Ms. Battle?
5      A.     Did not.
6      Q.     And you didn't conduct an
7  interview of Ms. Battle either?
8      A.     I did not.
9      Q.     Did you interview any of the
10  administrative personnel?  I know you've
11  mentioned Ms. Mason, Ms. Graham, Ms. Pickett.
12  Did you interview anybody else?
13      A.     I did.  Their names, I do not
14  recall.  If you'd like, I'll take a look at the
15  report and see if it refreshes my memory on any
16  of them.
17      Q.     Please.
18      A.     I do know that I interviewed some
19  people in finance or the fiscal department.  I
20  do recall that during the course of my
21  scheduled interview for either Ms. Mason or Ms.
22  Graham, someone approached and asked me if she
23  could be interviewed, and her name still is not

Page 68

1  clear to me.  But I know that I did interview
2  her at her request, and she was in the fiscal
3  department.
4      Q.     Did you interview Gary Gilmore or
5  talk to him?
6      A.     Gary Gilmore?
7      Q.     Do you remember him?
8      A.     Gary Gilmore?  Do you remember
9  the position he had?
10      Q.     He was the CFO.
11      A.     I don't believe so.  I don't
12  remember ever seeing him.  I remember
13  interviewing somebody in the financial office
14  but his name does not ring a bell.
15      Q.     Okay.
16      A.     And I would remember, because I
17  don't think I interviewed any males.
18      Q.     Okay.
19      A.     Just coincidentally it would
20  stand out to me, because I don't remember
21  seeing many male employees when I went to the
22  workplace and interviewing any.  I may have met
23  him, but I don't remember interviewing him.

Page 69

1      Q.     On page three of the Executive
2  Summary, under Roman numeral two, paragraph A,
3  the second paragraph where you state the
4  confusion, resentment, and anxiety abound
5  within the LSA workforce.
6      A.     Uh-huh.
7      Q.     Can you tell me the names of the
8  people that you interviewed that led to that
9  conclusion by you?
10      A.     I cannot.  I can tell you that
11  they were identified on whatever time sheets I
12  kept.  I can tell you that they reported not
13  only their individual concerns but concerns
14  that had been reported to them.  I can tell you
15  that I recall that some of the employees who
16  made those reports were in the central office.
17  I can tell you that my recollection is that
18  some reported complaints that emanated from
19  regional offices.  But as to the particular
20  people, that would be part of work product
21  somewhere, and I don't even know if I retained
22  that work product.
23          MR. MENDELSOHN:  Okay.  It may

18 (Pages 66 - 69)

Page 70

1 have been in the documents but I don't know
2 whether I've seen it, the billable hours.
3        MR. VREELAND: I don't think I've
4 seen it. I don't know. I can get it for you.
5    Q.    But to jump ahead, the billable
6 hours would show the people that you talked to
7 or interviewed?
8    A.    I'm fairly confident that my
9 itemized invoice would show anybody I
10 interviewed, anybody from whom I got records.
11 There were -- I hope I'm mistaken. I'm trying
12 to remember if I tried to retain anyone's
13 confidence because I began each interview by
14 emphasizing that their disclosures were
15 confidential.
16        My recollection today is that my
17 itemized invoice would show the people that I
18 talked with.
19    Q.    Okay. Because like if you met
20 with somebody for an hour, you would normally
21 put it in your invoice?
22    A.    I met with them for five minutes,
23 I'd put it in; if I had a phone interview, I'd

Page 71

1 put it in. Because if I'm going to bill, I'm
2 going to include a description that's fairly
3 detailed of what I did.
4    Q.    Okay. What I'm trying to figure
5 out is the best way for me to figure out who
6 all you talked to would be to look at the bill?
7    A.    I think that's an accurate
8 statement.
9        MR. VREELAND: We'll produce
10 that.
11        MR. MENDELSOHN: Okay.
12    Q.    Do you know approximately how
13 many people you interviewed? Are we talking
14 about five or ten?
15    A.    You want just my best judgment
16 today?
17    Q.    Yeah.
18    A.    You know, that should be in my
19 report. I'd give a guess at six or so, but I
20 am fairly certain in the course of
21 investigation, I would have referenced --
22        Let's see. I'm looking at page
23 six, course of investigation. Fact finding

Page 72

1 started on August 28th, continued actively
2 through September 8th, with comprehensive
3 in-person interviews and analytical scrutiny of
4 voluminous personnel policy and fiscal records,
5 et cetera. Let me just take a --
6        Well, here it is. The
7 investigator personally interviewed five
8 witnesses with personal or probative knowledge
9 of the investigative issues and documents. In
10 addition to the witnesses named in their
11 complaints to the Board of Directors, two
12 central staff employees volunteered interviews.
13    Q.    Okay. Do you know the names of
14 those two central --
15    A.    I do not, if it is not there. I
16 don't have an independent recollection today.
17 That is when it might be on my itemized
18 invoice.
19    Q.    Okay.
20    A.    I know one was -- I can tell you
21 what department they were with, I don't know
22 their names.
23    Q.    Okay.

Page 73

1    A.    One was involved with fiscal
2 matters, one was involved with IT matters.
3    Q.    Do you recall what the IT matter
4 guy or lady was about? I mean whether --
5        Let me just back up. Was any of
6 that conversation related to some type of
7 unlawful intrusion into the IT system?
8    A.    Oh, no. Not -- The matter that
9 you asked me about earlier?
10    Q.    Yes. Yes.
11    A.    No. No. No. I am confident
12 that my investigation did not include anything
13 about a breach of security. The persons I
14 interviewed all focused on the issues that I
15 defined in my scope of investigation.
16    Q.    Again, I'm just trying to
17 separate what you did and didn't do, not
18 suggesting that you should have or shouldn't
19 have.
20        But we had talked earlier about
21 Ms. Mason and I guess it was Ms. Graham who
22 said that their claims about being harassed had
23 been solved. Did you look into any of the

19 (Pages 70 - 73)

Page 74

1 disciplinary action that Mr. Davis had taken
2 against either of those two women?
3    A.    When you say look into, I recall
4 that it was disciplinary action that triggered
5 both complaints. So, yes, I do recall asking
6 both the affected employees, and I recall that
7 everybody else I interviewed either volunteered
8 information or I questioned them about it.
9         Even the two central staff
10 employees referenced there, whose identity
11 wasn't made known to me, but I did interview,
12 both had observations about their complaints.
13        So I do recall that everybody I
14 interviewed had something to say about both the
15 discipline, the reaction, and the overall
16 complaint of hostile workplace, both as to what
17 Ms. Mason and Ms. Graham characterized and to
18 how they themselves characterized the
19 workplace.
20    Q.    Okay. Mr. Davis, of course, had
21 the authority to discipline employees?
22    A.    Is that a question?
23    Q.    Yes.

Page 75

1    A.    I assume that he did.
2    Q.    Okay.
3    A.    I don't recall seeing anything in
4 the handbook that took away the authority of
5 the executive director to discipline employees.
6    Q.    And the mere discipline of an
7 employee does not necessarily create a hostile
8 working environment, does it? No employee
9 likes to --
10    A.    Merely disciplining an employee
11 does not, in and of itself, create a hostile
12 workplace. True.
13    Q.    Did you make any determination
14 about whether Mr. Davis's disciplining of these
15 two women was inappropriate?
16    A.    I made no determination that is
17 reported.
18    Q.    Okay.
19        And just to be clear, and I'm not
20 trying to be cute, but you're not in a
21 position, like you were when you were a judge,
22 to decide who is telling the truth and who is
23 and not telling the truth on any accusation

Page 76

1 about him disciplining those two women?
2    A.    Well, I certainly didn't have the
3 opportunity to interview Mr. Davis, so I could
4 not judge his credibility on that issue.
5    Q.    Right.
6    A.    I did interview the subjects of
7 the discipline, I did interview persons who
8 were in the workplace at the occurrence of the
9 discipline. My investigation wasn't so much
10 was discipline justified or not, it was the
11 more general question of whether a hostile
12 workplace had been created by Mr. Davis as it
13 related to the claims of those women.
14    Q.    Okay. And I'll, again, check
15 your billable records. But I'm just asking you
16 if you remember. Did you ever talk to
17 Charlotte Rand, do you recall talking to her?
18    A.    She had left the workplace. I
19 desired to speak with her, because my
20 recollection was that she and another person
21 whose name escapes me, were supervisors
22 purportedly involved with creating the hostile
23 workplace or contributing to the hostile

Page 77

1 workplace.
2    Q.    And, again, just from your
3 recollection, and I'll verify it with your
4 billable records, do you remember if you ever
5 interviewed Christine Davis, if that was a name
6 of --
7    A.    No. Actually, page seven
8 confirmed fairly easily the persons
9 interviewed. It said I interviewed five
10 people.
11    Q.    Okay.
12    A.    And in addition to the persons
13 named, it said I interviewed two other folk.
14 And today I have recalled that those two other
15 persons were at the central office, one in
16 fiscal, the other in IT.
17        Now, as to Christine Davis, the
18 name doesn't ring a bell, but I'm fairly
19 confident that I would not have reported,
20 having interviewed personally five people, and
21 interviewed more, without disclosing the
22 identity of those others.
23        Did Ms. Davis hold a position in

Page 78

1 either fiscal or IT?
2     Q.     What's -- I'm sorry?
3     A.     Ms. Christine Davis, was she
4 employed in either fiscal or IT?
5     Q.     No, I don't think so.
6     A.     Then the likelihood is that she
7 wouldn't fit either of the other two witnesses
8 I refer to at page seven.
9     Q.     Do you recall anything being
10 brought up during your investigation about
11 Eileen Harris?
12     A.     I don't have an independent
13 recollection.  The name certainly is ringing a
14 bell, but I don't have an independent
15 recollection.  Perhaps if you'd tell me the
16 position she held, that might ring a bell.
17     Q.     She was an operations director
18 before this.
19     A.     I do recall her name.  As to the
20 context for any reports to me or complaints or
21 allegations, I just have no memory.
22     Q.     I brought this up earlier, and
23 neither one of us were -- have a good

Page 79

1 recollection of it.  And just since I mentioned
2 it, I thought I'd follow up with it.
3          If you look at page ten,
4 remember, earlier I'd asked you about a 2016
5 handbook, I think, and we didn't remember it.
6 This is where I picked up on that, was on page
7 ten.
8     A.     Okay.  I'm sorry.  I don't recall
9 your question earlier.
10     Q.     Well, I'm not sure I had one.
11     A.     This does refresh my memory about
12 a reference to a 2016 handbook.
13     Q.     Yeah.  And you mentioned there
14 that no one had ever heard of this reputed
15 edition, that was in the last sentence?
16     A.     Correct.
17     Q.     Yeah.  And the only thing you saw
18 was from a memo that he had written, in which
19 he referred to the 2016 handbook.
20     A.     I may have seen something else
21 referring to it.  But the question here was
22 whether I was correctly relying on the 2006
23 handbook, Plaintiff's Exhibit 21, or whether,

Page 80

1 in fact, as one of his -- Mr. Davis's memoranda
2 referenced there had been an amended handbook,
3 so that's the context.
4          I do recall that among the
5 writings I received, attributed to Mr. Davis,
6 was a memorandum, and apparently was dated
7 August 17, wherein, he did make the statement
8 that there was a 2016 handbook reflecting
9 amendments.
10          Now, I don't remember much more
11 about the memorandum.  It may have been one
12 directed to the board or -- I just don't
13 remember anything else about it.
14     Q.     I guess I'm just trying to figure
15 out something.  Well, let me tell you what I'm
16 thinking, that may be the easier way to ask the
17 question.  It's my understanding that there was
18 no 2016 handbook, and that that was blatantly a
19 typographical error in the memo.  And I say
20 that to ask you, you never saw any physical
21 evidence that there was a 2016 handbook or any
22 other handbook, other than the --
23     A.     No, I did not.  In fact, that is

Page 81

1 the conclusion I reach at page ten; and it was
2 a conclusion necessitated by prior writings
3 that seemed to suggest that there was, in fact,
4 a policy handbook or employee handbook that
5 post dated the 2006; and that the assertion by
6 Mr. Davis had been that certain provisions in
7 the 2006 handbook had, in fact, been amended by
8 one in 2016.  So, yes, I focused on at least
9 trying to determine if there had been
10 subsequent amendments.
11          And I made the conclusion at ten,
12 at page ten, that I found no witness to verify
13 or confirm its existence, and I otherwise found
14 no evidence that there had been a 2016
15 handbook.
16     Q.     Okay.  And that's why I was
17 making sure, because I don't know if there's a
18 2016 one either.
19          (Off-the-Record discussion
20          was held.)
21     Q.     Were you aware -- Let me ask you
22 this:  Do you know who Dave Mowery is?
23     A.     Dave Mowery?

21 (Pages 78 - 81)

Page 82

1     Q.     Big old guy, six-seven or so,
2 he's a political consultant.
3     A.     Do not.
4     Q.     So I'm assuming that you didn't
5 know that Legal Services hired him around the
6 same time that you were hired?
7     A.     Did not.
8     Q.     And nobody mentioned to you that
9 Legal Services had provided your report to Mr.
10 Mowery?
11          MR. VREELAND: Object to the
12 form.
13     A.     Did not. I've had no
14 communications with Legal Services or anyone
15 else about how my report was circulated,
16 distributed, provided.
17     Q.     You viewed it -- your report as
18 confidential, attorney-client report, didn't
19 you?
20     A.     Absolutely. It is stated in the
21 terms of my ultimate engagement. In fact,
22 there is a -- There is advice to me to be
23 mindful of my electronic communications; and

Page 83

1 all of my reports, both of my reports, clearly
2 characterize it as a confidential report. As
3 to what the board does with it, I did not
4 engage in speculation about that.
5     Q.     Right. But the client can
6 disclose it or not?
7     A.     Sure. Sure. I definitely did
8 not make any disclosures.
9          MR. MENDELSOHN: Give me a moment
10 to look over some notes. If y'all want to take
11 a five-minute break or so.
12          MR. VREELAND: Sure.
13          (Recess taken.)
14     Q.     Just a couple more questions. I
15 believe you told me that you had seen the
16 monthly reports that Mr. Davis provided to the
17 board?
18     A.     I did.
19     Q.     Were you aware that he is the one
20 who instituted the practice of doing monthly
21 reports?
22     A.     I recall reading that as a fact.
23     Q.     And it wasn't because of a manual

Page 84

1 or any directives that he was required to do
2 these?
3     A.     I do not know his motivation.
4     Q.     But as far as -- You didn't find
5 any like policy or requirement that directed
6 the executive director to do this?
7     A.     I did not look for any. I just
8 noted that he had instituted a policy of making
9 monthly reports. I requested monthly reports
10 upon noting that to be his policy, and I read
11 them as part of my investigation.
12     Q.     And those -- Would you agree with
13 me, those were pretty thorough reports?
14     A.     I don't know that I can agree or
15 disagree. I recall reading the reports for
16 analytical scrutiny of some issues. Today, I
17 don't recall the specific issues that concerned
18 me. I believe, to the extent I made any
19 conclusions about them, they would be in my
20 report.
21          I recall today that they
22 certainly were more than a page. So if you
23 mean by thorough, did they seem to address a

Page 85

1 number of relevant issues? I think that they
2 did. But I don't have an independent memory
3 today.
4     Q.     Did you -- and you may not
5 remember this either. But did you recall
6 anybody providing you with any information
7 where Ms. Battle or members of the board ever
8 reprimanded Mr. Davis for work that he was
9 doing?
10     A.     I do.
11     Q.     Okay.
12     A.     But I don't recall the specifics.
13 And I don't know that reprimand would be the
14 proper word, or discipline would be the proper
15 word. But I do recall reading writings. I
16 can't tell you today if they were emails or
17 letters. But I would characterize them as
18 either challenging or raising questions about
19 some of the work that he was engaged in.
20     Q.     Do you know when that came up?
21     A.     I have no idea right now.
22     Q.     Okay.
23     A.     I have no independent

22 (Pages 82 - 85)

Page 86

1 recollection. I know that in the course of my
2 investigation, I did receive writings and
3 records, mostly emails, I believe, and that's
4 the way I would characterize some of them.
5    Q.    Okay. Do you know who they came
6 from?
7    A.    I don't remember today.
8        (Whereupon, Plaintiff's
9         Exhibit 22 was marked for
10        identification purposes.)
11    Q.    Okay. Let me show you Exhibit
12 Number 22 and ask you if you recall seeing
13 that. It's a six-month report that he
14 provided?
15    A.    This looks familiar. I do
16 remember a number of monthly reports, and I do
17 believe that there was a report caption
18 six-month personnel update. I can't swear that
19 I received this precisely; but just looking at
20 the caption, it looks like something that I
21 received. It's directed to the personnel
22 committee, and that's the only thing that gives
23 me pause. I believe that all of his -- most of

Page 87

1 the monthly reports I examined were directed to
2 the entire board. But it's quite possible that
3 I saw this, because I recall requesting any and
4 all reports he may have made to a board or a
5 committee.
6    Q.    And on page three of your
7 Executive Summary, which is Exhibit 19, under
8 that subparagraph A, the third paragraph down.
9 Needed consensus is lacking on the comparative
10 authority of the executive director and the BLD
11 concerning these personnel matters.
12        Can you explain to me what you
13 meant by that?
14    A.    Well, it references the preceding
15 paragraph when I am relating the ending of the
16 probationary period for new employees. And it
17 relates to the overall conflict I found as to
18 whether Mr. Davis himself, as executive
19 director, had the entire authority, independent
20 of the board of directors, concerning personnel
21 matters.
22        So the statement needed consensus
23 is lacking, is a reference to the fact that

Page 88

1 there appeared to be or I found there to be a
2 dispute between Mr. Davis, as executive
3 director, and the board of directors on the
4 scope of his authority for personnel matters.
5    Q.    Uh-huh.
6    A.    That is, whether he had complete
7 authority, absent any supervision or direction
8 of the board. So that is why the conclusion I
9 make is there needs to be some consensus on
10 that.
11    Q.    Right. And as you were
12 discovering the lack of consensus on that, did
13 you review the letter or the offer of
14 employment that was sent to Mr. Davis, setting
15 out what his authority was?
16    A.    I don't recall if I did. It is
17 likely that I did if it were provided to me.
18 And I don't know what particular letter you're
19 referring to, so I hesitate only because I'm
20 not certain if I saw that particular document.
21    Q.    Sure. Let me see if it's in
22 here. I know what it is, but I'm not sure if
23 it was an exhibit yet.

Page 89

1        It was a letter from Phil
2 Mitchell that laid out what his duties were
3 going to be. You don't recall that one way or
4 the other?
5    A.    I do not. The name Phil Mitchell
6 does not ring a bell to me. But, again, I
7 waded through just literally hundreds, if not
8 more, records. And whether I received his job
9 description, I couldn't tell you.
10        Is that what you're referring to,
11 Plaintiff's Exhibit 4, job description?
12    Q.    That's something different than
13 the letter.
14    A.    Okay. Is this the letter
15 attached, Plaintiff's Exhibit 5?
16    Q.    Yes. And that's my question, do
17 you recall seeing either Exhibit 4 or Exhibit
18 5?
19    A.    I would not recall today, and
20 looking at it now doesn't refresh my memory.
21 I'd just have to guess. I do not recall
22 whether I saw his job description or this --
23 What is this, a hiring letter --

23 (Pages 86 - 89)

Page 90

1    Q.    Yes.
2    A.    -- outlining duties,
3  responsibilities, compensation.  I do not
4  remember.  I may have, I don't know.
5         MR. MENDELSOHN:  I don't have
6  anything else.
7         MR. VREELAND:  I don't have any
8  questions.
9  (The deposition was concluded at 12:09 p.m.,
10   March 4, 2019.)
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 91

1         REPORTER'S CERTIFICATE
2  STATE OF ALABAMA,
3  MONTGOMERY COUNTY,
4      I, Angela Smith McGalliard, Registered
5  Professional Reporter, Certified Realtime
6  Reporter, Certified Court Reporter and
7  Commissioner for the State of Alabama at Large,
8  do hereby certify that the above and foregoing
9  proceeding was taken down by me by stenographic
10  means, and that the transcript was produced by
11  computer aid under my supervision, and that the
12  foregoing represents a true and correct
13  transcript of the proceedings occurring on said
14  date and at said time.
15      I further certify that I am neither of
16  kin nor of counsel to the parties to the
17  action; nor in any manner interested in the
18  result of said case.
19      Signed the 14th day of March, 2019.
20
21
       ANGELA SMITH MCGALLIARD, RPR, CRR, CSR
22     AL CSR Lic. No. 98, Expires 9/30/19
       Notary Expiration 9/17/19
23

24 (Pages 90 - 91)

**[& - amendments]**

| & | | |
| --- | --- | --- |
| **&**   1:18 4:16,20 5:7 | | |

| 0 | | |
| --- | --- | --- |
| **00026**   1:5 4:4 | | |

| 1 | | |
| --- | --- | --- |
| **1**   29:11,12 | | |

**12**   3:10,13
**12:09**   90:9
**14**   24:16,23
**14th**   91:19
**16**   3:10
**160**   15:8
**17**   3:13 80:7
**1772**   1:19 4:16 5:7
**18**   3:8,8 8:19,22 9:3
  9:11 12:13
**18307**   91:21
**19**   3:9 12:17,21,23
  87:7
**197**   11:3

| 2 | | |
| --- | --- | --- |
| **2**   29:11,12 | | |

**20**   3:11 12:17,21
  13:5 15:7
**2006**   6:10 28:5 35:8
  79:22 81:5,7
**2007**   6:15
**2016**   36:11 79:4,12
  79:19 80:8,18,21
  81:8,14,18
**2017**   59:10 63:23
**2018**   64:3
**2019**   1:20 90:10
  91:19
**2021**   4:20
**21**   3:14,14 9:6,20
  27:22 28:2 79:23
**219**   29:5
**22**   3:15 86:9,12

**221**   29:5
**25**   9:7
**27**   3:14
**28th**   72:1
**2:18**   1:5 4:4

| 3 | | |
| --- | --- | --- |
| **3**   3:5 | | |

**35203**   4:21
**36117**   1:19 4:17 5:8
**3rd**   4:21

| 4 | | |
| --- | --- | --- |
| **4**   89:11,17 90:10 | | |

**4th**   1:20

| 5 | | |
| --- | --- | --- |
| **5**   89:15,18 | | |

| 6 | | |
| --- | --- | --- |
| **6**   3:5 60:12 63:13 | | |

  64:8
**626**   3:8 8:23
**64**   29:4

| 7 | | |
| --- | --- | --- |
| **70s**   11:17 | | |

**75**   11:6
**76**   11:4,7
**78**   11:4,9

| 8 | | |
| --- | --- | --- |
| **8**   3:8,16 | | |

**80s**   11:22
**86**   3:16
**8th**   72:2

| 9 | | |
| --- | --- | --- |
| **9/17/19**   91:22 | | |

**9/30/19**   91:22
**98**   91:22

| a | | |
| --- | --- | --- |
| **a.m.**   5:9 | | |

**able**   45:13 48:2
  60:23

**abound**   69:4
**absent**   88:7
**absolutely**   82:20
**accepted**   19:23
  20:2
**accountants**   42:17
**accounting**   42:8,11
**accurate**   41:22
  71:7
**accurately**   42:4
**accusation**   39:10
  75:23
**accusations**   17:9
  17:10 39:5 52:9
**acknowledged**
  47:11
**acquaintance**
  10:12 52:22 53:10
**acting**   5:2
**action**   1:5 4:4
  16:11,12,15 41:17
  74:1,4 91:17
**actions**   16:18 43:2
  49:21
**actively**   72:1
**actual**   13:6 26:1
  35:7
**addition**   72:10
  77:12
**address**   84:23
**addresses**   48:9
**adjective**   38:11
**adjudication**   6:14
**adjustments**   49:15
  49:16
**administrative**
  6:14 67:10
**adopted**   35:14
**advance**   53:23 56:2
  56:7

**advanced**   46:9
  56:19
**advancing**   54:9
  58:3
**adverse**   43:3 45:15
  46:15
**advice**   82:22
**advise**   15:19
**advised**   35:20
**advising**   10:9 56:14
**advocacy**   65:4
**afraid**   62:14
**agency**   7:23 35:15
  61:9
**ago**   28:11 61:11
**agree**   32:4 57:6,7
  84:12,14
**agreed**   1:14 2:1,8
  2:16 22:8
**agreement**   9:8
**ahead**   26:6 70:5
**aid**   91:11
**al**   1:10 4:9 49:5
  91:22
**alabama**   1:2,9,19
  4:2,8,17,21 5:2,8
  9:10 10:23 11:1,8
  91:2,7
**albert**   4:19
**allegation**   17:3
  62:17
**allegations**   15:14
  30:19 33:23 78:21
**alleged**   6:18 16:13
  64:15
**allegiance**   40:19
**allotted**   23:4
**amended**   80:2 81:7
**amendments**   80:9
  81:10

**amounts** 44:1
**analysis** 13:2 43:16
  45:22 47:1 53:20
  58:13
**analytical** 26:20,23
  38:18 54:12 58:7
  72:3 84:16
**analytically** 22:16
  30:5
**analyze** 30:3 42:3
  47:16
**analyzed** 45:19,23
**analyzing** 47:11
**angela** 1:17 4:12
  5:1 91:4,21
**answer** 26:16 40:11
  51:4 66:18
**answering** 24:10
**anticipated** 19:6
**anxiety** 69:4
**anybody** 13:18,20
  14:3 42:11,18 62:6
  63:4 67:12 70:9,10
  85:6
**anyone's** 70:12
**apart** 40:12
**apparently** 14:17
  31:2 80:6
**appear** 45:3
**appearances** 4:14
**appeared** 88:1
**appearing** 4:17,22
**appears** 15:13
  34:11 46:4
**approached** 67:22
**appropriately** 47:9
**approval** 21:3
**approved** 21:5
**approximately**
  71:12

**area** 11:9
**areas** 19:19
**arising** 9:13
**artur** 1:6 4:5 9:14
  50:19
**ascertain** 27:10
**asked** 10:16 17:22
  24:3 26:7 67:22
  73:9 79:4
**asking** 12:9 15:14
  30:18,20 34:3 36:4
  56:21 62:6 74:5
  76:15
**asserted** 53:21
**asserting** 8:15
**assertion** 81:5
**assign** 2:13
**assorted** 26:19
**assume** 75:1
**assuming** 25:18
  26:4,6 43:22 82:4
**attached** 30:9
  89:15
**attachment** 27:3
**attempt** 32:17 35:3
**attendant** 33:16
**attorney** 7:7 8:8,13
  46:5 66:3 82:18
**attorneys** 65:8 66:5
**attributed** 37:23
  39:1 80:5
**attributing** 38:19
  40:18
**august** 9:6,7,11,20
  11:6 59:10,15 64:1
  72:1 80:7
**authenticity** 62:14
**authority** 74:21
  75:4 87:10,19 88:4
  88:7,15

**authorized** 14:19
**availability** 10:3,17
  15:5
**available** 12:10
  34:18
**avenue** 4:21
**averitt** 42:8,16
**aware** 19:2 81:21
  83:19

**b**

**back** 23:12 31:8
  49:7 56:10,15 73:5
**background** 6:8
  36:5 57:10,20 59:1
**bad** 40:18,21,22
**based** 47:17
**basic** 49:7
**basis** 51:1,18
**bates** 3:8 8:22 15:8
  28:21 29:1,4
**battle** 9:4 10:2
  11:23 12:14 13:19
  14:5,6,9 19:10,18
  23:12,15 24:4,5
  27:18 32:21 33:3
  52:21 59:10 63:4
  67:4,7 85:7
**began** 11:6 30:16
  70:13
**beginning** 5:8
**begins** 29:5
**behalf** 4:17,22
**behavior** 38:20
**believe** 7:20 8:2
  10:13 16:2 18:7,16
  19:23 26:14 28:7
  32:9 37:5 41:20
  47:3 56:16 58:19
  68:11 83:15 84:18
  86:3,17,23

**believed** 20:16,17
  40:9 54:1
**bell** 61:2,13 65:5
  68:14 77:18 78:14
  78:16 89:6
**bench** 6:9
**benefit** 32:6 41:6
  41:13
**best** 9:20 11:3,13
  40:9,20 43:1 61:11
  71:5,15
**better** 15:11 50:11
**beyond** 16:17
**big** 25:9 82:1
**bigger** 45:6 48:6,8
**bill** 56:4 71:1,6
**billable** 70:2,5
  76:15 77:4
**billing** 15:6
**binds** 8:2
**birmingham** 4:21
**bit** 15:11 21:18
**blatantly** 80:18
**bld** 87:10
**board** 6:17 9:5 10:9
  10:14,20 11:2,16
  11:17,19 12:1,3,4,6
  13:3,21 14:3,6,18
  15:14,18 16:8,10
  16:17,19 17:19
  18:16 20:2 21:2,3,5
  21:9 22:9 23:16
  24:6,8,13 25:10
  26:5 30:21,23 31:4
  31:15,16 32:3 33:5
  38:6 47:7,21 49:2
  50:11 51:7,7,13
  52:21 53:3,4 56:12
  56:14 60:6 65:15
  67:1,3 72:11 80:12
  83:3,17 85:7 87:2,4

87:20 88:3,8
**board's** 9:10 31:19
  51:14
**borrow** 46:19
**bottom** 15:17
**bounds** 7:6
**boyd** 1:17,22 3:10
  3:12 5:9,12 6:6
  50:18 52:7
**brain** 61:7
**breach** 49:8 64:15
  73:13
**breached** 62:18
**break** 83:11
**brought** 78:10,22
**budget** 37:2,3 39:9
  39:12 41:4,18
  46:19 47:8 48:13
  50:8,9
**budgetary** 41:15
  42:2 43:16,23
  44:13,20 45:10
  47:14 50:12 51:14
**budgets** 47:1,12,13

**c**

**calendar** 24:23
**call** 10:2 12:9 32:8
  35:3 43:6
**called** 10:23 51:9
  63:5
**campaigns** 10:12
**campbell** 11:18
**capacity** 9:5
**caption** 86:17,20
**careful** 18:17
**case** 52:5 91:18
**cases** 21:8
**casework** 21:7
**casual** 66:23
**causative** 49:9

**cause** 5:10 49:23
**caused** 46:19 49:22
  50:19 51:22 55:5
**ccr** 1:18 5:1
**central** 22:13 69:16
  72:12,14 74:9
  77:15
**certain** 36:1 42:21
  42:23 50:3 71:20
  81:6 88:20
**certainly** 7:19 28:8
  37:13 38:1,4 76:2
  78:13 84:22
**certainty** 66:19
**certificate** 91:1
**certified** 91:5,6
**certify** 5:3 91:8,15
**cetera** 72:5
**cfo** 68:10
**challenging** 85:18
**chance** 24:14 53:12
**characterize** 83:2
  85:17 86:4
**characterized**
  74:17,18
**charlotte** 76:17
**cheating** 6:18
**check** 76:14
**choice** 34:10
**chose** 29:10
**christine** 77:5,17
  78:3
**circulated** 82:15
**circumstances** 10:1
  14:10
**cite** 26:17
**cited** 27:1
**civil** 1:5 4:4 5:4
**claim** 54:9 56:3,18
  58:11,18

**claimed** 61:22
**claiming** 8:7
**claims** 58:4,7 63:13
  73:22 76:13
**clarify** 26:23
**clear** 18:11,14,18
  34:2,17 39:6 42:20
  46:13,22 49:18
  52:3 58:3 63:19
  68:1 75:19
**clearly** 41:14 65:12
  83:1
**client** 7:7 8:1,8,13
  82:18 83:5
**closings** 45:9
**cogently** 33:20
**coincidentally**
  68:19
**combed** 26:18
**combination** 6:13
**come** 62:16 63:2,14
  64:16
**coming** 23:12 28:15
**commissioner** 2:18
  4:13 5:3 91:7
**committed** 37:6
**committee** 14:19
  30:21 47:9 50:16
  51:8,9,10,11 86:22
  87:5
**communicate**
  15:11 31:3
**communicated**
  21:1
**communications**
  22:1 24:12 32:2
  33:12,14 82:14,23
**company** 63:5
**comparative** 87:9
**compare** 47:13

**compel** 31:21 34:13
**compelled** 31:17
**compensation**
  37:10 44:16 45:3
  45:23 46:8 50:9
  66:15 90:3
**complaining** 56:2
  59:11
**complaint** 53:21
  54:14,20 57:14,19
  58:20 59:3 74:16
**complaints** 16:7
  17:3,13 25:12
  53:15 54:6 55:5,9
  57:8 59:18 69:18
  72:11 74:5,12
  78:20
**complete** 17:20
  18:9 57:18 88:6
**completed** 13:1
  15:20 20:7 21:20
  24:16 54:11
**completely** 55:17
**completing** 23:12
  23:20 25:2
**completion** 18:23
**compliance** 2:5
**comprehensive**
  72:2
**comprehensively**
  20:3,11
**compromise** 63:6
**computer** 91:11
**concept** 49:7
**concern** 7:9
**concerned** 84:17
**concerning** 57:19
  87:11,20
**concerns** 9:12
  16:20 69:13,13

**[conclude - deemed]**

**conclude** 40:7 44:8

**concluded** 40:12 41:23 45:1 50:19 63:20 90:9

**concluding** 13:11

**conclusion** 32:1 40:17 41:7,11 44:4 46:2 51:2 55:12,13 66:12 69:9 81:1,2 81:11 88:8

**conclusions** 37:9 38:2,7,19 44:18 45:2,20 46:10 49:19 50:23 51:19 52:10,16 56:9 58:8 58:21 84:19

**conduct** 23:9 37:8 37:23 38:10 39:2 67:6

**confidence** 66:12 70:13

**confident** 27:16 38:17 50:10 59:15 60:8 70:8 73:11 77:19

**confidential** 7:15 13:2 22:1 31:23 43:9 70:15 82:18 83:2

**confidentiality** 7:22

**confirm** 15:5 55:16 81:13

**confirmatory** 9:8

**confirmed** 77:8

**conflict** 15:6 44:7 53:1 87:17

**confusing** 43:11

**confusion** 55:2 57:2 69:4

**cons** 31:20

**consensus** 87:9,22 88:9,12

**considerable** 31:20

**considered** 22:14

**constraints** 15:1 45:10

**construed** 50:22 52:12

**consultant** 82:2

**consuming** 22:14

**contact** 14:7 32:9 32:17 33:3 34:20 42:16

**contacted** 9:17 14:4 32:21 42:8 52:20

**contained** 29:17

**content** 66:14

**contents** 28:6 37:21 54:23

**context** 62:11 78:20 80:3

**continue** 45:4 46:3 54:9 56:4 58:6

**continued** 17:2 33:17 72:1

**continuing** 33:12 43:20 44:11

**contractual** 7:21

**contributed** 54:6

**contributing** 76:23

**convenience** 30:10

**conversation** 14:9 62:17 73:6

**conversations** 64:17

**cooperation** 31:21

**copies** 30:12 33:17

**core** 21:7,14

**corporation** 11:1

**correct** 8:6 45:17 45:19 48:7 55:7 79:16 91:12

**correctly** 79:22

**counsel** 1:16 2:10 2:12 5:6 91:16

**country** 34:8

**county** 6:17 91:3

**couple** 7:5 83:14

**course** 13:13,14 26:2 30:3 58:23 67:20 71:20,23 74:20 86:1

**court** 1:1 2:6 4:1 5:2,15 6:1 91:6

**cover** 36:21

**create** 75:7,11

**created** 21:6 22:3 25:22 41:2 55:22 76:12

**creating** 76:22

**creation** 17:14 25:13

**credibility** 76:4

**crime** 38:15,20 39:1

**crimes** 37:6

**criminal** 16:14 37:8 37:15,22 38:10,15 38:20 39:2

**critical** 33:11 43:12

**crr** 91:21

**csr** 91:21,22

**cute** 75:20

**cv** 1:5 4:4

**d**

**d** 3:2,10,12

**date** 5:3 9:19 24:15 24:21 91:14

**dated** 9:6,20 80:6 81:5

**dates** 12:8

**dave** 81:22,23

**davis** 1:6 4:5 9:14 10:6,11 15:19 16:15 17:11 30:13 32:18,21 37:5 38:20 40:7 41:5 43:3 46:18 49:22 50:19 51:15 52:9 52:23 54:1 55:6,21 57:7,16 59:11 66:5 66:20 74:1,20 76:3 76:12 77:5,17,23 78:3 80:5 81:6 83:16 85:8 87:18 88:2,14

**davis's** 17:1 41:17 43:20 44:11 45:12 47:2 55:17 75:14 80:1

**day** 1:20 9:22 64:22 91:19

**days** 9:21

**deal** 19:12,13 20:11

**dealt** 44:21

**decide** 75:22

**decided** 19:19

**decision** 30:4 32:9 33:2,6,11 34:12 41:12 50:9 53:23 56:4 58:4

**decisions** 9:13 21:6 25:11 37:10 39:7 40:13 43:21 44:12 44:16 45:3,23 46:9 46:18 47:15 66:15

**declaration** 50:4

**deemed** 56:11

**defend** 57:16
**defendant** 4:22
**defendants** 1:11
 4:10
**defense** 33:22
**define** 27:14
**defined** 27:12
 48:17 73:15
**definitely** 28:4
 37:17 83:7
**degree** 62:2
**degrees** 27:14
**deliberated** 33:5
**deliberately** 7:3
**deliberation** 26:20
**delivery** 25:4
**delores** 1:16,22 5:9
 5:12 6:6
**delve** 57:19
**demeaning** 22:6
**denied** 47:12
**department** 67:19
 68:3 72:21
**departures** 55:17
**deposition** 1:16,22
 2:3,4,14,17 7:8
 90:9
**depositions** 2:7
**derived** 27:1
**describe** 54:19
**described** 22:22
**description** 48:10
 71:2 89:9,11,22
**desired** 16:4 23:19
 56:2 76:19
**detailed** 3:11 13:6
 13:10 40:4 44:18
 48:18 71:3
**details** 36:19
**determination**
 55:21 75:13,16

**determinations**
 52:7
**determine** 41:17
 43:2 57:17 81:9
**determined** 44:10
 58:19
**different** 42:7 59:5
 61:9 89:12
**differently** 48:21
**difficult** 51:4
**difficulty** 18:15
**diminished** 21:10
**directed** 61:1 80:12
 84:5 86:21 87:1
**direction** 88:7
**directions** 19:5
**directives** 84:1
**directly** 42:18
**director** 9:14 11:18
 11:20 17:15 33:8
 39:8 53:8,9 60:7
 65:3 75:5 78:17
 84:6 87:10,19 88:3
**director's** 22:4
**directors** 9:6 11:2
 24:8 38:6 53:4,4,16
 72:11 87:20 88:3
**disagree** 46:7 84:15
**disciplinary** 74:1,4
**discipline** 74:15,21
 75:5,6 76:7,9,10
 85:14
**disciplined** 57:13
**disciplining** 75:10
 75:14 76:1
**disclose** 83:6
**disclosed** 43:20
 52:21
**disclosing** 77:21
**disclosures** 70:14
 83:8

**discovering** 88:12
**discussed** 60:2,9
**discussing** 13:4
 19:9 59:22
**discussion** 8:16
 18:4,6 23:11,20
 61:21 64:6 81:19
**discussions** 18:8,11
 62:1
**disposition** 54:19
**dispute** 88:2
**disputed** 33:22
**disregard** 49:15
**dissension** 65:16
**distributed** 82:16
**distributing** 13:3
**district** 1:1,2 4:1,2
**division** 1:3 4:3
**divisive** 33:12
**document** 88:20
**documentation**
 7:21 25:19 26:8
**documented** 52:6
**documents** 8:12
 26:3 28:9 29:2,16
 70:1 72:9
**doing** 6:12 59:2
 83:20 85:9
**dollars** 51:23
**duly** 5:13
**durant** 11:20 53:7
**duties** 89:2 90:2
**duty** 49:8

**e**

**e** 3:2
**earlier** 73:9,20
 78:22 79:4,9
**early** 27:17 52:20
**earnestly** 33:6
**easier** 80:16

**easily** 77:8
**edition** 79:15
**effect** 2:4 44:11
 49:9 50:1
**effects** 43:17,20
**effort** 34:13 47:12
 47:16
**eight** 44:17 45:4,7
 45:7 46:1 51:22
**eileen** 78:11
**either** 10:1,10
 12:11 14:12,17
 30:21 31:17,22
 47:2 50:12 52:12
 58:10 61:20 67:7
 67:21 74:2,7 78:1,4
 78:7 81:18 85:5,18
 89:17
**electronic** 82:23
**elements** 46:2
**eliminate** 55:2
**email** 7:18 10:2
 12:11,12 26:22
 30:22 59:9,14,17
 59:23 60:12,17
 61:21 62:10,12
 63:7,11 64:7,14
**emailed** 14:13
**emails** 7:8,16 26:19
 33:17 34:1 60:5
 61:8 62:19 85:16
 86:3
**emanated** 69:18
**emphasize** 34:11
**emphasizing** 70:14
**employed** 53:7
 78:4
**employee** 53:6,11
 55:16 75:7,8,10
 81:4

**employees**  16:8
  17:6 68:21 69:15
  72:12 74:6,10,21
  75:5 87:16
**employers**  27:13
**employment**  17:2
  25:11 41:3 88:14
**engage**  83:4
**engaged**  61:6 85:19
**engagement**  9:4
  82:21
**entire**  87:2,19
**environment**  17:10
  17:14 21:6 22:3
  25:13 55:22 75:8
**error**  80:19
**escape**  42:13
**escapes**  76:21
**especially**  55:17
**esquire**  4:15,19
**established**  21:4,9
**estates**  6:23
**et**  1:10 4:9 72:5
**event**  63:10
**everybody**  58:17
  74:7,13
**evidence**  2:15
  33:19 37:5 39:11
  40:22 41:5 51:16
  80:21 81:14
**exact**  24:21
**exactly**  12:9 34:21
**examination**  3:3
  5:10 6:2
**examine**  23:18 31:5
  34:1
**examined**  5:13
  87:1
**example**  20:23
  27:11 51:6

**exams**  6:19
**exchanged**  7:8
**exchanges**  30:22
  59:14,17 60:5
**excuse**  22:9
**executive**  3:9 9:13
  11:18,20 12:23
  14:18 17:15 22:4
  23:17 24:11 30:21
  31:18,23 33:8 38:5
  38:8,14,23 39:8
  40:3 41:10 43:8
  49:12 53:8,16 60:7
  69:1 75:5 84:6 87:7
  87:10,18 88:2
**exhibit**  3:8,9,11,14
  3:15 8:19,22 9:3
  12:13,23 13:5 15:7
  25:17 27:22 28:2
  29:12 60:12 63:13
  64:8 79:23 86:9,11
  87:7 88:23 89:11
  89:15,17,17
**exhibits**  3:6,13
  12:17,21 13:7,9
  25:22,23 27:1
  28:11,16 29:5,8,11
  29:18 30:9 48:7
**existed**  62:12
**existence**  81:13
**expedites**  5:23
**expended**  39:13
**expenditures**  39:12
  40:8
**experience**  27:13
**experienced**  22:5
**expertise**  47:11
**expiration**  91:22
**expires**  91:22
**explain**  20:14 57:2
  87:12

**explaining**  33:18
**explanation**  33:11
  43:18 56:18
**express**  15:23
  17:23
**expressed**  16:21
  17:7 52:23
**extend**  23:5
**extended**  37:21
  62:3
**extensive**  6:16
**extensively**  6:22
**extent**  30:7 44:23
  45:22 47:21 48:16
  48:23 53:9 62:9
  84:18

**f**

**fact**  13:6 16:3
  39:20 41:18,19
  51:17 57:13 63:5
  71:23 80:1,23 81:3
  81:7 82:21 83:22
  87:23
**factors**  51:2
**facts**  47:23 50:10
  51:1 57:14,19
**fair**  22:15 47:4 49:3
**fairly**  6:16 20:11
  52:12 70:8 71:2,20
  77:8,18
**familiar**  9:2 86:15
**familiarity**  10:5,10
  21:13
**family**  6:23
**far**  16:12 17:9 29:9
  40:5 55:8 64:3
  66:22 84:4
**fashion**  37:9
**federal**  5:4
**feedback**  33:20

**feel**  13:15 38:17
  53:1
**felt**  18:11 31:4
**fifty**  46:6 54:18,22
  55:14
**figure**  26:8 29:14
  71:4,5 80:14
**file**  53:13 54:16
**files**  29:23 47:18
**filing**  2:17
**final**  58:7,13
**finance**  30:2 42:12
  42:14 51:9 67:19
**financial**  41:6,16
  42:17 43:3 45:14
  45:15 49:22 50:13
  50:19 52:8 68:13
**financially**  10:11
  41:13
**find**  23:1 37:4
  39:11 50:10 57:2
  84:4
**finding**  38:10 39:18
  40:2 48:22 51:17
  55:23 56:1 71:23
**findings**  38:19
  52:11 56:6,12,18
**fine**  5:17 17:17
**firm**  42:9,11
**first**  5:13 9:17 10:8
  10:21 14:9 20:1
  23:14 32:17 44:4
  57:9 58:16
**fiscal**  30:1 42:15
  47:8 51:9 67:19
  68:2 72:4 73:1
  77:16 78:1,4
**fit**  78:7
**five**  15:8 21:23,23
  46:5 70:22 71:14
  72:7 77:9,20 83:11

**focus** 19:8,12 20:3
**focused** 22:20
44:20 73:14 81:8
**folk** 77:13
**follow** 23:23 28:21
61:19 79:2
**following** 5:11
**follows** 5:14 33:10
**force** 2:4 31:15
**foregoing** 5:5 91:8
91:12
**forget** 63:19
**forgot** 29:11
**form** 2:11 51:1
63:17 82:12
**former** 10:12
**fortin** 65:1,3 66:3
**fortune** 10:22
**forty** 46:4,4,5
**forum** 18:15
**found** 37:14,22
41:4 46:15,17
47:17 48:5,19 49:1
56:15,22 81:12,13
87:17 88:1
**foundation** 46:11
**foundational** 46:2
51:1,16
**founding** 11:2 53:4
**four** 17:13 20:4,16
25:10,15 46:4,4
49:11,13
**frame** 42:2
**frankly** 22:21
37:15
**free** 7:10,13,13,20
8:4 51:17
**freely** 47:10
**full** 2:5 6:4 18:17
61:8

**fully** 19:2 20:11
**fulsome** 23:9 53:20
54:13
**funding** 42:1
**funds** 56:17
**furnished** 26:4,10
30:12
**further** 2:1,8,16
18:3 23:19 24:12
38:22 47:22 52:1
58:22 59:1,2 91:15
**future** 29:14

**g**

**gary** 68:4,6,8
**general** 36:20 37:3
76:11
**gilmore** 68:4,6,8
**give** 9:19 11:21
22:18,23 24:20
26:15 27:19 31:15
49:4 51:5 53:20
54:12 71:19 83:9
**gives** 86:22
**glancing** 41:10
**glimpse** 7:15
**go** 19:15 46:19 48:3
49:4 52:1 56:10,15
57:3,3
**going** 8:10 13:12
28:2 29:22 36:9
48:2 49:20 60:22
71:1,2 89:3
**good** 7:4 10:22 13:9
78:23
**gotten** 38:13
**governed** 27:7
**graham** 55:16 58:1
67:11,22 73:21
74:17
**greater** 66:12

**grounds** 2:13
**guess** 11:14 20:21
42:23 51:12 55:19
61:15 71:19 73:21
80:14 89:21
**guy** 73:4 82:1

**h**

**handbook** 3:14
26:14 27:5,8,12,17
28:3,5,8 35:8,9,11
35:14,21,21 36:2,6
36:11 75:4 79:5,12
79:19,23 80:2,8,18
80:21,22 81:4,4,7
81:15
**handling** 10:15
**happened** 25:5
59:15
**happy** 56:15
**harassed** 73:22
**harassment** 17:13
25:12
**harm** 49:22 50:13
50:20
**harris** 78:11
**head** 36:16
**heard** 79:14
**held** 8:17 78:16
81:20
**help** 6:9 13:16
15:10 20:14 43:10
55:1 62:14
**helps** 63:11
**hesitate** 88:19
**higher** 45:13
**highlighted** 38:13
**hire** 23:22 43:21
44:12 45:13
**hired** 63:5 66:5,5
66:11,20 82:5,6

**hires** 46:5,6
**hiring** 37:2,10
44:16 45:2,23 46:8
50:8 66:14 89:23
**hirings** 49:14
**history** 36:1
**hold** 77:23
**honestly** 27:19
50:21
**honor** 11:1
**hope** 70:11
**host** 29:23 59:13
**hostile** 17:4,10,14
22:2 25:13 27:12
32:3 53:20 54:14
54:20 55:5,22
58:20 74:16 75:7
75:11 76:11,22,23
**hour** 70:20
**hours** 15:6 70:2,6
**huh** 12:15 15:9,12
28:13 34:15 45:11
46:14 65:22 69:6
88:5
**hundreds** 26:18
89:7
**hurt** 41:18

**i**

**idea** 16:16 34:9,22
63:15,18 85:21
**identification** 8:20
12:18 27:23 86:10
**identified** 69:11
**identify** 9:15 12:21
**identifying** 37:7
**identity** 74:10
77:22
**ii** 4:19
**illiterate** 51:13
**immediately** 23:2

**impact** 21:7 42:1 43:3 44:19,21 45:14,15 46:8 47:15,22 50:8,13 52:8
**impacts** 44:14
**impermissible** 49:17
**implementation** 21:2
**important** 31:5
**impossible** 19:7
**inability** 18:8 61:5
**inappropriate** 75:15
**include** 58:9 71:2 73:12
**included** 40:2 41:3 53:18
**inclusive** 48:19
**incompetent** 49:14
**independent** 9:11 36:18 40:16,19 41:9 42:16 50:15 60:1 72:16 78:12 78:14 85:2,23 87:19
**independently** 36:2 42:4 47:4 58:2
**indicate** 22:2 39:21
**indicated** 19:22
**indicating** 10:5 47:7
**indication** 39:22
**individual** 69:13
**inevitably** 21:23
**information** 57:5 74:8 85:6
**informed** 22:5,9
**initial** 15:4 53:3

**initiative** 21:16
**initiatives** 21:1
**input** 21:3 33:7
**inquired** 62:10
**inquiries** 10:4 58:22
**inquiring** 10:3
**instituted** 83:20 84:8
**intend** 56:7
**intended** 11:13
**intent** 47:20
**intention** 52:14
**interest** 32:10 40:9 53:1 58:3
**interested** 91:17
**interests** 40:20
**interview** 30:16 31:9,22 32:5 33:7 34:13 53:22 65:7 66:6,19,22,23 67:1 67:7,9,12,21 68:1,4 70:13,23 74:11 76:3,6,7
**interviewed** 29:21 58:16,17 60:8 65:13 66:9 67:18 67:23 68:17 69:8 70:7,10 71:13 72:7 73:14 74:7,14 77:5 77:9,9,13,20,21
**interviewing** 62:6 65:1,6,9,20 68:13 68:22,23
**interviews** 23:5 26:22 58:2 62:3 72:3,12
**intimidating** 17:4 22:7
**intrusion** 73:7

**investigate** 15:1,15 17:7 24:3 25:8 41:21 42:22 47:4 47:21 50:5,12 55:9 63:6 65:14 66:2
**investigated** 14:14 21:16,17 36:3 37:11 38:1,22 44:10 46:16 47:9 47:16 48:23 56:3
**investigating** 48:13 55:4 58:6 62:4
**investigation** 6:16 7:11 9:9,12 10:15 13:11 14:10,19,21 16:4,20 17:21 18:17 19:4 21:12 21:19,20 23:4,9,13 26:2 30:17 31:11 31:22 32:11 42:3 43:2,19 48:11,17 50:14 54:13 57:18 58:23 61:7 62:8 63:23 71:21,23 73:12,15 76:9 78:10 84:11 86:2
**investigations** 6:22 19:2 63:20
**investigative** 6:14 13:1,18 27:2 33:7 52:11 58:4 72:9
**investigator** 19:8 26:18 33:5 50:15 72:7
**investigator's** 20:2
**invoice** 70:9,17,21 72:18
**involve** 16:18
**involved** 6:22 13:18,20 19:3 22:15 42:14 56:18

73:1,2 76:22
**involving** 16:8 22:10 60:5,6,7
**irrelevant** 56:6,11
**issue** 44:21 45:19 45:21 76:4
**issues** 9:12 16:6,10 19:9 20:4,12 22:20 23:19 30:4 33:22 41:15 47:8 48:9,20 55:4 62:4 72:9 73:14 84:16,17 85:1
**item** 65:13,14
**itemized** 70:9,17 72:17
**items** 18:14

**j**

**j** 4:15
**jaffe** 59:5
**jefferson** 6:17
**jemison** 1:18 4:16 5:7
**job** 89:8,11,22
**judge** 50:18 52:7 75:21 76:4
**judgment** 71:15
**judgments** 52:4
**jump** 70:5
**jumping** 26:6
**justified** 76:10

**k**

**keep** 22:9
**kenneth** 4:15
**kept** 69:12
**kin** 91:16
**kind** 16:14 23:9 26:5 36:20 37:6 49:23 63:12

**knew** 7:18 19:7
20:10 21:15,18
35:13 53:10
**know** 5:20 6:7,12
7:7 8:4 9:18 11:11
11:14,22 12:8
17:16,19 18:10
21:14 23:3,7 24:21
25:16 27:6 31:16
32:20 35:9,12,18
35:22 36:5,8,15,16
40:11 42:17 43:17
44:9 45:18 49:7
52:17 53:18 55:2
55:19 56:15 59:5
61:16,23,23 62:11
62:15 64:18 67:10
67:18 68:1 69:21
70:1,4 71:12,18
72:13,20,21 81:17
81:22 82:5 84:3,14
85:13,20 86:1,5
88:18,22 90:4
**knowledge** 72:8
**known** 35:19 62:12
74:11

**l**

**l** 1:13 4:19
**lack** 15:5 47:11
58:3 88:12
**lacking** 32:10 87:9
87:23
**lady** 73:4
**laid** 47:23 89:2
**large** 12:3 22:12
91:7
**late** 11:17
**launched** 63:12
**laveeda** 9:4 10:2
61:1

**law** 7:3 11:6
**laws** 2:5
**lawyers** 65:20
**lay** 15:13
**layoffs** 45:9
**leading** 2:11
**leap** 51:21
**learned** 51:7
**led** 69:8
**left** 76:18
**legal** 1:9 4:8 7:13
9:9 10:8,22,23 11:7
14:3 35:15 40:9,20
43:4 45:15 53:6
56:5 82:5,9,14
**lehr** 4:20
**lends** 19:4
**letter** 9:4,8 14:22
15:4 88:13,18 89:1
89:13,14,23
**letters** 85:17
**liberally** 27:15
**lic** 91:22
**likelihood** 78:6
**likes** 75:9
**limit** 19:19
**limited** 16:20 18:22
**line** 3:4,7 19:15,15
48:3,3
**link** 50:5
**listed** 18:14 25:17
**listening** 31:7
**literally** 89:7
**little** 15:11 43:7
**logical** 43:18
**long** 11:10 56:17
**longer** 11:13 54:7
**look** 8:21 15:7 20:8
20:9,23 26:15 28:6
36:17 41:16 44:17
49:6 50:7 53:12

56:10 57:20 60:11
60:15,21 61:16
66:10 67:14 71:6
73:23 74:3 79:3
83:10 84:7
**looked** 18:18 29:15
29:23 47:18
**looking** 22:21
26:11 31:14 37:20
38:7 49:11 52:3
57:21 59:1 60:18
60:23 61:12 64:7
66:13,15 71:22
86:19 89:20
**looks** 24:15 28:4
86:15,20
**lose** 51:23
**lot** 6:7 36:21 57:20
**lsa** 3:14 17:13 21:7
21:14 22:1,6,10,12
33:13 42:1 46:19
47:1 49:22 50:20
51:22 56:17 69:5

**m**

**ma'am** 6:5 13:23
**making** 14:2 38:18
40:7 41:12 51:6
58:7,22 64:10
81:17 84:8
**male** 68:21
**males** 68:17
**management** 9:13
22:4
**managing** 65:8
**manner** 47:5 52:13
91:17
**manual** 83:23
**march** 1:20 90:10
91:19
**mark** 28:2

**marked** 8:19 12:18
27:22 86:9
**markings** 29:12
**marvin** 11:18
**maryland** 35:16,22
**mason** 10:13 52:17
52:22 55:9,16 57:9
58:1 67:11,21
73:21 74:17
**mass** 29:1
**materially** 49:16
**matter** 13:19 41:19
47:3 48:13 73:3,8
**matters** 17:8 22:10
38:22 41:20 42:2
61:10 73:2,2 87:11
87:21 88:4
**mcgalliard** 1:17
4:12 5:1 91:4,21
**mean** 13:19 25:23
34:5 62:1 73:4
84:23
**meaning** 31:13
**meaningful** 43:16
**means** 31:4 48:23
91:10
**meant** 87:13
**mediation** 6:13
**mediations** 6:12
**meeting** 13:4 24:7
24:14 66:10
**meetings** 51:11
**member** 24:6
**members** 12:4 22:2
65:17 67:1,4 85:7
**memo** 79:18 80:19
**memoranda** 33:23
80:1
**memorandum** 80:6
80:11

**memory** 14:23 26:12 27:9 53:2 64:9 67:15 78:21 79:11 85:2 89:20
**mendelsohn** 1:18 3:5 4:15,16 5:7,19 6:3 8:9 28:23 38:9 60:22 69:23 71:11 83:9 90:5
**mention** 36:23
**mentioned** 28:10 31:8 67:11 79:1,13 82:8
**mere** 75:6
**merely** 75:10
**meriting** 49:1
**met** 23:16 59:7 68:22 70:19,22
**michael** 65:1,2
**mid** 11:22
**middle** 1:2 4:2
**middlebrooks** 4:20
**mind** 16:14 36:10 42:20 43:14,19 64:4
**mindful** 82:23
**minds** 46:7
**minute** 28:10 83:11
**minutes** 70:22
**misappropriating** 39:14
**misconduct** 57:11
**mistaken** 70:11
**misunderstood** 31:6 48:12
**mitchell** 89:2,5
**moment** 22:23 26:15 83:9
**money** 37:1 39:14 46:19

**montgomery** 1:19 4:17 5:8 91:3
**month** 3:15 86:13 86:18
**monthly** 30:12 31:1 31:5 83:16,20 84:9 84:9 86:16 87:1
**motions** 52:4
**motivated** 41:12
**motivation** 84:3
**motivations** 49:17
**motive** 40:18,18,22 40:22
**move** 59:4
**mowery** 81:22,23 82:10

**n**

**n** 1:13 3:2
**name** 6:4 65:5 67:23 68:14 76:21 77:5,18 78:13,19 89:5
**named** 72:10 77:13
**names** 30:2 42:12 66:16 67:13 69:7 72:13,22
**narrowly** 27:14
**necessarily** 75:7
**necessary** 2:9
**necessitated** 81:2
**need** 13:13,15 15:20 17:7,20 19:16 42:20 43:18 47:21 55:20 57:4
**needed** 18:3 19:6 21:17,20 27:6 87:9 87:22
**needs** 88:9
**neither** 24:5 47:15 56:1 78:23 91:15

**networks** 33:13
**never** 24:3,4 32:8 34:18 59:7 80:20
**new** 21:1,16 25:11 41:2 87:16
**night** 64:22
**nine** 45:5 46:1,3 54:18,21,22 55:14
**nonattorney** 46:6
**normally** 70:20
**north** 4:21
**northern** 1:3 4:3
**notary** 91:22
**note** 54:10
**noted** 55:15 84:8
**notes** 83:10
**notice** 2:17 63:21
**noting** 84:10
**notwithstanding** 16:9
**noun** 38:11
**number** 8:22 13:9 15:8 20:23 21:8,22 21:23 29:5,20 31:1 39:6 41:2 42:15 45:7 62:12 85:1 86:12,16
**numbered** 20:4 25:14
**numbers** 20:15 25:9,17 28:22 29:1
**numeral** 69:2
**numerous** 49:10

**o**

**o** 1:13
**oath** 35:2
**object** 49:5,5 63:16 82:11
**objections** 2:10,13
**observations** 74:12

**occurred** 61:10
**occurrence** 76:8
**occurring** 91:13
**offer** 88:13
**offered** 2:15
**office** 22:13 45:9 57:12 68:13 69:16 77:15
**offices** 1:18 5:6 22:13 69:19
**oh** 15:9 29:19 73:8
**okay** 6:20 7:1 8:9 10:19 11:10,23 12:7 14:8,15 15:17 16:12,22 18:2,7 20:20 25:3,16,21 26:3 29:13 32:12 32:20 34:7 35:7,17 35:23 39:17,20 40:15 41:1 43:6,10 44:5 46:12 48:15 49:3,12 50:17 55:12,15,19 56:20 60:3 61:14,18 62:21 64:20 65:7 65:11 66:4 68:15 68:18 69:23 70:19 71:4,11 72:13,19 72:23 74:20 75:2 75:18 76:14 77:11 79:8 81:16 85:11 85:22 86:5,11 89:14
**old** 49:7 82:1
**once** 58:1 63:20
**ones** 24:2 25:8
**operations** 21:14 78:17
**opinion** 18:21 21:11

**opportunity**  23:8
  34:19 76:3
**opposite**  46:12
**opted**  58:8 65:13
**oral**  5:10 56:13
**orally**  24:11
**order**  22:15
**originated**  35:21
**outlined**  10:17 17:8
  33:21 48:10
**outlining**  14:14
  90:2
**outset**  26:4,9 27:5
**outside**  21:3 37:1,2
  39:8,12
**overall**  74:15 87:17

**p**

**p**  1:13
**p.m.**  90:9
**pad**  39:22
**page**  3:4,7 15:8
  19:22 23:3 26:17
  29:4 32:12 34:12
  38:14 43:17 44:2,3
  44:17 45:7 49:11
  49:13 51:22 54:18
  55:14 69:1 71:22
  77:7 78:8 79:3,6
  81:1,12 84:22 87:6
**paragraph**  17:12
  20:1 34:11 44:4
  69:2,3 87:8,15
**part**  21:19 28:19
  43:11,22 61:4
  69:20 84:11
**participate**  8:3
  32:4
**participated**  34:23
**participating**  6:15
  32:11

**particular**  14:17
  50:8 59:3 64:7
  69:19 88:18,20
**parties**  1:15 2:12
  10:4 91:16
**parts**  13:12 19:16
**pattern**  31:2
**pause**  86:23
**pay**  43:21 44:12
  45:13 49:15
**people**  30:1 37:2
  42:12,14 45:13
  51:12 54:4 65:12
  66:4,9,10,16,20
  67:19 69:8,20 70:6
  70:17 71:13 77:10
  77:20
**perceived**  17:20
**percentages**  51:23
**period**  11:19 18:23
  20:13 21:21 22:17
  25:6 26:20 47:1
  87:16
**permit**  42:3
**permitted**  65:19
**person**  72:3 76:20
**personal**  23:5
  39:15 41:6 72:8
**personally**  29:22
  39:13 41:13 72:7
  77:20
**personnel**  6:17
  29:23 53:13 54:16
  67:10 72:4 86:18
  86:21 87:11,20
  88:4
**persons**  29:21
  73:13 76:7 77:8,12
  77:15
**phil**  61:2 89:1,5

**phone**  10:2,18 12:9
  12:11 24:9 26:22
  51:11 70:23
**physical**  80:20
**physically**  34:9
**pick**  27:18
**picked**  79:6
**pickett**  59:6,22
  60:6,8 61:21 63:3
  63:13 67:11
**pike**  5:2
**pinpoints**  48:22
**place**  1:19 4:16 5:7
**plaintiff**  1:7 4:6,18
**plaintiff's**  3:6 8:18
  9:3 12:16,22 13:5
  27:21 60:11 64:8
  79:23 86:8 89:11
  89:15
**plan**  13:12
**planning**  18:5
**platt**  1:19 4:16 5:7
**please**  6:4 12:21
  13:16 67:17
**point**  10:14 12:13
  53:5,6 58:17,19,22
**policy**  43:21 44:12
  72:4 81:4 84:5,8,10
**political**  82:2
**posed**  18:14
**position**  8:11 33:21
  50:12 57:10 68:9
  75:21 77:23 78:16
**positions**  25:12
  41:3 57:8
**possibilities**  52:4
**possible**  27:11 87:2
**possibly**  37:8 53:8
**post**  32:2 81:5
**potential**  63:6

**practice**  7:2 11:6
  83:20
**preceding**  47:2
  87:14
**precise**  9:19
**precisely**  86:19
**predecessor**  53:9
**prefatory**  48:10
**preferential**  49:14
**preferred**  23:6
**preparation**  26:21
  56:5
**prepared**  3:10 13:1
  13:2 25:23 29:9,10
  30:13 57:16
**present**  24:8
**presentation**  51:6
  56:13
**presenting**  24:11
**president**  9:5 14:7
  15:19 20:2 30:23
  31:19 33:5 52:21
  60:6
**presume**  16:11
**pretty**  35:14 41:23
  84:13
**prevent**  10:14
**previously**  21:4
**prior**  2:15 10:11
  21:3,13 52:22
  63:21 81:2
**priorities**  21:4,9,15
**privilege**  7:7 8:8,15
**probably**  7:15
  21:11 36:21 43:11
  51:13 56:10 59:16
**probationary**
  87:16
**probative**  72:8
**problems**  54:2

procedure 5:5
procedures 22:6
proceed 58:11
proceeding 91:9
proceedings 5:11
  91:13
process 13:18
produce 71:9
produced 26:19
  28:18 91:10
producing 8:12
product 8:7,15
  56:11 69:20,22
productive 55:18
professional 91:5
promise 64:2
promotional 6:18
proper 85:14,14
proposal 10:17
pros 31:20
protocols 22:6
provided 5:4 25:18
  28:8 30:1 32:9
  33:16 51:17 59:9
  59:13 82:9,16
  83:16 86:14 88:17
providing 85:6
provisions 44:7
  81:6
proximate 49:9
prudent 56:17 58:5
published 33:14
pull 59:19
purely 18:1
purported 65:15
purportedly 76:22
purpose 24:10
  60:16
purposes 8:20
  12:19 27:23 57:4
  86:10

pursuant 9:10
put 40:23 46:20
  70:21,23 71:1

**q**

qualifications
  37:16
qualified 37:18
question 36:21
  41:14 44:5 45:16
  46:10 48:3 51:5
  56:23 61:19 66:19
  74:22 76:11 79:9
  79:21 80:17 89:16
questioned 74:8
questions 2:11,12
  24:10 26:23 83:14
  85:18 90:8
quick 28:6
quickly 16:10
  27:11
quite 87:2

**r**

raise 62:13
raising 85:18
rand 76:17
reach 81:1
reached 58:13
reaching 51:18
reaction 74:15
read 5:20 31:1
  43:23 49:21 64:21
  84:10
reader 30:10
reading 2:2 19:17
  25:16 83:22 84:15
  85:15
really 35:22 43:12
  57:1
realtime 91:5

reason 34:2 40:6,8
  63:21
reasonable 46:7
  51:2
reasoning 22:23
recall 6:15 9:15
  10:4,7,16 11:12,17
  11:19 12:2,3,5 13:3
  14:8,12,16,21,23
  16:23 18:6 19:9,10
  19:17 20:5 24:12
  24:13,22 26:9,13
  27:3,10,20 28:5
  29:21,23 30:2,11
  30:14,14,17,19,22
  30:23 33:15 35:20
  36:11 37:7,12
  38:18 39:16 41:4
  42:10,11,13,14
  47:6 51:8,10 52:19
  53:5,7,17,19 54:15
  54:17 56:13,22
  59:2,13,22,22 60:4
  61:5,20 62:1,6,20
  65:9,14 66:1,7,9,21
  67:14,20 69:15
  73:3 74:3,5,6,13
  75:3 76:17 78:9,19
  79:8 80:4 83:22
  84:15,17,21 85:5
  85:12,15 86:12
  87:3 88:16 89:3,17
  89:19,21
recalled 77:14
receive 33:19 86:2
received 10:1 29:20
  31:1 62:13 80:5
  86:19,21 89:8
receiving 42:15
  51:16

recess 83:13
recited 40:13
recognize 12:22
recollection 9:21
  9:23 11:3 16:7 24:7
  24:9 27:4 36:18
  40:17 41:9 42:7
  54:3,8 58:15 59:12
  60:2,14 62:2 69:17
  70:16 72:16 76:20
  77:3 78:13,15 79:1
  86:1
recommendation
  19:22 20:3,5
recommendations
  38:21
recommended
  18:22 19:21 21:18
record 8:16 11:7
  33:1 66:13 81:19
records 26:1,19
  27:2 29:20 30:1,5
  41:16 42:15 47:18
  70:10 72:4 76:15
  77:4 86:3 89:8
refer 13:14 19:17
  78:8
reference 11:5 20:6
  23:18 31:18 38:9
  41:11 44:19 54:12
  66:11 79:12 87:23
referenced 13:8
  15:2 21:17 25:23
  28:9 30:8 32:1
  36:13 37:20 44:20
  66:17 71:21 74:10
  80:2
references 29:15
  87:14
referred 79:19

**referring** 32:12
60:13 79:21 88:19
89:10
**reflecting** 80:8
**reflective** 48:6
**refresh** 14:23 27:8
53:2 60:13 64:9
79:11 89:20
**refreshes** 26:12
67:15
**refuse** 34:20
**refused** 34:8,18
**regional** 65:8,20
66:3 69:19
**registered** 91:4
**regularly** 51:10
**relate** 11:15 24:15
57:12 61:8
**related** 6:18 62:8
65:15 73:6 76:13
**relates** 22:1 44:15
47:14 54:13 87:17
**relating** 2:6 47:8
87:15
**relaying** 10:8
**relevant** 20:1 30:6
58:18 59:14 85:1
**relied** 30:7
**rely** 48:18 55:20
**relying** 79:22
**remember** 19:16
37:19 61:17 62:23
63:1,8,9,22 64:6,19
64:21,23 65:6 66:2
68:7,8,12,16,20
68:23 70:12 76:16
77:4 79:4,5 80:10
80:13 85:5 86:7,16
90:4
**reminds** 60:19

**remotely** 62:7
**report** 3:12,16 13:3
13:6,8,10,22 15:21
18:13 24:16 25:2,9
25:17 26:12,21
27:1 28:11,20,22
29:3,4,9 30:9,10
31:18,23 36:13
37:22 39:19,21
40:3,4,14,23 41:8
42:6 43:7,9 44:18
45:6 46:21 47:7
48:6,8,18 49:1,20
50:18,21 53:19
54:11 55:20,20,23
56:1,5,11,16 58:9
67:15 71:19 82:9
82:15,17,18 83:2
84:20 86:13,17
**reported** 21:8
50:10 52:11 53:23
54:4 55:13 69:12
69:14,18 75:17
77:19
**reporter** 5:2,15 6:1
91:5,6,6
**reporter's** 91:1
**reporting** 19:10
**reports** 25:5 30:12
30:20 31:2,5 33:23
69:16 78:20 83:1,1
83:16,21 84:9,9,13
84:15 86:16 87:1,4
**represented** 28:3
**representing** 14:3
**represents** 91:12
**reprimand** 85:13
**reprimanded** 57:11
85:8
**reputed** 79:14

**request** 15:5 68:2
**requested** 26:14
59:17 84:9
**requesting** 30:22
87:3
**required** 26:23
84:1
**requirement** 84:5
**requirements** 40:6
**resentment** 69:4
**resignation** 16:9
17:1 32:2 33:9,16
33:18
**resigned** 15:20
16:3,5 30:17 31:11
**resolution** 9:11
14:13,20 16:17,21
17:8 25:10 26:5,13
65:15
**resolve** 16:10
**resolved** 16:6
**resources** 58:6
**respect** 8:12 34:16
35:7
**respective** 1:15
**responding** 38:17
**response** 16:19
61:11
**responsibilities**
90:3
**responsive** 30:18
**rest** 19:13
**restored** 55:18
**result** 51:21 91:18
**resumed** 7:2
**retain** 70:12
**retained** 69:21
**retaliation** 22:8
**returned** 11:5
**review** 38:23 47:12
88:13

**reviewed** 38:6
54:16
**reviewing** 54:17
**revision** 43:21
44:12
**right** 12:7,9 17:16
20:14 25:8 31:7
32:15,23 33:1
34:14 35:1 44:1
50:6 55:8 61:2
65:18 76:5 83:5
85:21 88:11
**ring** 61:2 65:5
68:14 77:18 78:16
89:6
**ringing** 78:13
**rings** 61:13
**road** 5:2 64:14
**rolled** 64:3
**roman** 69:2
**rosetta** 1:16,22 5:9
5:12 6:6
**rpr** 91:21
**rule** 37:17
**rules** 2:6 5:4

**s**

**s** 1:13
**salaries** 45:14
**salary** 49:14,15,16
**satisfied** 57:22
**saturday** 24:22
25:1
**save** 19:15
**saw** 28:11 79:17
80:20 87:3 88:20
89:22
**saying** 32:6 40:12
**says** 7:13 17:12
43:19
**scales** 49:16

scheduled  67:21
scope  18:22 48:11
  48:16 73:15 88:4
scrutiny  72:3 84:16
second  29:7 69:3
secure  27:5
secured  26:1
securing  60:4
security  62:19
  64:15 73:13
see  11:14 12:8 13:7
  15:2 21:22 22:22
  23:2 24:19 26:12
  26:16 29:6 35:12
  38:9,11,15 39:1,3,4
  41:11,22 42:5,7
  46:3 50:1,8 53:15
  54:11 59:19 60:13
  60:19 64:12,20
  67:15 71:22 88:21
seeing  64:23 68:12
  68:21 75:3 86:12
  89:17
seek  33:7
seen  28:15 70:2,4
  79:20 83:15
selections  20:15
send  10:16 33:18
  61:22 62:10 63:14
sent  9:4 12:13
  59:10 88:14
sentence  15:18
  19:23 45:1 79:15
separate  58:2
  73:17
september  24:16
  24:23 72:2
serve  11:10
served  11:14
service  10:8

services  1:9 4:8
  7:13 9:10 10:9,22
  10:23 11:7 14:4
  35:15 40:10,20
  43:4 45:15 53:6
  56:5 82:5,9,14
serving  11:2,13
set  7:8 26:20
setting  88:14
seven  23:3 26:17
  32:13 34:12 46:6
  77:7 78:8 82:1
share  62:7
shared  14:13 24:18
sheet  66:8
sheets  24:18 69:11
shield  63:6
short  11:19 25:6
shorter  38:8 49:12
shot  49:4
show  29:3 66:8
  70:6,9,17 86:11
shown  63:12
shows  11:7 15:18
shut  46:20
side  52:13
sign  5:20
signature  2:2 91:21
signed  9:7 91:19
significance  48:5
significant  39:7
  48:19 64:13
simply  62:22
sitting  35:19 41:8
  56:8 65:23
six  3:15 15:13
  18:14 19:20,22
  71:19,23 82:1
  86:13,18
smith  1:17 4:12 5:1
  91:4,21

solely  34:11 48:9
solved  73:23
somebody  62:18
  68:13 70:20
sorry  64:5 78:2
  79:8
source  54:1
span  18:19
speak  7:23 8:5
  42:18 76:19
speaking  42:10,12
specific  16:7 17:2
  24:2,10 33:22 37:4
  84:17
specifically  10:5,7
  30:15,18,20 47:6
  56:12 59:16 61:5
specificity  62:2
specifics  64:6,7
  85:12
specified  9:12
  14:21 27:7
speculating  18:1
speculation  83:4
spending  25:11
  37:1 39:7 40:5,13
  46:18
spent  31:19
spread  22:12
srw  1:5 4:4
staff  17:13 22:2,5,7
  22:8,12 45:9 65:16
  72:12 74:9
stake  17:1
stamp  15:8
stamped  8:22
stand  12:5 37:14
  45:20 46:10 68:20
standards  27:7
standpoint  31:14

started  11:8 72:1
starting  13:17
state  33:21 50:23
  66:11 69:3 91:2,7
stated  16:3,16,17
  18:13,20 38:1,5
  48:21 52:13,16
  82:20
statement  44:15
  71:8 80:7 87:22
states  1:1 4:1 46:1
status  51:14 54:5
stayed  64:1
stenographic  91:9
step  6:8 7:6 52:1
stipulated  1:14 2:1
  2:8,16
stipulation  5:5
stipulations  5:16
stopped  58:22
straight  7:5 43:13
strident  33:13
stuff  52:5 57:15
style  22:4
subject  59:5 66:1
subjects  14:14,21
  15:2 62:8 76:6
submitted  13:6
  27:2
subparagraph  87:8
subsequent  81:10
subtitles  66:16
succinctly  50:23
suggest  81:3
suggested  19:11
  22:18
suggesting  40:22
  73:18
summary  3:10
  12:23 23:17 24:11
  31:18,23 37:9 38:2

38:5,8,14,23 40:3
41:11 43:8 44:3,18
45:2 46:1 49:12
52:4,16 69:2 87:7
**supervision** 88:7
91:11
**supervisors** 76:21
**supervisory** 54:5
**supplement** 56:16
**supplemental**
26:18,21
**supplied** 29:20
**support** 10:11 22:7
**supported** 45:1
**supports** 58:11
**sure** 5:19 7:4 8:14
12:15 14:2 25:7
28:1 31:12 32:23
35:5,6 36:7 37:16
38:3 40:2 41:23
44:6,15 46:13 52:6
58:14 64:10,11
79:10 81:17 83:7,7
83:12 88:21,22
**surely** 38:12 54:17
59:2 65:19
**surrounding** 57:14
**suspect** 52:14
**swear** 86:18
**sword** 63:5
**sworn** 5:13
**sylvia** 10:13 52:17
55:3
**synonym** 38:16
**system** 63:7 73:7

**t**

**t** 1:13,13
**tab** 29:10
**tabbed** 13:8 27:3
28:12,19 29:11

**table** 28:6 37:21
54:23 66:14
**take** 8:11,21 16:11
23:6 28:5 45:21
60:21 66:10 67:14
72:5 83:10
**taken** 1:17 74:1
83:13 91:9
**talk** 7:10 13:18
34:18 51:23 66:23
67:3 68:5 76:16
**talked** 70:6,18 71:6
73:20
**talking** 31:8 32:14
35:8 37:3 45:8 55:3
57:9 60:17 71:13
76:17
**talks** 63:3
**team** 65:19
**tell** 5:21 6:4 20:10
24:23 25:1 27:19
28:15 35:12 56:9
61:4 69:7,10,12,14
69:17 72:20 78:15
80:15 85:16 89:9
**telling** 75:22,23
**ten** 71:14 79:3,7
81:1,11,12
**tenure** 11:5 45:12
51:15
**term** 47:2,3 59:15
**terms** 37:3 82:21
**terrorizing** 22:5
**testified** 5:14
**testify** 49:20
**text** 26:22 33:14
**thereto** 2:15
**thing** 41:1 79:17
86:22
**things** 7:5 36:22,23
42:21,23 49:6,10

57:12 61:5 64:4
**think** 6:15 10:10
18:20 20:7 32:13
37:19 58:18 68:17
70:3 71:7 78:5 79:5
85:1
**thinking** 80:16
**third** 87:8
**thompson** 4:20
**thorough** 47:5
84:13,23
**thought** 21:23
22:22 37:15 79:2
**threatening** 22:7
**three** 15:21 18:3,9
18:19,23 19:19
20:13,17,20,23
21:21 22:17 23:13
24:2 43:17 44:2,3
61:6 69:1 87:6
**time** 2:13,14 6:11
10:21 12:1 14:4
15:1 18:20 19:3,6
19:15 20:13 21:21
22:14 23:4,14
24:18 25:6 30:3,16
31:20 41:21 42:2
42:22 53:22 58:5
66:8 69:11 82:6
91:14
**times** 26:7
**today** 14:16 35:20
36:12 37:12 38:23
39:16 40:16 41:8
54:3,15 56:8,21
57:5 58:15 63:1,8,9
65:23 70:16 71:16
72:16 77:14 84:16
84:21 85:3,16 86:7
89:19

**told** 14:9 51:22
83:15
**tone** 33:14
**top** 36:15
**totally** 61:9
**transcript** 91:10,13
**tremendous** 18:15
**trial** 2:14
**tried** 37:8 50:22
70:12
**triggered** 59:18
74:4
**true** 20:22,22 40:1
75:12 91:12
**trust** 6:1
**truth** 75:22,23
**try** 8:10 33:3 57:2
**trying** 17:17 19:14
20:21 26:8 29:2,14
31:21 34:4 35:4
39:5,22 43:12,13
44:6 52:2,5 57:3,17
63:14 70:11 71:4
73:16 75:20 80:14
81:9
**twenty** 44:17 45:4
45:5,7,7 46:1,1,3
51:22 54:21
**two** 20:4,15 25:9,14
34:12 41:2 44:7
54:4 61:10 69:2
72:11,14 74:2,9
75:15 76:1 77:13
77:14 78:7
**type** 41:15 51:8
73:6
**typographical**
80:19

| u | usual  5:15 30:3 | weeks  15:21 18:3,9 | 81:2 85:15 86:2 |
|---|---|---|---|

**u**  1:13
**uh**  12:15 15:9,12
  28:13 34:15 45:11
  46:14 65:22 69:6
  88:5
**ultimate**  32:1 33:6
  54:19 56:9 82:21
**unavailable**  30:15
  31:9,10,13 33:2
  34:4,6,10
**uncovered**  38:13
  40:21 48:1
**underscored**  7:21
**understand**  31:13
  48:4 50:1 52:3
**understanding**
  7:14,22 17:5 22:11
  35:13 80:17
**understood**  41:14
  47:10
**undertake**  9:9
  14:20 16:19 22:16
  46:23 50:13
**undertaken**  64:1
  65:21
**undertaking**  22:14
**undertook**  13:22
  31:11
**unfortunately**  19:3
**uninformed**  22:9
  22:10
**united**  1:1 4:1
**unlawful**  73:7
**unnecessary**  49:13
**update**  86:18
**urgency**  16:1,2
**urgent**  15:20 17:6
  17:20 18:4
**use**  39:15 56:17
  58:5

**v**

**various**  29:21
**varying**  27:13
**verify**  77:3 81:12
**view**  52:23
**viewed**  82:17
**voluminous**  72:4
**voluntarily**  32:4
**volunteered**  72:12
  74:7
**vreeland**  4:19,20
  5:17 7:12 8:6,14
  24:19 28:17,21
  29:3 63:16 70:3
  71:9 82:11 83:12
  90:7
**vs**  1:8 4:7

**w**

**waded**  89:7
**waived**  2:3,18 8:11
**waiver**  8:1
**wallet**  39:23
**want**  5:20,20 7:6
  31:12 36:20 42:6
  49:20 50:17,21
  52:6 58:11 60:15
  71:15 83:10
**wanted**  16:6,10
  56:14
**wanting**  27:10
**warranted**  21:11
**warren**  42:8,16
**way**  17:18 32:16
  35:18 43:1 44:8
  46:13 48:4 49:3
  61:13 71:5 80:16
  86:4 89:3
**week**  18:19,23
  20:13 21:21 22:17

  20:18 21:11 61:6
**weighing**  31:20
**went**  29:17 60:20
  68:21
**willingness**  23:18
**winston**  11:20
**wish**  48:12 54:9
**witness**  2:3 5:9,23
  24:17 29:6 56:2
  81:12
**witnesses**  13:20
  72:8,10 78:7
**women**  74:2 75:15
  76:1,13
**wondering**  60:18
  64:16
**word**  31:7 85:14,15
**words**  18:17
**work**  6:13 7:14 8:7
  8:15 17:14 22:3
  25:13 56:11 58:12
  69:20,22 85:8,19
**workforce**  65:16
  69:5
**working**  75:8
**workplace**  6:21 9:9
  17:3,4 19:1 27:12
  29:22 53:21 54:5,8
  54:14,20 55:5,18
  55:22 58:20 61:7
  68:22 74:16,19
  75:12 76:8,12,18
  76:23 77:1
**woven**  51:3
**write**  56:17
**writing**  30:8 31:3
  62:7
**writings**  30:5,18
  33:17 59:17 60:5
  60:10 61:8 80:5

**written**  50:22
  79:18
**wrong**  44:9

**x**

**x**  3:2 51:23

**y**

**y'all**  18:7 83:10
**yeah**  8:9 13:16
  29:12 36:14 44:6
  71:17 79:13,17
**year**  11:21 45:8
  64:2
**years**  61:10

Alabama Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(e) Submission to witness; changes; signing. When
the testimony is fully transcribed the deposition
shall be submitted to the witness for examination
and shall be read to or by the witness, unless such
examination and reading are waived by the witness
and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within thirty (30) days
of its submission to the witness, the officer shall
sign it and state on the record the fact of the
waiver or of the illness or absence of the witness
or the fact of the refusal to sign together with
the reason, if any, given therefor; the deposition
may then be used as fully as though signed unless
on a motion to suppress under Rule 32(d)(4) the

court holds that the reasons given for the refusal
to sign require rejection of the deposition in
whole or in part.

(F) Certification and filing by officer; exhibits;
copies; notice of filing.

(1) The officer shall certify on the deposition
that the witness was duly sworn by the officer and
that the deposition is a true record of the
testimony given by the witness. Unless otherwise
ordered by the court, the officer shall then
securely seal the deposition in an envelope
indorsed with the title of the action and marked
"Deposition of [here insert name of witness]" and
shall promptly file it with the court in which the
action is pending or send it by registered or
certified mail to the clerk thereof for filing.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1,
2016.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.



**PLAINTIFF'S EXHIBIT**
18

**Delores R. Boyd**
**Attorney Mediator**

3 North Anton Drive                                                       Montgomery, AL  36105

August 21, 2017

Atty. LaVeeda Battle, President
Board of Directors
LEGAL SERVICES ALABAMA
2657 Fairlane Dr., Suite 300
Montgomery,  Alabama 36116

*RE:  ENGAGEMENT Letter for Workplace Investigation*

Dear LaVeeda,

Confirming our phone and email communications, I hereby agree to undertake a workplace
investigation for Legal Services Alabama pursuant to the Board's August 18 Resolution for an
independent investigation of specified issues and concerns arising from management decisions
by Executive Director Artur Davis. Thanks to you and the Board for the opportunity to conduct
this investigation for an organization with a mission I passionately embraced during my active
law practice, as evidenced by my service on the founding Board for the original legal services
program headquartered here in Montgomery.

*Conflict of Interest*
This letter also confirms  my verbal representation – after reviewing the background information
and records you supplied – that I perceive no *conflict of interest* in undertaking this task.  I am
acquainted with Davis and Sylvia Mason, a complainant but have no personal relationship that
poses either an actual or perceived conflict of interest.  I am also acquainted with some  of the
Directors and LSA employees identified on the LSA website but have no relationship with any
which would implicate a conflict of interest.  I became acquainted with several during the course
of my active law practice (1976-2000), judicial service through 2007, and professional activities
since.

*Fees and costs*
Responding to your requested notice of *my fees for this investigation:*  I am happy to reiterate
my willingness to perform these  services at an hourly rate of $350; that is a discounted rate
below the $375 - $475 hourly rate published in the state bar's mediator roster as my usual range
for mediation, investigative, and administrative adjudicative services.  You can also expect me to
favor LSA as much as I can in billing judgments.  I am willing to proceed without any retainer,
and *I will not bill for  investigative travel or copying* inevitably incurred for my personal
evaluation, exhibit preparation, and draft reports.  You have advised that  this investigation can
be conducted entirely in Montgomery.  The Board should expect me to  submit my written
Report along with an itemized statement and invoice for payment within two weeks.

334-590-4624  -  judgeboyd@knology.net  -  boyddeloresr@gmail.com
U.S. Magistrate Jude (2001 - 2006)  -  Litigator (1976 - 2001)

*Time for Completion*

I projected a minimum period of 30 days to complete and report this investigation which presents a myriad of distinct and substantial issues.   You have advised of the Board's urgent need for an expedited Report, and I will do my best to meet your deadline.  I will inquire then concerning the quantity and format desired for the the written report.  Should the Board desire, I will be happy to make an oral presentation to ensure an accurate understanding of my investigative findings and conclusions; hopefully, any such appearance can be scheduled at a mutually convenient time; as a courtesy to the Board, I will not charge additional time for what should require no more than two hours of my time.

Communications; Retention of Records

I acknowledge the confidential nature of this investigation and the completed report.  I will aim to limit electronic communications as much as possible and to otherwise to safeguard all records delivered to me.  I suggest that I be permitted to retain all investigative information and records for at least 30 days in case the Board requires supplemental reports or clarification which will require my reference.   I will await your instructions for the Board concerning final storage, retrieval, or other disposition of these records.


If I have not addressed any matter which should govern my services, please advise.  Otherwise, I would appreciate your signature below accepting the terms stated, and I am prepared to undertake this investigation promptly.   Be assured of my commitment to render my very best services for LSA in this matter.


Sincerely,

Delores R. Boyd

ACCEPTED for Board of Directors, LSA:

LaVeeda Battle, President

Date: Aug 25, 2017

334-590-4624  -  judgeboyd@knology.net  -  boyddeloresr@gmail.com
U.S. Magistrate Jude (2001 - 2006)  -  Litigator (1976 - 2001)

# EXECUTIVE SUMMARY

FOR

## CONFIDENTIAL REPORT

### INVESTIGATION OF WORKPLACE GRIEVANCES AND CONCERNS
### *RE* Executive Director's Management



### WORKPLACE

**LEGAL SERVICES ALABAMA**
**CENTRAL OFFICE - Montgomery Alabama**

**INVESTIGATION**
**August 28, 2017 - September 8, 2017**

**REPORT COMPLETED**
**September 14, 2017**

**REPORT PREPARED FOR**
**Board of Directors, Legal Services Alabama**

## INVESTIGATOR

**Delores R. Boyd**
United States Magistrate Judge (RET.)
Montgomery, Alabama
judgeboyd@knology.net
(334) 590-4624

EXECUTIVE SUMMARY FOR CONFIDENTIAL REPORT
Investigation of Workplace Grievances and Concerns re Executive Director's Management
prepared for Board of Directors - Legal Services Alabama
INVESTIGATOR:  Delores R. Boyd (U.S. Magistrate Judge, RET.)          September 14, 2017

## I.    ISSUES INVESTIGATED[1]

(1)    **Hiring and Compensation Decisions**
(2)    **Hostile Workplace Complaints**

These two issues directly address the  concerns numbered (1), (2), and (4) in the Board's authorizing resolution for this independent investigation.  The imperatives for completing this investigation within three weeks did not allow for any meaningful analysis of budgetary effects from the questioned hiring and compensation decisions.

(3)    **Revisions in Personnel Policies**

Initial interviews readily revealed this significant issue of serious and continuing  concern for employees: *the Executive Director's substantial revision of personnel policies, without Board approval,* in a manner which facilitated hire and pay decisions and also contributed to workplace tensions and diminishing morale.  The concern proved well-founded and warranted analytical findings and conclusions for the Board's notice and evaluation.

(4)    **Contextual Framework**

The investigation clearly established *the* driving force for the Executive Director's questioned acts:  *his fixed opinion on the scope of his exclusive management authority absent supervision by, or notice to, the Board of Directors.*  His fundamental conflict with the BOD on this issue – coupled with continuing confusion and anxiety created within LSA from Davis's widely circulated viewpoint - justifies the Investigator's outline of the controlling facts in Section II.

---

[1]Before commencing this investigation on August 28, the Investigator advised the Board President Battle that the mandate for completion within three weeks would make it impossible to conduct a complete and careful investigation of another substantial issue specified in the Board's authorizing resolution:
(3) "[whether] "new initiatives which have been communicated to the Board only after implementation, without prior Board input or approval" . . "may be outside of the priorities previously established and approved by the Board, and [whether] the environment created by these decisions may have had an impact on the core case work of LSA as the number of cases being reported within the Board established priorities may have diminished."

2

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

EXECUTIVE SUMMARY FOR CONFIDENTIAL REPORT
Investigation of Workplace Grievances and Concerns re Executive Director's Management
prepared for Board of Directors - Legal Services Alabama
INVESTIGATOR:  Delores R. Boyd (U.S. Magistrate Judge, RET.)          September 14, 2017

## II.     ANALYTICAL CONCLUSIONS

### A.     *Summary Conclusion*

LSA'S published "Core Value Statements" — integrity, professionalism, teamwork, and compassion – are all implicated by issues and concerns arising during Davis's tenure. The investigation disclosed continuing effects from Davis's policy revisions and his hire and pay decisions.

Confusion, resentment, and anxiety abound within the LSA workforce concerning the continuing application of substantial changes effected in job standards and policies which promised (a) fair and equal opportunities for hiring and promotional advancement; and (b) salary settings and adjustments premised on fair, uniform, and consistently applied policies. Davis's act in ending the probationary period for new employees threatens the integrity of previous standards designed to ensure competent and compassionate employees to serve LSA clients and to maintain its administrative functions.

Needed consensus is lacking on the comparative authority of the Executive Director and the BOD concerning these personnel matters. The 2006 Handbook is no longer an instructive guide because all the policy changes Davis made were not posted for uniform notice, some were not posted at all, and some policies have been either arbitrarily honored or enforced in an arbitrary, capricious, or lax manner.

Managing Attorneys have received instructions from Davis which empower them with actual and discretionary authority in dealings with the press and employee recruitment. Support personnel generally have felt diminished and disrespected, and morale has diminished. Employees who have been aggrieved directly or indirectly by Davis's conduct remain apprehensive about LSA's intent to address and remedy their concerns.

### B.     Substantial Revisions in Personnel Policies

1.     Davis substantially revised established Handbook *policies concerning Public Relations Guidelines, employee hirings, and employee evaluations.* These changes were made without requisite approval from, or prior notice to,

3

D00149

EXECUTIVE SUMMARY FOR CONFIDENTIAL REPORT
Investigation of Workplace Grievances and Concerns re Executive Director's Management
prepared for Board of Directors - Legal Services Alabama
INVESTIGATOR:  Delores R. Boyd (U.S. Magistrate Judge, RET.)        September 14, 2017

the Board of Directors.  In his monthly reports to the BOD, Davis did not disclose these substantial policy revisions.

(2)     Revised policies on Public Relations Guidelines  were established by a memorandum and not posted on the LSA Portal.  Two policy changes were posted on the LSA Portal but not communicated to all LSA staff in a timely manner:

•revisions in hiring processes  (including, *inter alia*, ending the requirement of "job opportunity" postings" and authorizing the Executive Director's unprecedented participation in hiring processes;

•revisions in evaluation processes by ending the six-months probationary period for all employees.

(3)     Some of these policy revisions effect changes which appear  inconsistent with values, standards, and goals published in the Handbook as protections secured for employees and clients.

C.     **Hiring and  Compensation Decisions**

1.  *Summary*

Because the BOD is well aware of LSA's fiscal status prior to Davis's appointment in December 2016, as a contextual backdrop for his questionable hiring and compensation decisions, this summary statement should suffice:  the previous year had been marked by  staff layoffs and office closings, and the 2017 budget (approved in December 2016) reflected appropriate  modifications to restore the agency's fiscal health.

Notwithstanding his notice of LSA's fiscal concerns, the investigative record amply establishes that Davis proceeded quickly to make several hiring and pay decisions -- without Board input or notice -- which buttress reasonable and serious concerns about  (a)  unnecessary, incompetent, preferential, or otherwise inappropriate *hirings;*  (b) *salaries and salary adjustments* approved in disregard of existing pay scales,  budgetary  allocations and BOD established imperatives;  (c) *salaries and salary adjustments* approved arbitrarily, for impermissible motivations, or without a determinative regard for the agency's best interests.

4

EXECUTIVE SUMMARY FOR CONFIDENTIAL REPORT
Investigation of Workplace Grievances and Concerns re Executive Director's Management
prepared for Board of Directors - Legal Services Alabama
INVESTIGATOR:  Delores R. Boyd (U.S. Magistrate Judge, RET.)        September 14, 2017

### 2.  INVESTIGATOR'S NOTE

*Privacy and confidential concerns – and preserving the Board's discretionary*
*authority to decide how to disseminate, evaluate, and respond to this Report –*
*support the Investigator's decision to exclude from this Executive Summary* any
portions of her  comprehensive analysis (*Report*, pp. 58)  which identify the  decisions
by Davis and the affected employees.

### D.      Hostile Workplace Complaints

The Investigation included  complaints from LSA's two longest-serving employees. After Davis
resigned, as did  two other principals who reportedly contributed to create these grievances, the
Investigator separately probed each employee to ascertain *first*, the impact of these occurrences on the
workplace; *second*, the status of the questioned disciplinary sanctions imposed against them; and *third*,
the nature of any remedial action each still desired from the BOD.  Each  confirmed – voluntarily, and
absent any input from the Investigator – that these resignations,  especially  Davis's, had completely
restored a positive and productive workplace; that LSA had already acted to their satisfaction to rescind
the disciplinary action Davis took, reportedly in order to force each to resign or retire; and that neither
requested any further remedy of a monetary, equitable, or any other character.

### F.      RECOMMENDATIONS[2]

#### 1. Personnel Matters

*(1) [employees identified in "hostile workplace complaints]*

The BOD should  confirm with each employee the Investigator's representations that their
"hostile workplace" complaints have been resolved to their satisfaction by Davis's resignation and that
the BOD may consider their complaints "closed and resolved" without any consideration of additional
remedies of any kind.

_____

[2]Pursuant to the Investigator's Note at Sec. C-2, the Investigator excludes the text of all
recommendations which identify an employee.

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

EXECUTIVE SUMMARY FOR CONFIDENTIAL REPORT
Investigation of Workplace Grievances and Concerns re Executive Director's Management
prepared for Board of Directors - Legal Services Alabama
INVESTIGATOR:  Delores R. Boyd (U.S. Magistrate Judge, RET.)        September 14, 2017

*** [omitted nos. 2, 3 [*inadvertently missed to number " 4" in the Report*]

(5) The BOD should evaluate the propriety of action in response to significant changes which have been posted (for all employees) in the Handbook ***policies governing hiring processes and the probationary period for evaluation.***

(6) The BOD should evaluate the propriety of action in response to the significant change made in LSA's ***Public Relations Guidelines*** by Davis's "LSA press policy", a revision not posted but circulated to managing attorneys.

(7) The BOD should evaluate the revised and posted "***Funeral Leave***" revision referenced in this Report to determine if it mandates concurrence or revision.

(8) The BOD should act expeditiously to plan for ***a comprehensive review of the 2006 Employee Handbook*** for its revision to incorporate appropriate modifications.

## 2.    FISCAL POLICIES, PRACTICES, & CONCERNS

(1) The Handbook's policy for ***"hiring notice and personnel action notice" forms*** (Ch. 2, § 10) requires "approval" signatures by the Director of Operations, Human Resources, Finance, and the Executive Director. The policy was revised – by email and practice- in mid-February and the investigation disclosed significant practice deviations thereafter, warranting the BOD's consideration of the underlying rationale for this policy and whether any action is warranted in response to its change.[3]

(2) The Investigator received credible information and documentation that the Handbook's ***"Outside Employment"*** policy (Ch. 3, § 6) have been materially breached in two instances and the policy may warrant operational clarity.[4]

(3) The Investigator received credible information and documentation that the Handbook's ***"overtime policy"*** (Chap. 4, § 3) and "***leave-time" certifications*** may have been revised,

---

[3]Upon request, the Investigator will prepare (within 30 days) an outline of the documentation produced for this policy change.

[4] In lieu of detailing here the reported breaches, the Investigator will, upon request, prepare (within next 30 days) a summary of reported findings along with the exhibits produced.

6

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

EXECUTIVE SUMMARY FOR CONFIDENTIAL REPORT
Investigation of Workplace Grievances and Concerns re Executive Director's Management
prepared for Board of Directors - Legal Services Alabama
INVESTIGATOR   Delores R. Boyd (U. S. Magistrate Judge, RET.)        September 14, 2017

by email guidance from Davis.[5]

## 3. POLICY MATTERS

(1) Investigative reports and documentation warrant the BOD's review of its *contract attorney policy* to ascertain any breaches and/or need for clarification.

(2) Investigative reports and documentation warrant the BOD's *policy guidance on grants management,* specifically clarifying questions raised by significant changes implemented without Board notice of approval, including but not limited to, the nature and scope of "priority" grants and the use of grant funds for expenditures beyond the purpose or scope of the grant

(3) Investigative reports and documentation may warrant that the BOD *re-visit its recently approved pay plan, to confirm the integrity of Davis's representations concerning the bonus-pay/incentive phase.*

Executive Summary submitted by:

_____

DELORES R. BOYD, INVESTIGATOR
(United States Magistrate Judge,RET.)

September 14, 2017

---

[5]Upon request, the investigator will prepare (within 30 days) an outline of the documentation produced for this report.

7

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

D00153



# CONFIDENTIAL REPORT

## INVESTIGATION OF WORKPLACE GRIEVANCES AND CONCERNS
_RE_ **Executive Director's Management**

## WORKPLACE

### LEGAL SERVICES ALABAMA
### CENTRAL OFFICE - Montgomery Alabama

### INVESTIGATION
August 28, 2017 - September 8, 2017

### REPORT COMPLETED
September 14, 2017

### REPORT PREPARED FOR
Board of Directors, Legal Services Alabama

## INVESTIGATOR

Delores R. Boyd
United States Magistrate Judge (RET.)
Montgomery, Alabama
judgeboyd@knology.net
(334) 590-4624

Outcomes

1) Personnel Manual - adopt 2006

2) <u>Fiscal</u> - finance - Audit ⇒ transparent protocols
   "outside budget." ∴ reporting.

3)

**CONFIDENTIAL REPORT**

*Investigation of Workplace Grievances and Concerns in Executive Director's Management*
prepared for    Board of Directors   LEGAL SERVICES ALABAMA
Investigator  Delores R. Boyd (U.S. Magistrate Judge, RET.) Date  September 14, 2017

On December 5, 2016, Legal Services Alabama ("LSA") hired Artur Davis ("Davis") as Executive Director.  Created  in 2004 as a non-profit statewide agency,  LSA represents the merger of Alabama's pre-existing Legal Services programs in  North Central Alabama,  Metro Birmingham, and the Legal Services Corporation of Alabama

Midway into the eighth month of his tenure, Davis became the focal point of  increasingly volatile conflicts with Central Office employees,  triggering grievances communicated to the Board of Directors ("BOD") through its President, LaVeeda Battle ("*Battle*").  Notice of these grievances, against the backdrop of previously communicated reports of allegedly unauthorized management decisions, prompted emergency deliberations by the Board's Executive Committee.

On August 18, 2017, the Executive Committee – by Resolution duly approved by the BOD - placed Davis on "administrative leave, with pay", pending an investigation of specified complaints. Davis announced his resignation in a letter emailed on August 22 , and three days later he penned a commentary, "*Why I left Alabama's legal services program*",  in the online newspaper (AL.com) based in Birmingham.[1]

This Board authorized investigation commenced on August 28 and the Investigator submits this REPORT as outlined in the Table of Contents.

---

[1] EX. 1 includes the Resolution along with the letter-notice to Davis, his resignation, and commentary to the press

CONFIDENTIAL · Legal Services Alabama · Artur Davis · Docs Produced by Defendant

**CONFIDENTIAL REPORT**

*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for    Board of Directors   LEGAL SERVICES ALABAMA
Investigator  Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2011

## TABLE OF CONTENTS

I.   INVESTIGATIVE FRAMEWORK  - - - - - - - - - - - - - - - - - - - - - - - - - -   5
     Issues Investigated; Course of Investigation

II.  CONTEXTUAL FRAMEWORK  - - - - - - - - - - - - - - - - - - - - - - - - -   8
     Issue: Scope of Authority for BOD v Executive Director

III. REVISIONS IN PERSONNEL POLICIES  - - - - - - - - - - - - - - - - - - - -   11

   A.   Summary Conclusions  - - - - - - - - - - - - - - - - - - - - - - - - - -   11

   B.   Public Relations Guidelines  - - - - - - - - - - - - - - - - - - - - - -   11

   C.   Hiring and Evaluation Processes  - - - - - - - - - - - - - - - - - - - -   14

        1.   Hiring Processes  - - - - - - - - - - - - - - - - - - - - - - - - -   14

             a.   Handbook policies and standards      - - - - - - -   15

             b.   Lack of prior notice to, consultation with, - - - - - - - -   16
                  or approval by BOD

             c.   Delayed notice to all staff (in April) of  - - - - - - - - - -   17
                  revisions announced in February

             d.   The revised hiring policies mandated by  - - - - - - - -   18
                  Davis reflected solely his intent to implement
                  his preferred methodology rather than
                  Handbook policies with which he disagreed.

             e.   Authority for Executive Director's  unprecedented - -   19
                  participation in hiring processes.

             f.   Davis's new hiring rules materially      - - - - - - - - - - -   20
                  undermined Handbook standards

2

CONFIDENTIAL REPORT
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:   Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

g.  Davis's revisions authorizing the end of job  - - - - - -  23
    postings for new hires adversely affected at
    least one identified employee whose non-
    promotion complaint was timely presented
    and is credibly supported.

2.  Evaluation Processes [probationary period] - - - - - - - - - - - - - - -26

IV.  HIRING AND COMPENSATION DECISIONS  - - - - - - - - - - - - - - - -  28

A.  Summary Conclusions  - - - - - - - - - - - - - - - - - - - - - - - - - - -  28

B.  Pay Adjustment on January 23, 2017  - - - - - - - - - - - - - - - - - - -  29
    Joyce Hall, Administrative Assistant

C.  Recruitment Activity (January - April)  - - - - - - - - - - - - - - - - -  31

D.  Salary Adjustments For Existing Attorneys  - - - - - - - - - - - - - - - -  33
    [prior to BOD-approved pay plan]

    1.  Tim Kingston  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  33

    2.  Metcasa Henderson - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -34

    3.  Rachelle Greczyne - - - - - - - - - - - - - - - - - - - - - - - - - - - - -34

E.  Attorney Hires  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  35

    1.  Jonathan Blocker  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  36

        a.  Hiring Process  - - - - - - - - - - - - - - - - - - - - - - - - - - - -  36
        b.  Compensation  - - - - - - - - - - - - - - - - - - - - - - - - - - - -  38

    2.  Felicia Pettway  - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  39

        a.  Hiring Process: Conclusions - - - - - - - - - - - - - - - - - -  39
        b.  Hiring Process: Analysis  - - - - - - - - - - - - - - - - - - - - -  42
        c.  Compensation: Conclusions  - - - - - - - - - - - - - - - - -  43
        d.  Compensation: Analysis  - - - - - - - - - - - - - - - - - - - - -  44

3

CONFIDENTIAL REPORT
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:    Board of Directors   LEGAL SERVICES ALABAMA
Investigator   Delores R. Boyd (U.S. Magistrate Judge, RET.)   Date: September 14, 2017

F.     NON-ATTORNEY HIRES   - - - - - - - - - - - - - - - - - - - - - - - - - -     45

       1.     Pay adjustments for Existing Employees   - - - - - - - - - - - - -     46
              Desiree Jones & Christine Davis

       2.     Takenya Rogers   - - - - - - - - - - - - - - - - - - - - - - - - - - -     50

              a.     Hiring Process: Conclusions   - - - - - - - - - - - - - - - - -     50
              b.     Hiring Process: Analysis   - - - - - - - - - - - - - - - - - - -     51

       3.     Desiree Taylor   - - - - - - - - - - - - - - - - - - - - - - - - - - - -     54

              a.     Hiring Process: Conclusions   - - - - - - - - - - - - - - - -     54
              b.     Hiring Process: Analysis   - - - - - - - - - - - - - - - - - -     55

       4.     Mary Aplin   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -     56

              a.     Hiring Process: Conclusions   - - - - - - - - - - - - - - -     56
              b.     Hiring Process: Analysis   - - - - - - - - - - - - - - - - - -     57


V.     HOSTILE WORKPLACE COMPLAINTS   - - - - - - - - - - - - - - - - - - - - - - - -     59


VI.    CONCLUSIONS AND RECOMMENDATIONS - - - - - - - - - - - - - -     60

4

CONFIDENTIAL   Legal Services Alabama - Artur Davis - Docs Produced by Defendant

**CONFIDENTIAL REPORT**

*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for    Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

## I.    INVESTIGATIVE FRAMEWORK

### A.    Issues Investigated

The Board's authorizing resolution (Ex. 1) *identified* these six categories of "serious issues and

allegations" to be investigated "careful[ly]" and "fully" by an independent Investigator:

(1) "concerns that there may be significant spending decisions made by the
Executive Director that are outside of the budget approved by the Board for
additional staff positions not included in the budget, and other items not traditionally
included in the budget";

(2) "[whether] ...the Executive Director may have created new employment
positions, that are not included in the budget and that have not been noticed or
advertised, and [whether] the new employment positions and/or the salaries for such
positions may have a budgetary impact that exceeds the LSA budget as approved by
the Board";

(3) "[whether] "new initiatives which have been communicated to the Board only
after implementation, without prior Board input or approval" ..."may be outside of
the priorities previously established and approved by the Board, and [whether] the
environment created by these decisions may have had an impact on the core case
work of LSA as the number of cases being reported within the Board established
priorities may have diminished";

(4) "complaints [from LSA staff] of harassment and the creation of a hostile work
environment by the Executive Director;"

(5) confidential communications from LSA staff members which indicate that "a
hostile work environment may have been created by the Executive Director's
management style of terrorizing experienced staff when informed about LSA
protocols and procedures; demeaning support staff; intimidating and threatening
staff with retaliation unless they agree to keep the Board uninformed about matters
involving LSA;   and

(6) "reports that the Executive Director has stated that he would 'destroy LSA if he
is challenged by the Board on any of his decisions."

The Board President advised the Investigator of Davis's resignation and of the urgent need

5

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for    Board of Directors    LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, Ret.) Date: September 14, 2017

for a completed report within three weeks. His resignation triggered urgent priorities for the Acting
Director which delayed her scheduled interview. The Investigator then advised the Board President
of her inability to conduct a careful and comprehensive investigation into *all* of the identified areas
within three weeks. The Board President accepted the Investigator's recommendation to focus
comprehensively only on issues numbered (1), (2) , and (4). Investigative findings for these issues
are reported in Section IV    **Hiring and Compensation Decisions**, and Section V    **Hostile
Workplace Complaints.**

Initial interviews readily revealed a related issue of serious concern for employees: *the
Executive Director's substantial revision of personnel policies, without Board approval,* in a manner which
facilitated hire and pay decisions and also contributed to workplace tensions and diminishing
morale. The concern proved well-founded, and the investigative findings are detailed in Section III
**Revisions in Personnel Policies** .

Yet another driving force for the Executive Director's disputed actions decisions was his
fixed opinion on the scope of his exclusive management authority absent supervision by, or notice
to, the Board of Directors. His fundamental conflict with the BOD on this issue provides a needful
**"Contextual Framework"** which warrants the analytical findings detailed in  Section II.

**B.    Course of Investigation**

Fact finding for this investigation started on August 28 and  continued actively through
September 8, with comprehensive in person interviews and analytical scrutiny of voluminous
personnel, policy, and fiscal records, documents, emails, and correspondence which spanned the
entirety of Davis's tenure. The Investigator personally interviewed five witnesses with  personal or

6

CONFIDENTIAL - Legal Services Alabama - Artur Davis   Docs Produced by Defendant                    D00161

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for     Board of Directors · LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

probative knowledge of the investigated issues and documents.  In addition to the witnesses named

in their  complaints to the BOD, two Central Staff employees volunteered interviews. The

Investigator combed hundreds of supplemental emails and assorted records produced throughout

the period set for analytical deliberation and preparation of this report; supplemental interviews by

phone, text, and email were also required to clarify analytical questions.  All exhibits cited in this

report derive from  investigative records, and they are submitted in a tabbed attachment.

The  Investigator and Board President deliberated earnestly their ultimate decision *not* to

seek an interview or other investigative input from the Executive Director after his resignation.

Critical to that decision were his continuing and divisive communications within LSA networks as

well as the strident tone and text of his published communications.  Moreover, Davis cogently

outlined his position on the disputed issues and his defense of specific allegations  in several

memoranda, reports, and myriad emails produced for this investigation.  His documented

"testimony" is cited in analytical context and the attachment includes some exhibits, as appropriate,

also reflecting his pertinent views.

The allotted time for this investigation also did not extend to personal interviews with other

employees with likely probative information, including two since-resigned principals directly

involved with identified grievances and concerns.  As is the case with Davis, this Report does cite

pertinent "testimony" documented in similar writings by these witnesses.

The evaluative process for witness interviews paled in comparison to the rigorous

examination demanded for the tremendous quantity of personnel, policy, and fiscal "papers"

produced.  The considerable time expended on synthesis and  critical analysis for this production

7

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:    Board of Directors - LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

was unavoidably necessary. Nonetheless, the Investigator does readily acknowledge herein her

inability to make definitive findings on some questions within the allotted time for completion of

this Report. Time constraints did not allow, for example, this Investigator's *complete* analysis of the

Board's concern for decisions made "outside of the budget approved" or decisions with a

"budgetary impact that exceeds the LSA budget." A complete analysis of those issues should be

predicated on extensive interviews with the agency's chief financial officer, auditors, and the

directors assigned to supervise fiscal matters. The Investigator also received probative

documentation for Davis's material deviations from established BOD policies which appear to

impact the integrity of personnel safeguards or reflect imprudent fiscal practice; the Investigator

identifies these concerns in Section VI for the BOD's evaluation.

Notwithstanding the limited investigative time which curbed complete analysis of all the

BOD's concerns as well as significant issues proximately arising from the narrowed issues

investigated, the Investigator is confident that the investigative findings and conclusions submitted

are adequate to guide the Board's own assessments concerning all these matters.


## II.  CONTEXTUAL FRAMEWORK

Indisputably at the core of all the investigative issues was (and perhaps *is*) Davis's fundamental,

fixed, and impenetrable viewpoint that his authority as Executive Director encompassed the right to

govern LSA free from supervision by the Board of Directors. His understanding of the nature of

decision-making falling exclusively under his "day-to-day management" differed significantly from not

only clearly articulated advice to the contrary from the BOD but also clearly stated guidance in its

8

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

**CONFIDENTIAL REPORT**

*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for    Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

governing documents

This investigation produced considerable evidence that throughout his tenure, Davis underscored his viewpoint to his management team, LSA attorneys, and support staff; he did so consistently, frequently, and with apparent persuasion on several fronts.  In a lengthy memorandum emailed to the Executive Committee on August 17 (*Ex. 2*), he reaffirmed his guiding interpretation of "LSA policies and procedures for Board engagement with management decisions." Subsequent communications to the press and within the LSA network have perpetuated his viewpoint, with the foreseeable result of confusion or skepticism about the Board's asserted authority.

Though not specifically directed to investigate this fundamental divide, this Investigator finds it needful to preface her analysis of the investigated issues with a statement of relevant findings. Understanding the contextual framework for this investigation should serve to guide the Board's consideration of (a) any needed modifications in LSA's Employee Handbook; and (b) any remedial steps to correct erroneous communications about the Executive Director's authority.

A.      **The Amended and Restated Bylaws of LSA, Inc., adopted June 16, 2015,**
        **include these provisions concerning powers of the BOD and its Executive Director.**

        1       The business and affairs of the Corporation shall be managed by its Board of Directors.
                .. The Board of Directors shall have control and general management of the affairs and
                business of the corporation, and shall determine the policies of the corporation and in
                general assume responsibility for the direction of said policies, including the
                promulgation and adoption of such appropriate guidelines and regulations as it may
                deem necessary and proper to carry out its duties, and not inconsistent with these
                Amended and Restated Bylaws, the Restated Articles of Incorporation, the laws of the
                State of Alabama and the Legal Services Corporation Act and regulations issued from
                time to time thereunder, in each case as the same may be amended from time to time.
                [Article 1, Section 1]

        2       The Board of Directors shall employ an executive director of the Corporation who shall
                serve at the pleasure of the Board of Directors.  The executive director shall be made

9

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievance and Concern re Executive Director's Management*
prepared for:   Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET., Date: September 14, 2017

responsible for the general operation of programs including supervision and direction of the day to day affairs of the Corporation, including the hiring and dismissal of staff [subject to grievance procedures as established by the Board]. In the event the Board shall hire other full-time employees, it shall adopt a formal personnel policy establishing the terms and conditions of employment.

B.      The "Employee Handbook" dated 2006 remains in force.

The Investigator found no support for Davis's assertion in his August 17 memorandum (Ex.2) that LSA has a "2016 handbook" with "amendments made in recent years", to material provisions in the 2006 handbook. No witness interviewed had ever heard of this reputed edition, and a requested investigation failed to uncover any requisite posting for any updated version. Davis received the 2006 Employee Handbook attendant to his hiring. Review of selected personnel files confirmed witness reports that the 2006 Handbook is referenced on the "personnel file checklist" and remains applicable.

The 2006 Employee Handbook ("Handbook") is the source of the citations which follow and it is also the source of references in this Report along with the excerpts prepared as Ex. 3.


C.      "The Board of Directors is responsible for establishing policies which govern the operation of LSA. The bylaws establish a broad framework for the Board and LSA."
          [Chapter 1 7@1 1]

D.      "Matters not covered in this Handbook may be determined by the Executive Director in a manner consistent with any policy adopted by the Board of Directors and/or prior practices of LSA."          [Chapter 1-8(a-1-2]


Other Handbook provisions delineate responsibilities of the Executive Director and the BOD for the processes and procedures which govern recruitment, hiring, performance, compensation, and benefits for employees. These provisions will be identified in analytical context; similarly reserved for

10

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns in Executive Director's Management*
prepared for:    Board of Directors   LEGAL SERVICES ALABAMA
Investigator:  Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 201

"in context" analysis are any "prior practices of LSA" due to be considered by the Executive Director

for any determinations on "matters not covered in this Handbook.

### III.    REVISIONS IN PERSONNEL POLICIES

**A.    Summary Conclusions**

    1.    Davis substantially revised established Handbook policies concerning Public Relations Guidelines, employee hiring , and employee evaluations.   These changes were made without requisite approval from, or prior notice to, the Board of Directors.  In his monthly reports to the BOD, Davis did not disclose these substantial policy revisions.

           Revised policies on Public Relations Guidelines  were established by a memorandum and not posted on the LSA Portal.  Revisions in hiring and evaluation processes were posted on the LSA Portal but not communicated to all LSA staff in a timely manner.

           Some of these policy revisions effect changes which appear  inconsistent with values, standards, and goals published in the Handbook as protections secured for employees and clients.

    2.    Revisions on the Handbook's "Funeral Leave Policy" were made without prior notice to, or approval by the Board.   The change granted "discretion [to] an employee's supervisor or manager to approve leave based on  death of family members not considered to be immediate family." This revision was timely posted to the LSA Portal and is included with this report (Ex  10) to provide notice to the Board.

**B.    Public Relations Guidelnes**

    The subject of Davis's first revision in policies, "*LSA Press policy*", covered a matter described in the Handbook as "*Public Relations Guideline.*" This one page revision - by memorandum dated January 29, at 7:08 p.m., (Ex. 4), includes this material admission.

---

    Ex  3.  Handbook, Chapter 3-7 (Job Standards and Procedures)

11

**CONFIDENTIAL REPORT**

*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:   Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 201

"David asked at the Managers meeting if we could have some new guidance re LSA's
press and media policy. ***While I have not seen the current policy in writing, this
email serves as the policy going forward:***"
(emphasis added)

Davis emailed the policy only to LSA's managing attorneys and management staff.[3] While the

Investigator could not determine if Davis instructed them to disseminate the revised policy to other

employees, the evidence uncovered amply supports **three *factual findings*** concerning the *notice*

**for this revision of policy:**

(1) The revision was not posted to the *LSA Portal* pursuant to the routine practice for
communicating changes to the Personnel Handbook.[4]

(2) Davis had no prior consultation with the BOD or any director and gave no
contemporaneous notice to the BOD.

(3) The monthly reports to the BOD (captioned "*Monthly Report from Executive Director*") sent
for each month between December 2016 and July 2017 did not give notice of the change.[5]

---

[3]Staff Directories identify these addressees as *Managing Attorneys* David Webster, Ann Brown,
Holly Ray, Tracie Melvin, Willie M. Jones, Stephanie Blackburn, Debra Hansen, and Laura Clemons; Jaffe
Pickett, *Director of Development & Strategic Partnerships*; and Michael Forton, *Director of Advocacy.*

[4]*Ex. 5.* No witness interviewed recalled any emailed notice to all staff for this revision, and all
complied with a request to access the "LSA Portal" that each identified as the means of communicating such
changes. The witness with primary responsibility in January for posting such changes, the Information
Systems Coordinator, did not receive the revision for posting. The Investigator requested that she and all
witnesses interviewed undertake diligent portal and email searches for the revision, but none could be found.
Each produced a consistent page for all posted changes to the Handbook between January and August. That
page is attached as *Ex. 5.*

[5]In a section captioned *"Public Engagement Media"*, Davis describes in the *January* report his
newspaper interviews during visits to Selma and Mobile and his "live on air interview" to the Fox Network
affiliate in Mobile."

12

D00167

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:     Board of Directors - LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

*Critical analysis of Davis's __substantive__ deviations from Handbook policy also supports*

*three findings of fact:*

(1) The *Handbook policy* contemplated its distribution to, and compliance by, all staff, as evidenced by this introductory admonition: "The following guidelines represent the LSA policy for *all staff* when dealing with the various news media. *Any deviation from this procedure will be considered a serious infraction of the LSA policies.*" *(Ex.* 3 at 3-6; emphasis added)

Four of the six provisions in the *Davis policy* are directed to "Managing Attorneys" while only these two

are stipulated for all staff; neither has a parallel in the *Handbook policy*:

> • No LSA staff personnel, including Managing Attorneys, are authorized to engage or respond to press on subjects related to political developments, or broad policy questions about LSA or the Legal Services Corporation. Any press inquiries in these categories should be reported to the Executive Director and the Director of Development and Strategic Partnerships.

> • All LSA personnel are permitted and encouraged to exercise their rights of speech and association in non-work time, in any forums or social media conducted on non LSA accounts. All personnel are reminded that to the extent that any personal, non work time communications make reference to your status as an LSA employee, that temperate, civil discourse that would not reflect on LSA in a negative way is expected.

(2) The *Handbook policy* declares that [t]he "Executive Director and the President of the Board of Directors are the only official spokes persons for the organization." The *Davis policy* does not include this designation   and makes no provision at all for the President or any other representative of the BOD.  *(Ex.* 3 at  3-6/ A)

(3) The *Handbook policy* requires "advance notice" to the  Executive Director, or his designee, for "information on all cases of potential newsworthiness being litigated in court . . . so that news reporters may be alerted and/or a press release prepared for distribution following the court appearance. As illustrated by the following provisions, the *Davis policy* provides wider latitude to Managing Attorneys, or their designated staff attorneys, while reserving some restrictions for cases in the category of "potential newsworthiness. .

13

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:   Board of Directors - LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

•All LSA Managing Attorneys are authorized to engage local media outlets for the following purposes:  notifying media of outreach or community education events conducted by your office; responding to routine informational requests about Alabama law in our coverage areas; answering routine questions about outcomes of matters handled by LSA; providing informational interviews about Alabama law in your coverage areas.

• Managing Attorneys are reminded that any case matters or representations that involve matters of potential news controversy or widespread public concern should always be identified to the Executive Director and Director of Development.

## C.   Hiring and Evaluation Processes

This section identifies and analyzes Davis's significant changes in the hiring and evaluation rules for employees. The Investigator readily concluded that these changes served to facilitate or to provide after-the-fact justification for decisions approved by Davis in the context of new hires, salaries, and pay adjustments. The relationship between these policy revisions and subsequent operational decisions is contextually analyzed in Sections IV.

### 1. Hiring Processes

Barely two months into his administration, Davis announced by memorandum on February 12, at 4:11 pm, *"revised hiring rules"* which affected all LSA staff. As shown in the *analytical findings* which follow, these *revised hiring rules* -

(a) addressed personnel standards and policies which are specifically and comprehensively covered in the Handbook;

(b) were issued for implementation without prior notice to, consultation with, or approval by the Board;

14

**CONFIDENTIAL REPORT**

*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:     Board of Directors - LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

(c)  were not communicated to all staff until April postings on the LSA portal;

(d)  expressly relied solely on his stated disagreement with Handbook processes and his preferred methodology;

(e)  authorized his unprecedented participation in the hiring process with insufficient restraints on his discretionary authority;

(f)  materially undermined Handbook standards and protections secured for LSA employees and  clients; and

(g)  triggered at least one identified employee complaint premised upon the lack of "job posting" for a new hire, a complaint which is credibly supported.

### a.   Handbook policies and standards: hiring  processes

Chapter 2 of the Handbook, captioned Hiring and Employment, includes 14 sub-sections which specify policies and standards governing all employees, including, *inter alia*, qualifications for attorney hiring (§3); responsibility for recruitment and staff selection (§7); job opportunity notices (§8);  and application and hiring process (§9).

The stated subject in the February 12 email from Davis is "revised hiring rules"; the subject of the attachments is *"Memo to MAS on hiring process.docx; attorney hiring rules.docx"*; and  the six-page memorandum specifies *"Re: Hiring Process at LSA."*   There can be no reasonable doubt that revisions in the hiring process and rules do not constitute  "matters not covered in [the] Handbook" which would empower  any Executive Director to act solely on his authority in disregard of the BOD. [6]

––––––––––

–––––––––––––––––––––––––

[6]*Ex.6.* incorporates the email and attachments [4-pp. memorandum and two pages from Regulations of the Legal Services Corporation, Part 1616-Attorney Hiring.)

15

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievance and Concern re Executive Director's Management*
prepared for:    Board of Directors  LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

### b.   Lack of prior notice to, consultation with, or approval by BOD

The Investigator found no evidence that Davis consulted with the BOD (by its President, Personnel Committee, or any other director) prior to preparing or announcing his "revised hiring rules"; nor is there any evidence of the Board's prior notice or approval.   Monthly reports to the BOD in December and January gave no notice of intent to make the revisions.  In fact, his December 2016 report references his apparent awareness of and compliance with the Handbook hiring process as it relates to "job postings" and "interviews".   The January report appears to note his similar awareness and compliance as relates to filling an attorney vacancy.[7]

After-the-fact notice is non-compliant with the Handbook.  After a thorough examination of all the monthly reports between February and April (*when the revised rules were finally posted to the LSA Portal*) the Investigator found no disclosures by Davis of his announced revisions for the hiring process.

The "New Personnel Update" in the February report announces two non-attorney hires and two attorney hires without any reference to the hiring process.   In a section captioned "Continuing Retention/Recruitment Issues, Davis includes a nine-line report on LSA's "continuing ...trend ... of regular turnover in the ranks of our younger attorneys".   In the remainder of this paragraph he reports "another  challenge that is apparent when we post positions for attorney slots ... struggling to attract lateral candidates who are ready to immediately carry a caseload, or who have broad experience in more

---

[7] Concerning vacancies in the Operations Director and Finance positions, Davis remarked: "[w]e have received a significant number of responses to our job postings for these two slots and will be conducting first-round interviews. . ."

[8] Under his "Personnel Update" section, Davis notes: "One of our lawyers, Patrick Jones, announced his resignation I late December, which has led to our posting for a new staff attorney in Montgomery."

16

CONFIDENTIAL · Legal Services Alabama · Artur Davis · Docs Produced by Defendant

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concern re Executive Director's Management*
prepared for    Board of Directors   LEGAL SERVICES ALABAMA
Investigator  Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

complex anti poverty litigation."  Davis then  hints at developing strategies  which implicate LSA's

hiring and compensation processes.[9]

---

### c.  Delayed notice to all staff (in April) of revisions announced in February

The revisions announced by Davis only to LSA Managing Attorneys and three members of the

management team plainly indicated his intent that they become effective immediately. [10]  Though the

changes affected all staff, nothing in the published announcement imposed any duty on the addressees

to disseminate the new rules to staff attorneys, support personnel, and all other employees.  Nor did the

Investigator find evidence that he ever had his February memorandum circulated to all staff.

The LSA Portal did not post the formal policies prepared by the Operations Director pursuant

to Davis's memorandum until April 6  ("*Notice of Vacancies*", Ex. 7) and April 21 ("*Changes to Probationary

Period for New Hires*", Ex. 8).  Nonetheless, the interim weeks between February 12 and the April postings

saw a flurry of hires whose selections reflected Davis's immediate implementation of the changes he

---

[9]Davis's  pertinent remarks: "This program has not historically adjusted pay for new hires to
experience, and the fact that so many of our openings are tied to restricted grants is not appealing to lawyers
who want the opportunity to develop a broader practice.  As we develop our strategy to retain and recruit
talent, we will be evaluating the option of creating two LSA Trial Attorney slots, paid at the low end of the
management tier, who will lead our internal trial advocacy efforts and who will be assigned to jury or bench
trials around the state."

[10] *See* Ex. 6 (the *Davis memorandum*) Regarding the new rules announced for "hiring of staff
attorneys", Davis did note that "[t]he handbook at LSA will be modified by Charlotte to track the rule."  He
did not, however, announce any delay in implementing the rules, and in fact, he reported that they were
already in effect as relates to his active recruitment and hiring "in the context of one hire that is underway
right now." For the revised rules ending "the 6 month probationary rule", he set an effective date -  January
3, 2017   which pre-dated the February announcement.

17

CONFIDENTIAL -  Legal Services Alabama - Artur Davis - Docs Produced by Defendant

D00172

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:    Board of Directors - LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

announced in February.[11]

_____

### d.  The revised hiring policies mandated  by Davis reflected solely his intent to implement his preferred methodology rather than Handbook policies with which he disagreed.

Davis's memorandum (*Ex.* 6) purports to be responsive to requests from Managing Attorneys

for clarification of the LSA process; that the revisions reflect his unauthorized revision of that process

is clearly stated in his introductory paragraph:

> "Literally half of you have asked for some clarification of our process for hiring
> attorneys and administrative staff, so I thought it would be a good idea *to advise you
> of what the rules are under new leadership."* (*emphasis added*)

That he was aware of, but disregarded the propriety of, existing policies for hiring and replacing

attorneys" is evidenced by his summary description of that "fairly rigid formula" *and* his conclusion that

"not a single one of these features is contained in the actual [LSC regulation]," which he attached to the

memorandum.  Without regard for whether the Handbook policies reflected a considered judgment that

LSA policies would extend beyond the minimum standards required by LSA Regulations, Davis cavalierly

announced that [t]he handbook at LSA will be modified ...to track the [LSC] rule."

Nowhere in the entirety of his Memorandum does Davis recognize any interest in input by the

BOD or any of the employee stakeholders.

_____

### e.  Authority for Executive Director's  unprecedented participation in hiring processes.

Davis's new hiring rules for attorneys advised of his ultimate hiring authority and promised his

_____

[11]These new hires are identified in the analysis of Davis's hiring and compensation decisions.

18

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:   Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.)  Date: September 14, 2017

intervention would be in limited circumstances, as follows:

> "...in very limited circumstances that relate to my knowledge of an area and that require immediate action, ***I will reserve the right to treat a given selection differently and to conduct the process myself in direct consultation with the executive team.*** That is happening in the context of one hire that is underway right now, and I have discussed it with the relevant Managing Attorney. It will be the exception to the rule." *(emphasis added)*

Nonetheless, he followed that advisory with an unequivocal pledge to exercise  perceived

authority in the selection process for lawyers and staff:

> "I will also be transparent with you that I view recruitment of high quality lawyers and staff as part of my role as ED. Yes, I will talk periodically to potential candidates who are interested in LSA *even if there is no immediate opening.* When there are openings, if I have contacts in an area, I will reach out to them to identify candidates.  If I have an informed opinion of a candidate or received a recommendation or reservation about a candidate, I will let you know.    *(emphasis added)*

The Investigator characterizes this stated level of participation as "unprecedented" because it

is not accompanied by any assurances of the safeguards included in the Handbook to guard against

impermissible exercises of discretion (e.g., *pre selection*) as well as the standards therein embraced to reflect

salutary goals in the hiring process (e.g., *EEO goals*).  To be sure, the Handbook identifies the Executive

Director as "the hiring and firing authority for all ...hiring decisions" aside from his own (Ex. 3, Ch 2-17).

It also delineates (at Ch. 2-7, A-E) responsibilities for others in the selection process.

———   ——

> **f.   Davis's new hiring rules materially undermined Handbook standards and protections.**

•As a preface to the "Hiring and Employment" policies which are detailed in Chapter 1, the

Handbook states a *"General Hiring Policy"* as a guiding principle:

19

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for      Board of Directors - LEGAL SERVICES ALABAMA
Investigator : Delores R. Boyd (U.S. Magistrate Judge, RET) Date September 14, 2017

"*LSA is committed to the principles of recruiting and selecting the best qualified applicants for positions, on the basis of both demonstrated and potential skills and ability, and of providing equal employment opportunities to all persons* regardless of sex or sexual orientation, race, color, creed, national origin, age, physical handicap, political affiliation, or any other consideration prohibited by law.  Its recruitment and hiring policies reflect LSA's Equal Opportunity and Anti Discrimination Policy."
   *(emphasis added)*

The referenced EEO policy in Chapter 3, includes this Affirmative Action goal in § G:

"LSA is dedicated to a comprehensive recruiting plan to ensure that qualified candidates of diverse backgrounds are informed of job opportunities and become part of the pool of candidates considered."

Akin to these guiding principles are the "LSA Core Value Statements" which are stated not only in the

Handbook but re stated on the LSA portals; in pertinent part for this analysis:

"Our core values are reflected in the following core value statements:
   A.  Integrity: We are honest, ethical and accountable in our endeavors."

• *The Handbook's statement of "Qualifications for Attorney Hiring", reproduced from Chapter 3, § 3[1], sets*

*a baseline of expectations for applicants as well as a benchmark for unsuccessful candidates to compare themselves to*

[12]      a.  Good academic training and high academic performance;
         b.  Prior legal experience, preferably legal services for low-income and other needy people;
         c.  A knowledge and understanding of the legal problems and needs of the client community;
         d.  Prior working experience in the client community or other programs that help low-income and needy people;
         e.  Fluency in a foreign language commonly used by LSA clients;
         f.   Appropriate special hiring requirements of a funding agency;
         g.  Needed cultural understanding;
         h.  Character and professionalism; and
         I.   Other relevant factors

20

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:     Board of Directors - LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

*the selected candidate.*

• The Handbook's requirements for the *content of job postings* of attorney and staff vacancies are

outlined in a chapter captioned *"Job Opportunity Notice"* (Ex. 3, § 8, at 2-5); both the caption and the

text clearly promise would-be applicants of an "opportunity" to apply. In pertinent part, this section

mandates:

> Notice Required:   Notice of a position vacancy shall contain a description of the
> position and shall state the necessary qualifications, salary, application procedures, closing
> date ....The announcement will be prepared for all vacant regular positions by the
> Operations Staff. However, position notices for temporary attorney and non-attorney
> positions and contract attorneys will not be required.

> Notice to Staff: Notice of vacancies will be distributed to the staff from the Human
> Resource Department; in written form on the LSA portal and website at the time the
> notice of vacancy is submitted for publication.

The *revised policies posted by the Operations Director in April (Ex. 8)* altered, as follow, both the

requirement for notice and the content of the notice.

₌ Concerning the " salary" and "closing date" descriptions in posted notices. The revision allowed the
posting to indicate "*salary or "salary to be determined based on experience"*, and to indicate "closing date or
"until filled";

₌ *Concerning the persons authorized to prepare job notices*, revisions altered the requirement that "the
announcement ...be prepared for all vacant regular positions by the Operations Staff", providing instead
for preparation by "supervising personnel or executive staff."

₌ *Regarding the employee positions exempted from the "posted notice" requirement*, the revisions expanded the
category from only "temporary attorney and non attorney positions and contract attorneys" to include
a new category: *"positions as program manager of LSA recipient grants"*

₌ *The revised rules created discretionary authority for postings of "administrative level positions"*, providing:

> While it shall be the ordinary practice of LSA to post on its website administrative level
> positions, supervisory personnel, who shall include managing attorneys and department
> directors, may fill an administrative level vacancy without advertising or posting the

21

> position upon obtaining approval from the Executive Director or Director of Operations. . . . This amendment shall apply to positions that have just vacated or that have been vacant for an extended period.

• Davis's revised rules also changed the ***location and duration requirements for posting notices***, thereby significantly limiting the Handbook's promises of wide dissemination and maximum posting time for vacancies in both attorney non attorney hirings.

For "regular staff opening for attorney positions", the Handbook directed that "publication minimums ...include advertisements Saturday and Sunday over a four week period in at least one newspaper of a statewide distribution, local bar association (s) in the county in which the vacancy exists, and to law school placement offices."

In his February memorandum Davis announced the change to Managing Attorneys in this manner:

> "So, when we hire new attorneys, we will post the position with the local bar and on our website, but it will be at our discretion whether to post for 14 days or 30 days. Beyond that, each managing attorney will be responsible for reviewing the applications and will have discretion to develop a process that works for you ."

The published policy – prepared and posted by Operations Director Rand in April -- provided.:

> "The minimum requirements for posting an attorney position are that it be listed with local bar association (s) in the county in which the vacancy exists and on LSA's website. The minimum requirement for posting an executive department leadership position is that it be listed on LSA's website. Position announcements may be publicized on LSA's Portal, local and state newspapers, NLADA, and other relevant websites at management's discretion. The duration of a position posting is at management discretion." (Ex. 8)

———— ————

g. **Davis's revisions authorizing the end of job postings for new hires adversely**



CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns in Executive Director's Management*
prepared for    Board of Directors   LEGAL SERVICES ALABAMA
Investigator. Delores R. Boyd (U.S. Magistrate Judge, RET.) Date September 14, 2017

affected at least one identified employee whose non-promotion complaint was timely presented and is credibly supported.

Beyond the handful of witnesses interviewed, this investigation did not afford time to probe the broader workforce to evaluate reactions to significant policy revisions posted in April. The likelihood is strong that many shared the one word reaction elicited from each witness  "shocking."[13]

The Investigator received permission from one witness, **Sr. Accounting Clerk Christine Davis, an employee since 12/16/2013,** to report how both the revised "job posting" policy and the delayed notice to employees adversely impacted a promotional opportunity for which she qualified.[14] The impetus for her grievance was notice of Mary Aplin's hiring on May 30, 2017, as Grants Manager, at a "new hire" salary of $47,000.[15]

---

[13]Included in this consensus is the Information Technology Coordinator ("Burdette") who had the primary duty   prior to these revisions   of posting job notices pursuant to established Handbook policy and the practices of the employee who trained her when she lost her post as part of LSA layoffs in 2015. As will be discussed in the context of "hiring and compensation" decisions, Operations Director re-assigned those "job posting" duties to a "new hire", and Burdette was tasked with training her. Reacting to the changed "job posting" policies, Burdette remarked: "*I just believed a change that big had to be approved by the BOD ...it looked like the changes meant they could bring in whoever they wanted without doing a proper interview; it's like favoritism, and it's just not healthy, especially when it deals with money. I just wondered how we went for layoffs in 2015 and closing offices to making all these changes, creating new positions, and paying raises.*"

[14]During our initial interview Christine did not disclose this grievance and instead provided information and records helpful to the Investigator's understanding of LSA's fiscal operations and the spending decisions in controversy. Days afterwards, the Investigator uncovered among a batch of supplemental records delivered for review the pertinent emails which relate her grievance, prompting a re-interview.

[15]The recruitment and selection process for Aplin began weeks before her actual hire, and it reflected significant components of the revised rules first announced in Davis's February memorandum. Aplin's hiring, compensation, and performance are core issues in the analysis of questionable "hiring and compensation" decision by the Executive Director and his alleged creation of a hostile workplace Accordingly, detailed here are only such matters necessary to understand how the revised "job posting" rules

23

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:   Board of Directors   LEGAL SERVICES ALABAMA
Investigator   Delores R Boyd (U S Magistrate Judge, RET.) Date September 14, 2017

Christine's accounting duties during the past four years   principally involved   "Grants Accounting" and LSA budgetary functions.[14]   The current Acting Executive Director, whose primary duty for over a dozen years has been generating grants revenue,[15] unconditionally affirmed Christine's superior qualifications.

Prior to Aplin's hiring, Christine had applied for a posted "finance officer" position , but Davis advised of his intent to recruit "outside" for that position and in fact hired Dyrle Burkett, whose tenure ended after a month for personal reasons.  In late April, as word began spreading of "interviews" being conducted for another position within Christine's capabilities, she decided to express her concerns in an email to Operations Director Charlotte Rand ("Rand") on May 9 (*included in Ex. 9 with other emails referenced herein*).  Christine and Rand had discussed on several occasions Christine's disappointment in being passed over for the "finance officer" post, Christine's strong desire for promotional advancement, and Rand's awareness of, and consistent praise, for Christine's performance.[16]

Christine's email reminded Rand of their specific discussions in April about the potential for a

---

victimized Christine Davis.

[14] The Investigator has assigned a first name reference to Christine Davis (i.e., "Christine") to avoid reader confusion, because she shares a surname with the Executive Director ("Davis") who is the primary subject of this investigation.

[15] Christine's "hiring" job description is included in Ex. 9. Before our initial interview she had been identified to me by all other witnesses as a critically necessary part of the team which maintained operational duties in the Central Office following the departure of the former Executive Director and prior to the hiring of a Chief Financial Officer. A sign on the respect for her capabilities is that another witness who also felt herself qualified for the position given to Aplin, stressed that had the job been posted, she would have deferred to Christine before applying.

[16] This email also questions pay raises by Christine to a less-tenured employee, a matter reserved for analysis in context of compensation decisions

24

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievance and Concerns re Executive Director's Management*
prepared for    Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

newly created position in Grants Administration and her excitement with the opportunity to apply. Of

particular relevance to the "job opportunity notice" eliminated by Davis's revisions in the "job postings"

policies are these excerpts from Christine's email:

> •On Monday, 4/24/2017 you informed/notified me that we were hiring a Chief Financial
> Officer, I asked about the Grant Administer position and made you aware that I had been very
> excited to be able to have the opportunity to apply for that position; but you stated that we were
> going to put this on hold and let the Chief Financial Officer make that decision.  I made you
> aware that I was capable to perform those duties with the grants (budgeting and allocations ....

> •If in the future, *if there are any plans of hiring a Grant Administer, I would like the opportunity to apply.*
> Hiring outside of the organization not only declines in house dedicated staff employees a chance
> for promotion and/or advancement but it will only prolong the late submittals on reports; the
> new person would have to be trained.  You know as well as I do, the grants and reporting takes
> longer than overnight to learn.  I already know how to prepare these reports, *I already have basic
> knowledge of the reports you are submitting and have even guided you on how to prepare them.* I already
> understand the rules, procedures, and what the funder expects, guidelines, budgets, etc. on each
> individual grant and/or report.  I would only need very little training on the administering grants,
> such as, regulations and compliances, and the narratives.  With that being said, some training will
> be needed regardless, if it is an in house employee or a new comer.
>           *(emphasis added)*

Christine ended the three page notice of concerns with this explanation for her continued passion

for LSA notwithstanding her lack of advancement:

> When you and Dyrle came aboard, I was asked "if you don't normally do this, why are you doing
> it?"  I done it for the organization, to help us stay above our threshold, to try to keep us from
> losing any more grand funding.  Funders are tired of us submitting late reports.  *I done it because
> no one else knew how to do it.  I have been able to guide and provide you with information concerning the grants
> and reports to help you achieve.  This is why I am having a hard time understanding the change of plans for
> administering grants.*  Thank you for your time and if you would like to discuss, please let me know.
>           *(emphasis added)*

In a conversation with Christine the next day, Rand apologetically told her "they were looking

at someone else" with "writing experience" for the rumored position still not posted or described for

other applicants.  Christine protested  that she could be trained to write while a new hire from outside

25

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:     Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

LSA's grants funding operations would need much more training. Her follow-up email (Ex.9) thanked

Rand for being "honest ...about the original plan had changed " and for making her aware of the

interview that day for the position.   The fact that someone  - presumably,  Aplin  - was then being

interviewed for the un-posted position prompted this closing inquiry by Christine:

> "Which leads me to my next question:  *How and/or why are we interviewing for a position*
> *that has not even been posed? Our LSA Employee Handbook under Job Opportunity*
> *Notices on page 2-5 states that all positions will be posted.  I was just making you aware*
> *of this." (emphasis added)*

Christine's email attached the Handbook provisions referenced.   Rand's response the next day advised,

in relevant part:

> *The amendments to the handbook made a few weeks ago have changed the posting*
> *requirements.  Posting is now at the discretion of the executive director.  Please take a*
> *look at the portal for clarification.  (emphasis added)*

The Investigator's fact-finding in this section is *not* an evaluation of the merits of Christine's claim

for administrative or judicial resolution.  Rather, it is designed to facilitate the BOD's evaluation of

Davis's significant revisions in hiring processes.


2.     Evaluation Processes [probationary period]

The Handbook outlines in Chapter 2, at § 9 a probationary period and preparation of

probationary evaluations (§§ 13-14).  As is the case with Davis's revisions of hiring rules,  it is clear

(pursuant to the findings made, *supra,*) that his *revisions to end the probationary period    (a)*

*required, but did not receive, the Board's prior notice, input, or approval; and (b)*   were not

communicated to the entire LSA staff until an April 21 portal posting of the Operation Director's April

26

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for    Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

18 memorandum re "*Elimination of LSA Probationary Period*" (Ex. 8).

The posted change included no rationale for eliminating the probationary period and described

the change as follows:

> *Effective immediately, new employees are no longer subject to a probationary period of any length upon*
> *hire. Probationary Evaluations after 6 months of employment will therefore no longer be an LSA*
> *practice. Chapter 2, Sections 13 and 14 are deleted from the employee handbook. Nothing in this*
> *amendment to the employee handbook shall be construed to alter the at will nature of any employment*
> *contract at LSA.*

In his February memorandum to Managing Attorneys and the management team, Davis

described the probationary rule as " a rule which is not present in LSC regulations and which is hardly

necessary in an at will state."[19]

**Ending LSA's well-established probationary period for "all new regular employees"**

**materially undermined the stated purpose for this employee benchmark:**

> *The probationary period shall be an integral part of the examination and selection process and shall be*
> *used by the supervisor to observe closely the employee's work, and to train and aid the employee in*
> *adjusting to the position to which he/she has been selected.*

Enforcing a six month probationary rule of "actual service "to ensure that its client population

be served by only competent, trained, and LSA mission driven staff is clearly consistent with "LSA's

Core Value Statements" along with its published expectation of "ethical and appropriate behavior, as

well as high standards of performance by all employees" (Handbook, Ch.3 1)

---

[19]April's posted elimination of the probationary rule did not include the language in Davis's
memorandum ending the probationary rule for "all attorneys and executive level staff directors and officers
who started employment after January 3, 2017" while maintaining it "for administrative level personnel and
any attorney personnel who started prior to January 3, 2017." (Ex. 6). This investigation did not determine
enforcement of this provision before the April postings, nor did it seek to determine Davis's objective basis
for selecting January 3, 2017 as a cut-off date.

27

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for    Board of Directors    LEGAL SERVICES ALABAMA
Investigator   Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 13, 2017

Indeed, the question of "competence" is at the core of several allegations which involve Davis's

hiring and compensation decisions for new hires whose qualifications were exempted from the lens of

actual service for a probationary period.


## IV.    HIRING AND COMPENSATION DECISIONS

### A.    Summary Conclusions

Because the BOD is well aware of LSA's fiscal status prior to Davis's appointment in December

2016, as a contextual backdrop for his questionable hiring and compensation decisions, this summary

statement should suffice:  the previous year had been marked by staff layoffs and office closings, and

the 2017 budget (approved in December 2016) reflected appropriate modifications to restore the

agency's fiscal health.

Notwithstanding his notice of LSA's fiscal concerns, the investigative record amply establishes

that Davis proceeded quickly to make several hiring and pay decisions    without Board input or notice

- which buttress reasonable and serious concerns about (a) unnecessary, incompetent, preferential, or

otherwise inappropriate *hirings*;   (b) *salaries and salary adjustments* approved in disregard of existing pay

scales, budgetary allocations and BOD established imperatives; (c) *salaries and salary adjustments* approved

arbitrarily, for impermissible motivations, or without a determinative regard for the agency's best

interests.

Time limitations for this investigation simply did not allow this investigator to determine whether

or how each or all of Davis's decisions had a "budgetary impact that exceeds the LSA budget as

approved by the Board." (*Resolution of the Executive Committee of the BOD, EX. 1*)  Instead, the investigative

28

CONFIDENTIAL REPORT
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:   Board of Directors   LEGAL SERVICES ALABAMA
Investigator:  Delores R. Boyd (U.S. Magistrate Judge, RET.)  Date: September 14, 2017

findings which follow detail the hiring and pay decisions during Davis's tenure which clearly support these serious concerns.  Because hiring and pay concerns are interwoven with many of the employees involved, the analytical framework necessarily examines these concerns by identifying the employee (or the similarly treated group of employees.

**B.**    **Pay Adjustment on January 23, 2017**
      **Joyce Hall, Administrative Assistant**

Davis made the earliest of many questionable pay decisions on January 23, 2017, and the documentation for this decision *(Ex. 11)* demonstrates the capricious approach which would guide many of his subsequent decisions.  LSA's Managing Attorney for the Montgomery Office ("the MA") emailed a request that Davis "please consider Joyce Hall for an immediate pay increase", describing her as a "stellar administrative assistant" employed by LSA or its predecessors "for over 27 years."    Among other justifications for requested raise, the MA noted:

> Joyce has taken on extraordinary duties as our lone administrative assistant in the Montgomery Office.  In 2015, her responsibilities doubled when the Montgomery Office's second administrative assistant was laid off. ...  I will not bore you with the long list of all of her duties, but will be happy to provide you with one if needed. ...  I believe that Joyce is worth her weight in gold to the Montgomery Office and LSA generally.  However, I am deeply concerned that she does not feel appreciated and will leave the LSA family.

Davis responded at 10:08 a.m., barely 15 minutes after receiving the email:

> "...[t]hanks for getting this to me.  *It is approved.  What is the specific increase you recommend?*          (emphasis added)

The MA responded, in pertinent part:

> Due to Joyce's workload, longevity with LSA, and her current salary, I believe a $3500 pay increase would be appropriate. *But I will bow to your expertise and knowledge of our budget*

29

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for    Board of Directors  LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.  Date: September 14, 2017

*(emphasis added)*

Davis responded promptly:

> ...glad to do a raise for Joyce but can't go as high as $3500; we are trying to squeeze out
> space for another attorney hire in Selma and are just in the margins right now. 3500
> would eat a little too deeply into the hole we found. We can do $1500.

Davis authorized the requested raise – from $28,492.81 to $29,992.00, with a retroactive effective

date of January 16 –  without prior consultation with either of the employees then responsible for

Human Resources and Operations (Jaffe Pickett) or Finance (Christine Davis). Established policy and

practice required their "approval" signatures, along with the Executive Director's, on the Personnel

Action Notice form ("PAN") prescribed to document the rate change.

Neither Pickett nor Davis concurred, however, with the merits of this decision; and their

concerns had nothing to do with Hall's exemplary service or her MA's advocacy on her behalf. Instead,

their concerns underscored the impropriety of both the *process* and the *result*. The Investigator found

these concerns, succinctly summarized for this analysis, legitimate and compelling:

> • The process was uninformed by any consideration for the existing pay scale for, or actual
> salaries of, either Administrative Assistants, or long tenured, hard working, and deserving
> support personnel, at least two of whom surpassed Hall in actual years of service;
>
> • The process established an expectation that Davis would make unilateral pay decisions based
> on whim, caprice, or advocacy, rather than on considerations of fairness, equality and consistent
> treatment of all LSA employees;
>
> •Salary increases for all LSA employees had been postponed for years due to budgetary restraints,
> notwithstanding a consensual desire by all for pay raises; and
>
> • Employees had notice to expect in 2017 an orderly and comprehensive analysis of the
> compensation plan for all employees, resulting in modifications that would likely include pay
> raises for all. In fact, preliminary steps on this study had already been taken.

30

**CONFIDENTIAL REPORT**

*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for     Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, Ret.) Date: September 14, 2017

open positions."[22]

Aside from Davis's pattern of scheduling interviews irrespective of vacancies, Pickett documented several troubling "patterns" in his recruitment initiatives, including (1) referrals of job seekers to him from friends and political acquaintances, (2) solicitation by Davis to job seekers solely in response to requests by friends, (3) Davis's preference for hiring employees without posting notices, (4) his willingness to create slots for desired employees by shifting the duties of existing employees, and most troubling for Pickett, (5) Davis's dishonest or misleading reports to the BOD which falsely suggested Pickett's responsibility for, or concurrence with, questionable hiring decisions.

Pickett had already advised Davis of her serious concerns about his revision of hiring roles and salary decisions which lacked prior Board input. As she increasingly questioned Davis's recruitment campaign, particularly his capricious use of grant funds for salaries, and suggested that he seek guidance from the BOD, their relationship deteriorated and he relied on his newly hired Operations Director for assistance in his hiring and compensation decisions.

This backdrop is relevant to the questionable hire and pay decisions highlighted through the attorney hires identified in Section IV-D and the non-attorney personnel discussed in Section IV-E.

_____

[22] A January 26 email to Pickett about Davis's interest in recruiting a former public defender in Birmingham (redacted here to omit confidential names and information) is illustrative:

"I had an out of the box idea: does [   ] strike you as someone who could potentially serve as program manager for the prison reentry grand and the broader community development work in the spring/summer phase of the BOA project?  ***  She has her detractors and may see this as a step down, but I have heard she is very bright and very hard working.  ***  I briefly thought of her for OPS a few weeks ago ..."

32

CONFIDENTIAL · Legal Services Alabama - Artur Davis - Docs Produced by Defendant

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievance and Concerns re Executive Director's Management*
prepared for     Board of Directors   LEGAL SERVICES ALABAMA
Investigator   Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

## D.     Salary Adjustments For Existing Attorneys
### [prior to BOD-approved pay adjustments in June]

Before the Board-approved compensation plan, made effective this year in June, Davis approved

salary adjustments for three staff attorneys: Tim Kingston ("Kingston") on April 7; Meteasa Henderson

("Henderson") on April 13; and Rachelle Greczyn ("Greczyn") on May 22.

### 1. Kingston

Hired on September 7, 2016 for the Mobile office, Kingston started with the $38,000 salary

prescribed on the pay scale for new attorneys. Four months into his tenure, on April 5,  Davis emailed

this request to Sr. Accounting Clerk Christine Davis : *would you please do a personnel action adjusting Tim*

*Kingston in the Mobile office to $40,000, effective immediately?* [24] Christine responded in the affirmative, but

mindful of the probationary period for new employees, she also emailed the Operations staff about the

usual practice followed to enforce Handbook policy:

> [I]n the past the supervisor would have to request to have the employee removed from
> probation after 6 months. They would perform a 6 month review/performance and
> remove the employee from probation and sometimes they would leave them on
> probation.  HR(Eileen) would do a PAN to file in the employee's file removing from
> probation by manager's approval.  So, I would probably ask Ann Brown if she would
> like to have him removed and/or ask Charlotte how she would like to handle and how
> we will handle the probation period going forward.  Has he been here 6 months yet?  If
> he is getting a raise, I would assume there would be no reason for him to still be on
> probation.

The Operations Director's response advised:

> *We are no longer doing a probationary period for employees.* This isn't retroactive but Tim has
> been here longer than 6 months.  I just talked to Ann Brown and she said Tim is no

---

[24] The email indicated the subject as "salary adjustment" and reflected copies to Kingston's MA (Ann
Brown) and finance officer Dyrle Burkett.

33

CONFIDENTIAL · Legal Services Alabama · Artur Davis · Docs Produced by Defendant

D00188

**CONFIDENTIAL REPORT**

*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for    Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R Boyd (U. S. Magistrate Judge, RET.) Date September 14, 2017

longer on probation and she sent an email about it a few weeks ago, responded immediately.   *(emphasis added)*

This email constituted Christine's initial notice of this revised policy.   Since the Operations Director did not post it on the portal until April 21, it is evident from this example that both Davis and Managing Attorneys considered his February 21 memorandum announcing the end of probation to have been effective on that date.

### 2.  Henderson

The pay adjustment for Huntsville staff attorney Meteasa L. Henderson, on the LSA workforce since October 3, 1994, was also generated simply by an email from Davis to the Sr. Accounting Clerk,. Her salary increased from $49,976.04 to $55,000, effective April 13.

### 3.  Greczyn

Hired July 25, 2016 in the Dothan office, Greczyn's $38,000 starting salary increased to $40,000, effective May 22, 2017, pursuant to emailed instructions from Davis.

### E.    Attorney Hires

Davis's tenure ushered in 10 newly hired, full time attorneys, one in January; three in March; one in April ; one in May; two in July, and two in August.   In his monthly reports to the Board through July, Davis notified them of the hiring decisions.   He typically provided laudatory descriptions of their backgrounds and potential value to LSA, but omitted from all the reports any mention of the salaries set.

34

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:    Board of Directors - LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

[24]    Unlike his predecessors, Davis did not provide the BOD with the quarterly statistical reports mandated, as follows, by Handbook policy, thereby depriving the BOD of an alternate source for information on salaries for new hires:

> "To insure compliance with all equal opportunity policies, *the Executive Director shall submit to the Grievance/Personnel Committee of th Board quarterly statistical reports of the race and sex of all employees hiring during the quarter* for which the report is submitted. In addition to race and sex, *the report shall identify each new employee by name, office, position, salary and effective date of employment.* Promotions and effective dates thereof shall also be reported on a quarterly basis."
> (Handbook, 3-13, § 17)    *(emphasis added).*

The January and March hires do not reflect questionable hiring or pay irregularities which warrant analysis.[25] Nor can the Investigator find any serious concerns about the hiring process or the salaries for the attorneys hired in July and August. They are presumably consistent with the new pay plan approved by the Board in June.[26] The Investigator's scrutiny of countless records of job postings on the LSA Portal and elsewhere discloses that some form of notice was posted for all of these job hires. All but the January hire appear to have been governed, however, by Davis's revised hiring rules which relaxed the requirements governing content, location, and duration.[27]

---

[24]The glaring omission of "salary" information in Davis's BOD reports parallels his policy revisions making "discretionary" the mention of "salary" in job notices.

[25]All three of these staff attorneys had starting salaries of $38,000: Whitley Hall, hired March 6 (Montgomery); James Rich, hired March 13 (Anniston); and Elizabeth Hollic, hired March 15 (Selma).

[26] The July 31 hires were Andrea Bolton (Birmingham; $43,000) and Elizabeth Faulk (Montgomery, $50,000). Both August hires were for staff attorney positions in the Montgomery office: Hilaire Armstrong, on August 14 ($40,000) and Valynda Jerome-Williams , on August 21 ($45,000)

[27]The IT coordinator, tasked principally with posting job notices, produced for this investigation exemplars of the notices she posted on the LSA Portal and assorted web sites, but her posting duties had been shifted to a new hire in March.

35

D00190

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:    Board of Directors - LEGAL SERVICES ALABAMA
Investigator: Dolores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 201

Both Jonathan Blocker's ("Blocker") hiring on May 3, as a Birmingham staff attorney, and Felicia Pettway's ("Pettway") hiring on April 3, as Managing Attorney for the Selma office, warranted further analytical scrutiny. Closer analysis of the hirings of Blocker and Pettway is not intended, and should not be considered, as an assessment of either attorney's competence, character, or value to LSA. Those issues are beyond the scope of this investigation and this Investigator did not search for, or find, any basis to recommend such an inquiry. In reporting on the selection of these attorneys, their salaries, and related issues, this Investigator's analysis examines Davis's conduct only and the allegations of improprieties attributed to his decisions on these matters.

    1.    **Jonathan Blocker**

        a.    **Hiring Process**

Blocker's hiring resulted directly from Davis's personal recruitment efforts, which began at least as early as February 21, when he emailed to Pickett his resume for review. The resume served as her introduction to Blocker, with whom she had no prior acquaintance or knowledge. Pickett did not know of a posted attorney vacancy in Birmingham but found Davis's direct involvement consistent with his February 12 pledge to actively recruit "high quality lawyers and staff" irrespective of openings. At Blocker's interview, she learned of his prior acquaintance with Davis through common political acquaintances, and Blocker named one who referred him to Davis.

Blocker accepted a hiring offer on April 26, and Davis' emailed the "good personnel news" to the BOD president (copying its Personnel Committee Chair and Pickett). His email praised Blocker's

36

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for    Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R Boyd (U S Magistrate Judge, RET'L) Date September 14, 2017

qualifications", and further noted:

> You may recall from my last monthly report that one of our Birmingham staff attorneys was leaving. We received today an official acceptance from our first choice hire. ... I would normally not burden your inbox with a staff attorney hire, but thought you would both want to know that Jonathan becomes our first African American male hire since 2011.

It is this statement in Davis's closing paragraph    *"Jaffe was very instrumental in recruiting Jonathan..."*   that triggers a material investigatory inquiry: Does that declaration reflect a *serious ethical impropriety by Davis?* Still evidencing her strong offense when interviewed, Pickett unequivocally described it as " *absolutely false" and "a blatant misrepresentation to the BOD"*,  designed solely to secure support for Davis's hiring decision.[29]

When Pickett read Davis's similar representation in his April Monthly Report, she felt confident that she had not over-reacted to his email. Davis glowingly reported Blocker's hiring, beginning May 3, "joining our Birmingham office, occupying the slot that Jonathan Bedwell vacated, and ended:

> "**By the way, Jaffe Pickett deserves great credit for helping recruit and close the deal with Jonathan, who was weighing other options.**"

Pickett reported that her only role in Blocker's selection consisted of reading his resume, scheduling and attending his first interview, and making the follow-up phone or email contacts requested by Davis.  His false representations about her involvement confirmed her doubts (*raised by several cited*

---

[28] In pertinent part, Davis stated that Blocker "a former prosecutor in Orlando, has a superb record as a young lawyer and has a strong commitment to making economic justice the next step in his career. He came to Birmingham last year when his wife was assigned for her residency."

[29]Pickett described numerous statements from Davis indicating his belief that the BOD reposed superior trust and confidence in Pickett; that Davis did not trust the Board or desire to establish greater lines of communication with them; and that Pickett should reduce her informational disclosures to the BOD.

37

CONFIDENTIAL    Legal Services Alabama - Artur Davis - Docs Produced by Defendant                    D00192

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievance and Concern re Executive Director's Management*
prepared for    Board of Directors   LEGAL SERVICES ALABAMA
Investigator   Delores R. Boyd (U.S. Magistrate Judge, Ret.)  Date  September 14, 2017

*communications from Davis during the months before this hire*) about Davis's character for truthfulness and the

integrity of his communications with, and concerning, the BOD and LSA staff.

*To be clear on the Investigator's analytical finding for this hiring process:* the *investigated allegation surrounding*

*Blocton's hiring implicates the core of LSA's Core Value Statements:* **Davis's dishonesty, evidenced by blatant**

**and knowing mis-representations to the BOD on material and consequential matters.**

### b.    Compensation

Not surprisingly, Davis set a starting salary for Blocker, $43,000, without seeking any input from

Pickett, and without apparent regard for the new compensation plan then being developed for

implementation in two months. The salary exceeded the usual $38,000 starting scale and made Blocker

then the highest paid of the LSA class of trial attorneys.[30] Unlike most starting attorneys in that class,

however, Blocker joined LSA as an experienced trial attorney:   His resume listed extensive trial

experience in state and federal courts since 2007, publications, and CLE presentations. *Whether the*

*starting salary for Blocker can be justified is not an investigative issue; instead, the analytical*

*concern is the propriety of Davis's unilateral decision in April with notice of LSA's current*

*budget, attorney pay scales, and the new pay plan then being prepared, in part, to update*

*compensation for all attorneys in a fair and objective manner.*[31]

---

[30]For this finding the Investigator relies principally on Pickett's informed representation and the
Investigator's examination of a "salary review report" for all LSA employees (dated 1/10/2017).

[31]Davis's "February Report to the BOD did provide a clue to his rationale for paying a higher starting
salary to more experienced "lateral candidates" like Blocker: "*This program has not historically adjusted
pay for new hires to experience.* \*\*\*. *As we develop our strategy to retain and recruit talent, we will be
evaluating the option of creating two LSA Trial Attorney slots, paid at the low end of the management tier,
who will lead our internal trial advocacy efforts and who will be assigned to jury or bench trials around the
state.*" In an email to Blocker on March 29 Davis indicated his awareness that "[an] internal task force on

38

D00193

**CONFIDENTIAL REPORT**

*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for     Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

2.     **Felicia Pettway**

Felicia Pettway's hiring on on April 3 as Managing Attorney in Selma and her $70,000 salary unquestionably presented the most troubling allegations involving Davis's "hiring and pay" decisions.

a.     **Hiring Process: Conclusion**

*Analytical conclusion:* The Investigator found a credible basis for reports that Davis personally and aggressively recruited Pettway with a determination (a) to "remedy" his failed effort to hire her in his former congressional office, and (b) to use Pettway's perceived political connections in the Black Belt as a means to rebuild his own political reputation. Pre-selection and preferential treatment for impermissible motivations can be reasonably attributed to Davis in this instance.

*Analysis:*

Davis's February Report described "the challenges in Selma", citing its "history of turnover and contentious departures and [low] service levels" and its status as a "workplace that desperately needs more management attention and better lawyers." Concerning his plans to fill the vacancy created by the MA's resignation, he advised, in relevant part:

> We have also identified several strong managing attorney candidates in Selma and will be conducting final interviews this week. I believe we are on the verge of finding the right lawyer to direct our effort in this impoverished part of our state.

On February 28, Davis emailed HT staffer Burdette a "job description" for this vacancy, instructing her to "post tomorrow on the website, and with the Dallas County Bar Association."[2] Davis's

---

compensation issues is currently drafting a plan for executive and board approval.

[2]Davis's "location" instructions reflected his February 12 revision of hiring rules not formally published on the Portal until April. The Handbook policy required publications "in at least one newspaper

39

CONFIDENTIAL - Legal Services Alabama - Artur Davis   Docs Produced by Defendant

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for    Board of Directors - LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

notice (Ex. 12), set a "salary range of $55,000-$60,000" with an "open until filled" application deadline.

The Investigator confirmed the postings made by this employee but could not determine whether

additional notices were created or posted by others.[33]

Ten days after Davis sent the job description for posting – and while the posting on the NLADA

website remained active still on 3/24) – Davis sent a letter offer to Pettway for the position, accepted

by her on March 13.[34]   In relevant part, Davis made this offer:

> We are pleased to offer you the position of Managing Attorney at our Selma regional office in
> Selma, Alabama at an annual salary of $55,000.00. This offer also includes the additional position
> of Rural Project Manager of our current foreclosure project which offers foreclosure and related
> legal assistance to rural areas including the Black Belt.  You will be hired to perform this annual
> contract for Rural Project Manager at a sum of $15,000, to be paid in 2017 disbursement of
> $7500 each, on the date you begin employment, and a subsequent date six months after the date
>
> you begin employment. This role of Project Manager is contingent on your employment at LSA.
> The scheduled start date is April 3, 2017. *Should you choose to join LSA, you will perform the duties
> described in Attachments A and B.*

The Personnel Action Notice (PAN) which documents Pettway's hire on April 3, describes her

title as  Managing Attorney/Rural Project Manager,  and salary – "$55,000 & ( $15,000 contract). [35]

---

of a statewide distribution, local bar association(s) in the county in which the vacancy exists, and to law
school placement offices."

[33]From the records reflecting "job postings" personally created by IT staffer Burdette, the
Investigator found postings on (a) the LSA Portal (last modified 3/14/2017); (b) the NLADA website,
updated 3/24/2017); and (c) the Indeed.com website (created Mar. 1 with the status as "2 active candidates,
2 awaiting review ").

[34]The signed letter-offer and acceptance, along with the referenced attachments – secured by the
Investigator from Pettway's personnel file – comprise  the second record (4pp.) in composite Ex. 12.

[35]The PAN (Ex. 12, rec.3) , is signed only by Charlotte Rand, for Human Resources and Director of
Operations, and it is non-compliant with Handbook policies (not formally revised and posted as on the 4/4

40

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for    Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

On April 3 Davis emailed to all LSA staff a "welcome announcement" for Pettway, describing her experience, which included her prior post "as the executive director of the Voting Rights Museum in Selma."[9] Davis's March report to the BOD advised, in relevant part:

> I am pleased to report that after much effort, we have found a Managing Attorney for the Selma Office. Felicia Pettway is a longtime community activist in the Black Belt who went to law school in mid career after time as an award winning corporate sales manager at GE and as the Executive Director of the Voting Rights Museum in Selma. *** I believe that Felicia Pettway is an authentic leader who has credibility in the region and will be a major part of our movement into the community/economic development space.

Davis omitted any reference to the salary set for Pettway, and this Investigator uncovered no documentation for timely reporting of this material matter through other means.

Against this straightforward chronology of Pettway's hiring, the Investigator turns to the relevant backdrop for the first-stated conclusion.

### b.   Hiring Process: Factual Background

On January 4 Pickett received directly from Pettway her emailed resume with this note:

> It was really good seeing you today. I have attached a copy of my resume for your review. I am interested in employment opportunities with Legal Services, and upon your review of my resume, I welcome an opportunity to discuss any future opportunities.

This transmittal reflected Davis's outreach and not any request from Pettway to Pickett. The next day Davis emailed Pickett:

---

signature date) which mandates "approval" signatures also from the Executive Director and the Finance officer.

[9]Ex. 12, rec. 4.

41

D00196

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns in Executive Director's Management*
prepared for:   Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

I think Felecia Pettway is capable and nearly hired her in my congressional office once. I can see her as an eventual Black Belt addition if we get new slots there. I do have a vague memory that *the rap on her is that she does not like to be supervised* so I don't know how she and Laura would engage. I *don't know that her expertise is strong in any of our coverage areas* but perhaps it is.
*(emphasis added)*

Davis continued his recruitment outreach with Pettway in telephone and email correspondence to which Pickett was not privy.   Davis did include Pickett in his interviews with three other applicants for this post, on February 28, March 7, and March 8.[37]

Pickett recalled participating with Davis in three interviews with Pettway.[38]  At the initial interview on January 24, Davis remarked on his missed opportunity to hire Pettway when she applied for work in his congressional office.  Davis's conduct then and thereafter left no doubt for Pettway that Davis had pre-selected her for the MA slot in Selma.  At another in person interview on March 9, Pettway told Davis that her bottom line salary was $75,000, and Pickett gleaned that the two had prior discussions about the $55,000 - $60,000 salary range posted for the position.  She reported Davis's response to the effect that she [Pettway] would be too "valuable" to LSA and he did not want "to lose her."

After Davis announced Pettway's selection on April 3, he authorized Pettway's planning of an LSA-funded "open house" at the Selma office.  Reminded by Pickett of the "meet and greet" reception

---

[37] All three candidates expressed satisfaction with the published salary range for this post ($55,000 - $60,000).  Pickett was favorably impressed with the candidates interviewed on March 7 and 8 because each was then working in jobs exposing them to LSA's client base and service in regions which included Selma. Immediately after each interview, Davis remarked to Pickett on their lack of "fit" for the post. The candidate interviewed on February 28 had worked in Davis's  congressional office. Following her interview, Davis commented that she had "issues" there which would not make her a good fit in Selma.

[38] The meeting dates for her recollections from the meetings cited are confirmed by entries  penned by Davis on his LSA office calendar

42

CONFIDENTIAL · Legal Services Alabama · Artur Davis · Docs Produced by Defendant

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for    Board of Directors  LEGAL SERVICES ALABAMA
Investigator: Delores R Boyd (US Magistrate Judge, RET.) Date September 14, 2017

already hosted there in January, Davis explained that Pettway was not then the MA and the planned reception would be "bigger and better."[39] Pickett received an emailed invitation prepared by Pettway and sent to a large group of community activists, public officials (including council members and legislators).[40] Davis seemed well pleased with the reception. Pickett knew of no precedent for any other Regional Office having such an "open house" reception for an MA and Executive Director, particularly so soon after the convening of a "reception" designed for the same purpose.

    c.    **Compensation: Conclusions**

    **Analytical conclusion:**  The starting salary Davis set for Pettway, $70,000, made her LSA's highest paid Managing Attorney. It was a negotiated salary – short by only $5,000 of the amount Pettway demanded. Davis "officially" reported – and personnel records reflected – Pettway's starting salary as only $55,000, describing the $15,000 supplement as funded by a grant pursuant to which she would perform additional duties. The description was mis leading and plainly false.

    d.    **Compensation: Analysis**

    Pickett witnessed the interview during which Pettway made clear that it would take $75,000 for her to accept the MA post in Selma. The salaries posted for LSA's Managing Attorneys as of January

---

[39]"Davis had mandatory "meet and greet" receptions at each of LSA's regional offices after his hire, with participation by the MA and regional staff as well as invited "community partners." The Selma office hosted its reception of January 4: the morning session, held at the Black Belt Foundation Building, attracted about 15 community partners for a round-table session also intended by Jaffe, the Selma MA and staff. The afternoon meeting convened at the Selma Office, where Davis met with staff and conducted press interviews.

[40]"Pickett attended and found the 50 or so attendees (all identified by Pettway) to be a different group from the community partners at the January meeting. She recognized State Sen. Hank Sanders in the group. Investigative documents confirmed a meeting scheduled between Davis and Sanders that same day as well as fiscal records for Sen. Sanders' paid radio "spots" for the Voting Rights Initiative launched by Davis during this same period..

43

CONFIDENTIAL · Legal Services Alabama · Artur Davis · Docs Produced by Defendant

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for     Board of Directors   LEGAL SERVICES ALABAMA
Investigator  Delores R Boyd (U.S. Magistrate Judge, RET.) Date September 13, 2017

10 confirms that none matched Pettway's $70,000 salary.[41]

Davis never accurately or fully reported to the BOD the following material facts regarding the $15,000 grant supplementation that he described on hiring and pay documents as the consideration for this Managing Attorney's "additional position of Rural Project Manager of [LSA's] current foreclosure project." **The Investigator found these facts to be well-documented and credible:**

• Pettway was not required to perform, and did not perform, any additional duties and responsibilities for the management of this grant. To the extent that Pettway rendered any management services relating to the purpose of this grant – foreclosure and related legal assistance to LSA clients in rural areas   such services were reasonably expected to be in consideration for her Managing Attorney salary. Payment for any such services by Pettway simply was not authorized by the grant.

• The preparer of this grant, Jaffe Pickett, did not include in the grant submission any additional money for an "attorney" grants manager. Actual grants management for this grant flowed from her unit, which never required, or received, any material assistance from Pettway.  Pickett has prepared and had approved certain grants which do include express authorization for payment from the grant funds of all or a significant portion of salaries to attorneys whose work will comprise the core of the grant's stated purpose. (e.g, Access to Justice Attorney, LITC attorney, or Domestic Violence Attorney). The grant identified as supplementation compensation for grant-funded services by Grant was not such a grant

• The grant in controversy represented "part 2" of the first grant successfully prepared by Pickett for the same purpose in 2016. Similarly, it did not authorize dedicated funds for paid

_____

[41]Birmingham MA David Webster, $ 65,000; Dothan MA Tracie Melvin, $50,000; Mobile MA Ann Brown, $57,009; Huntsville MA Holly Ray, $50,000; Montgomery MA Stephanie Blackburn, $52,000; and Laura Clemons (Pettway's MA predecessor in Selma), $50,000

44

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for.    Board of Directors   LEGAL SERVICES ALABAMA
Investigator:  Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

management by an attorney. The Huntsville Office conducted the foreclosure prevention services made

possible by the grant, and its Managing Attorney did not receive or request supplemental pay.

• Davis's authorized disbursements of $15,000 to Pettway raised serious concerns from LSA's

in-house finance department and from its auditors. *Though not hired until April 3, Pettway received a $7500*

*check on March 30,* described on the payment invoice as "community outreach", pursuant to the

Operations Director's instructions advising:

> Artur informed me that we need to cut a check for a contract to Felicia Pettway, the new
> Managing Attorney in Selma. She will be doing a rural outreach project outside of her normal
> duties. This check is her first installment of $7500.

Pursuant to Davis's advice in the letter offer prepared and signed by him, the second installment of

$7500 was payable six months after her starting date of employment. No investigative record or report

provides any corroboration for the reference to Pettway's performance of "rural outreach project outside

of her normal duties.

F.    **NON-ATTORNEY HIRES**

Davis approved six non-attorney hires. Excluded from this total are two selections which were

pre-approved by the BOD:  Charlotte Rand, as Director of Operations[42], on February 6, and Gary

---

[42]The Investigator found, however, that Davis recruited Charlotte Rand , acting solely on an emailed
referral from an executive director at the Montgomery office for the Girl Scouts of Alabama. Other
documentation amply corroborates reports for this source as a friend of both Davis and his wife. Similar
documentation confirmed that the same friend referred and strongly encouraged Davis to hire two other non-
attorney selectees, Mary Aplin and Takenya Rogers. As analyzed elsewhere in this report, the Investigator
found  that the hirings of Aplin and Rogers  played a significant role in creating staff tensions and
grievances.

The Investigator also found that Davis acted alone in setting Rand's salary pursuant to their emailed

45

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns in Executive Director's Management*
prepared for    Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

Gilmore, as Chief Financial Officer on May 15. Finance Officer Dyrle Burkett, selected in February, is

also excluded from this analytical analysis based on his abbreviated tenure.[43]

The remaining non-attorney hires are:

• *Takeria Rogers*, March 6:  Administrative Assistant

• *Deane Taylor*, March 27:  Development Assistant/ Administrative Assistant

• *Tamara Harold*, April 12 (a re-hire):  Administrative Assistant

• *Mary Aplin*, May 30:   Grants Manager

The hiring and pay processes for all except Tamara Harold[44] warrant analysis for allegations against Davis

concerning their hiring process, the adverse effects of their selections on existing staff, and their

compensation.

The Investigator begins this analytical section, however, with a discussion of two questionable

pay adjustments to two existing employees[45], each made unilaterally by Charlotte Rand and sanctioned

---

negotiations.

[43]Davis's January Report to the BOD announced February 6 as the starting date for Dyrle Burkett., and his April Report advised: "...we received the disappointing news this month that our new Financial Officer, Dyrle Burkett, experienced a family emergency in his home state of Florida. After several weeks of consideration, Mr. Burkett decided to leave LSA to return home."
The Investigator notes that the Sr. Accounting Clerk Christine Davis's grievance about promotions does reference her "missed" opportunity to compete for the Finance Officer position after Davis declared his intent to hire from the outside. (see Ex. 9)

[44]Investigative time simply did not extend to a factually credible analysis of reported allegation that the re-hire salary for Tamara Harold as an Administrative Assistant in Mobile,  $25,000, exceeded the applicable pay scale. The Investigator's review of her personnel file disclosed a $22,000 starting salary when Harold joined LSA in 2005. Other documents raised reasonable questions whether any job postings for a vacancy preceded her re-hire.

[45]Davis's pay adjustment in January to a third employee, Administrative Assistant Joyce Hall, is analyzed at the onset of this Section analyzing Davis's questionable hiring and compensations decisions.

46

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for      Board of Directors   LEGAL SERVICES ALABAMA
Investigator  Delores R. Boyd (U.S. Magistrate Judge, RET.) Date  September 14, 2017

by Davis in response to management and staff complaints.

1.      **Pay adjustments for Existing Employees**
        **Desiree Jones & Christine Davis**

        **Analytical Conclusions**

        (a)  Within 60 days after Davis hired the Director of Operations (Rand), she unilaterally

decided to implement "merit raises" for Accounting Clerks Desiree Jones ("Jones") and Christine Davis.

Notwithstanding her seniority, experience, and proven performance of multiple duties (including those

assigned to Jones), Christine Davis received only a $1,000 pay raise while Jones, whom Christine  was

required to train in several tasks, received a $3,000 raise. Rand's decision was unauthorized by Handbook

policy, subject to challenge under federal EEO laws, demonstrably unfair, and unjustifiable.   Rand's

decision constituted impermissibly differential and otherwise discriminatory treatment of these two

employees.

        (b) Rand's discriminatory and unauthorized  decision demoralized Christine Davis,  and

it caused a significant, continuing adverse impact which raises the potential of a remedial cause of action

against  LSA.

        ( c)  The Executive Director  did not have prior notice of Rand's decision.  Upon timely

notice by LSA's  Acting Executive Director prior to Davis's hire, along with other Central Office staff,

Davis refused to rescind Rand's decision, and instead expressly sanctioned it as an act within her

management authority.  This decision was plainly wrong and reflected an abdication of his duty to

safeguard the interests of all LSA employees, pursuant to the job standards and values  published in the

Handbook.  His impassioned defense of Rand also created a reasonable perception among employees

that he favored, and would discriminate in favor of, Rand.  Moreover, Davis's actions contributed

47

CONFIDENTIAL · Legal Services Alabama · Artur Davis · Docs Produced by Defendant

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:    Board of Directors - LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

substantially to an increasingly tense workplace in the Central Office.

### Analysis

LSA hired Christine as an Accounting Clerk on December 16, 2013, with a starting salary of $35,700. She is now the "Senior Accounting Clerk." LSA hired Jones on July 20, 2015, as an Accounting Clerk on July 20, 2015, with a $28,000 salary.

At approximately mid-March, Operations Director Rand instructed Christine to train Jones in payroll accounting, a function uniquely within Christine's duties, which also then included accounting for a then-ongoing merger of LSA's accounting systems.[46] During Finance Officer Burkett's short tenure between February and April, personnel records identify him as the Supervisor for both employees.

Christine, who also performed as LSA's Payroll Clerk, received a Personnel Action Form (PAN) which authorized a salary hike for her, effective April 5, to $36,700. As shown on the form dated April 7(Ex. 13), the approval showed only a signature from Rand.. In response to Christine's immediate, in-person inquiry, Burkett described the hike as a "merit raise" and advised her to expect another raise once the BOD approved the new plan then under development. Christine reported her "very surprised" but "thankful" reaction, explaining that she had worked 4.5 years without a raise but understood the reasons.

On April 10, Takenya Rogers (newly hired on March 6 as Rand's AA) emailed Christine two PANS for pay adjustments: Christine's and another for Jones, increasing Jones's salary from $28,000 to

---

[46]Jones did provide some "fill-in" payroll help for Davis by June.  Chief Financial Officer Gilmore confided to Christine some concerns about Jones's readiness but nonetheless, he proceeded in June to assign to Jones the primary duties for payroll accounting.

48

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for      Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

$31,000, effective April 4.[27] Christine reported that she was "kind of disappointed" to see Jones getting a $3,000 raise while hers was only $1,000, especially in view of her longer tenure and her ability to fill in to perform Jones's duties while Jones could not reciprocate for Christine.[28]

Within the same week, Christine met with Rand and requested an explanation for the discrepancy. Rand assumed sole responsibility for the decision, noted that she knew she would have a lot of people questioning her, and offered this rationale: that Jones was underpaid and she wanted to bring her up to a certain level. She also assured Christine that she would get another raise when the BOD approved the new pay plan.

Further evidence of Christine's frustration with Rand's decision is documented in her lengthy email on May 11 to Rand. The entire email is included at Ex. 9 in the context of a separate analytical issue. For a fuller, in context appreciation of Christine's grievance as it relates to her disparate treatment from Rand, the Investigator highlights these excerpts:

> •I am very thankful for the merit raise I received; however, Desiree received a larger raise * * *
> I found this unfair, for a co-worker with fewer responsibilities, less knowledge, and experience of the organization receive a higher merit over seniority, experience, and more knowledgeable. I can perform HR duties, Payroll, Grants, PAI, Vendors, Accounts Payable, etc and I am now training Desiree of this knowledge and she receives the higher merit.

---

[27] The PANS for Jones also showed a signature only by Rand., on April 7 (Ex. 13, rec. 2) Rogers's email indicated "Updated PAN's") on the subject line, and the attachments were described as "Jones Desiree rate change 04.04.2017; Davis Christine rate change 04.04.2017. The Investigator failed to resolve the discrepancy between the April 5 effective date shown on Christine's PAN.

[28]Christine's investigative interview yielded this further explanation:
*"Honestly, I am the go-to person here. When Charlotte was hired, she was supposed to have all the experience in accounting, grants, and HR, but she had none. She could not do the grants budgeting and they had to hire a CFO for that. . . she was not a numbers person and she admitted that to me."*

49

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:   Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

• The prior accounting clerk's salary was $48,000. I am still making less than what she was and performing more duties

• Some of my workload is supposed to be shifted to Desiree, due to me being overloaded and grants administering takes up a lot of my time. I find myself spending more time training Desiree than freeing up any time. To date, nothing has been shifted.

• I have also stepped up and helped where needed to help others achieve their very own responsibilities.

Shortly after Christine met with Rand in April about this pay grievance, she shared her concerns with Pickett, who "tried to smooth it out," telling her to "hang in there ...maybe the BOD will do something."[*] When Pickett confronted Davis directly about Christine's grievance, Davis reportedly told her that he would not have done what Rand did but would stand by her "as a manager" because he had told her that she could use her own judgment in such matters. Pickett complained that she, as a manager could not similarly act to raise the salary of the grants coordinator who had worked at LSA for 38 years. Pickett's viewpoints failed to persuade Davis to rescind Rand's order. Instead, following this conversation, she experienced being "shut out" increasingly by Davis from "management team" conferences. Davis also reacted by removing much of her previous authority in grant applications and management.

2.    **Takenya Rogers**

    a.    **Hiring Process; Conclusions**

_____

[*] Christine also shared her concerns with Dorothy Graham, and volunteered to the Investigator the considerable basis for her view that Pickett and Graham had kept the Central Office afloat for several months before, and continuing after, either Davis's or Rand's hiring.

50

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:    Board of Directors   LEGAL SERVICES ALABAMA
Investigator:  Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

(a) Davis personally recruited Takenya Rogers ("Rogers") on referral from a friend,  for an un

posted job opportunity unmatched by any priority or published need at LSA's Central Office.  Davis

and/or the Director of Operations assigned Rogers to the Operations unit for supervision by the

Director.  The hiring of Rogers on March 6, and her comparatively high starting salary, supports a

reasonable suspicion that Davis created a job specially for her with an expectation of unconditional

loyalty in return.

(b) Davis  mis-presented to the BOD and staff that Rogers's hiring served to help Pickett's

overburdened Resource Development unit;.

( c) Davis's hiring of Rogers triggered the transfer of an existing  Administrative Assistant from

the Operations Department to the Call Center.  Rand and Davis, in communications sent to the entire

LSA staff, materially misrepresented the reason for this transfer.  The transfer and its publicity  affected

the transferred employee, and substantially diminished morale for LSA's support personnel.

(d) Davis's "creation" of an un-posted position to facilitate this hiring resulted in the shifting of

critical duties from an existing employee and imposed on her a burdensome duty of training.

**b.    Hiring Process: Analysis**

Investigative records  – including emails between Davis and the source of referrals for other job

seekers, including Charlotte Rand and Mary Aplin –  confirm that Davis solicited Rogers upon this same

friend's request.  On February 15, at 10:21 pm, Davis emailed to Rogers this note (redacted by this

Investigator to omit the name of Davis's source, notwithstanding that he copied the email to both Rand

and Pickett):

Ms. Rogers, my name is Artur Davis and I am the Executive Director at Legal Services of
Alabama. [***] forwarded your resume to me and suggested that you might be interested in an

51

D00206

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns in Executive Director's Management*
prepared for    Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

employment opportunity with our Central Office in Montgomery. This position would be a shared staffer between the Operations Department and Department of Development and Strategic Partnerships. The duties would range from core administrative work to staff assistance with public outreach and fundraising, to grant datakeeping, to website administration. Would you let me know if this is something you would like to discuss with my executive team?

Rogers's predictably affirmative response generated emails the next day from Davis: first, to Rogers for her preferred times for an interview on the 20th or the 21st, and next to Rand and Pickett with the same inquiry.

The Investigator did not determine the date or details of Rogers's interview, but her personnel file documents her hiring within the week. Rand's offer letter to Rogers, dated February 27, and accepted with Rogers' signature on March 2, advised:

We appreciate your interest in the Administrative Assistant position and we are pleased to offer you the position at our Central office ... at an annual starting salary of $27,500.00 and benefits. Your scheduled start date is March 6, 2017.

On the scheduled start date Rand and Rogers also signed her three page job description, and scrutiny confirms Pickett's report that Davis *mis-represented* his stated reason for hiring Rogers as a "shared staffer" between Rand's and Pickett's departments. The job description stated Rogers' title as "Assistant to the Director of Operations," but that department is listed as her "reports to" supervisor.   The Position Summary makes no mention of Pickett's supervision, declaring instead:

Under the Director of Operations' supervision, the Assistant to the Director of Operations provides high-level administrative support to the Director of Operations as well as the department and provides logistical support for human resources trainings/meetings.

Among the specified duties listed for Rogers is one responsibility within Pickett's province:

52

CONFIDENTIAL · Legal Services Alabama · Artur Davis · Docs Produced by Defendant

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:   Board of Directors, LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

"*Completes and submits assigned LSC and/or other grantee reports.*" [8]  Pickett confirmed that her long

overburdened staff (herself and Dorothy Graham) received no material help from Rogers in this area.

On several occasions Pickett reminded Davis that he had justified his hiring of Rogers, in part, to

alleviate the burdens in her department. His unresponsiveness confirmed for her his pattern of making

misrepresentations     to the BOD and staff -  that were designed to establish either her involvement

in a personnel decision or her intended benefit from that decision.

Pickett's continuing suspicion of Davis's bad-faith mis-representations in order to advance his

agenda at LSA was advanced by Davis's transfer of an Administrative Assistant, Renae Jones, ("Renae")[9]

from the Central Office to the Call Center as an Intake Screener.   Hired on April 13, 2015, Renae

enjoyed and never requested a transfer from her work as an Administrative Assistant in the Operations

unit.  Nonetheless, on March 2    the same day Rogers signed her letter offer, Rand emailed "staffing

updates" to all the LSA staff, announcing this change:

> We are happy to announce that Renae Jones will be transferring from her position as
> Administrative Assistant in the Central Office to Intake Screener in the Call Center. Renae will
> have the opportunity to be on the front lines of service to our client populations.
> Congratulations, Renae!

Rand sent a similar email,  on March 6, welcoming "a new Administrative Assistant to Operations,

Takenya Rogers."

---

[8] Detailed under this duty was this function which had been performed routinely only by Graham
and Pickett for lack of needed support: "gathers/compiles necessary case statistical, matters and other
information and/or data and completes reports as assigned."

[9] As this Investigator has already used this surname for employee Desiree Jones, she opts here to use
Renae Jones' first name.

53

CONFIDENTIAL   Legal Services Alabama   Artur Davis - Docs Produced by Defendant

**CONFIDENTIAL REPORT**

*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for    Board of Directors   LEGAL SERVICES ALABAMA
Investigator  Delores R. Boyd (U. S. Magistrate Judge, Ret.) Date  September 14, 2017

Each of four witnesses interviewed presented these facts and each disputed Rand's suggestion that Renae's move was voluntary.  Investigative time did not permit a personal interview with Renae. Reportedly, she was hurt, distraught, and cried  upon her transfer to a Call Center which was her starting point.  All witnesses described the transfer as a demotion and shared Renae's demoralized reaction.

Davis sent a message to all LSA staff, on May 8,  which included his own  misrepresentation about Renae's transfer:

> We are building a culture that allows mobility at every level of this organization for our teammates who show initiative.  When one of our central office staffers, Renae Jones, expressed a desire to grow, instead of giving her cliches about working harder, we gave her a chance to join our vitally important call center, where she is thriving.

Davis's crafty rationalization compounded Renae's anguish and the support personnel's diminishing morale.  A long tenured employee  explained that new hires routinely *start* at the  Call Center, as did Renae.  Conversely, assignment as an Administrative Assistant (especially within the Operations Unit of the central office) represents promotional progression and a genuine opportunity for growth.  Davis's mis representation  reflected his "insensitive" character   - "he just lies and doesn't really care about the program or his employees ... it's all about Mr. Davis."

Shortly after Rogers' hire, Rand also removed one of H statfer Jessica Burdette's primary duties, namely, posting job notices, a task she had been performing since the November 15 layoff of another employee.  As already detailed elsewhere, Davis announced in February his considerable changes to the "job postings" requirement, and Rand posted the new policy in April

     3.     **Desiree Taylor**

          a.     **Hiring Process: Conclusions**

54

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:    Board of Directors - LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

(a) Davis personally and aggressively recruited Desiree Taylor ("Taylor"), reportedly a former campaign worker, and hired her on March 27 for an un-posted job opportunity unmatched by any priority or published need at LSA's Central Office. Davis set a $23,000 starting salary that reasonably appeared inconsistent with LSA's pay scale and budgeted priorities. This hiring added to a growing, reasonable suspicion that Davis created jobs for friends and candidates to further his personal agenda instead of LSA's best interests.

(b) Davis made material misrepresentations to justify this hiring, e.g., needed support for the overburdened Resource Development unit. Davis approved post-hiring assignments for Taylor which corroborate this misrepresentation and reflect his true intent to create a new "Communications" position with primary duties for media outreach and his unauthorized initiatives.

### b.    Hiring Process: Analysis

Investigative records confirm that Davis aggressively recruited Taylor after a January visit to Selma during which he noted her recognition as a "40 under 40" community leader who "would be a good fit" at LSA. February emails disclose Davis's strategic hiring plan – to present Taylor's hire as "development and operations help" and to expedite the hiring before the BOD could halt additional hires in response to projected de-funding of LSC. *Davis's duplicity implicates another investigated allegation – his resolve not to collaborate with the BOD* irrespective of policy and practice mandates, and his associated creation of a hostile environment for Central Office employees who encouraged that protocol.

Davis started the relevant exchange of emails with Operations Director Rand and RD Director Pickett (subject - Development and Operations Help) on February 12 by sending them Talor's resume. Rand did not get the attachment and responded initially with these pertinent concerns:

55

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

D00210

**CONFIDENTIAL REPORT**

*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:  Board of Directors  LEGAL SERVICES ALABAMA
Investigator  Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

I think we should be conscientious of what our needs may be depending on how you envision fundraising changing at LSA. You've mentioned a capital campaign. Assuming Jaffe would spearhead this campaign, I would expect her to be out the door meeting with donors and grantors more or less full time for the duration of the campaign. That means that Dorothy and any additional staff person's job responsibilities may shift considerably from what they are now. So we should definitely be hiring with an eye towards the major campaign responsibilities being covered. *** It may be that Ms. Taylor is more than qualified to meet these responsibilities and would transition seamlessly from annual development work to a capital campaign. But I'm mentioning it so that we don't find ourselves shorthanded ..

Davis's response concurred with Rand's concerns, admitted the likely "need to develop a staffer who

has a range of skills", and explained his rush to avoid BOD pressures:

I think we will be under some pressure to do hiring freeze after the Trump budget because of the board's skittishness, and that this kind of hire may seem harder to justify after March; it is not so much that a 35,000 hire means a thing to the budget, but it is ingrained in the culture of this board. So, candidly, I am trying to assemble the parts before there is some internal pressure to "make do with what we have." (As context, [***] was much inclined to punt to the board some personnel matters, which has conditioned a few of them to expect a voice beyond what it should be.

After Rand reviewed Taylor's resume, she emailed concerns to explore at Taylor's interview and

expressed her misgivings about whether "pushing though a hire before March is in our best interest." When

interviewed, Taylor shared with Pickett her prior "work on Artur's campaign."   On March 2, Rand sent

Taylor a letter offering her an Administrative Assistant position at the Central Office with a $23,000 starting

salary.  When the offer had not been accepted by March 4, Davis emailed to Pickett:

Since I am the one who originally reached out to her, I will send her an email encouraging her to accept the position, but I am not sure what is going on here. I do recognize that you need the help in your department and see no reason not to develop and job description and post it if she does not come through.

Taylor "came though" by signing the offer on March 6 and starting work on March 27.

Inconsistent records in Rogers  personnel file support Pickett's report that Davis is mis-represented his

56

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for:    Board of Directors   LEGAL SERVICES ALABAMA
Investigator:  Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

intent to post Taylor principally as support staff in her development unit.[52]  Investigative interviews and records confirmed her actual operation performing "communications" services to Davis and administrative support to Rand.

> 4.    **Mary Aplin**

>> a.    **Hiring Process: Conclusions**

Davis personally recruited Mary Aplin ("Aplin") upon a friend's referral, for a Grants Manager position which was not posted. Davis approved a starting salary of $47,000, making Aplin LSA's highest salaried, non-attorney employee. The hiring process, the hiring itself, and the compensation raised reasonable questions of palpable pre-selection, blatant disregard for standards of competence, actual staffing needs in grants management, and budgeted priorities. This hiring contributed substantially to employee conflicts and a deteriorating workplace environment in the central office.[53]

>> b    **Hiring Process: Analysis**

Emails and other investigative records demonstrate that Davis recruited Mary Aplin in response to her resume and application sent to him on May 5 by the same source of previous referrals. Aplin's resume confirms her prior employment for two years with the source.[54] Davis considered hiring her to fill the CFO vacancy but settled on a "grants-related" position pursuant to these post-interview

---

[52] One "new hire" PAN (signed only by Takenya Rogers) set her title as "Development Assistant" and another, signed only by Rand, set it as "Administrative Assistant". A duly signed job description on June 9, 2017 described Taylor as a "Communication & Development Associate." All three forms identified Pickett as her supervisor.

[53] Some adverse impacts of Aplin's employment are described elsewhere , and the analysis which follows states only the basics of the hiring and pay allegations against Davis for this hire.

[54] The Investigator cannot make conclusive findings on reported close-friendship between the source and Davis's spouse.

57

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concern in Executive Director's Management*
prepared for    Board of Directors   LEGAL SERVICES ALABAMA
Investigator   Delores R. Boyd (U.S. Magistrate Judge, Ret.) Date: September 14, 2017

impressions emailed on May 10 to Rand and Pickett:

> My sense is that she has less entrenched knowledge of grants than [***], but that at a mid forties
> price point, she is still a very capable candidate. She has held two jobs that required her to run
> the gamut from grant writing to grant accounting to grant reporting; she also has ancillary general
> financial experience. I think that her personality is low-key but that she conveys a very strong
> desire to fit in and work hard, in whatever role she is asked to play. I have some lingering
> concern that her prospective title, grant manager, could be misconstrued given the culture of the
> central office as a more senior role than I mean it to be. I wonder if grant coordinator might
> avoid some of this angst, *** Charlotte and I discussed at length the question of how she would
> interact with Christine Davis, who has asked to be re designated as a grant administrator. [55]

Pickett responded with a cautionary note about Aplin's position and supervision:

> Would it be a better fit to have this person ... in finance? If she will be a grants coordinator that seems
> to be an RD role and would fit best working with Dorothy and myself.  *** we should be aware of
> the salary differences of a 13 year grants coordinator and a new one ...  Am I missing something?

On the May 30 effective date of Aplin's hire emailed all employees, in pertinent part:

> Aplin .. Will serve LSA as Grant Manager. *** Mary will report to our Operations Director, ...and
> will work closely with our CFO, as well. .. Her duties will include monthly report narratives, budget
> and outcome reporting, and maintenance of grant records.

Fiscal records confirm that Aplin's $47,000 salary surpassed that of several more support staff whose

records reflected more seniority; more experience; and previous, demonstrated competence in the performance

of their duties. [57]

---

[55]Pickett remained Davis that Dorothy Graham already performed in the "Grant Coordinator"
position. As already analyzed, Davis expressed a well-founded concern about Christine Davis's desire for
this post. Analyzed in Section VII ("hostile workplace complaints") is his mistaken impression of Aplin's
capabilities in grant writing, accounting, and reporting.

[57]Several attorneys, e.g., then earned only $38,000 - $40,000. Grants Coordinator Graham, tenured
for 38 years and performing the work described for Aplin, earned $38,978

58

D00213

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns in Executive Director's Management*
prepared for    Board of Directors   LEGAL SERVICES ALABAMA
Investigator   Delores R. Boyd (U.S. Magistrate Judge, Ret.) Date September 14, 2017

IV.    HOSTILE WORKPLACE COMPLAINTS

LSA's longest-serving non-attorney employees - Sylvia Mason, Executive Assistant to the Executive Director( 39 years+) and Dorothy Graham, Grants Coordinator (38 years+) timely filed complaints arising from conflicts with Davis in the Central Office, including disciplinary action he directed following contentious incidents during the last week of his employment. Their grievances were properly construed to be within the scope of the Handbook's strict prohibitions on " harassment" and "conduct creating a hostile work environment."

The Investigator conducted a thorough investigation which included extensive interviews and analytical scrutiny of the documentary record. Davis did not return to the Central Office after August 18 and the next week saw the departures and resignations of two Central Office employees whose conduct reportedly contributed significantly to these employees' grievances. Consequently, the Investigator deliberated the significance of these circumstances and directly probed each employee to ascertain first, the impact of these occurrences on the workplace; second, the status of the questioned disciplinary sanctions imposed against them; and third, the nature of any remedial action each still desired from the BOD in response to their complaints. Graham and Mason separately confirmed    voluntarily, and absent any guidance or suggestions from the Investigator    that these employee departures, especially Davis's, had completely restored a positive and productive workplace; that the BOD had already acted to their satisfaction to rescind the disciplinary action taken to force reassignment, resignation, or retirement; and that neither requested from the BOD any further remedy of a monetary, equitable, or any other character.

59

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns in Executive Director's Management*
prepared for     Board of Directors   LEGAL SERVICES ALABAMA
Investigator   Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

Pursuant to these findings, the Investigator concludes that neither LSA's fiscal interest nor the

BOD's investigative duties under the Handbook justify that the Investigator outline for this Confidential

Report the precise analytical findings and conclusions for these grievances.[57]

## VI.   CONCLUSIONS AND RECOMMENDATIONS

### A.   CONCLUSION

LSA'S published "Core Value Statements"     integrity, professionalism, teamwork, and
compassion   are all implicated by issues and concerns arising during Davis's tenure. The investigation
disclosed found continuing effects from Davis's policy revisions and his hire and pay decisions.

Confusion, resentment, and anxiety abound within the LSA workforce concerning the
continuing application of substantial changes effected in job standards and policies which promised fair
and equal opportunities for hiring and promotional advancement; salary settings and adjustments
premised on fair, uniform, and consistently applied policies.  Davis's act in ending the probationary
period for new employees threatens the integrity of previous standards designed to ensure competent
and compassionate employees to serve LSA clients and to maintain its administrative functions.

Needed consensus is lacking on the comparative authority of the Executive Director and the
BOD concerning these personnel matters. The 2006 Handbook is no longer an instructive guide because
all the policy changes Davis made were not posted for uniform notice; some were not posted at all, and

_____

[57] The Investigator stands ready to provide such oral or written analyses to the BOD, or any
designated committee, upon notice that further reporting is warranted

60

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for      Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.)  Date: September 14, 2017

some policies have been either arbitrarily honored or enforced in an arbitrary, capricious, or lax manner.

Managing Attorneys have received instructions from Davis which empower them with actual and discretionary authority in dealings with the press and employee recruitment. Support personnel generally have felt diminished and disrespected, and morale has diminished. Employees who have been aggrieved directly or indirectly by Davis's conduct remain apprehensive about LSA's intent to address and remedy their concerns.

The Investigator has already outlined her analytical conclusions for all of these matters (Sections III and IV). Consequently, they are not here repeated. Instead, the Investigator respectfully submits Recommendations for the BOD's evaluation of any responsive action which may be necessary or proper in response to the analytical conclusions.

In the interest of full disclosure to the BOD on matters within the scope of its published responsibilities along with its fiduciary duty generally, the Investigator includes among these Recommendations succinct statements of investigative findings of fiscal practices and personnel actions which warrant the BOD's knowledge and assessment.

61

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for    Board of Directors - LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U. S. Magistrate Judge, RET.) Date: September 14, 2017

## B.    RECOMMENDATIONS

### 1. Personnel Matters

(1) *Sylvia Mason and Dorothy Graham*

The BOD should  confirm with each employee the Investigator's representations that their "hostile workplace" complaints have been resolved to their satisfaction by Davis's resignation and that the BOD may consider their complaints "closed and resolved" without any consideration of additional remedies of any kind.

(2) *Christine Davis, Sr. Accounting Clerk.*

The BOD should assess the propriety of action in response to the promotional and pay grievances reported with her express desire and authorization.

(3) Renae Jones, Intake Screener

The BOD should assess the propriety of action in response to the reported transfer of Renae Jones from her Administrative Assistant position in the Central Office to the Call Center.

(5) The BOD should evaluate the propriety of action in response to significant changes which have been posted (for all employees) in the Handbook policies governing hiring processes and the probationary period for evaluation

(6) The BOD should evaluate the propriety of action in response to the significant change made in LSA's Public Relations Guidelines by Davis's "LSA press policy", a revision not posted but circulated to managing attorneys.

(7) The BOD should evaluate the revised and posted "Funeral Leave" revision

62

CONFIDENTIAL · Legal Services Alabama · Artur Davis · Docs Produced by Defendant

**CONFIDENTIAL REPORT**
*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for    Board of Directors   LEGAL SERVICES ALABAMA
Investigator: Delores R. Boyd (U.S. Magistrate Judge, RET.) Date: September 14, 2017

referenced in this Report to determine if it mandates concurrence or revision.

(8) The BOD should act expeditiously to plan for a comprehensive review of the

2006 Employee Handbook for its revision to incorporate appropriate modifications.

## 2.    FISCAL POLICIES, PRACTICES, & CONCERNS

(1) The Handbook's policy for "hiring notice and personnel action notice" forms

(Ch. 2, § 10) requires "approval" signatures by the Director of Operations, Human Resources, Finance,

and the Executive Director.  The policy was revised – by email and practice – in mid-February and the

investigation disclosed significant practice deviations thereafter, warranting the BOD's consideration of

the underlying rationale for this policy and whether any action is warranted in response to its change.[5x]

(2) The Investigator received credible information and  documentation that the

Handbook's **"Outside Employment"** policy (Ch. 3, § 6) have been materially breached in two instances

and the policy may warrant operational clarity.[5y]

(3) The Investigator received credible information and documentation that the

Handbook's ""overtime policy" (Chap. 4, § 3) and "leave time" certifications may have been revised, by

email guidance from Davis.[6]

---

[5x]Upon request, the Investigator will prepare (within 30 days) an outline of the documentation produced for this policy change.

[5y]In lieu of detailing here the reported breaches, the Investigator will, upon request, prepare (within next 30 days) a summary of reported findings along with the exhibits produced.

[6] Upon request, the Investigator will prepare (within 30 days) an outline of the documentation produced for this report.

63

**CONFIDENTIAL REPORT**

*Investigation of Workplace Grievances and Concerns re Executive Director's Management*
prepared for     Board of Directors   LEGAL SERVICES ALABAMA
Investigator  Delores R. Boyd (U S Magistrate Judge, RET.) Date  September 14, 2017

### 3. POLICY MATTERS

(1) Investigative reports and documentation warrant the BOD's review of its contract attorney policy to ascertain any breaches and/or need for clarification.

(2) Investigative reports and documentation warrant the BOD's policy guidance on grants management, specifically clarifying questions raised by significant changes implemented without Board notice of approval, including but not limited to, the nature and scope of "priority" grants and the use of grant funds for expenditures beyond the purpose or scope of the grant.

(3) Investigative reports and documentation may warrant that the BOD re-visit its recently approved pay plan, to confirm the integrity of Davis's representations concerning the bonus pay/incentive phase.

Final Report submitted by.

DELORES B. BOYD, INVESTIGATOR

(United States Magistrate Judge, RET.)

64





PLAINTIFF'S
EXHIBIT
21

# LEGAL SERVICES ALABAMA, INC.

## Employee Handbook

**OPR:  Director of Operations**
**Effective Date: July 2006**

LEGAL SERVICES ALABAMA

# WELCOME TO LEGAL SERVICES ALABAMA, INC.

Dear Fellow Employee:

This Employee *Handbook* (hereinafter "Handbook") provides answers to questions you may have about Legal Services Alabama's benefits, procedures, and policies, as well as LSA's responsibilities to you and your responsibilities to LSA, your colleagues, and clients. If anything is unclear, please discuss the matter with your immediate supervisor or LSA's Director of Operations. You are responsible for reading and understanding the Handbook and your performance evaluations will reflect, in part, your following the Handbook. In addition to making your duties clearer, we hope this Handbook also gives you an indication of LSA's interest in the welfare of all who work here.

The Handbook is a work in progress and will likely be amended from time to time. You will be informed of those changes to the Handbook and will be expected to post the changes. Your suggestions for improving the Handbook are welcome and should be forwarded to the Director of Operations.

The personal satisfaction and compensation gained from doing a job well are only some of the reasons why people work. Other factors influence your decision to work, such as, pleasant working environment, relationships with co-workers, and a sense of serving client needs, career development, and fringe benefits. LSA is committed to doing its part to assure you of a satisfying work experience.

I extend to you my personal wishes for your success and happiness at LSA.

Sincerely,

Melissa A. Pershing
Executive Director

# LEGAL SERVICES ALABAMA, INC.
## Employee Handbook

### Table of Contents

**CHAPTER 1     INTRODUCTION TO LEGAL SERVICES ALABAMA AND
APPLICABILITY OF GUIDE**

**Page No.**

| | | |
|---|---|---|
| 1. | Description of Legal Services Alabama | 1-1 |
| 2. | Applicability of Hand Book to Employees | 1-1 |
| 3. | History | 1-1 |
| 4. | LSA Mission Statement | 1-1 |
| 5. | Our Core Values | 1-1 |
| 6. | LSA Core Value Statements | 1-2 |
| 7. | Board of Directors and Bylaws | 1-2 |
| 8. | Executive Director | 1-2 |
| 9. | Legal Services Alabama Funding | 1-2 |
| | A. Funding Sources | |
| | B. Purposes of Funding | |
| | C. Legal Services Corporation Funding and Compliance | |
| | D. Non-LSC Funding May Not Be Used for LSC Prohibited Purposes | 1-3 |
| | E. Permissible Use of Non-LSC Funds | 1-3 |
| | F. Legal Services for Clients Not Financially Eligible Under LSC | 1-3 |
| 10. | Application of State, Federal and Local Laws to LSA | 1-3 |
| | A. Applicable Federal Law | 1-3 |
| | B. Reporting Violations of Law and Others | 1-4 |
| | C. Notice to Employees and Board Members | 1-4 |

**CHAPTER 2     HIRING AND EMPLOYMENT**

| | | |
|---|---|---|
| 1. | General Hiring Policy | 2-1 |
| 2. | Personnel Records | 2-1 |
| | A. Maintenance | |
| | B. Contents | |
| | C. Confidentiality | 2-2 |
| 3. | Qualifications for Attorney Hiring | 2-2 |
| 4. | Nepotism Policy | 2-2 |
| 5. | Conditions of Employment | 2-3 |
| 6. | Employment Classifications | 2-3 |
| | A. Regular Full-Time Employees | |

|  |  | Page No. |
|---|---|---|
|  | B. Regular Part-Time Employees |  |
|  | C. Temporary Full-Time Employees | 2-4 |
|  | D. Temporary Part-Time Employees |  |
| 7. | Responsibility for Recruitment and Staff Selection | 2-4 |
|  | A. Executive Director |  |
|  | B. Administrative Office Staff |  |
|  | C. Attorney Staff |  |
|  | D. Paralegal Staff |  |
|  | E. Support Staff |  |
| 8. | Job Opportunit y Notices | 2-5 |
|  | A. Notice Required |  |
|  | B. Notice Location and Duration |  |
|  | C. Notice to Staff |  |
| 9. | Application and Hiring Process | 2-5 |
| 10. | Hiring Notice and Personnel Action Form | 2-5 |
| 11. | Notice to Unsuccessful Applicants | 2-6 |
| 12. | New Employee Orientation | 2-6 |
| 13. | Probationary Period | 2-6 |
| 14. | Preparation of Probationary Evaluations | 2-6 |

**CHAPTER 3     JOB STANDARDS AND PROCEDURES**

| 1. | General Policy | 3-1 |
| 2. | Compliance with Rules and Regulations | 3-1 |
|  | A. Minor Infractions |  |
|  | B. Major Infractions | 3-2 |
| 3. | Disciplinary Action | 3-2 |
|  | A. Warnings and Penalties | 3-3 |
|  | B. Probation |  |
|  | C. Demotion |  |
|  | D. Termination Procedure | 3-4 |
|  | E. Grievance Procedures |  |
| 4. | Resignation Procedures | 3-4 |
|  | A. Termination of Employment by Employee Action |  |
|  | B. Final paychecks issued | 3-5 |
| 5. | Performance Evaluations | 3-5 |
| 6. | Outside Employment | 3-5 |
| 7. | Public Relations Guidelines | 3-6 |
|  | A. Official Spokes Persons |  |
|  | B. Advance Notice to Director |  |

Page No.

|  |  |  |
|---|---|---|
| | C. Contact with Media | |
| | D. Public Contact | |
| | E. Rules on out of Court Statements | 3-7 |
| 8. | Political Activities | 3-7 |
| 9. | Acceptance of Gifts and Gratuities | 3-7 |
| 10. | Ethics and Responsibility | 3-7 |
| | A. Code of Professional Responsibility | |
| | B. Ultimate Responsibility | |
| | C. Unlicensed Personnel | |
| | D. Restrictions on Certain Activities | 3-8 |
| 11. | Office Hours and Work Location | 3-8 |
| | A. Regular Work Week | |
| | B. Employee Location During Work Hours | |
| | C. Irregular Work Hours | |
| | D. Unanticipated Absences from Work | |
| | E. Leave or Pay Deductions for Absences | |
| | F. Office Closure Due to Inclement Weather or Emergency | 3-9 |
| 12. | Office Keys and Security Cards | 3-9 |
| 13. | Use of Equipment and Premises | 3-9 |
| 14. | Computer and Internet Usage | 3-9 |
| 15. | Appearance and Attire | 3-9 |
| 16. | Record Retention and Document Destruction Policy | 3-10 |
| 17. | Equal Opportunity Policy and Procedure | 3-10 |
| | A. Purpose | |
| | B. General | |
| | C. Statement of Equal Employment Opportunity | |
| | D. Equal Opportunity in Employment | 3-12 |
| | E. Equal Opportunity in the Provision of Legal Services | |
| | F. Provision of Legal Assistance | |
| | G. Affirmative Action Goal | 3-13 |
| | H. Benefits and Compensation | |
| | I. Statistical Reports | |
| 18. | Policy Prohibiting Sexual Harassment | 3-13 |
| | Investigation Procedure | 3-15 |
| 19. | Reporting Professional License Complaints | 3-16 |
| 20. | Solving Work-Related Problems | 3-16 |
| 21. | Drug and Alcohol -Free Work Place Policy | 3-17 |
| 22. | Whistle-Blower Protection | 3-19 |
| 23. | Smoking Prohibition | 3-19 |

|  |  | Page No. |
|---|---|---|
| 24. | Policy concerning Personal Relationships Between LSA Staff and Clients | 3-19 |
|  | A.   Statement of Policy |  |
|  | B.   State of Disciplinary Actions for Policy Infractions | 3-20 |
| 25. | Policy concerning Representation of LSA Staff or Their Relatives | 3-20 |
|  | A.   Statement of Policy | 3-21 |
|  | B.   State of Disciplinary Actions for Policy Infractions | 3-21 |

**CHAPTER 4        COMPENSATION**

| 1. | General Policy | 4-1 |
|---|---|---|
| 2. | No Retaliation Policy | 4-1 |
| 3. | Overtime Policy | 4-1 |
| 4. | Time Sheets | 4-1 |
| 5. | Pay Periods | 4-2 |
| 6. | Statement of Earnings | 4-2 |
| 7. | Direct Deposit | 4-2 |
| 8. | Salary Advances | 4-2 |
| 9. | Garnishments | 4-2 |

**CHAPTER 5        TRAVEL REIMBURSEMENT**

| 1. | Allowable Transportation Expense | 5-1 |
|---|---|---|
| 2. | Per Diem | 5-1 |
| 3. | Lodging-Actual Cost | 5-2 |
| 4. | Travel Reimbursement Forms | 5-2 |
| 5. | Travel Advances | 5-3 |
| 6. | Travel Reimbursement to LSA Board Members | 5-3 |

**CHAPTER 6        LEAVE BENEFITS**

| 1. | Holidays | 6-1 |
|---|---|---|
| 2. | Earned Time Off | 6-1 |
|  | A.   Accrual of Earned Time Off | 6-2 |
|  | B.   Treatment of vacation /ETO caps |  |
|  | C.   Payment for accrued ETO at time of termination |  |
|  | D.   ETO cap treatment and the Sick Leave B6ank |  |
|  | E.   Use and Approval of Earned Time Off |  |
|  | F.   Carryover and Pay for Earned Time Off |  |
|  | G.   Donation of Earned Time Off | 6-3 |
|  | H.   Termination of Employment and ETO |  |
|  | I.   Advanced Earned Time Off | 6-4 |
| 3. | Nonbalance-based Leave | 6-4 |
|  | A.   Jury Duty |  |
|  | B.   Military Leave |  |
|  | C.   Bar Exam Leave |  |

|  | D. | Funeral Leave | |
| 4. | | Court appearance under court order or subpoena | 6-5 |
|  | A. | Court appearance as a litigant | |
|  | B. | Witness Duty | 6-5 |
| 5. | | Leave Without Pay | 6-5 |
| 6. | | Election Day | 6-5 |

**CHAPTER 7**        **OTHER BENEFITS**

| 1. | Organizational Memberships-Payment of Dues | 7-1 |
| 2. | Supplemental Insurance Coverage | 7-1 |
| 3. | Healthcare | 7-1 |
| 4. | Workmen's Compensation | 7-1 |
| | A. Coverage | |
| | B. Claims Notification | 7-2 |
| 5. | Unemployment Compensation | 7-2 |
| 6. | Social Security and Medicare | 7-2 |
| 7. | Supplemental Retirement Plan | 7-2 |

**APPENDIX A**        **FORMS**

LSA Form 4-1  Time and Attendance Record
LSA Form 5-1  Local Travel and Expense
LSA Form 5-2  Extended Travel Expense Statement
LSA Form 5-3  Extended Travel Authorization
LSA Form 6-1  Donated Leave Form
LSA Diagram 1  LSA Interview and Hiring Process

# Chapter 1   INTRODUCTION TO LEGAL SERVICES ALABAMA AND APPLICABILITY OF THE EMPLOYEE HANDBOOK

### 1.   Description of Legal Services Alabama

Legal Services Alabama ("LSA") is a non-profit statewide legal services program created on January 29, 2004 as the result of a merger of three predecessor organizations: Legal Services of Metro Birmingham (originally founded 1977), Legal Services of North Central Alabama (originally founded 1969) and Legal Service Corporation of Alabama (founded 1977). It is funded with public and private help to provide free legal assistance to eligible people and groups unable to pay for such services. Eligibility is based on income, assets, and other factors as determined by LSA's Eligibility and Limitation Guidelines and other LSA policies.

### 2.   Applicability of the Employee Handbook to Employees

This employee handbook provides information to help employees and their supervisors work together efficiently in a positive working environment and to ensure that LSA and its staff comply with applicable state and federal law. It does not constitute an employment contract, and it does not confer legal rights on any employees. LSA reserves the right to change handbook practices because of changes in the law or organizational needs.

To the extent that any information in this handbook varies from the terms of any applicable law or any benefit plan, the terms of the law or plan will govern.

Employees with questions about any aspect of the handbook should direct the questions to their supervisor or to the Director of Operations.

### 3.   History

Access to justice for those unable to afford legal help is rooted in the principles of America and the legal profession. Alabama has a long history of providing volunteer or *pro bono* legal assistance to those in need.

### 4.   LSA Mission Statement

Legal Services Alabama is a state-wide nonprofit dedicated to providing access to justice and quality civil legal assistance to educate and empower Alabama's low-income community.

### 5.   Our Core Values

Legal Services Alabama's core values are integrity, professionalism, teamwork and compassion.

6.  **LSA Core Value Statements**

   Our core values are reflected in the following core value statements.

A. Integrity:  We are honest, ethical and accountable in our endeavors.
B. Professionalism:  We pursue excellence in our creative, courageous and zealous representation of our clients.
C. Teamwork: Valuing our diverse strengths, we cooperate with our clients, staff and community justice partners.
D. Compassion:  We are caring, empathetic and respectful.

7.  **Board of Directors and Bylaws**

LSA is governed by a Board of Directors composed of attorneys and client-eligible community representatives who are supportive of free legal services for low income individuals, communities and other vulnerable populations.  The Board of Directors is responsible for establishing policies which govern the operation of LSA.  The bylaws establish a broad framework for the Board and LSA.  A copy of the bylaws is available in the LSA Central Office.

8.  **Executive Director**

Matters not covered in this *Handbook* may be determined by the Executive Director in a manner consistent with any policy adopted by the Board of Directors and/or prior practices of LSA.

9.  **Legal Services Alabama Funding**

A.  **Funding Sources**

Legal Services is funded primarily by Legal Services Corporation (LSC).  Most additional funding comes from aging agencies and federal, state and community grants, reflecting a partnership for justice with the government, the public and the community.

B.  **Purposes of Funding**

While LSA's funding pays for a broad range of services for individual clients and client groups, some funders impose restrictions on the range of services they fund.  All LSA employees, volunteers and board members have an obligation to be aware of and to comply with these limitations.

C.  **Legal Services Corporation Funding and Compliance**

All employees must comply with the provisions of the LSC Act and Regulations.  A copy of these regulations is available at the LSC web site.  Violation of these policies and other LSC policies may result in disciplinary action or discharge.

D.     **Non-LSC Funding May Not Be Used for LSC Prohibited Purposes**

LSC has conditioned its LSA grant on not spending LSC or non-LSC funds for purposes prohibited by the LSC Act and activity prohibited by or inconsistent with Section 504 in 110 Stat. 1321 (1996) and those provisions of LSC Regulations that implement those provisions. 45 CFR §1610.2 definitions are incorporated by reference to help identify prohibited activity. LSA policies reflect the LSC prohibitions.

E.     **Permissible Use of Non-LSC Funds**

Tribal and public funds may be used for the specific purposes for which they were provided, if the funds are not used for any activity prohibited by Section 504. Private funds may be used by LSA according to the purposes for which they were given, if the funds are not used for any activity prohibited by the LSC Act or Section 504 of the FY 1996 LSC appropriation, Pub.L. 104-134, 110 Stat. 1321 (1996).

F.     **Legal Services for Clients Not Financially Eligible Under LSC Guidelines**

LSA may use non-LSC funds to provide legal services to a person who does not meet LSC's financial guidelines in 45 CFR §1611, if the funds are used for specific purposes for which those funds were provided and are not used for any activity prohibited by the LSC Act or inconsistent with Section 504.

10.    **Application of State, Federal and Local Laws to LSA**

All LSA employees, board members, and volunteers are bound by all relevant state, federal, and local laws.

A.     **Applicable Federal Law**

All Legal Services Alabama employees and board members are subject to the following federal laws and the punishments relating to the proper use of federal funds:

18 USC 201   Bribery of Public Officials and Witnesses
18 USC 286   Conspiracy to Defraud the Government with Respect to Claims
18 USC 287   False, Fictitious, or Fraudulent Claims
18 USC 371   Conspiracy to Commit Offense or Defraud the U.S.
18 USC 641   Public Money, Property or Records
18 USC 1001  Statements of Entries Generally
18 USC 1002  Possession of False Papers to Defraud the U.S.
18 USC 3729  False Claims
18 USC 3731  False Claims Procedures
18 USC 3732  False Claims Jurisdiction
18 USC 3733  Civil Investigation Demands

18 USC 3730  Civil Actions for False Claims except actions authorized by 3730(b) may not be brought against LSA or an LSA employee)

For purposes of the laws listed above, the LSC and LSA's funding will be considered federal funds provided by grant or contract.

## B.   Reporting Violations of Law and Others

The Executive Director of LSA or other responsible employee(s) will give telephone notice to the LSC Office of the Inspector General (OIG) within two working days of the discovery of any information that indicates that LSA may have been the victim of misappropriation, embezzlement or other theft or loss of any funds (LSC, non-LSC, or client funds). Such notice shall be followed by written notice by mail or facsimile within ten (10) calendar days from the time of the discovery of the theft. The required notice shall be provided regardless of whether the funds are recovered.   Other reporting will be undertaken when required pursuant to federal or state law, specific grant conditions or insurance.

## C.   Notice to Employees and Board Members

This section's notice of the applicability of federal law is provided in accordance with 45 CFR 1640.3.

# Chapter 2        HIRING AND EMPLOYMENT

## 1.      General Hiring Policy

LSA is committed to the principles of recruiting and selecting the best qualified applicants for positions, on the basis of both demonstrated and potential skills and ability, and of providing equal employment opportunities to all persons regardless of sex or sexual orientation, race, color, creed, national origin, age, physical handicap, political affiliation, or any other consideration prohibited by law. Its recruitment and hiring policies reflect LSA's Equal Opportunity and Anti-Discrimination Policy.

## 2.      Personnel Records

### A.    Maintenance

Employee personnel files are maintained in the LSA Central Office located in Montgomery, Alabama. Keeping employee files up-to-date are important to pay, deductions, benefits and other matters. If an employee changes any of the following items, s/he is encouraged to notify the Central Office Human Resources department as soon as possible:

1.    Legal name
2.    Home address
3.    Home telephone number
4.    Emergency point(s) of contact
5.    Dependent data (additions/deletions)
6.    Marital status
7.    Change of beneficiary
8.    Exemptions on tax forms (federal/state)
9.    Military status

Failure of an employee to keep this information up-to-date may affect coverage of benefits and other issues that concern an individual LSA employee.

### B.    Contents

The Human Resource department shall maintain a personnel file for each LSA employee containing current information and records including:

1.    Application and/or resume, dates of employment and personnel action notices.
2.    Evaluations and Professional Development Plan.
3.    Disciplinary actions and corrective actions.

C.     **Confidentiality**

All personnel files are confidential and can only be accessed by LSA employees who have authorization. Authorized personnel include: employee, immediate supervisor, supervisor in the supervisory chain, human resources personnel, payroll personnel, Operations Director, and the Executive Director. LSA employees have the right to review and copy their personnel files at the LSA Central Office during regular business hours. Employees who do not wish to travel to the Central Office to review their personnel file should contact the Human Resources department to explore other avenues for reviewing the file. Original files may not be removed from the Human Resources department. The employee will be notified of any adverse information placed in their personnel file. Employees have the right to respond to information in their file and the response will be placed in the personnel file in accordance with LSA policy and/or procedures.

Employee identity, job title, and date of employment are not treated as confidential information and will be released to third parties. Other information in files will be treated as confidential and will not be released to the public unless required by law, contract, or written authorization of the employee.

3.     **Qualifications for Attorney Hiring**

With respect to attorney hiring, every effort will be made to recruit and hire people who meet the following qualifications:

    a.     Good academic training and high academic performance;
    b.     Prior legal experience, preferably legal services for low-income and other needy people;
    c.     A knowledge and understanding of the legal problems and needs of the client community;
    d.     Prior working experience in the client community or other programs that help low-income and needy people;
    e.     Fluency in a foreign language commonly used by LSA clients;
    f.     Appropriate special hiring requirements of a funding agency;
    g.     Needed cultural understanding;
    h.     Character and professionalism; and
    i.     Other relevant factors.

4.     **Nepotism Policy**

Individuals who are related by blood, marriage, or reside in the same household are permitted to work in the same office, provided no direct reporting or supervisor-to-subordinate relationship exists. That is, no employee is permitted to work within "the chain of command" when one relative's work responsibilities, salary, hours, career progress, benefits or other terms and conditions of employment could be influenced by the other relative. Related employees may have not influence over the wages, hours, benefits, career progress and other terms and conditions of the other related staff members.

Employees who marry or become part of the same household while employed are treated in accordance with these guidelines. LSA will require one of the employees to transfer at the earliest practicable time.

No member of the LSA Board of Directors, no employee of LSA, and no member of the immediate family of such Board Member or employee shall deal directly or indirectly with LSA for profit or gain, except upon full disclosure and after competitive bidding (where otherwise required) and with the express authorization of the Board of Directors of LSA. This policy is intended to protect management integrity and is not intended to be discrimination on the basis of marital or parental status.

For the purpose of the above rules, immediate family shall include any of the following persons:

| | |
|---|---|
| Husband | Wife |
| Father | Mother |
| Son | Daughter |
| Brother | Sister |
| Father-in-Law | Mother-in-Law |
| Brother-in-Law | Sister-in-Law |
| Son-in-Law | Daughter-in-Law |
| Grandparents | Grandchildren |

## 5.    Conditions of Employment

LSA does not guarantee or promise employment on any fixed term, specific duration, permanent or lifetime basis. All employment (whether regular, temporary, probationary, full time or part-time) is for an indefinite duration on an at-will basis, and either the employee or the Company may terminate employment at any time for any reason without notice or cause. No supervisor, officer, agent, or employee of LSA has any authority to alter, modify, waive, or make any exception to this policy, except duly authorized in writing by the Board of Directors.

## 6.    Employment Classifications

## A.    Regular Full-Time Employees

A regular, full-time employee is one who has been hired without a predetermined terminal point of employment; who works thirty (30) or more hours per week; and who has satisfactorily completed a probationary period. Regular, full-time employees are eligible for all employee benefits.

## B.    Regular Part-Time Employees

A regular, part-time employee is one who has been hired without a predetermined terminal point of employment; who works less than thirty (30 hours) per week; and who has satisfactorily completed a probationary period. Regular, part-time employees who work more than fifteen (15) hours per week (but less than thirty (30) hours per week) are entitled to Worker's Compensation, leave, and paid holidays that occur on days on which the employee regularly works.

C.   **Temporary Full-Time Employees**

A temporary, full-time employee is one who has been hired with a predetermined terminal point of employment and who is regularly scheduled to work more than thirty (30) hours per week. Temporary, full-time employees with a predetermined employment period not exceeding three (3) months are entitled to Worker's Compensation, and paid holidays which fall on days on which the employee works. Temporary, full-time employees with a predetermined employment period of more than three (3) months are entitled to Worker's Compensation, group insurance coverage, leave, and paid holidays.

D.   **Temporary Part-Time Employees**

A temporary, part-time employee who has been hired with a predetermined terminal point of employment not exceeding three (3) months, and who is regularly scheduled to work less than thirty (30) hours per week, is eligible for Worker's Compensation. A temporary, part-time employee who has been hired for a period of more than three (3) months is entitled to Worker's Compensation, prorated leave accrual, and paid holidays (also prorated) that occur on days on which the employee regularly works

**7.    Responsibility for Recruitment and Staff Selection**

A.    **Executive Director**.  Recruitment, selection and evaluation of the Executive Director is the responsibility of the Legal Services Alabama Board of Directors. The Executive Director is the hiring and firing authority for all other hiring decisions.

B.    **Administrative Office Staff**.  The recruitment of administrative staff will be the responsibility of LSA's Operation's staff.  Selection of administrative office staff will be the responsibility of the Executive Director in consultation with appropriate core management and other office staff.

C.    **Attorney Staff**.  The recruitment of legal staff will be the responsibility of LSA's Operation's staff.  Selection of attorney staff will be the responsibility of the Executive Director in consultation with the appropriate advocacy management staff.  Before filling an attorney position, the Operations Office will notify the local bar association of the existence of a vacancy and any special qualifications for the position.  Source: 45 CFR §1616.

D.    **Paralegal Staff**.  The recruitment of paralegal staff will be the responsibility of LSA's Operation's staff.  Selection of paralegals will be the responsibility of the Executive Director in consultation with the appropriate advocacy management staff.

E.    **Support Staff**.  The recruitment of support staff will be the responsibility of LSA's Operation's staff.  Selection of support staff will be the responsibility of the Executive Director in consultation with the appropriate advocacy management staff.

8.    **Job Opportunity Notices**

A.    **Notice Required**.  Notice of a position vacancy shall contain a description of the position and shall state the necessary qualifications, salary, application procedures, closing date, and that: "LSA, Inc. is an equal opportunity program and employer."  A copy of each job announcement will be maintained in the Central Office Human Resources department.  The announcement will be prepared for all vacant regular positions by the Operations staff.  However, position notices for temporary attorney and non-attorney positions and contract attorneys will not be required.

B.    **Notice Location and Duration**:  Regular staff openings for non-attorney position publication minimums will include advertisements Saturday and Sunday over a minimum two-week period in at least one newspaper of a statewide distribution.  Regular staff opening for attorney positions publication minimums will include advertisements Saturday and Sunday over a four-week period in at least one newspaper of a statewide distribution, local bar association(s) in the county in which the vacancy exists, and to law school placement offices.

C.    **Notice to Staff**:  Notice of vacancies will be distributed to the staff from the Human Resource department; in written form on the LSA portal and website at the time the notice of vacancy is submitted for publication.

9.    **Application and Hiring Process**

Applications/resumes will be accepted from anyone seeking employment for available positions.

See Diagram 1.  LSA Interview and Hiring Process for an explanation of events, activities and responsibilities for the interview and hiring process.

10.    **Hiring Notice and Personnel Action Form**

When a hiring decision has been made and agreed to by a new employee, the Executive Director or the immediate supervisor will prepare a letter to the new employee confirming the terms of employment.  The letter will include the position name, compensation, the anticipated start date and a welcome to Legal Services Alabama.  A copy of this letter will be maintained in the employee's personnel file.

A Personnel Action Notice (PAN) will be prepared for all new employees by the Operations Human Resources department with appropriate approval.  The PAN is the authorizing document for all personnel matters.  The form will include among other things the employee's name, position title, exempt/nonexempt status, salary/hourly rate, date of hire, and personal data.  Coordination will include the Director of Operations, Human Resources, Finance, and the Executive Director.

11.    **Notice to Unsuccessful Applicants**

After a position has been filled, all other applicants shall be notified in writing by the Human Resource Department that the position has been filled.

## 12.   New Employee Orientation

New employees will be provided as appropriate:  a written job description, personnel action notification, IRS W-4 withholding form, State of Alabama A-4 withholding form, *LSA Employee Handbook*, insurance/benefit information and enrollment forms, healthcare declination memorandum, office key, other information and materials deemed appropriate.

Human Resources will provide each new employee with the *Employee Handbook of LSA*, the Client Service and Compliance Manual, and the Grants Administration Handbook.  Each new employee shall acknowledge receipt of same in writing. Human Resources will also insure that every new employee shall receive a written job offer confirmation that informs that employment is probationary in accordance with the provisions of this Handbook.  This must be signed and returned to Human Resources.

All new employees shall as soon as practicable meet with his/her immediate supervisor and any co-workers to become familiar with the office and program's policies and procedures. A similar meeting with the Central Office will be arranged within three months of a new full-time employee's start date to enable the employee to become more familiar with LSA's program practices, policies, benefits, and services.

## 13.   Probationary Period

All new regular employees shall be subject to a probationary period of six (6) months of actual service.  Any extended probationary period must be approved by the Executive Director, at the request of the employee's supervisor.  The probationary period shall be an integral part of the examination and selection process and shall be used by the supervisor to observe closely the employee's work, and to train and aid the employee in adjusting to the position to which he/she has been selected.  If LSA determines the employee has successfully completed the probationary period, a Personnel Action Notice will be accomplished to reflect a change from a probationary employee to a regular employee.  Becoming a regular employee does not in any way alter or change the "at-will" nature of all employment with LSA.  At any time during the probationary period, an employee may be terminated without cause and without right to appeal a termination of employment through LSA's grievance procedure.

## 14.   Preparation of Probationary Evaluations

Prior to the end of the six (6) month probationary period, the employee's immediate supervisor must submit a written recommendation to either:

   a. dismiss the probationary employee;
   b. retain the employee; or
   c. extend the probationary period.

Such recommendation will be sent to the Executive Director, who shall review the recommendations on each probationary employee and shall take appropriate final action

regarding the employee's probationary status.  A copy of the probationary evaluation shall be placed in the employee's personnel file.

Notwithstanding anything in the foregoing to the contrary, no employee shall be deemed to have had probationary (a/k/a introductory) employment status removed until such time as the Executive Director has received an evaluation and approved a change in employment status in writing (or electronically).  While on probationary status the decision for dismissal lies solely with the discretion of the Executive Director and is not subject to appeal.

# Chapter 3     JOB STANDARDS AND PROCEDURES

## 1.     General Policy

Legal Services Alabama expects ethical and appropriate behavior, as well as high standards of performance by all employees. These standards are established by the board and management, the law, community practices, and standards of professional conduct. To the extent staff members and Legal Services Alabama vary from these expectations, the ability to effectively serve clients is diminished.

All staff must exercise judgment about publicly discussing LSA business. Employees must refrain from any action and avoid public pronouncements that might reflect adversely upon Legal Services Alabama. All staff members are expected to treat client confidences in a way that is consistent with the practice of law and rules of professional responsibility.

All staff are expected to comply with the policies and procedures established by Legal Services Alabama. Further, the staff are expected to comply with the Legal Services Corporation Act, regulations and rules. The staff is subject to disciplinary action for infractions of these policies and procedures.

## 2.     Compliance with Rules and Regulations

LSA expects employees to comply with the personnel policies and practices contained herein. An employee may be disciplined or terminated for cause which shall include, but not be limited to, the offenses outlined in paragraphs below. The offenses listed in the paragraphs below of this section are not intended to be all-inclusive but are illustrative of unacceptable conduct. In the absence of special circumstances, offenses shall be subject to the penalties indicated in this handbook.

## A.     Minor Infractions

Minor infractions are the type of behavior that does not always - upon first offense - require severe disciplinary action, but if continued, will lead to suspension or termination. For example:

1.     Wasting time, loitering, or being away from assigned working place unnecessarily.

2.     Absence from work for a part of one day or for one (1) day or more without permission.

3.     Excessive excused or non-excused absenteeism for all or for a portion of a day and excessive tardiness.

4.     Careless use of LSA property.

5.     Removal of any matter on bulletin boards or other property without proper authorization.

6.    Failure to immediately report an accident.

7.    Other acts or omissions warranting disciplinary action.

B.    **Major Infractions**

Major infractions are the types of behavior that may result in severe disciplinary action, such as suspension or termination on the first occurrence.

1.    Unjustifiable refusal to carry out a specific order or instruction issued by a supervisor.

2.    Failure to comply with the Legal Services Corporation and LSA's rules, regulations, instructions, and guidelines.

3.    Thievery from fellow LSA workers, LSA clients, or others.

4.    Interference or disruption of work of other employees.

5.    Violation of LSA's regulations concerning client confidentiality.

6.    Intentional omission of any pertinent facts.

7.    Lying or misrepresentation of facts to supervisor, co-employees, or other employees with respect to the handling of the business of the office or with respect to any personnel matter such as lateness, illness, leave, etc.

8.    Recommending or encouraging another employee of LSA to violate or circumvent LSA's policies or procedures, or a Legal Services Corporation rule or regulation, or failure of a supervisor to report a violation of same.

9.    Engaging in, or recommending, or requiring, an employee or client of LSA to engage in an illegal act.

10.   Violation of LSA's Equal Employment Opportunity Policy or Sexual Harassment Policy.

11.   Any other conduct detrimental to clients, employees, or LSA.

**3.    Disciplinary Action**

For purposes of this Handbook, discipline refers to a written warning, probation, demotion, suspension without pay, or dismissal depending upon the seriousness of the problem and incidence of prior violations.

A.   **Warnings and Penalties**

    a.    Commission of a minor infraction will result in at least one of the following penalties, although in any particular case the penalty may be greater.

        1.    First Offense - First <u>written</u> warning notice.

        2.    Second Offense - (of any nature) Final written warning notice and/or suspension.

        3.    Third Offense - (of any nature) Termination.

    b.    Commission of major infractions may result in the following penalties, although in any particular case the penalty may be greater.

        1.    First Offense - Final written warning notice, suspension or termination.

        2.    Second Offense - Termination.

        3.    All warnings issued will become a permanent part of the employee's record.

B.   **Probation**

The supervisor, in conjunction with the Executive Director, may place an employee on probation for up to three months for misconduct, poor performance and other appropriate reasons. The supervisor will discuss fully with the employee the reason(s) this action is being taken and the period of time the probation will cover. A detailed report relative to the action taken will be submitted to the Executive Director and a copy placed in the employee's personnel file. The supervisor will also give a copy of the report to the employee. The supervisor may interview and re-evaluate the employee as often as deemed necessary during the probationary period. However, a written report of each interview must be submitted to the Executive Director, with a copy placed in the employee's file. The supervisor is required to submit a performance evaluation report at the end of the probationary period as well as a recommendation regarding the disposition of the case.

C.   **Demotion**

        1.    Demotion shall be construed as removal from a particular position with an offer of a lower classified position due to the employee's inability or unwillingness to perform in the higher classified position. A change of title or duties alone does not constitute a demotion.

2.  Demotion may be considered a disciplinary action if not done for budgetary and/or other reasons. The final approval must be given by the Executive Director.

D.  **Termination Procedure**

An employee may be terminated only by the Executive Director. Termination procedure is as follows:

1.  A recommendation for termination with appropriate documentation shall be made to the Executive Director by the employee's direct supervisor. Written notice of termination will be prepared by the employee's direct supervisor with reasons therefore shall be delivered to the employee and filed in the employee's personnel file.

2.  An employee who is to be terminated will be given two (2) weeks notice of intention to terminate, unless the Director determines that retention of the employee is not in the best interest of LSA.

E.  **Grievance Procedures**

The following grievance procedures shall be used for any employee grievance involving probation, demotion or suspension without pay. The employee should first discuss the issue with the immediate supervisor within three (3) working days after receiving notice of disciplinary action. If no mutually acceptable agreement is reached within five (5) working days between the immediate supervisor and the employee, the employee is authorized to appeal to the next supervisory level. This appeal must be filed in writing within three (3) working days after the end of this five (5) day period. This supervisor shall make a decision within five (5) working days after receipt of the written appeal and shall communicate same to the grievant in writing within said time. The employee may appeal through all supervisory levels up to and including the Executive Director level by following the procedure outlined above.

The Executive Director shall make the final decision concerning matters involving probation. Matters involving demotion, suspension without pay or termination may be appealed finally to the Personnel Committee of the Board of Directors. Such appeal must be made in writing within three (3) working days of the decision of the Executive Director. The Personnel Committee's review shall be limited to whether or not the Executive Director acted in an arbitrary and capricious manner. This appeal shall be the final appeal for matters involving demotion, suspension without pay or termination.

4.  **Resignation Procedures**

A.  **Termination of Employment by Employee Action**

1.  When an employee resigns he/she shall give a reasonable amount of notice, but not less than four (4) weeks in the case of exempt employees, and two (2) weeks

3-4

in the case of non-exempt employees:

2.     The employee shall provide written notice to his or her direct supervisor who shall forward to the Executive Director of the intent to resign, stating the reason and the effective date.

3.     An employee who resigns from LSA and does not give the required notice will lose all leave benefits due or to become due.

B.     **Final paychecks shall be issued only after:**

a.     An exit interview questionnaire has been completed and/or exit interview has been attended;

b.     All keys and any other LSA property in the possession of the employee have been returned; and

c.     LSA has been reimbursed for any monies or advanced time owed LSA.

**5.     Performance Evaluations**

Performance evaluations will be conducted in accordance with the LSA Performance Evaluation Manual.

**6.     Outside Employment**

Employees shall not engage in outside employment without their supervisor's permission.  For seasonal employment, such as that related to tax preparation, employees must request permission to engage in outside employment annually.  In no case will any LSA employee engage in outside employment that:

a.     Interferes with the efficient performance of the employee's duties;

b.     ˜ Constitutes a conflict of interest with the employee's duties.

c.     Utilizes any resources of LSA (including but not limited to supplies, phone, fax, copier, computers, support personnel) during work or non-work hours.

All exempt personnel employed by LSA are expected to devote their full professional activities to LSA matters.  Therefore, except for the limited exceptions outlined below, exempt personnel may not undertake outside professional employment.

The following limited exceptions for outside legal work may be granted upon written approval of the Executive Director.

a.     Undertaking matters on a non-fee basis for relatives or close friends where the relationship and subject matter make it inappropriate to refer the matter to an

attorney in private practice. Typical examples of cases falling into this category would be obtaining a divorce for a relative, litigating a minor lawsuit on behalf of a relative, handling an adoption for a close friend, or defending a relative charged with a misdemeanor. Any such employment shall not occur during the employee's regular or assigned working hours unless the employee, for any time period during which such work is performed, is on either annual leave or leave without pay.

b. Acting pursuant to an appointment made under a court rule or practice of applicability to all attorneys in the jurisdiction, and remitting to LSA all compensation received.

## 7.   Public Relations Guidelines

The following guidelines represent the LSA policy for all staff when dealing with the various news media. Any deviation from this procedure will be considered a serious infraction of the LSA policies.

A.   **Official Spokes Persons**

The Executive Director and the President of the Board of Directors are the only official spokes persons for the organization.

B.   **Advance Notice to Director**

Information on all cases of potential newsworthiness being litigated in court shall be given to the Executive Director or the Executive Director's designee as far in advance as possible so that news reporters may be alerted and/or a press release prepared for distribution following the court appearance.

C.   **Contact with Media**

No contact with the media for any reason whatsoever (including litigation investigation) is to be initiated without first informing the Executive Director or the Executive Director's designee of the need, and discussing the best method of approach. If the media initiates the contact, a timely response may be made by the Supervising or Coordinating Attorney at his/her discretion. It is preferable that the Supervising or Coordinating Attorney then notify the Executive Director prior to making the response; but in any case the Supervising or Coordinating Attorney shall notify the Executive Director immediately after the response, providing background regarding the media initiated contact.

D.   **Public Contact**

Employees asked by an outside agency or organization to appear *on behalf of LSA*, or *to speak about LSA* as a guest speaker or program participant, must notify the Executive Director or his/her designee before accepting the invitation, except when the employee has had regular, periodic or ongoing appearances before the specific agency or

organization and has notified the Executive Director. The Executive Director or his/her designee reserves the right to direct the employee not to appear on LSA's behalf or to determine the content of the employees' presentation.

E.  **Rules on Out-of-Court Statements**

All employees should be aware of and should conform to court rules and/or the Code of Professional Responsibility that restrict or prohibit out of court statements about particular cases.

## 8.  Political Activities

Employees of LSA are subject to the regulation of the Legal Services Corporation set out at 45 CFR 1608.

## 9.  Acceptance of Gifts and Gratuities

Employees, members of the employee's immediate family, and members of the Board of Directors are prohibited from accepting gifts, money or gratuities, from:

a.  Persons receiving benefits or service from LSA;
b.  Any person or entity perfoming services under contract with LSA;
c.  Persons who are otherwise in a position to benefit from the actions of any employee of LSA.

## 10.  Ethics and Responsibility

A.  **Code of Professional Responsibility**

It is the duty of each attorney providing legal assistance to clients of LSA to become acquainted with and adhere to the Code of Professional Responsibility of the Alabama State Bar and to protect the best interests of their clients in keeping with the standards of professional conduct.

B.  **Ultimate Responsibility**

A licensed attorney shall have ultimate responsibility, subject to the office rules governing eligibility, for each matter (litigation and non-litigation) with which LSA is involved, unless the case is one, which, by law, may be handled entirely by non-attorney personnel.

C.  **Unlicensed Personnel**

All employees of LSA who are not licensed attorneys shall use care to avoid any inadvertent violation of any statutes or rules prohibiting the practice of law by unlicensed persons and shall check with supervisory staff in doubtful cases before acting.

D.   **Restrictions on Certain Activities**

All employees of LSA shall refrain from picketing, boycotts, strikes, illegal activities, and legislative and administrative representation to the extent restricted by regulations of the Legal Services Corporation (45 CFR 1612).

**11.   Office Hours and Work Location**

A.   **Regular Work Week**:   The regular workweek is Monday through Friday.   Each employee is expected to work forty hours per week.  Typical office hours are from 8:00 a.m. to 5:00 p.m., Monday through Friday.  The Supervising or Coordinating Attorney sets the office hours for their respective local office.  The Executive Director may authorize office variances of the workweek to comply with community practices.  Employees ordinarily will not be allowed to work through lunch in order to arrive late or leave early without prior approval from the employee's immediate supervisor.  The scheduling of employee lunch periods will be determined and assigned by supervisors.

B.   **Employee Location During Work Hours**:  All employees are expected to keep their offices informed of their location during office hours.  Staff may not perform their regular work at home or other locations without supervisor approval.  When work takes an employee away from the office, the employee shall advise his/her supervisor of the destination and estimated time of return.

C.   **Irregular Work Hours**:   An employee's work hours may be different from the above-stated typical office hours to meet office needs and special employee needs if approved by his/her supervisor.  Consideration of the continuity of office services, employee participation in important office activities, how long the schedule will vary, among other things, will determine the supervisor's decision.  Ordinarily, the scheduled workday shall include the same total number of hours as a regular workday.  All work schedules must be approved by his/her supervisor.

D.   **Unanticipated Absences from Work**:  From time to time, it is necessary for employees to be absent from work because of emergencies, illnesses, or pressing personal business.  Earned Time Off (ETO) is provided for this purpose for eligible employees.  An employee who is unable to report to work or arrives late is required to contact his/her supervisor by 9:00 a.m. unless an emergency exists.  In any event, notice should be given as soon as practical and made during business hours.  Notice through another employee is not acceptable unless the supervisor is absent.  Leaving work during business hours to conduct personal business is not permitted without prior approval from the employee's supervisor.  Each employee is an essential member of the team that makes LSA work for clients.  Thus, being prompt and regular in attendance is important.  Excessive tardiness or absence from work may be grounds for disciplinary action.

E.   **Leave or Pay Deductions for Absences**:  A full or partial day of absence from a regular work day will be charged, as appropriate, to Earned Time Off.  If the employee does not have accrued leave to cover the absence, it may be necessary for pay deductions to be taken to reflect the number of hours absent from work without approval.  Failure to comply with LSA's time and

attendance policies may be cause for disciplinary action. (See chapter 6 number 2G for donated leave policy).

F.     **Office Closure Due to Inclement Weather or Emergency**.    If severe weather conditions or other emergency circumstances exist, the Executive Director or his/her designee(s) may close an LSA office for all or a portion of a day.  The involved employees shall record the time as paid Administrative Leave.

## 12.    Office Keys and Security Cards

Office keys, security cards, and parking decals for new employees may be obtained from the Supervising or Coordinating Attorney or his/her designee.  No keys may be duplicated without the consent of the Supervising or Coordinating Attorney or the Director of Operations.  Upon ending employment with LSA, all keys, security cards, and parking decals must be returned to the Supervising or Coordinating Attorney or Director of Operations.

## 13.    Use of Equipment and Premises

LSA supplies and equipment, including telephones, are to be used only by LSA staff and for LSA purposes.  LSA allows for *de minimis* personal calls to notify family of safe arrival/late departure.  Any other personal long distance phone calls or cellular phone calls will not be charged to LSA's account.  Supervising Attorneys will ensure that telephone bills for their office are reviewed and charges for personal calls will be reimbursed to LSA.   Employees are responsible for reimbursing LSA for any personal phone charges for which LSA is billed. Personal use of supplies and equipment is strictly prohibited except as provided for in the LSA *Accounting Guide*.   Other exceptions may only be made when authorized by the Executive Director as a professional courtesy and all actual LSA expenses are reimbursed by the user.

## 14.    Computer and Internet Usage

Program computer and internet systems provide valuable tools to help provide high quality, cost effective legal services.  As with our other program equipment, LSA's technology facilities are for job-related duties.  Thus, the use of computers and internet-related services for personal use, other than incidental use, is prohibited.  Further, program computers may not be used for: (1) any commercial or illegal purpose; (2) playing games during business hours; and (3) obtaining or transmitting obscene, pornographic or harassing material.  In addition, employees and volunteers are expected to observe the security provisions of LSA's computer and computer-related systems. Any misuse of Legal Services Alabama hardware or software or related documentation may lead to disciplinary action or discharge.

## 15.    Appearance and Attire

Legal Services Alabama's public image is dependent on staff, individually and collectively. People are inclined to judge organizations by the people who represent them.  The personal appearance, quality of service, and positive attitude of staff are essential to creating and maintaining a positive public image.

**16.     Record Retention and Document Destruction Policy**

Refer to the LSA *Accounting Guide* for LSA's policy on record retention and document destruction.

**17.     Equal Opportunity Policy and Procedure**

**A.     Purpose**

The purpose of the Legal Services Alabama (LSA) Equal Opportunity Policies and Procedures is to assure the right of all persons to work in, participate in, and receive the assistance provided by LSA without regard to race, color, religion, gender, disability, national origin, age, or any other consideration prohibited by law. These policies protect-(1) any person employed by or seeking employment with the program, (2) any person being served by or seeking the assistance of the program, and (3) any person participating in, or seeking to participate in a policy-making, planning, or advisory body of the program.

**B.     General**

The Board of Directors of LSA has the overall responsibility for the Equal Opportunity Policies.

1.     The implementation of these policies is the responsibility of the Executive Director of LSA.
2.     The Executive Director of LSA will review on a continuing basis all aspects of the programs operations to ensure that these policies are being observed and to determine if additional affirmative efforts are necessary.

**C.     Statement of Equal Employment Opportunity Policy and Policy Against Threats, Harassment, and Retaliation**

**Legal Services Alabama is an Equal Opportunity Employer.**

Legal Services Alabama policy strictly prohibits discrimination, retaliation, or harassment on the basis of race, color, religion, sex, national origin, age, disability or any other basis prohibited by law. This Policy applies to recruiting, hiring, promotions, demotions, compensation, raises, benefits, training, facilities, discipline, and all other terms and conditions of employment. *Retaliation against any employee for making a good faith claim of discrimination, retaliation, or harassment is prohibited.*

Legal Services Alabama will reasonably accommodate all disabled applicants and employees as reasonably necessary to aid the employee or applicant to perform the essential functions of the job, provided that no undue hardship is causes to Legal Services Alabama and there is no direct threat to health or safety of themselves or others. All persons with disabilities are invited to notify Legal Services Alabama and participate in an interactive process to determine whether reasonable accommodation without undue hardship is available. All information relating to disabilities will be kept confidential.

Legal Services Alabama strictly prohibits all forms of harassment of employees or applicants for employment (whether by supervisors, co-employees, clients, suppliers, or other persons) on the basis of race, color, religion, sex, national origin, age, disability, or any other basis prohibited by law. Harassment may be verbal, written or physical. *Conditioning employment, promotions, raises, or any other terms and conditions of employment on sexual activities or sexual favors is strictly forbidden.*

Prohibited harassment also includes creation of a hostile work environment on the basis of sex through unwelcome sexual advances or comments, slurs, stereotypes, jokes, pranks, innuendo, graffiti, pictures, gestures, or physical contact of a racial or sexual nature, as well as offensive, demeaning, or vulgar language or actions directed towards employees because of their race or because of their sex. Similar conduct creating a hostile work environment on the basis of religion, national origin, age, disability, or other illegal basis is also prohibited.

LSA maintains a "zero tolerance" policy for all types of harassment and for inappropriate, unprofessional, or offensive conduct (whether on the basis of race, color, religion, sex, national origin, age, disability, or any other basis prohibited by law). Legal Services Alabama policy prohibits all degrees of inappropriate, unprofessional, or offensive conduct, including conduct that may not be sufficiently severe, pervasive, or repetitive to legally constitute harassment under applicable laws. "I was only joking or kidding" will not be tolerated as an excuse.

Legal Services Alabama policy also prohibits all intimidation, threats, or acts of violence committed on company property or by an LSA employee against any other LSA employee (including supervisors and other agents of LSA).

Any employee who believes that he or she is being subjected to prohibited discrimination, retaliation, threats, or harassment, or who witnesses what he or she believes to be such conduct, or who in any way feels uncomfortable with the actions of Legal Services Alabama supervisors, employees, or outsiders, must promptly notify one of the following persons:

| | |
|---|---|
| Executive Director | (334) 264-1739 |
| Director of Operations | (334) 241-8687 |
| Immediate Supervisor | |

**NOTE**: *INDIVIDUALS WHO BELIEVE THAT THEY ARE BEING HARASSED BY A SUPERVISOR ARE NOT REQUIRED TO DISCUSS THE MATTER WITH THE SUPERVISOR. THEY SHOULD NOTIFY THE EXECUTIVE DIRECTOR IMMEDIATELY, OR THE DIRECTOR OF OPERATIONS, OR WHERE APPROPRIATE, THE PRESIDENT OR VICE-PRESIDENT OF THE LSA BOARD OF DIRECTORS.*

If the problem is not immediately resolved to the satisfaction of the employee, he or she **must** then report such dissatisfaction, and his or her earlier complaint to the LSA Board President. Supervisors are **required** to report suspected or alleged violations of this Policy to the Director of Operations and in his/her absence, the Human Resources Coordinator. Legal Services

Alabama policy prohibits retaliation against any employee or supervisor who in good faith brings any discrimination, retaliation, harassment allegation or other suspected violation of this Policy to the attention of Legal Services Alabama.

This policy applies to all LSA officers, supervisors, and managers as well as employees. No Company officer, manager, or supervisor has the authority or power over you to require you to submit to unwelcome sexual advances or unwelcome sexual conduct or to tolerate a hostile work environment. If any officer, manager, or supervisor should ever make such an attempt, you should report it immediately, as outlined above, and Legal Services Alabama will see that (1) the conduct stops; (2) the manager or supervisor is dealt with appropriately; and (3) there is no retaliation against you.

All complaints of prohibited discrimination, retaliation, or harassment, or other conduct prohibited by this Policy will be promptly and thoroughly investigated, and Legal Services Alabama will take appropriate action, including remedial and disciplinary action if necessary, based on the results of the investigation. Complaints will be kept as confidential as possible, subject to Legal Services Alabama's duty to investigate fully and take appropriate corrective action. All employees are expected and encouraged to participate fully and freely in any such investigation, and there will be no retaliation against any employee for truthfully participating in such an investigation.

Violation of this Policy, including its no-harassment and no-retaliation provisions, will lead to disciplinary action up to and including discharge, as appropriate in the circumstances.

D.      **Equal Opportunity in Employment.** It is the policy of LSA to seek and employ qualified persons, to provide equal opportunities in all aspects of employment, and to administer all personnel activities in a manner that will not discriminate against any person because of race, color, religion, sex, disability, national origin, age, or any other consideration prohibited by law.

E.      **Equal Opportunity in the Provision of Legal Services**. It is the policy of LSA to make no distinction in the provision of legal assistance to eligible persons because of race, color, religion, sex, disability, national origin, age, or any other consideration prohibited by law.

F.      **Provision of Legal Assistance**

LSA will not, on the ground of race, color, religion, gender, disability, national origin, age, or any other basis prohibited by law:

1. deny legal assistance to any eligible person;
2. provide legal assistance to a person different in form or manner from that provided to others;
3. treat differently any person in determining whether she or he is eligible for legal assistance;
4. deny a person the opportunity to participate as a member of policy-making, planning, or advisory body; or
5. establish legal services offices at locations with the purpose or effect of excluding persons from the benefits of legal assistance.

G.   **Affirmative Action Goal**

LSA is dedicated to a comprehensive recruiting plan to ensure that qualified candidates of diverse backgrounds are informed of job opportunities and become part of the pool of candidates considered.

H.   **Benefits and Compensation**

All compensation and fringe benefits, including access to training and educational programs for employees of LSA will be determined without regard to race, color, religion, gender, disability, national origin, age or any other consideration prohibited by law.

I.   **Statistical Reports**

To insure compliance with all equal opportunity policies, the Executive Director shall submit to the Grievance/Personnel Committee of the Board quarterly statistical reports of the race and sex of all employees hiring during the quarter for which the report is submitted. In addition to race and sex, the report shall identify each new employee by name, office, position, salary, and effective date of employment. Promotions and effective dates thereof shall also be reported on a quarterly basis.

**18.   Policy Prohibiting Sexual Harassment**

LSA policy strictly **prohibits** all forms of sexual harassment of employees whether by supervisors, co-employees, clients, suppliers, or other persons. *Conditioning employment, promotions, raises, or any other terms and conditions of employment on sexual activities or sexual favors is strictly forbidden.* Prohibited harassment also includes creation of a hostile work environment on the basis of sex through unwelcome sexual advances or comments, slurs, stereotypes, jokes, pranks, innuendo, graffiti, pictures, gestures, or physical contact of a racial or sexual nature, as well as offensive, demeaning, or vulgar language or actions directed towards employees because of their race or because of their sex.

LSA maintains a "zero tolerance" policy for sexual harassment and for sexually inappropriate or unprofessional conduct.  Legal Services Alabama policy prohibits all degrees of sexually inappropriate, unprofessional, or offensive conduct, including conduct that may not be sufficiently severe, pervasive, or repetitive to legally constitute sexual harassment under applicable laws.  "I was only joking or kidding" will not be tolerated as an excuse.

Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal and physical conduct of a sexual nature when:

Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; or

Submission to or rejection of such conduct by an individual is used as the basis of employment decisions affecting such individual; or

3-13

Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

Any employee who believes that he or she is being subjected to sexual harassment or other conduct prohibited by this Policy, or who witnesses what he or she believes to be prohibited sexual harassment of or other prohibited conduct toward another, or who in any way feels uncomfortable with the actions of Legal Services Alabama's supervisors, employees, or outsiders, **must** promptly inform, at his or her choosing, one of the following person:

| | |
|---|---|
| Executive Director | (334) 264-1739 |
| Director of Operations | (334) 241-8687 |
| Immediate Supervisor | |

**NOTE:** *INDIVIDUALS WHO BELIEVE THAT THEY ARE BEING SEXUALLY HARASSED BY A SUPERVISOR ARE NOT REQUIRED TO DISCUSS THE MATTER WITH THE SUPERVISOR. THEY SHOULD NOTIFY THE EXECUTIVE DIRECTOR IMMEDIATELY, OR THE DIRECTOR OF OPERATIONS, OR WHERE APPROPRIATE, THE PRESIDENT OR VICE-PRESIDENT OF THE LSA BOARD OF DIRECTORS.*

If the problem is not immediately resolved to the satisfaction of the employee, he or she **must** then report such dissatisfaction, and his or her earlier complaint to the LSA Board President. Supervisors are **required** to report suspected or reported sexual harassment or other prohibited conduct to the Director of Operations and in his/her absence, the Human Resources Coordinator. *Legal Services Alabama policy prohibits retaliation against any employee or supervisor who in good faith brings any sexual harassment allegation or other suspected violation of this Policy to the attention of Legal Services Alabama.*

This policy applies to all LSA officers, supervisors, and managers as well as employees. *No Company officer, manager, or supervisor has the authority or power over you to require you to submit to unwelcome sexual advances or unwelcome sexual conduct or to tolerate a hostile work environment.* If any officer, manager, or supervisor should ever make such an attempt, you should report it immediately, as outlined above, and Legal Services Alabama will see that (1) the conduct stops; (2) the manager or supervisor is dealt with appropriately; and(3) there is no retaliation against you.

All complaints or reports of sexual harassment or other conduct prohibited by this Policy will be promptly and thoroughly investigated, and Legal Services Alabama will take appropriate action, including remedial and disciplinary action if necessary, based on the results of the investigation. Complaints will be kept as confidential as possible, subject to Legal Services Alabama's duty to investigate fully and take appropriate corrective action. All employees are expected and encouraged to participate fully and freely in any such investigation, and there will be no retaliation against any employee for truthfully participating in such an investigation.

Violation of this Policy Prohibiting Sexual Harassment, including its no-harassment and no-retaliation provisions, will lead to disciplinary action up to and including discharge, as appropriate in the circumstances.

The investigation of sexual harassment complaints shall be conducted under the direction of the Executive Director in a timely manner.

**Investigation Procedure**

A. Whenever an employee feels that she or he has been sexually harassed and/or molested by a co-employee or supervisor, she or he must, in writing, report the incident(s) to the immediate supervisor, Director of Operations or Executive Director in sufficient detail to permit the immediate supervisor, Director of Operations or the Executive Director to initiate an independent investigation of the facts.

B. All such complaints must be reported within 180 days of the last act or occurrence. Within twenty (20) business days from receipt of the complaint, the immediate supervisor or Executive Director or his/her designee must have completed the investigation, written findings, and noticed both the complainant and the alleged wrong-doer of the disciplinary action, if any, which will be imposed.

C. If any party is dissatisfied with the disposition of the complaint by the immediate supervisor, a written appeal may be submitted to the Executive Director. In cases where the Executive Director is the first management employee to receive the complaint and a party is dissatisfied with the Executive Director's decision, such party may appeal directly to the Grievance Committee of the Legal Services Alabama Board of Directors.

D. All appeals to the Executive Director or the Grievance Committee must be made within ten (10) business days from receipt of the notice of findings and disciplinary action imposed. Appeals will not stay any disciplinary action imposed.

E. Upon receipt of any party's appeal, the director of Grievance Committee must conduct an independent investigation of the facts, and issue findings and disciplinary sanctions, if any, within fifteen (15) days.

F. If the original complaint is against an immediate supervisor, then the complaint must be filed with the Executive Director and the procedure outlined in B, C, D, and E above must be followed. If the original complaint is against the Executive Director, the complaint must be filed with the Grievance Committee and the procedure outlined in D and E must be followed except that, rather than appeal to the Grievance Committee, the complainant will file his or her initial complaint with this committee. Further, the 180 day time period for filing a complaint referenced in B still applies.

19.    **Reporting Professional License Complaints**

Alleged misconduct is a concern to LSA as it may give rise to serious issues about LSA's and the involved employee's competence and could effect LSA's malpractice coverage. The purpose of this policy is to ensure that LSA's management is timely apprised whenever serious complaints of a professional nature are made, or criminal conduct.

A.    Reporting Professional License and Bar Complaints.   Any employee who receives a complaint from the Alabama State Bar Association or other professional licensing authority (e.g., notary, CPA, federal court, etc.) which requires a response shall provide a copy of the complaint to the advocate's immediate supervisor within three (3) working days of receipt. The supervisor shall immediately forward the complaint to the Executive Director. If the immediate supervisor is not available, the complaint shall be forwarded directly to the Executive Director.

If the complaint is work-related or involves an LSA client or applicant for services, LSA management shall take appropriate steps to ameliorate or prevent any harm to LSA or the LSA client/applicant. Where deemed necessary, LSA may participate in the complaint or grievance process.

The employee shall provide a copy of the final resolution of the complaint to his/her immediate supervisor who shall promptly provide a copy to the Executive Director. The Executive Director shall forward a copy of any complaint and resolution to the Director of Operations. As this directly bears on the fitness of the employee or his/her lawful ability to fulfill job duties, this policy applies whether the complaint originated from an LSA client/applicant or another source. Only adverse determinations by the licensing authority or personnel actions taken by management predicated on the incident complained of will be placed in an employee's permanent personnel file.

20.    **Solving Work-Related Problems**

Legal Services Alabama seeks to build a shared feeling of pride and commitment to its mission of making equal access to justice for all a reality. This requires that all employees work together to build effectiveness and enthusiasm for LSA's work. It is realized that valid differences will occur in the work place. Usually, the differences may be informally resolved between the employees, co-worker and/or supervisor.

At any time an employee may contact the Operations Director and the Human Resources staff for help in resolving a problem. LSA may impose counseling, training, disciplinary or other action, which, in its judgment, most effectively addresses the problem. The complaining employee will be advised that the matter has been addressed and resolved.

**21.    Drug and Alcohol-Free Workplace Policy**

A.      Legal Services Alabama is committed to providing employees, clients and guests with a drug and alcohol-free legal work environment that is safe, productive, and conducive to the welfare of all.

B.      It is LSA's policy that any unlawful manufacture, distribution, dispensing, possession or use of a controlled or illegal substance, in the workplace is prohibited. Violation of this policy is considered a serious infraction of program policy and will result in disciplinary procedures including termination.

C.      Rehabilitation: Legal Services Alabama staff who are dependent upon controlled substances, other drugs, alcohol, and inappropriate or illegal use of prescription drugs, are encouraged to seek medical help for these problems. Employees seeking rehabilitation are entitled to normal program benefits.

Normal disciplinary procedures based upon inappropriate job behavior related to chemical dependency will not be erased by the employee's enrollment in the rehabilitative process. Rehabilitation will be considered as a factor, however, in evaluating the appropriate discipline for such behavior.

Failure to seek appropriate treatment, to complete rehabilitative programs, relapses, or the failure to document rehabilitative history to the satisfaction and at the request of LSA Management will be considered willful misconduct which may result in immediate termination.

D.      Controlled or Illegal Substance: The term "controlled or illegal substance" means any drug listed in 21 U.S.C. §812 and any other state or federal law that restricts usage of a substance. Generally, these are drugs with potential for abuse. They include "legal drugs" which are not prescribed or which are prescribed but inappropriately used.

E.      Notice of Conviction: Each employee is required by law and program policy to inform LSA's Executive Director in writing within five (5) days after he or she is convicted for violation of any federal or state criminal drug or alcohol statute where such violation occurred on LSA's premises or during the performance of work for LSA. A conviction means a finding of guilt (including a plea of *nolo contendere*) or the imposition of a sentence by a judge or jury in any federal or state court.

F.      Notice to Funding Agency: Within ten (10) days of receiving or otherwise acquiring notice of such a conviction, LSA will, if required by a funding agency, notify the agency, if the employee was directly engaged in work pursuant to the provision of a grant from such agency.

G.      Disciplinary Action: If LSA determines that violation of this policy impairs an employee's ability to carry out their job-related duties, LSA will take appropriate disciplinary action up to and including termination from employment or require such employee to satisfactorily participate in a drug abuse assistance or rehabilitation program approved for such purpose by a federal, state or other appropriate agency.

Further, LSA will take appropriate disciplinary action within thirty (30) days of notification that an employee is convicted of a crime under a statute for drug-related work activity occurring in the workplace or while performing work, or require such employee to satisfactorily participate in a drug abuse assistance or rehabilitation program approved for such purpose by a federal, state or other appropriate agency.

H.     Maintenance of Drug-Free Workplace:   LSA will periodically advise employees of the negative consequences of drug use in the workplace.  Further, employees will be advised of the sources and availability of rehabilitative and social services.

I.     For Cause Testing:   Each  employee, as a condition of continued employment, is subject to medical or physical examination or tests, including urine drug screen and/or a drug screen using hair, at the determination of the Executive Director, providing the following conditions are met:

- If the employee's manager has reasonable cause to suspect that the employee is in violation of this policy; or
- If the employee's job performance is deficient in a manner which suggests a possible violation of this policy.

If an employee tests positive for-cause testing and is determined to be in violation of this policy, the employee will be required to:

- attend a substance abuse program,
- follow the attending physician and/or a qualified substance abuse counselor's guidance,
- agree to random testing over the next 12 months,
- supply LSA with documentation of treatment and/or documentation that no further treatment is necessary,
- agree to remain substance free as a condition of employment,
- be responsible for any cost incurred that is not covered by LSA's medical plan for treatment,
- voluntarily resign if the employee subsequently tests positive for any
- subsequent illegal or un-prescribed substance and or being   under the influence of alcohol

Any adulterated specimen will be viewed as falsification and will result in immediate termination.

Any employee who refuses to submit to drug testing will be considered to be insubordinate and will be terminated.  Additionally, if an employee refuses to submit to or cooperate with a post-accident blood or urine test, he/she may forfeit his/her right to recover workers' compensation benefits.

LSA recognizes that drug abuse and/or dependency are medical/behavioral conditions that can be successfully treated.   Employees with drug problems are encouraged to request assistance; however, a request for assistance does not excuse the employee from violation of this policy.

3-18

J.      Employee Notice of Policy:  All employees are to be made aware of this policy by being provided a copy of the policy and all employees are required to read the policy and acknowledge receipt and reading of the policy provided by LSA.

**22.    Whistle-Blower Protection**:  If any employee, volunteer, or board member reasonably believes that some policy, practice, or activity of LSA (be it financial or otherwise) is in violation of the law, a clear mandate of public policy, or ethical standard, a written complaint shall be filed by that employee with either the Executive Director or Board President at the discretion of the concerned employee.  The complaint may be anonymous and it will be kept as confidential as practicable.   The Executive Director or Board President shall investigate or cause to be investigated the wrongful activity, memorialize the results of the investigation in writing, and take corrective action if appropriate.

Concerns should be reported that are either (1) good faith questions regarding the legality or propriety of any action taken by one of LSA's officers, directors, employees or agents; or (2) a good faith belief that some action needs to be taken for LSA to be in compliance with laws, polices, or ethical standards.

LSA will not retaliate against an employee, volunteer, or board member, who, in good faith, has made a protest or raised a complaint or threatened to do so with LSA or a public body including law enforcement, against some policy, practice, or action of LSA or any entity with which LSA has a business relationship, on the basis of a reasonable belief that the practice is in violation of the law, a clear public policy, or ethical standard.

This policy was adopted to ensure whistleblower protection as required by the Sarbanes Oxley Act (in particular 18 USC §1107) and the Legal Services Corporation.  At a minimum, notice of this policy shall be given to all employees and board members by providing a copy of this Employee Handbook and making the Handbook a part of each LSA office's library for access by the public and volunteers.  A copy of the Handbook shall be posted on the LSA intranet.

**23.    Smoking Prohibition**

Smoking is prohibited in all LSA offices.

**24.    Policy concerning Personal Relationships Between LSA Staff and Clients**

LSA is committed to the highest standards of integrity and professionalism in its work, the respect it shows its clients, and its image and reputation among members of the bench and bar, and in the communities it serves.  This policy is intended to ensure a professional relationship between LSA staff members and the clients they represent.

A.    **Statement of Policy**

1.    No LSA employee shall initiate, encourage, engage in, or attempt to engage in a dating, amorous, sexual, or intimate personal relationship with any current or former LSA client within two years following the completion of LSA's representation of the client.

2.    The only exception to the above-stated policy is the situation when the relationship began prior to and is continuing at the time the client first seeks legal assistance or representation from LSA. In cases that fall within the scope of this narrow exception, the LSA employee who is maintaining the ongoing relationship with the client shall immediately notify his or her supervisor of the existence of the relationship.

    a.    In no case shall an LSA employee represent or otherwise assist in representing the client with whom he or she is maintaining the ongoing relationship that is excepted within the terms of this policy.

    b.    When an employee notifies his or her supervisor of the existence of a relationship within the scope of this exception, the supervisor shall analyze the likely impact that the case may pose to the office and shall make a decision on whether it is prudent for LSA to extend in-house representation, representation through a PAI or VLP referral, or to decline representation all together.

    c.    In any event, a report of any case that is either accepted or rejected pursuant to this policy shall immediately be forwarded to the Executive Director and to the Director of Advocacy.

B.    **State of Disciplinary Actions for Policy Infractions**

Any knowing violation of this policy shall be deemed a major infraction within the terms of LSA's Employment Standards and any employee found in violation therof will be  subject to disciplinary action pursuant to the policies and procedures therein.

**25.    Policy concerning Representation of LSA Staff or Their Relatives**

LSA is committed to the highest standards of integrity and professionalism in its work, the respect it shows its clients, and its image and reputation among members of the bench and bar, and in the communities it serves.  This policy is intended to ensure a professional relationship between LSA staff members and the clients they represent.

A.    **Statement of Policy**

    1.    Any LSA employee, who becomes aware that a relative by blood or marriage is seeking representation in the office in which the employee works, shall immediately inform the supervising attorney of this fact.

    2.    In no case shall the LSA employee represent or otherwise assist in representing the client with whom he or she has a relationship as set forth in this policy.

    3.    In no case shall an otherwise eligible LSA employee or the otherwise eligible relative of an LSA employee be accorded preferential consideration over other potential clients concerning the scheduling of appointments, the acceptance of his or her case, LSA's policies on the priority of Core cases, or the expenditure of any LSA resources.

    4.    If the case of an otherwise eligible LSA employee or otherwise eligible relative of an LSA employee is accepted for representation as set forth in this policy, the Supervising Attorney and the Director of Advocacy (or his or her designee) shall analyze the likely impact that in-house representation will have on the local office and determine whether it is prudent for LSA to direct representation, representation through a PAI or VLP referral, or to decline representation all together.

    5.    In any event, a report of any case that is either accepted or rejected pursuant to this policy shall immediately be forwarded to the Executive Director and to the Director of Advocacy.

B.    **State of Disciplinary Actions for Policy Infractions.**

Any knowing violation of this policy shall be deemed a minor infraction within the terms of LSA's Employment Standards and any employee found in violation thereof will be subject to disciplinary action pursuant to the policies and procedures therein.

# Chapter 4    COMPENSATION

## 1.    General Policy

Employees of LSA shall be compensated on the basis of salary policies and procedures in effect at the time.

It is LSA's policy to comply with the Fair Labor Standard's Act (FLSA) requirements. Therefore, we prohibit all company managers from making any improper deductions from the salaries of exempt employees. We want employees to be aware of this policy and that LSA does not allow deductions that violate the FLSA.

If you believe that an improper deduction has been made to your salary, you should immediately report this information to the Director of Operations.

Reports of improper deductions will be promptly investigated. If it is determined that an improper deduction has occurred, you will be promptly reimbursed for any improper deduction made.

## 2.    No Retaliation Policy

No person shall be penalized or subjected to retaliation for filing a complaint of improper deduction or for cooperating in the investigation of such a complaint.

## 3.    Overtime Policy

It is the policy of LSA that all work be accomplished within the normal workweek. However, in the interest of quality legal services, any employee may be required to perform his or her duties outside of regular office hours.

    a. Overtime work for non-exempt employees must be requested by a supervisor and must be authorized *in advance* by the Executive Director or the Director of Operations. Overtime pay shall be in compliance with the Fair Labor Standards Act.

    b. Employees classified as exempt are not entitled to overtime pay or compensatory time.

    c. All time worked must be recorded and will be paid as either regular time or overtime, as appropriate.

## 4.    Time Sheets

Each employee shall fill out a Time and Attendance Record, submit it to the appropriate supervisor for approval, and submit it to Central Office/Accounting. Time sheets may be faxed in, and the originals mailed. (See Appendix A, LSA Form 4-1).

5.   **Pay Periods**

Payday is every other Friday (except when holidays intervene).  Employees turn in their two-week Time and Attendance Record form on one Friday, and are paid for that pay period on the following Friday.  Paychecks will not be authorized until an employee's Time and Attendance Record has been received and approved.

6.   **Statement of Earnings**

Each employee will receive a yearly statement of earnings.  The yearly statement of earnings is known as a W-2 with holding statement, which provides the amount earned and the taxes that have been withheld.  The W-2 will l   issued in January each year for use in filling income tax forms.

7.   **Direct Deposit**

All LSA employees are strongly encouraged to utilize the option of direct deposit.  Each employee will receive a stub, which will itemize pay and deductions in detail.  Any questions regarding direct deposit should be directed to the payroll /accounting department.

8.   **Salary Advances**

Advances on salary will be given only in emergency situations and only upon written request.  Advance amounts will be limited to one (1) payroll period, and will further be limited to the amount needed to cover the emergency (unless the paycheck has already been cut).  Such request must be submitted to the Director of Operations for approval, and must state the emergency situation for which the salary advance is needed.  No more than two (2) salary advances per calendar year may be given.

9.   **Garnishments**

LSA respects every employees right to privacy with regard to personal and confidential information.  However, LSA may be required, by law to withhold a portion of your pay if served with a court notice of a garnishment, wage assignment, wage deduction or government levy.  When situations such as this occur LSA's payroll/accounting department will notify you of any pending action involving such matter that requires a wage with holding situation.

# Chapter 5    TRAVEL REIMBURSEMENT

1.    **Allowable Transportation Expense**

a.    When an employee uses a private automobile in the conduct of LSA business, s/he may be reimbursed for his/her transportation expenses at the **IRS-approved standard mileage rate**. Travel between an employee's place of residence and his/her office cannot be considered official travel. LSA will not pay for any traffic citations--moving, standing or parking. No additional reimbursement is made for auto insurance, repairs, depreciation, etc., but employees may be reimbursed for miscellaneous expenses such as toll charges, local phone calls, parking meter or lot expenses, and local carfare.

b.    If forms of transportation other than a personal auto are used, actual cost is the basis of reimbursement. The form of transportation used should be the least expensive consistent with good sense--ordinarily less than first class on commercial carriers. The least expensive form need not be used where loss of time or effectiveness is disproportionate to the monetary saving. In case an employee, for his/her own convenience, travels by an indirect route or interrupts travel by direct route, the extra expense will be borne by the employee.

c.    Travel by taxi from an airport to a destination and vice versa is prohibited except where no more economical means of transportation is available or in circumstances where an employee would have reasonable concerns about safety, missing a flight or public transportation would be significantly burdensome due to health or other considerations, such as transporting luggage, boxes, etc.

d.    Rental car. LSA will reimburse for the use of a rental car for LSA business only in those circumstances where the use of a rental car is the least expensive mode of travel. LSA business does not include travel to/from home to work. Least expensive form of travel includes all costs associated with the acquisition, use and return of a rental car from a commercial entity. "Costs" include, but are not limited to, travel to/from the rental company, any claim by an employee for overtime compensation. The employee must show that the costs associated with the rental car, including gas and tax, are more cost effective than the use of a privately owned automobile reimbursed at the IRS-approved standard mileage rate. Carpooling is encouraged among employees when using a rental car. LSA will not reimburse employees for additional insurance coverage or additional benefits offered for the use of a rental car (such as, but not limited to, the rental company filling the gas tank upon return of the automobile). The employee assumes sole responsibility for any damage to or for any incident of damage incurred during the use a rental car. LSA does not pay for automobile insurance coverage.

2.    **Per Diem**

An employee is eligible for per diem only if authorized travel necessitates his/her being away from both the city of his office and/or residence for overnight travel. The employee is then eligible to receive per diem for the entire period of the trip involved. Per diem is paid at the rate

of $30.00 per day in-state and $50.00 per day out-of-state. A period is defined as the time official travel starts and ends.

In computing per diem, the following rule applies: When using a private auto, an airplane, bus or other commercial carrier for transportation between office or home and destination, official travel begins at the time the employee leaves his/her home or office and ends when s/he returns to his/her home or office.

**3.     Lodging - Actual Cost**. LSA will pay for the actual cost of lodging for an employee who is on official LSA business within or outside Alabama for which payment is deemed necessary as part of the travel. When traveling within Alabama to Mobile, Montgomery, Huntsville or Birmingham on LSA business, employees will lodge at the "direct bill" hotel/motel designated by LSA. The only exceptions shall be when lodging at a direct bill hotel is unavailable or when attending a conference/training and staying at the conference/training hotel. The Executive Director's Assistant maintains a list of direct bill facilities used by LSA. If an employee must travel overnight to Mobile, Montgomery, Huntsville or Birmingham, the employee will contact the designated individual. The Executive Director's Assistant makes the arrangements for the Executive Director and the Regional Directors meetings and the Director of Advocacy's Assistant makes the arrangements for the Director of Advocacy, the Advocacy Directors and practice group meetings. The assistants will make the employee's lodging arrangements at a direct bill hotel. LSA will reimburse for valet parking only if no other parking is available within a reasonable safe distance from the overnight accommodation. Additional costs of room service must be figured into the per diem rate and in no case will charges attributable to room service and exceeding the per diem rate be reimbursed or covered. LSA will not pay for any hotel accommodation charges in excess of the direct-bill rate if an employee elects not to lodge at the LSA designated direct-bill facility—unless the facility is the conference or training hotel. In any event, if an employee elects to lodge at a facility which is less expensive than the direct-bill facility, the employee will not be compensated for the difference in lodging rates.

**4.     Travel Reimbursement Forms**

The <u>Local Travel Expense Statement</u> should be completed in ink by an employee who 1) has used a private auto for official travel and 2) has not qualified for per diem. All relevant blanks on the statement must be filled in appropriately and any necessary receipts attached before reimbursement will be made. Casehandlers will attach a copy of their daily time keeping records to the statement. (See Appendix A, LSA Form 5-1).

The <u>Extended Travel Expense Statement</u> should be completed in ink after travel by an employee who 1) has used a carrier other than private auto or 2) has qualified for per diem. All relevant blanks on the statement must be filled in and all necessary receipts attached before reimbursement will be made. When mileage reimbursement is sought, distances between points of travel will be as shown in standard highway mileage guides, or an explanation will be attached. (See Appendix A, LSA Form 5-2).

<u>Extended Travel Authorization</u>  The Executive Director, Director of Operations and the  Director of Advocacy must approve all out-of-state travel. It is necessary that the travel authorization

form relating to any given trip be approved prior to the incurring of expenses. (See Appendix A, LSA Form 5-3).

## 5.    Travel Advances

Travel advances may be made _if time is available_ for Operations Services processing. A travel advance is secured by completing a Travel Authorization form, forwarding it to LSA Accounting Services, allowing at least two (2) full working days for processing, and time for the advance travel check to be returned by mail. Travel advances must be accounted for by submitting a Travel Expense Statement within one (1) week after the trip is made, or the advance will be deducted from the employee's wages. Travel advances will be allowed only be allowed for local travel when the employee demonstrates a need in writing, and properly approved by the employee's supervisor and the Director of Operations.

## 6.    Travel Reimbursement to LSA Board Members

LSA Board members may be reimbursed in the same manner as LSA employees, with two exceptions:

   a) the per diem is paid without the requirement of overnight travel status;

   and

   b) the per diem rate for non-attorney Board members is $30.00 per day.

Non-attorney board members are eligible for travel advances. Attorney board members are eligible for reimbursement of travel expenses after travel is completed and upon receipt of completed travel reimbursement forms and appropriate documentation.

# Chapter 6   LEAVE BENEFITS

1.    **Holidays**

A.    **The following holidays are recognized by LSA as paid employee holidays:**

New Year's Day (January 1)
Dr. Martin Luther King (Third Monday in January)
Memorial Day
Independence Day (July 4)
Labor Day (First Monday in September)
Veteran's Day (November 11)
Thanksgiving Day and the following Friday
Christmas Eve and Christmas Day (December 24 and 25)
Each office shall designate two floating holidays for the office

Holidays that fall on a Saturday will be scheduled for the preceding Friday and those that fall on a Sunday will be scheduled for the following Monday.

B.    **Holidays During Earned Time Off (ETO)**

Holidays occurring when an employee is on Earned Time Off (ETO) will not be charged ETO against the employee's accrued ETO.  Employees will not be paid for holidays occurring during a leave of absence without pay.

Employees leaving LSA will not be paid for a holiday falling on their termination date; the employee must be on the payroll the workday before and after a holiday in order to be paid for the holiday.

2.    **Earned Time Off** (Effective January 1, 2006).

A.    **Accrual of Earned Time Off**:  All eligible employees shall accrue Earned Time Off.  See Employee Classification, *Employee Handbook of Legal Services Alabama*.

1.    An employee begins to earn and accrue Earned Time Off with pay from their date of hire.

2.    An employee accrues Earned Time Off at the rate of 2.5 days for each full month of service for a total of thirty (30) days per year for the first two years of employment.

3.    An employee accrues Earned Time Off at the rate of 2.93 days for each full month of service for a total of thirty-five (35) days per year from the beginning of the third year of employment.

Effective January 1, 2006, all vacation and/or ETO will be referred to as Earned Time Off ("ETO").

B.   **Treatment of vacation/ETO caps.**

ETO will be capped annually at 1,040 hours for <u>all</u> LSA employees effective January 1, 2006.

C.   **Payment for accrued ETO at time of termination.**

LSA eligible employees, upon termination of employment from LSA <u>and</u> having given the proper and required notice, may receive payment of no more than thirty (30) days [240 hours] of accrued Earned Time Off at the time of termination. There will be <u>no</u> compensation for any leave deposited in the employee's sick leave bank. Failure to provide the required termination notice will result in the forfeiture of any payment for unused ETO. See the *Employee Handbook of Legal Services Alabama, Inc.*

D.   **ETO cap treatment and the Sick Leave Bank**.

While carryover that an employee can use for any kind of leave from one calendar year to the next is capped at 240 hours, an employee may deposit ETO hours in excess of 240 hours up to and including 1040 hours remaining at the end of the calendar year in the employee's sick leave bank. The hours in the sick leave bank may be used for: an employee's personal illness, if the employee is primary caretaker for an immediate family member who is critically ill, or may be donated to another employee who is ill or who is the primary caretaker for an immediate family member who is critically ill and qualifies under the donated leave policy. There is no sick leave bank cap. The hours deposited into the sick leave bank are <u>not</u> compensable to the employee in any way for any reason at any time.

E.   **Use and Approval of Earned Time Off**.

Employee requests for approval of taking Earned Time Off should be made in writing to the immediate supervisor at the earliest time possible. A copy of the request and approval should be retained by the employee to verify approval of the leave when submitting a time and attendance report. Leave requests for five days or more should be made not less than one week in advance. Employees are encouraged to include alternative choices for ETO (leave) dates.

Every effort should be made to grant leave requests. However, ETO cannot be allowed to interfere with office or unit operations. All employees should check to see if there are any office scheduling conflicts before scheduling ETO.

F.   **Carryover and Pay for Earned Time Off**.

Employees may not carryover more than 240 hours of ETO from one calendar year to another. Employees are entitled to payment for accrued leave up to the cap of 240 hours when dismissed or upon resignation. However, payment of ETO upon resigning is dependent upon giving required notice unless notice has been waived by the Executive Director because of

extraordinary circumstances. When resigning with less than required notice, the employee shall forfeit ETO.

G.    **Donation of Earned Time Off**

When an employee's own illness or that of an immediate family member for who the employee is the primary caregiver has or is expected to exhaust all of that employee's accrued ETO and any advance ETO which that employee may receive, the employee may apply to their immediate supervisor for a donation of accrued ETO from other employees. The immediate supervisor will confirm that the requests falls within this section and will also comply with any HIPAA requirements.

The employee and immediate supervisor **will** develop a short statement for circulation to all LSA offices describing the employee's need for donated ETO and the estimated amount needed. The immediate supervisor will then forward, **for approval**, the request and statement to the Executive Director for final request approval. After the Executive Director approves the request, the Executive Director will publish the statement seeking donated leave for the employee.

All donations will be strictly voluntary. Employees desiring to donate ETO will inform their immediate supervisor and the Executive Director of their desire to donate leave and will include the number of hours to donate. Appropriate record keeping steps will be taken to record the transfer. Appropriate steps will be taken to ensure the identity of those persons donating (or not donating) ETO will be kept confidential, except for voluntary disclosures by such employees to the employee requesting donated ETO.

An employee may donate up to thirty days (240 hours) ETO per calendar year. For donation and accounting purposes, each employee's ETO will be considered equivalent to every other employee's ETO.

No donated ETO may be used until all accrued ETO and advanced ETO (if allowed) is exhausted. No recipient employee who used donated ETO will be required to "pay back" such ETO either to LSA or the donating employee(s). Donated ETO not used by the recipient before termination of the illness will be returned pro rata to the donors. Provided, that a recipient employee may elect to have all or a portion of future accrued ETO transferred pro rata to the donors.

H.    **Termination of Employment and ETO**

Employees leaving LSA may not take ETO on their last day of employment unless they have received permission from the Executive Director and arranged to conduct all exit activities before last day of work. The termination date will be the last day worked. To be on ETO is understood to mean that an employee will return to work.

I.   **Advanced Earned Time Off**

Advance of Earned Time Off is discouraged; however, upon written recommendation from the employee's immediate supervisor and in extreme cases, the Director of Operations may authorize an advance of up to ten (10) workdays of ETO.   However, if the employee terminates employment while owing ETO, such amount will be deducted from the employee's final paycheck.   Such leave will be authorized only if the employee has demonstrated good work performance and has indicated that s/he intends to remain in the employ of LSA.

**3.   Nonbalance-based Leave**

A nonbalance-based leave policy is one in which time off is available but no balance is maintained.

A.   **Jury Duty**

When summoned for jury service, the employee must submit a copy of the summons to the immediate supervisor.   While actually serving on jury duty, the employee shall be eligible to receive paid time off for this purpose for a maximum of twenty (20) working days with no loss of accrued Earned Time Off.

B.   **Military Leave**

An employee who must take leave due to military obligations shall request such leave from their immediate supervisor and notify the Executive Director.   Such notice should be made at the earliest opportunity after receiving orders to report.   The employee shall follow all statutory requirements regarding time limits to return to LSA.   LSA will ensure compliance with federal and state laws regarding reinstatement and benefits.

C.   **Bar Exam Leave**

An employee who is eligible to sit for the Alabama State Bar Examination for the first time may be granted 120 hours of Administrative Leave to prepare for and take the examination.   This leave is only given to first-time examination attendees.   Leave may be given only upon the prior written approval of the immediate supervisor and the Executive Director.

D.   **Funeral Leave**

Leave with pay, not to exceed three (3) days, will be approved for an employee in the event of death in his/her immediate family (see Chapter 2, Paragraph 4 for listing of immediate family).

4.   **Court appearance under court order or subpoena**.

A.   **Court appearance as a litigant**

An employee is entitled to take ETO necessary to appear in court as a litigant. Such leave will be ETO. If the employee's accrued ETO has been exhausted such leave will be "leave without pay."

B.   **Witness Duty**

An employee is entitled to take ETO with pay to testify as a witness in a court or administrative proceeding if he/she has received a subpoena. Such leave will be ETO. If the employee's accrued ETO has been exhausted such leave will be "leave without pay."

5.   **Leave Without Pay**

Leaves of absence without pay, for valid reasons, may be granted to an employee when requested in writing, upon recommendation the employee's immediate supervisor, and with the final approval of the Executive Director. The length of time for leave without pay may not exceed three (3) months. Any extension of such leave may be granted by the Executive Director for a period not to exceed an additional three (3) months and in accordance with the procedure set forth above. Leave of absence without pay will normally not be approved when an employee has accrued ETO to cover the absence with pay. Because of the difficulties presented to LSA by long absences of employees, requests will be evaluated carefully and granted on a case-by-case basis. Where an employee is placed on leave without pay status, s/he will not accrue benefits of time in service during a leave of absence, and will return at the same rate of pay as when the leave began.

LSA will grant an employee any leave without pay, which is required by law.

6.   **Election Day**

Employees are encouraged to exercise their right to vote at the polls either before or after work. Earned Time Off may be used for voting by employees who choose to vote during normal working hours.

# Chapter 7    OTHER BENEFITS

### 1.    Organizational Memberships - Payment of Dues

LSA is restricted from using any funds provided by the Legal Services Corporation (LSC) to pay membership fees or dues to any private or non-profit organization, whether on behalf of LSA or an individual employed by LSA. A membership fee or dues payment is a payment to an organization on behalf of the program or an individual employed by the program to be a member of the organization, or to acquire voting or participatory rights in the organization.

LSC funds can and will be used by LSA to pay annual Alabama State Bar membership fees or dues on behalf of LSA attorneys as membership fees or dues are mandated by the Supreme Court of Alabama as a requirement of the practice of law in Alabama.

LSA will pay notary public fees, as these fees are necessary for an employee to become a notary public.

### 2.    Supplemental Insurance Coverage

LSA maintains a $10,000.00 group life/AD&D policy on all regular full-time employees. All employer-paid insurance benefits are contingent upon budgetary limitations.

Employees may participate in supplemental insurance plans offered, such as, long term disability (LTD), short term disability (STD), dental, vision, and voluntary term life insurance. Detailed information regarding the plan and enrollment can be obtained from the Human Resources Department and/or through the LSA portal.

### 3.    Healthcare

LSA presently maintains a group healthcare plan for full-time employees working thirty hours or more a week. LSA pays 100% coverage for the employee and 50% coverage for dependants which is subject to change as this percentage is determined by the LSA Board of Directors, if program funding permits. Employees designating dependent coverage are responsible for payment of their share of the dependent premium as well as all of their own and dependent's medical bills. Payment of employee medical bills is not the responsibility of LSA.

LSA has a Section 125(b) cafeteria plan. An open-enrollment period will be announced in accordance with the Plan. For more information, contact the Human Resources Department or visit the LSA portal.

### 4.    Worker's Compensation

A.    Coverage: LSA maintains Worker's Compensation coverage for full time and otherwise eligible employees. The coverage is the amount and extent required by Alabama's Workmen's Compensation Act, Title 25, Code of Alabama, 1975, Section 25-5-1, et seq.

All eligible employees are covered from their first day of employment for all injuries arising out of and in the course of their employment. For information regarding Worker's Compensation, please contact the Human Resources Department and/or the Director of Operations.

B.  Claims Notification:  Any employee injured must report the injury immediately to the employee's immediate supervisor and the Director of Operations or Human Resources Department. Failure to report an injury promptly can result in the loss of benefits.

## 5.  Unemployment Compensation

Employees are covered by the State of Alabama Unemployment Compensation Law, Title 25, Code of Alabama, 1975, Section 15-4-1, et seq., and are subject to all rules and regulations pertaining thereto. For information regarding Unemployment Compensation, please contact the Human Resources Department and/or the Director of Operations or visit the LSA portal.

## 6.  Social Security and Medicare

Payroll deductions are made at the combined Social Security and Medicare tax rate. LSA matches the employee's tax contribution.

## 7.  Supplemental Retirement Plan

LSA offers a tax-deferred retirement plan which employees may make their own contributions for their retirement. Subject to the availability of funds, LSA may make employer contributions to individual accounts in an amount to be determined by the Board of Directors. For information regarding the Supplemental Retirement Plan, please contact the Human Resources Department and/or the Director of Operations or visit the LSA portal.



# LEGAL SERVICES ALABAMA
## Time and Attendance Record

FIRST NAME _____        LAST NAME _____

_____ OFFICE _____

PAY PERIOD ENDING _____

| PAY PERIOD | | SAT | SUN | MON | TUE | WED | THU | FRI | SAT | SUN | MON | TUE | WED | THU | FRI | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | |
| **HOURS WORKED** | PAI/PBI | | | | | | | | | | | | | | | |
| | CDBG | | | | | | | | | | | | | | | |
| | HUD | | | | | | | | | | | | | | | |
| | AGING | | | | | | | | | | | | | | | |
| | ADECA | | | | | | | | | | | | | | | |
| | *BIRMINGHAM CAMPAIGN (DOMESTIC VIOLENCE) | | | | | | | | | | | | | | | |
| | AMERICORPS DISASTER | | | | | | | | | | | | | | | |
| | ALL OTHER HOURS (LSC) | | | | | | | | | | | | | | | |
| **HOURS OFF** | HOLIDAY | | | | | | | | | | | | | | | |
| | EARNED TIME OFF | | | | | | | | | | | | | | | |
| | SICK LEAVE | | | | | | | | | | | | | | | |
| | ADMINISTRATIVE LEAVE | | | | | | | | | | | | | | | |
| | OTHER LEAVE WITH PAY | | | | | | | | | | | | | | | |
| | LEAVE W/O PAY | | | | | | | | | | | | | | | |

**I certify the information reported is correct.**

_____        _____
Date                                          Signature of Employee

**Reviewed and Approved:**

_____        _____
Date                                          Signature of Supervisor
*Birmingham

LSA Form 4-1                                        OPR: LSA Finance
                                                   Date: 07/06



## Legal Services Alabama

### 'LOCAL TRAVEL EXPENSE STATEMENT

Mileage reimbursement is requested for travel on official business for month of _____, 20_____ .
**Reimbursement must be requested within 15 days after the end of the month in which the travel was incurred.**

Requestor _____     Office _____

| DATE | TOTAL MILES DRIVEN | DESTINATION AND PURPOSE |
|------|--------------------|-------------------------|
|      |                    |                         |
|      |                    |                         |
|      |                    |                         |
|      |                    |                         |
|      |                    |                         |
|      |                    |                         |
|      |                    |                         |
|      |                    |                         |

Total Amount Due $_____

_____     _____
Signature of Requestor                Signature of Supervisor
Date: _____               Date_____

_____
Director of Operations        OPR: LSA Finance
                              Date: 07/06

LSA Form 5-1

 LSC

# LEGAL SERVICES ALABAMA
## TRAVEL EXPENSE STATEMENT

Traveler _____   Date _____   Office _____

I.   PURPOSE OF TRAVEL: _____

II   ITINERARY

| Departure Date | Hour | From | To | Date | Arrival Hour | *Mode of Travel |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

*Indicate Car/Bus/Air/Train/Car Pool

III.   TRANSPORTATION
Car: Number of Miles _____ @ _____ per Mile      $_____
If driver, list passenger/s_____
If passenger, list driver _____
Air/Bus/Train: (attach unused copy of ticket)      $_____

IV.   LODGING (attach receipt)

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

Total Lodging   $_____

V.   OTHER EXPENSES (specify and itemize, do not claim tips related to meals) (RECEIPTS MUST BE ATTACHED

_____

Total Other Expenses   $_____

TOTAL COST   $_____
Amount of Travel Advance   $_____
Reimbursement Requested   $_____

I certify that this statement and attachments are true, correct, and complete to the best of my knowledge and belief, and the
payment for the amount claimed for reimbursement has not already been received.

Date _____      Signature of Traveler _____

Date _____      Approved/Disapproved_____
                                                         Supervising Attorney or Supervisor

Date _____      Approved/Disapproved_____
                                                         Director of Operations

FOR ACCOUNTING DEPARTMENT USE ONLY

NOTE:  Per Diem is determined based on the start travel and end travel dates provided by Employee

In-state per diem = $30.00 per day      $_____
Out-of-state per diem = $50.00 per day      $_____

TOTAL TO EMPLOYEE  $_____

LSA Form 5-2

OPR   LSA Finance
Date  07/06

 LSC

# LEGAL SERVICES ALABAMA

## TRAVEL AUTHORIZATION

1. Traveler _____ Date _____

   Office _____

   Purpose and Dates of Travel _____

   Hotel Name and City _____

2. Mode of Travel: (circle one)
   • • Personal Car          • • Car Pool          • • Train          • • Bus          • • Airline

3. Time in Travel Status:

   Departure from _____        to _____
                     (city)                                                         (city)

   Departure Time and Date _____

   Return Time and Date _____

4. Estimated Expenses
   Common Carrier (Plane/train/bus) _____                              $_____

   Mileage @ _____ per mile _____               =               $_____

   Per diem @ $30 in state or $50 out of state                              =               _____

   Hotel $_____ per night x _____ nights                              =               $_____

   Registration/conference fees                              =               $_____

   Other: (specify) _____                              =               $_____


   • •ADVANCE TO COVER TRAVEL EXPENSES REQUESTED               TOTAL          $_____


                                     Amount advanced to traveler          $_____

Traveler authorizes L.S.A. to deduct from his/her paycheck, the full amount of any advance expenditures which are not properly accounted for with a Travel Expense Statement within one week of my return.


Date _____          Signature of Traveler _____


Date _____          Approved/Disapproved _____
                                              Supervisor


Date _____          Approved/Disapproved _____
                                     Executive Director or Director of Operations


**LEGAL** ALABAMA

## DONATED LEAVE FORM

I, _____ ____ ____wish to donate as a direct grant to

_____ _____the following number of Earned Time Off (ETO) hours.

_____.

I understand that during a 12-month period I cannot donate more than 240 hours of ETO to other

employees.

DATED this ___ day of _____, 200____.


_____

SIGNATURE. EMPLOYEE DONATING ETO

APPROVED/DISAPPROVED:


_____

EXECUTIVE DIRECTOR

Dated: _____

OPR:  LSA HR
Date: 07/06

| | LSA Interview and Hiring Policy | | | | |
|---|---|---|---|---|---|
| Event | Action | Responsibility | | | |
| 1.  Vacancy identified. | | Immediate Supervisor | | | |
| | Notify HR department of pending vacancy | | | | |
| | | | | | |
| 2.  Prepare vacancy announcement | | HR | | | |
| | a.  position | | | | |
| | b.  minimum qualifications | | | | |
| | c.  starting salary | | | | |
| | d.  requested documents | | | | |
| | e.  name and address to submit requested documents | | | | |
| | f.  close out date | | | | |
| | g.  company's equal opportunity statement. | | | | |
| | | | | | |
| 3.  Submit job announcement for approval to Operations Dir. | | HR | | | |
| | | | | | |
| 4.  Review for standardization | | DO | | | |
| | Review for compliance with LSA policy | | | | |
| | | | | | |
| 5. Vacancy announcement published | | | | | |
| | a.  Posted on intranet | Info. Services | | | |
| | | | | | |
| | b.  Posted in newspaper(s), local bar assoc. and law schools | HR | | | |
| | Director I and II positions (Dir., Adv.Dir, Reg. Dir.) | Exec. Asst. | | | |
| | Supervising Attorney & Central Office Staff | HR | | | |
| | Staff Attorney, field office support staff, paralegals | Local office Asst | | | |
| | | | | | |
| 6.  Interview committee | | | | | |
| | a.  Identify members of interview committee | Executive Team | | | |
| | b.  Interview team composition is determined as follows: | | | | |
| | - Directors (Dev./Com, Adv.Ops) | Executive Director selects team | | | |
| | - Regional Directors:  Exec. Director, Dir. for Advocacy, Ops Dir. | | | | |
| | - Advocacy Directors:  Exec. Director, Dir. for Advocacy, Ops Dir. | | | | |
| | - Supervising Attorneys:  Dir. for Advocacy or designee. Ops Dir. Regional Dir. | | | | |
| | - Field office attorneys, paralegals, support:  Supervising Attorney, Regional Dir. | | | | |
| | c.  Identifies committee chair and notifies Exec. Asst. HR Asst, or Office Asst., as applicable | | | | |
| | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 7.  Receive resumes/applications | | HR | | | |
| | | | | | |
| | a.  Receive resumes | HR | | | |
| | b.  Verify attorneys are licensed in Alabama | HR | | | |
| | c.  Sends hiring package to Interview Committee Chair | HR | | | |
| | - Position announcement and position description | | | | |
| | - Sample hire letter | | | | |
| | d.  Assembles and sends resumes to Interview Committee | Local office Asst | | | |
| | | | | | |
| 8.  Schedule interviews | | Interview Committee Chair | | | |
| | | | | | |
| 9.  Conducts interview | | Interview Committee Chair | | | |
| | | | | | |
| 10.  Committee makes recommendation to Executive Director | | Interview Committee Chair | | | |
| | a.  Prepare memorandum to Executive Director | | | | |
| | | | | | |
| 11.  Hiring Decision | | | | | |
| | a.  Receives and reviews recommendation(s) | ED | | | |
| | b.  Selects candidate and determines hiring salary | ED | | | |
| | c  Notifies Interview Committee Chair and HR | ED | | | |
| | | | | | |
| 12.  Notification | | | | | |
| | a.  Hiring Letter prepared:  start date, position, starting salary | Interview Committee Chair | | | |
| | b.  Notifies HR of nonselects for interview and nonselects following interview(s) | Interview Committee Chair | | | |
| | b.  Nonselection letter(s) prepared and mailed | HR | | | |
| | | | | | |
| 13.  Forward all applications/resumes to Central Office Human Resources Department for retention | | Interview Committee Chair | | | |
| | | | | | |
| 14.  Retain all application/resumes in accordance with records rentention policy | | HR | | | |
| | | | | | |
| 15.  Remove advertisement from intranet and internet sites. | | Information Services | | | |
| | | | | | |

Diagram 1. LSA Interview and Hiring Process

Charge of Discrimination: Artur G. Davis

I am an African-American male. In December 2016, I was hired by Legal Services of Alabama, Inc. ("LSA") to serve as its Executive Director. My salary was $110,000 per year, plus benefits. My selection came after a period of protracted turmoil, which led to the resignation of the previous Executive Director, Jimmy Fry (white male), who had received repeated weak evaluations in the final years of his tenure.

There were myriad problems at LSA under Fry's watch, all of which damaged the organization. Fry's lackluster reputation in the legal community had contributed to the loss of funding sources and partnerships. Under Fry's leadership, LSA experienced major financial crises, including improper accounting practices, deficit spending, and the forced layoff of over 15 employees due to mismanagement of program assets. An internal survey of LSA personnel commissioned during the search committee process revealed low morale across the program's personnel ranks. Fry was the subject of internal concerns that he had made sexually inappropriate comments to at least two female staffers (in a board meeting that I attended the day I was hired, Fry openly observed in his departing remarks how attractive several of the women in the room looked) and had abused leave and mileage privileges. Despite these numerous examples of poor leadership, Fry was simply placed "on probation", for at least two consecutive years, an event that was not publicly disclosed and therefore did not materially affect his standing in or outside the program. When Fry submitted his resignation in December 2015, the day the board of directors was preparing to terminate him, he was permitted to remain in place for an additional 12 months rather than being compelled to make an abrupt departure.

Upon assuming the duties of Executive Director, at the request of the board leadership and search committee chair, I undertook an aggressive review of internal challenges and structural issues within LSA. These issues included: 1) poor employee morale due partly to low compensation and years without employee pay raises; 2) a decline in office caseloads and attorney productivity; 3) the absence of impactful litigation that might improve the conditions of low income people and attract new funding support; 4) insufficient partnerships with other public-interest stakeholders; and 5) difficulties in recruiting high quality personnel

I encountered immediate personnel challenges that required changes within the organization. The Operations Director at LSA, Eileen Harris, voluntarily resigned in late 2016. Harris had been accused in three separate written complaints of creating a hostile, intimidating environment for administrative staffers, and office relationships were strained. LSA's central office staff was not well structured, and there were significant gaps in major areas, including finance, management of grant compliance reports, and external outreach and communications.

I also learned in the first weeks of my tenure that LSA had been experiencing significant racial tensions for several years under Fry's tenure. Development Director Jaffe Pickett, an African American female, was the sole minority department head at LSA, and shared a number of her views about the office's racial climate. Among other things, she stated that she had won her promotion to a leadership position partly through internal complaints to the national Legal Services Corporation that there were no black department heads at LSA. Pickett expressed that racial tensions between black and white staffers in the central administrative office were commonplace at LSA. Early on, she expressed a strong opinion that two important open positions in the program, Finance Officer and Operations Director, should not both be filled with white individuals. Pickett stated to me in February 2017 that the black employees in the central administrative office would consider it "whitewashing" to fill these two jobs with whites and that she "could not support" such a move.

Despite Pickett's advice, I strongly believed that LSA should emphasize experience and qualifications over race in hiring and that diversity would be achieved without setting quotas for particular positions. Pickett's judgment notwithstanding, I hired a white female, Charlotte Rand, to run the Operations Department and a white male to handle finance operations, both of whom had superior credentials and references as compared to two black finalists.

Over the course of my tenure as ED, LSA made substantial strides that won widespread accolades from board members, stakeholders outside the organization, and rank and file employees. The accomplishments included (1) unanimous board approval of comprehensive pay raises and a bonus plan for employees; (2) a surge in employee morale, as described by numerous employees; (3) stabilizing a pattern

of declining caseloads after three straight years of reduced client service; (4) the creation of a High Impact Litigation Unit, an Education Practice group, a veterans' outreach initiative in the Montgomery office, and a campaign to assist ex-offenders with restoring their rights to vote under a new Alabama law; and (5) replacing departing personnel with a pool of diverse, highly qualified new attorneys, including two experienced lateral attorney hires.

I also strengthened the performance of the central office by replacing a minimally performing administrative staffer with a highly qualified replacement, adding a veteran Chief Financial officer to oversee LSA's long troubled financial operations, adding a communications staffer to improve organizational visibility, and hiring an experienced grant manager. All of these hires remained well in line with LSA's personnel budget for the FY 17 fiscal year.

Over the course of the spring and summer of 2017, LSA continued to struggle in one area: tensions and animosity among central office employees, which seemed often to split along racial lines. After Rand raised the pay of two white accounting clerks under her supervision, Pickett complained that two African American administrative staffers should have received raises too (although both were already the highest compensated administrative staffers in the program and were set to receive raises as part of the new compensation plan).

Pickett became an increasingly disruptive and insubordinate force, complaining to various employees that I was siding with Rand over her. Pickett became openly hostile to a white female grant manager, Mary Aplin, including making belittling remarks about her in at least one staff meeting, conduct that caused Aplin to file a hostile environment claim with the Office of Inspector General at the national Legal Services Corporation. Pickett's own assistant, Dorothy Graham, a black female, sent me a racially charged message that I had reinstated "Jim Crow" and was forcing "black people" in the central office to be subservient to the "whites". Graham and the program's Executive Assistant, Sylvia Mason, a black female, became openly hostile to Rand and increasingly to my leadership as well. In early August, 2017, Pickett confidentially approached the leadership of the board, including LaVeeda Battle, a black female, with a variety of deliberately false claims about the program's direction and my leadership (I learned of this event through internal sources in my final hours in the office).

On August 18, 2017, rather than ask my side of Pickett's claims, LaVeeda Battle notified me that the Executive Committee of the Board of Directors of LSA was going to conduct an "internal investigation" of my leadership, and that I would be placed on administrative leave during that investigation. I was ordered to vacate my office and barred from having any access to LSA facilities, properties or records. I was also instructed that, as an LSA employee, I must "refrain from any action and avoid public announcements that might reflect adversely upon LSA." Pickett, although the source of the complaints about my leadership, was named Executive Director, pending the completion of the investigation.

Prior to being suspended, I was given no notice whatsoever of either board concerns about my leadership or of Pickett's complaint. Battle did not advise me of the allegations being made against me nor give me any chance to respond to them before placing me on administrative leave. To the contrary, Battle and other board members had effusively praised my work and the new direction in the program, which had incidentally been detailed exhaustively in my monthly reports, in two board meetings in 2017, and in numerous email informational exchanges with Battle in her role as board president. Battle had said to me in mid-June that I was "doing an excellent job".

In addition, Battle failed to seek any corroboration of Pickett's claims from other department heads, including the director of advocacy, the director of operations, and the chief financial officer. Battle deliberately took the word of one self-interested staffer as gospel, without consulting any other leaders of the organization. Battle also included in the document suspending me numerous statements that were demonstrably false, easily subject to being disproved, or that entirely misstated the scope of board authority under the organization's bylaws.

Because of the high visibility of the role of Executive Director of LSA in both legal circles and the social services community, the Board's decision to place me on administrative leave injured and continues to injure my reputation and unfairly labeled me as someone who has engaged in improper conduct. The administrative leave triggered numerous false rumors regarding improprieties, some of which Battle and Pickett may have sought to foment to damage my professional standing. Indeed, Battle even hired at a $7500 expense to LSA a political consultant who managed a campaign against me two years ago, whose specialties include negative

NFIDENTIAL · Legal Services Alabama · Artur Davis · Docs Produced by Defendant

reputational attacks, in an effort to gather or disseminate negative information about me. Because of the pervasive negative rumors, and the need to separate myself from the organization to adequately defend myself, I had no other option but to resign as Executive Director. I resigned in an email to the staff and board on the evening of August 23, 2017.

I believe that LSA discriminated against me because of my race, African American, and my sex, male, in violation of Title VII of the Civil Rights Act as amended. One basis for this belief is that LSA's treatment of me is in stark contrast to the manner LSA treated my white predecessor Jimmy Fry, and another high ranking staffer, former Operations Director Eileen Harris, a white female. Despite Fry's documented history of poor performance, despite serious issues around his character in the workplace, and despite a record that would have merited termination by any reasonable standard, Fry was never subjected to the damaging event of an administrative suspension. When Fry's issues finally placed him in jeopardy of termination, he was given the face saving opportunity of a year-long transition and "voluntary" retirement. In Harris' case, she was the subject in late 2016 of documented written complaints by three staffers that she had subjected them to verbally abusive, bullying behavior. The Board launched no internal investigation, took no actions to discipline Harris, and generated no documents accusing Harris of harassment or creating a hostile environment.

I also believe that LSA discriminated against me because of my race in violation of Title VII of the Civil Rights Act as amended, in that the Board President rewarded an invidious double standard that as an African American executive, I should have aligned myself in favoritism with black employees clashing with their white counterparts. Ordinary exercises of executive discretion were seen as favoritism for whites. Reliance on racial stereotypes or norms is a violation of Title VII. *See Kimble v. Wisc. Dep't of Workforce Development*, 690 F. Supp.2d 765 (E.D. Wisc. 2010).

In addition, I believe that the extreme weakness of the factual grounds LSA cited to take adverse actions against me are strong evidence of pretext, and therefore circumstantially probative of a discriminatory intent. I believe that LSA's choice to rely on flimsy, easily disprovable charges without even a pretense of fact finding to suspend me would enable a jury to infer a hidden discriminatory intent, based on either the Board President's desire to punish me for not siding with black

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

employees or for improper favoritism on the Board President's part toward Jaffe Pickett for reasons of gender bias. *See Reeves v. Sanderson Plumbing Products Inc.*, 530 US 133, 147 (2000) ("it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation".) Therefore. I believe that a reasonable jury could conclude that LSA discriminated against me because of my race or gender in violation of Title VII of the Civil Rights Act as amended.

I declare under penalty of perjury that the foregoing is true and correct.

*Artur Davis*

Artur G. Davis

9-25-2017

Date



November 24, 2017

501 Riverchase Parkway East  Suite 100
Hoover  Alabama 35244-1834
Mailing Address  P.O. Box 360565
Hoover  Alabama 35236-0565
Telephone  (205) 322-1504
Facsimile  (205) 321-1444
Email  laveeda@battlelawfirm.com
Website  www.battlelawfirm.com

Mr. Robert Beard
Equal Employment Opportunity Commission
Ridge Park Place
1130 22nd Street
Birmingham, Alabama 35205

Debra Powell
Equal Employment Opportunity Commission
Ridge Park Place
1130 22nd Street
Birmingham, Alabama 35205

> Re:   **Charge No. 420-2018-00074**
> **Charge No. 420-2017-02792**

Dear Mr. Beard and Ms. Powell:

The following information is provided as the response to the above captioned charges.

<div align="center">

**Respondent's Position Statement to**
**Charge No. 420-2018-00074**
**Charge No. 420-2017-02792**

</div>

This Respondent's Position Statement is an initial response with respect to the above-referenced Charges of Discrimination (the "Charge") filed by the Charging Party, Artur Davis ("Mr. Davis"). The information set forth herein is based upon the preliminary investigation of the Charge, and Legal Services Alabama reserves the right to amend or supplement this statement as appropriate. Additionally, Legal Services Alabama does not consent to the use of this position statement in any adjudicatory proceeding.

1. **Description of Organization**

Legal Services Alabama (LSA) if a federally funded statewide program that provides free, high quality representation to low income and vulnerable individuals and families throughout the state of Alabama including Veterans, the elderly, victims of domestic abuse, foreclosures and disabled individuals.

LSA's Board of Directors, management and staff, work together with partners statewide to fulfil its mission: To serve low-income people by providing civil legal aid and by promoting collaboration to find solutions to problems of poverty. There are approximately 80 employees, with offices in Huntsville, Birmingham, Tuscaloosa, Montgomery, Selma, Mobile and Dothan.

Relevant sections of the Employee Handbook are attached.

## 2. Background Information

After an extensive year long search process, Mr. Artur Davis was hired as Executive Director of Legal Services Alabama (LSA) on December 6, 2016. The Board and staff immediately began working with Mr. Davis to assist with his transition to this new position.

Within months, it became evident that Mr. Davis was resistant to Board and staff suggestions about existing work on priority cases and with existing partners.

At the first Board of Director's meeting after Mr. Davis became the Executive Director, the President of the Board noticed that some of our partners and funders who had attended in the past were not present. She had a discussion with Mr. Davis about this and his need to heal relationships with people working with us who had previous working experiences with him. He took the position that the meetings should be closed to partners and funders. He disagreed with the Chair, and many partners who previously had been invited and attended the Board meeting were not there at Board meetings once he became Executive Director.

Within less than six months into his new job, in June, 2017, the Executive Committee met extensively with Mr. Davis in person about the program policy on reserves and equitable compensation for staff. Mr. Davis believed he should be able to spend down reserves without Board approval or policy parameters established on spending.

At that time, it was clear that the President Trump's budget provided "zero" funding for Legal Services nationwide. The threat remained imminent that there may be cuts in funding from LSA's largest funder. The Board was concerned with being able to withstand the possibility of deep federal funding cuts at the national level, maintaining sufficient reserves to retain staff as long as possible, and being able to continue to serve clients.

## 3. Response to the Charges of Race and Sex Discrimination and Retaliation

Mr. Davis alleges he was discriminated against based on his race, sex and he alleges retaliation. LSA denies these allegations as unfounded and inconsistent with the facts in this case.

Mr. Davis' statements that the prior LSA Executive Director resigned due to turmoil are untrue. The previous Executive Director provided one year's notice of his intent to retire. (Ex. 1) His other statements about the former Executive Director (White male) are likewise untrue and irrelevant to his charges in this case. Recounting the history of a previous administration under wholly dissimilar circumstances is an insufficient evidentiary basis to support a claim of race or sex discrimination.

2

The Board President never directed Mr. Davis to "seek an aggressive review of internal challenges." The other allegations raised by Mr. Davis regarding Board action are also untrue.

Within two months of the meeting between the Executive Committee and Board with Mr. Davis urging that he follow an equitable compensation plan for employees and preserve budgetary reserves, Mr. Davis appeared to be hiring new employees at arbitrarily higher salaries than comparable existing long term employees, paying new employees sign in bonuses, and creating new positions for former campaign workers outside of the newly adopted equitable compensation plan all without Board approval or Finance Committee approval for changes in the budget.

The Executive Committee held three meetings to discuss these issues. The Executive Committee met in person in Executive Session on August 2, 2017. A resolution was drafted to address specific guidelines for greater budgetary accountability and personnel issues for Mr. Davis. Additional telephonic sessions were held by the Executive Committee. On August 16, 2017, the Chair of the Board received notice of allegations of a hostile work environment created by actions by Mr. Davis against female employees.

Mr. Davis advised one of the members of the Executive Committee of his intent to resign on August 17, 2017. (Ex. 2) The Executive Committee held a teleconference with Mr. Davis. During the telephone conference Mr. Davis confirmed his view that the Board had no role as he was the "ultimate decision maker" on matters hiring/firing and compensation. (Ex. 3)

Upon receipt of the hostile work environment, and the explanation from Mr. Davis essentially that he had no accountability to the Board, the Executive Committee met and approved a resolution to place Mr. Davis on leave pending an investigation into the hostile work environment claims, and personnel actions affecting the budget.

Under the LSA adopted Equal Opportunity Policy and Procedures, all complaints of hostile work environment were due to be investigated. The Policy specifically provided that an LSA employee may notify the Board President where appropriate

The Resolution and letter placing Mr. Davis on leave were hand delivered to Mr. Davis at the Montgomery Central office before 5:00 p.m. August 18, 2017. Upon receipt of the resolution and letter, Mr. Davis threatened to expose LSA to negative press and to take action against LSA. (Exhibit 4 Exhibit 5)

The Executive Committee, by Resolution, authorized the hire of a public relations person to address any potential negative press created by Mr. Davis's public response, and security to assure the safety of staff. (Exhibit 6)

Later that evening, at 6:41 p.m. August 18, 2017, Mr. Davis sent a one sentence email that he intended to file a claim of race discrimination against LSA. (Ex. 7) At that

3

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

time, Mr. Davis was on notice that he was being investigated for hostile workplace claims, and had been placed on leave.

Mr. Davis was advised to refrain from any action and avoid public announcements that might reflect adversely on LSA. (Exhibit 5) Mr. Davis violated this provision of his leave by releasing negative statements to the press. (Exhibit 8)

On August 22, 2017, Mr. Davis announced his resignation from his position as Executive Director of LSA. (Ex. 9)

The Board proceeded with its investigation into the allegations regarding Mr. Davis' conduct and retained an independent investigator to investigate the complaints. The confidential report from the investigator found merit in most of the allegations in the Resolution and found even more egregious conduct than that provided in the resolution.

Under these circumstances, the actions by the LSA Board and Executive Committee were wholly consistent with its obligations under its EEO policies and its internal Employee Handbook, and were not discriminatory nor retaliatory against Mr. Davis.

### 4. Conclusion

LSA denies the allegation that Mr. Davis was discriminated against on the basis of race or sex, or that he was retaliated against by placing him on leave to investigate complaints of hostile work environment. His alleged notice of intent to assert rights under Title VII was sent to the President of the Board *after* Mr. Davis had been placed on leave. No adverse action was taken against Mr. Davis up to the time of his resignation on August 22, 2017. Therefore, no action by the Board or Executive Committee that could be remotely viewed as retaliatory affecting the terms and conditions of his employment.

LSA reserves the right to amend this position statement at any time.

(All Exhibits are Confidential)

Respectfully submitted,

LaVeeda Morgan Battle
President, Board of Directors
Legal Services Alabama

4

NFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant

# Invoice

Attention:    Celeste Minor
              Jemison & Mendelson

**Date**      February 28, 2019

**Suzanne Johnson**
120 CR 83
Union Springs, AL 36089
**T** Work Phone 334-312-0411
**F** Work Fax Phone 334-584-7482
Work Email **borderacres@mon-cre.net**

P.O. NUMBER:
INVOICE NUMBER:1772 Platt Place

| Description | Quantity | Unit Price | Cost |
|---|---|---|---|
| bi-weekly cleaning for January 11, 25 | | $ | $ 200.00 |
| February 8, 22 | | | $ 200.00 |
| | | | $ 0.00 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | Subtotal | |
| | | **Total** | **$ 400.00** |

Thank you for your business,

Suzanne Johnson

8/31/2017                                    Gmail - attached radio spot by Hank Sanders

LaVeeda Battle <laveedab@gmail.com>

## attached radio spot by Hank Sanders

**Artur G. Davis** <agdavis@alsp.org>                                Mon, Jul 10, 2017 at 2:22 PM
To: LaVeeda Battle <LaVeeda@battlelawfirm.com>
Cc: Yvonne Saxon <yvonne.saxon@gmail.com>, Phil Mitchell <pmitchell@harriscaddell.com>, Merceria Ludgood
<mludgood@mobile-county.net>, "Linda W.H. Henderson" <lwh@henderson-esq.net>

Laveeda, you may have forgotten that I have already raised this initiative and these clinics in detail by both email and
by phone with LSC compliance personnel and the general counsel's office. I made that clear in a conversation with
you before the last board meeting and during the board meeting itself. Not only has LSC sanctioned these events, the
general counsel's office praised them as valuable legal aid contributions.

To make sure all of you understand, these clinics, consistent with LSC instructions in my conversations with LSC
personnel and the plain language of the regulations, will not register voters or engage in voter registration activity.
Voter registration activity will not be allowed on the premises. Instead, these clinics will educate potential voters on
the scope of the new moral turpitude law; and assist qualified and income eligible individuals with the administrative
process for receiving a certificate of eligibility from the Board of Pardons and Paroles.

To add one final point, the LSC general counsel's office clarified that under LSC regs, activity which eventually leads to
registration is not voter registration activity. Such activity is literally defined as preparing or assisting with the
preparation of registration forms.

I hope this email clarifies this matter.

Artur G. Davis, Executive Director

Legal Services Alabama

2567 Fairlane Drive, Suite 300

Montgomery, Alabama  36116

334.223.5120

www.legalservicesalabama.org

From: laveedab@gmail.com [mailto:laveedab@gmail.com] On Behalf Of LaVeeda Battle
Sent: Monday, July 10, 2017 2:01 PM

CONFIDENTIAL - Legal Services Alabama - Artur Davis - Docs Produced by Defendant                                    D00077



6 Month Personnel Update

To:     Personnel Committee

From: Executive Director

The mid-year point is a good time to update the Personnel Committee on changes in our personnel roster and a re-alignment of some central office duties. As you are aware, LSA has continued to experience regular turnover for much of the year, and the central office has been in the midst of restructuring to reflect the demands of a statewide program. As I outline these changes, I will also comment on improvements we have introduced to the hiring processes for new lawyers.

### Central Office

### The structure under past leadership

Under the past ED's leadership, the central office structure consisted of an Operations Director with one administrative assistant; a Resource Development Director aided by a development coordinator; an Advocacy Director with one direct report, a case management database coordinator; an IT manager who directly reported to the ED; a book-keeping staff of two who jointly reported to the Operations Director and an external accounting firm, Warren Averett; and an executive assistant for the ED, who also coordinated board relations. Until early 2016, the central office also featured a PAI coordinator who was tasked with leading LSA's collaboration with volunteer lawyer programs and reduced fee contract attorneys.

While reasonably straightforward on paper, LSA's central office structure was plagued with inefficiencies: the duties of the Operations Director were closer to those of a Chief Operating Officer or Chief of Staff. The OPS Director's very expansive role ranged from HR responsibilities, including on-boarding, benefits management, employee evaluation, discipline, hiring processes, and leave approval; to supervision of LSA's internal book-keepers and liaison with Warren Averett; control of attorney training, including final approval of all attorney travel to CLEs and conferences; property management and vendor relationships; grant administration, including all reporting and compliance obligations, and serving as the principal point of contact for LSA grantors; a broad role of leading executive initiatives from strategic planning to workforce reduction; and a responsibility for managing LSA's other executive department heads. This array of duties was performed with the assistance of one administrative aide, whose prior experience was customer service in fast food retail, and who had no substantive experience with any core OPS responsibilities.

LSA's Resource and Development Department was limited in scope, consisting of grant writing and identification of grant opportunities; and a limited engagement with fundraising, usually a year end pro forma donor solicitation. RD also consisted of one support staff, a development coordinator, who does not write grants but assists in data base entry and online searches for grants.

The Director of Advocacy was given the broad role of managing LSA's litigation and legal advocacy priorities, with some shared responsibility for grantor report obligations. The major internal responsibilities for this role included leading LSA's major litigation projects, serving as a resource of knowledge for attorneys within the program and in some cases, serving as the primary interface with other public interest law organizations. The case management database coordinator directly reported to the Advocacy Director, a relationship complicated by their location in different cities.

The IT structure within LSA was fraught with ambiguous lines of authority. The IT Manager was a direct report to the ED, who did not have a substantial grasp of communications technology. The IT Manager was also permitted to usually "work from home", with the obligation of trouble shooting problems that arose in various offices and self-managing his own workload distribution. While the database coordinator has significant functional IT knowledge, her role was limited to set-up and maintenance of LSA's LegalServer, our principal system for case files and time keeping, and LSA's general all-purpose internal information "billboard". The coordinator was also tasked with website administration (but social media was assigned to the Development Director, who had sole posting authority). For reasons that remain unclear, the database coordinator was restricted from assisting with routine IT service issues, despite being perfectly competent to do so, on the grounds that it was "outside her job description." On the other hand, one of her major designated roles, extracting reporting data from LegalServer, was often unnecessary, as the new Advocacy Director was tech savvy enough to handle data extraction without assistance.

The PAI position was another source of internal confusion. The PAI coordinator was loosely responsible for the mandatory 12.5 % of LSC based resources that must be spent on promoting private attorney involvement in serving low income clients. While this is a common position in LSC structures, virtually no other state's bar has created its own official network of pro bono volunteer lawyers who are structurally independent of LSA (although they receive $350,000 annually from our program). Theoretically, the PAI coordinator could have taken on the task of driving LSA's enrollment of private contract attorneys, but this role was delegated to the regional managing attorneys, with wildly varying results: some offices have an active reduced fee contract program, some enter only a handful of contracts a year. Each office also sets its own course for other components of PAI, such as conducting CLEs or engaging legal education efforts.

Lastly, LSA's financial structure: under the past regime, there was constant tension over the leadership of LSA's finances. The line item responsibility for finances kept shifting: at one point, the ED was described in internal documents as the "CFO", despite a lack of core accounting knowledge and literally no financial background. While the OPS Director supervised the accounting department, her ability to do so was diminished by her own lack of a finance or accounting background. The monthly reconciliation of books was entirely a Warren Averett function, as were a number of other routine transactions, including filling out grant budgets. WA drove the annual budgeting process, as well.

The effect of so many gray areas in the central office was not surprisingly a combustible work environment. Among the obvious signs of disarray: a preoccupation over "job description"; inordinate overtime requests from non-exempt personnel; territorialism over the most mundane matters, like who had authority to speak to grantors; frayed nerves; constant missed deadlines on the grant reporting side; slow communication with vendors, and regular late bill paying; overloaded department heads whose time sheets routinely reflected 12 to 13 hour days. Our department heads were doing an

inordinate amount of administrative, even clerical work, while the ranks of support staff in the central office was trimmed to a barebones level. (Under prior leadership, an HR coordinator and development administrative assistant were eliminated in 2015, contributing to the overload for the OPS Director and RD Director).

**Changes in 2017**

It became clear that a more functional LSA required adjustments in role and alignment of responsibilities, and in some cases, new administrative support to absorb the backlog of work.

The duties of the OPS Director have been streamlined: today, the core responsibilities of Operations at LSA are: management of the HR portfolio; supervision of the IT department, which was previously a direct ED report; grant reporting; sub-grant relationships with the VLP program[1]; and vendor relations, including property management. The previous OPS admin was reassigned to the call center, where she is serving effectively as an intake screener, while a new administrative assistant was hired, who has a 15 year history in executive administration with a particular specialization in HR.

In May, after assessing the disproportionate time the OPS Director was spending on grant compliance (60%), including basic data entry, the decision was made to add a grants manager as a direct report to OPS. The hire, who has a ten year broad based portfolio in grants, ranging from writing to reporting to budgeting, provides the specialized experience in grants that LSA has lacked for the past decade, as well as extra help on the development and financial accounting side.

The legal database coordinator has been given the new assignment of information systems coordinator, where she plays a wide ranging role from sharing trouble shooting with the IT Manager, to assessment of institutional tech needs; as well as her traditional task of being our "LegalServer guru." She has also developed an internal protocol for managing IT issues within the organization to ensure better and faster prioritization.  Our New IT department has already earned its spurs by efficiently addressing several recent hacking/ransomware attacks on our servers.

Several former OPS duties have been reassigned: leave approval has been delegated to department heads and regional office managers; approval for training now resides with the Advocacy Director, who is far better positioned to evaluate which training opportunities make the most sense for our advocates; and LSA has stood up its own internal Finance department, led by a CFO with a twenty five year record of being the senior financial officer in both profit and non-profit settings. By the end of the summer, the WA contract will be downsized to a limited hourly consultant based role, consisting of occasional employee training, investment advice and some third party verification, with the entirety of our monthly transactional work and reconciliation done in-house.

The goal has been to redefine OPS as a center of program innovation, with a mandate for reshaping our operational systems to be cleaner and less cumbersome. By building a support staff structure within the department, LSA has created space for the OPS Director to take on more tasks for long range review, including monitoring of best practices and reforms in IT and benefits. She has also been assigned the mission of revamping LSA's extremely unwieldy evaluation processes.

---

[1] It is my judgment that since LSA does not emulate other programs in running its own volunteer lawyer network, and reduced fee contracts are managed at the regional office level, that a PAI coordinator would not be a justifiable full time position.

**Resource and Development**

The Resource and Development Department has been re-conceived as the Development and Strategic Partnerships Department. While the core duties of grant submissions remain based in this department, DSP now includes a broader focus on building institutional relationships with public entities, and private fundraising cultivation, a neglected element at LSA in the past decade. For example, DSP is in the process of scheduling a series of "Meet the new LSA" meet and greets for the donor community in Montgomery, Birmingham, Mobile, and Hunstville.

DSP has also assumed formal leadership of LSA's public relations, communications and branding: to assist that role, LSA has hired a development and communications associate who has previous experience as a journalist and communications director for a local college. As a result of this new capacity, LSA now maintains a regularly updated website that features specific content on our casework and public outreach initiatives, as well as staff profiles and an Advocate of the Month feature.

LSA's heightened profile is directly related to the addition of a dedicated communications staffer. Both our wage garnishment appeals win and our VA initiative have garnered coverage in television and online media, an extremely rare event under past leadership. As a testament to the value of a more robust website, multiple staffers have said that they chose to apply for jobs at LSA based solely on information about our work and staff displayed on the website.

**Attorney personnel changes**

Staff turnover has been a constant at LSA since the 2015 layoffs. Primarily for reasons discussed at length during our compensation plan meeting, 24 staffers departed LSA from January 2016 to March 2017, most of them junior staff attorneys who were leaving just as they were becoming peak performers. Because hiring has become a constant function at LSA, it has been important to refine the process to maximize our ability to identify and hire the best available talent.

Since late December, five attorneys, all in in the one to five years of experience range, left LSA: one in the Anniston satellite office, one in Birmingham, one in Montgomery, two in Selma. LSA was able to effectively replace each single departure within a month: all five new hires have received strong marks from their managers and supervisors; the Selma hires, at the Managing and staff attorney level, have compiled stronger numbers for cases opened in a two month span than their predecessors compiled in six months. The quality of the hires has been impressive, including a summa cum laude University of Alabama undergrad, a former civil and criminal litigator with extensive courtroom experience, and a MA in Selma with a strong combination of community ties and experience in LSA coverage areas.

Prior to the past six months, LSA's hiring practices received a lot of internal criticism. The process was unusually cumbersome and inflexible: postings were required to run for 30 days, with managers precluded from contacting candidates until the 30 days lapsed; all interviews were scheduled on a single day, with candidates excluded who could not make the designated date. Although the practice occasionally varied, as a general rule, the Executive Director sat in on interviews, and all hires received final review by the OPS Director. New hires were subjected to a six month probationary period. Recruiting of candidates was not allowed, and only candidates who submitted an application on their own were eligible for consideration.

LSA has substantially revised its protocols for hiring new lawyers. Managers have been given discretion to instantly screen strong resumes, and to conduct preliminary interviews by phone if they choose. While an effort is made to conduct interviews on a single date, candidates with conflicts may be interviewed on different dates. As Executive Director, I have relied on my own network of contacts to identify strong contenders and to proactively advise them of vacancies. With the exception of Selma, where a managerial vacancy existed, the interview process has been delegated to managers, whose recommendations are approved at the ED level (in every instance I have followed the recommendation). The six month probationary period has been ended, but attorneys with less than two years practice experience are formally assigned a mentor in the person of a successful young lawyer within the program.[2]

## Budgetary impact

Despite adding three new positions, a CFO, communications and development associate, and a grant manager, LSA remains remarkably close to its personnel budget for 2017, exceeding it only by the small amount of approximately $20,000 to date. In other words, for roughly the same cost, LSA has achieved a more cohesive personnel structure. While the full year costs of extra staff will expand the personnel budget in 2018, LSA remains well below the 65-70% salary to overall costs ratio of most LSC programs. LSA is also on the verge of winding down a six figure contract with Warren Averett, whose tasks will be conducted internally beginning in September, a change that will save close to $100,000.

---

[2] It is worth noting that LSC regulations provide grantees broad leeway in hiring polices, directing only that the positions be circulated to the private bar and on grantee websites, and that grantees seek out recommendations from the private bar. The much more restrictive policies of the past leadership seem to mimic rules for federal contractors, which LSC grantees are not.