IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ARTUR DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: 2:18-cv-26-RAH-JTA |
| | ) | (WO) |
| LEGAL SERVICES ALABAMA, INC., | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.   INTRODUCTION

Artur Davis ("Davis" or "Plaintiff") is a former U.S. Congressman, mayoral candidate for the City of Montgomery, Alabama, gubernatorial candidate for the State of Alabama, federal prosecutor, and litigator.  In December 2016, he became the Executive Director for Legal Services Alabama, Inc. ("LSA"), a non-profit, public interest organization that provides civil legal services to low income clients in Alabama.  That marriage, however, did not last long, as Davis resigned from the position approximately nine months later in August 2017 after complaints were lodged against him by two African American employees. Following his exit, Davis sued LSA, LaVeeda Battle ("Battle"), and Alex Smith ("Smith") (collectively, "Defendants") for race discrimination, retaliation, defamation, and conspiracy.

Pending before the Court is the Defendants' motion for summary judgment ("Motion").[1] (Doc. 39.)  The Court has carefully reviewed the Motion, the briefs filed in support of and in opposition to the Motion, and the supporting and opposing evidentiary materials.  In accordance with the governing standard, the Court concludes that the Motion is due to be granted.

## II.    JURISDICTION

This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 1331 and § 1343 and the jurisdictional grant in 42 U.S.C. § 2000e-5. The Plaintiff and Defendants (collectively, "Parties") do not challenge venue, and the Court concludes that venue properly lies in the Middle District of Alabama.  *See* 28 U.S.C. § 1391.

## III.   FACTS AND PROCEDURAL HISTORY

Montgomery-based, LSA is a non-profit, public interest organization that provides civil legal services to low-income clients throughout Alabama.  (Doc. 41-1 at 2; Doc. 43-22 at 1.)  Among the many services it provides, LSA helps qualified clients with legal issues involving domestic violence, garnishments, housing subsidies, mortgage modifications, public assistance, and other cases.  *See* Brad Harper, *Artur Davis Named Leader of State Legal Aid Group*, MONTGOMERY

---

[1] Following the close of briefing on the Motion, Davis filed a motion, (Doc. 48), to supplement his summary judgment opposition with a new case recently issued by the Eleventh Circuit.  For purposes of the Court's consideration of all legal issues associated with the Motion, this Court grants Davis' request.

ADVERTISER, Dec. 8, 2016.[2]  In addition, LSA supports local volunteer attorney programs so as to encourage lawyers throughout Alabama to take pro bono cases in their communities.  *See* Bob Lowry, *Lawyers Must Join Legal Aid Program*, HUNTSVILLE TIMES, Oct. 19, 2007.

LSA is run by a Board of Directors ("Board"), which includes a four-member executive committee and twenty-two members from across the State. *Board of Directors*, LEGAL SERVICES ALABAMA, INC., https://legalservicesalabama.org/ourstory-2/ (last visited July 10, 2020).

In December 2016, Davis was hired by LSA to serve as its new Executive Director, following the retirement of James H. Fry ("Fry"), after a purported national search.  (Doc. 41-1 at 3; Doc. 43-22 at 1.)  "The input we received from our partners, collaborators and staff on the skills needed for our next executive director strongly influenced our committee," Phil Mitchell ("Mitchell"), the Search Committee's Chair, said in a statement at the time.  Harper, *supra*. "Mr. Davis has all the qualities needed to serve as LSA's executive director at the highest level and re-establish the

---

[2] District courts may take judicial notice of matters that are accessible to the general public and "are not subject to reasonable dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Bryan v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).  *See also U.S. ex rel Osheroff v. Humana, Inc.*, 776 F.3d 805, 811 n.4 (11th Cir. 2015) (courts may take judicial notice of statements contained within—but not the veracity of—newspaper articles).

organization as the leader in serving the civil legal needs of low income Alabamians." (*Id*.)

This excitement soon waned. Naturally, as Executive Director, Davis had his own ideas as to how LSA should be run. (Doc. 43-22 at 2-5.)  These ideas were met with resistance from members of the Board, including Battle,[3] as well as sundry staff members.  (*Id.* at 5-7.) According to Davis, beginning in July and August, he was subjected to numerous instances of insubordination and poor employee attitude from several employees, including Jaffee Pickett ("Pickett"), an African American employee who served as the Assistant Executive Director at LSA.  (*Id.* at 5-6.)

Eventually, sometime in August 2017, Pickett relayed to the Board several complaints made by staff members about the hostile work environment allegedly created by Davis.  (Docs. 41-1 at 3; Doc. 41-2 at 77-80; Doc. 43-22 at 8.)  On August 17, 2017, as these grievances developed, Davis emailed LSA board member, Mitchell, to inform him that he was considering departing LSA. (Doc. 41-4 at 45.)

The next day, the Board met.  At the end of its discussion, the Board placed Davis on paid leave (suspension) pending an investigation into the staff complaints about Davis. (Doc. 41-2 at 83-86.) The nature of the suspension and the investigation

---

[3] Battle was a member of the Executive Director Search Committee ("Search Committee") that made this decision and is an African-American attorney who maintains a private solo practice and has served as an administrative law judge for the Equal Employment Opportunity Commission ("EEOC").  (Doc. 41-1 at 2-3.)

were detailed in a lengthy letter signed by Battle in her capacity as President of the Board, and promptly sent to Davis. (*Id.*) As this missive lays out, concerns had been expressed by staff and Board members about hiring, spending outside of budget, the creation of new initiatives without Board input, harassment and creation of a hostile work environment by Davis, and even statements by Davis critical of the Board. (*Id.*) The letter concluded that Davis should refrain from making any public announcement that might reflect adversely upon LSA. (*Id.* at 85.)

Davis initially responded in two ways. That very evening, he emailed the Board to announce his intent to file an EEOC charge of discrimination. (Doc. 43-21 at 1; Doc. 43-22 at 8.) Next, before the Board even launched its investigation, Davis submitted his notice of resignation from LSA on August 22, 2017, effective September 23, 2017. (Doc. 41-1 at 4; Doc. 41-4 at 58; Doc. 43-22 at 8.) According to Davis, he resigned because he did not believe he would receive a fair shake and justice from any investigative process. (Doc. 43-1 at 24-25.) Nevertheless, Davis was paid through the end of September of 2017. (*Id.* at 21, 23.)

To conduct the investigation, the Board retained Delores R. Boyd ("Judge Boyd"), a retired United States Magistrate Judge. (Doc. 41-1 at 3.) After speaking with employees and reviewing a parade of documents, among other things, Judge Boyd issued her final report in September 2017. (Doc. 45-8 at 47-118.)

During the pendency of this investigation, on August 25, 2017, Davis published an article on AL.com providing his explanation as to why he resigned from LSA.  (Doc. 41-4 at 59-62.)  In the article, Davis did not allege discrimination and retaliation by LSA and its board members or employees.  (*Id.*)  Instead, he described his resignation as representing the culmination of "a turbulent several weeks where . . . [he] was expending more time clashing with a board president and a few dissident employees than . . . [he] was spending on devising strategies to serve Alabama's low income families."  (*Id.*)  The clashes had turned "very petty," and though he purportedly "asked the national Legal Services Corporation to take a hard look at the integrity and future of the Alabama program, which desperately needs an intervention," he "*chose* resignation rather than a protracted fight to regain authority."  (*Id.* (emphasis added).)  He did so, it would seem, because he had "other plans for . . . [his] life, including a return to the public arena sooner or later," and had "maybe . . . hit the wall on what . . . [he] could do at Legal Services."  (*Id.*)  He would instead "put" his energy into Montgomery's future, and into being another constructive voice in Alabama."  (*Id.*)  Fittingly for such a long-time public servant, he signed off: "I'm still the grown version of a child who rose out of the poorest side of Montgomery, Alabama on the force of dreams."  (*Id.*)

## IV.   LEGAL STANDARD

6

Pursuant to Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323 (construing and quoting Rule 56(c)(1)). This burden is not a light one. *Harris v. Ostrout*, 65 F.3d 912, 917 (11th Cir. 1995).

The movant may meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex Corp.*, 477 U.S. at 322-24. A dispute of material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). What is material is determined by the substantive law applicable to the case. *Id.* If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings,

that a genuine issue material to the non-movant's case exists. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-17 (11th Cir. 1993); *see also id.* at 1116, n.3 (discussing Rule 56(e)) ("When a motion for summary judgment is made and supported . . . an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response ... must set forth specific facts showing that there is a genuine issue for trial."). Crucially, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 257. While, if the non-movant's response consists of nothing more than conclusory allegations, a district court must enter summary judgment for the movant. *See Holifield v. Reno*, 115 F.3d 1555, 1565, n. 6 (11th Cir. 1997); *Harris*, 65 F.3d at 917, "[T]he [plaintiff's] evidence is to be believed and all justifiable inferences are to be drawn in his favor" if there is a conflict in the evidence. *Anderson*, 477 U.S. at 255; *Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir. 2000). Indeed, "[e]ven if the district court believes that all the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of such credibility choices." *Harris*, 65 F.3d at 917.

8

Once the nonmoving party has responded, the court must grant summary judgment if there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).

## V.   DISCUSSION

### A.   Davis' Race Discrimination Claims

Two of Davis' claims merit concurrent consideration.  In Counts I and III, Davis contends that he was wrongfully suspended on August 18, 2017, based on his race, in violation of 42 U.S.C. § 1981 and 42 U.S.C. § 2000e.  (*See* Doc. 14.)  The Defendants move for summary judgment on these two claims, arguing that Davis has not and cannot meet his burden of proof of showing an actionable adverse employment action under the facts of this case.  (Doc. 40 at 11-12.)  The Defendants bolster this argument with another: since Davis voluntarily resigned, there was no constructive discharge[4] for purposes of meeting his prima facie case of discrimination.  (*Id.* at 8-12.)

Title VII and § 1981 operate similarly.   Both prohibit race-based discrimination.  *See* 42 U.S.C. § 2000e-2(a)(1); *Chapter 7 Tr. v. Gate Gourmet, Inc.*,

---

[4] Davis does not appear to argue in his summary judgment response that he was constructively discharged, although his Complaint vaguely raises the allegation.  In their Motion, the Defendants do not specifically address the extent to which, if any, Davis' suspension qualifies as an *adverse employment action*.  Presumably, the Defendants are lumping the suspension under the general umbrella of one of the many actions of LSA that could constitute a constructive discharge.  Given the disconnect between the parties as to exactly what is the adverse employment action at issue, the Court will address both the suspension and Davis' constructive discharge.

683 F.3d 1249, 1256 (11th Cir. 2012). Moreover, the elements of race-based employment discrimination claims brought under either statute are the same. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). For these reasons, the Eleventh Circuit "has routinely and systematically grouped Title VII and § 1981 claims for analytic purposes." *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010). The Court will do the same as it concerns Counts I and III.

To defeat the Motion, Davis first must establish a prima facie case of discrimination by one of three generally accepted methods: (1) presenting direct evidence of discriminatory intent; (2) presenting evidence to satisfy the four-part circumstantial evidence test set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); or (3) presenting statistical proof. *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989). Where, as here, Davis admittedly relies on circumstantial evidence to establish discriminatory intent, the Court typically uses the *McDonnell Douglas* analytical framework to evaluate the sufficiency of the complainant's evidence. *Flowers v. Troup Cty., Ga. School Dist.*, 803 F.3d 1327, 1335-36 (11th Cir. 2015).[5]

---

[5] Davis, however, contests this application of the *McDonnell Douglas* framework and instead defends a mixed-motive theory. Whether Davis advances a single-motive or mixed-motive theory affects his burden at the summary judgment stage and the Court's evaluation thereof.

Regardless of whether this (or Davis' proposed) framework is applied, Davis' burden remains the same: he still must prove that he suffered an actionable adverse employment action. *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016) (holding that a plaintiff must offer "evidence sufficient to convince a jury that . . . the defendant took an adverse employment action against the plaintiff"); *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) ("To make out a *prima facie* case of racial discrimination a plaintiff must show . . . she was subjected to adverse employment action.").

As it concerns Davis' race discrimination and retaliation claims, the only two potentially relevant adverse employment actions are Davis' suspension and his resignation five days later.  Davis depicts his suspension with pay as an actionable employment action; the Defendants disagree, citing a host of cases that stand for the proposition that a suspension with pay during an investigation does not rise to a sufficient level.  In an attempt to distinguish this litany of case decisions, Davis describes his suspension with pay as inherently different because he was a high profile, executive level employee of a statewide organization and therefore was saddled with an added stigma not otherwise attached to a suspension leveled against a lesser  employee.

Yet, for all the forcefulness and subtlety of this critique, neither tentativeness nor ambiguity define the relevant jurisprudence.  As accurately noted by the

11

Defendants, "[c]ourts have consistently held that being placed on administrative leave pending an internal investigation is not an adverse employment action that would dissuade a reasonable employee from making or supporting a discrimination charge." *Carrio v. Apollo Grp.*, No. CIVA 1:07-CV-1814BBM, 2009 WL 2460983, at *15 (N.D. Ga. Aug. 7, 2009); *see, e.g.*, *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 787 (7th Cir. 2007) (paid administrative leave pending investigation does not constitute materially adverse action); *Singletary v. Mo. Dep't of Corrs.*, 423 F.3d 886, 891–92 (8th Cir. 2005) (finding that corrections officer did not suffer a materially adverse action when his employer placed him on administrative leave pending a departmental investigation); *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) ("[A] suspension with pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse employment action."); *Breaux v. City of Garland,* 205 F.3d 150, 158 (5th Cir. 2000) (holding that a police officer suffered no adverse employment action where he was temporarily placed on paid administrative leave during an internal investigation); *Jackson v. Blue Bird Corp.*, No. 5:17-CV-00101-TES, 2018 WL 4169074, at *3, n.4 (M.D. Ga. Aug. 30, 2018), *aff'd*, 792 F. App'x 706 (11th Cir. 2019) ("Placing Plaintiff on a brief, paid leave during the investigation is not adverse employment activity."); *Stephen v. H. Lee Moffitt Cancer Ctr. & Research Inst. Lifetime Cancer Screening Ctr., Inc*., 259 F. Supp. 3d 1323, 1337-38 (M.D. Fla. 2017) (holding that a paid suspension pending

investigation was not an adverse employment action); *Brown v. Bd. of Regents of Univ. Sys. of Ga.*, No. 1:14-CV-0365-LMM-LTW, 2016 WL 4925792, at *9 (N.D. Ga. Feb. 12, 2016) ("Typically, courts within this circuit have concluded that a paid suspension or placement on administrative leave for less than a month is not an adverse employment action."); *Moore v. Miami-Dade Cty.*, No. 03-22421-CIVGOLD, 2005 WL 3273722, at *11 (S.D. Fla. Sept. 30, 2005) (collecting cases as to this issue and ultimately holding that suspension for one month pending investigation was not adverse employment action).  Davis may have been offended, and he may indeed think that the mere act of being suspended amounted to a grave misdeed, but an employee's subjective view of the significance and adversity of the employer's action does not control.  *Doe v. DeKalb Cty. Sch. Dist.*, 145 F.3d 1441, 1445 (11th Cir. 1998).  To rule otherwise is to make every inquiry by any employer as to any conduct by a suspended employee, regardless of the cause or circumstances, into an adverse action sufficient to trigger application of federal anti-discrimination law.  *See, e.g.*, *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir. 2001) (observing that the "terms, conditions, or benefits of a person's employment do not typically, if ever, include general immunity from the application of basic employment policies or exemption from [an employer's] disciplinary procedures"); *cf. Hulsey v. Pride Rest., LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004) ("[A] tangible employment action is a significant hiring, firing, failing to promote, reassignment

with significantly different responsibilities, or a decision causing a significant change in benefits."), *cited in Hyde v. K. B. Home, Inc.*, 355 F. App'x 266, 271 (11th Cir. 2009).  In some cases, a temporary suspension with pay may indeed be an adverse employment action, *McCollough v. Buffalo Elec. Co. of Ala.*, No. 2:16-cv-00438-AKK, 2017 WL 4222613 (N.D. Ala. Sept. 22, 2017), but not when the employee opted to resign within a week of the investigation's commencement and no other discomfort was actively imposed by the employer, as here, whatever embarrassment Davis may have otherwise felt.  *Cf. Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) ("[A]dministrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action.").

The only decision to the contrary cited by Davis comes from the United States District Court for the District of Rhode Island in *Mosunic v. Nestle Prepared Foods Co.*, 272 F. Supp. 3d 22 (D.R.I. 2017).  In that case, the court rejected other courts' holdings and concluded that the plaintiff had met her prima facie burden because "[s]uspension, regardless of whether it is paid, is adverse to the employee in and of itself. It is punitive in nature and at a minimum becomes part of one's permanent employment record, affecting one's ability for advancement, or to find other future employment, or gaining valuable job experience." *Mosunic*, 272 F. Supp. 3d at *27, n.3 (citing *Dahlia v. Rodriquez*, 735 F.3d 1060, 1078 (9th Cir. 2013) (holding that

14

the loss of experience while on administrative leave, *inter alia*, could constitute an adverse employment action)).

For several different reasons, this Court is not persuaded by *Mosunic*'s reasoning that a suspension with pay is an actionable adverse employment action simply because it is inherently "adverse to an employee in and of itself."  First, if that was the burden by which an actionable adverse employment action is measured, then virtually any disciplinary action would constitute an actionable adverse employment action.  Second, the case upon which *Mosunic* based this construction – *Dahlia* – narrowly held that plaintiff's "assertions—that administrative leave prevented him from taking the sergeant's exam, required him to forfeit on-call and holiday pay, and prevented him from furthering his investigative experience—if proved, would constitute an adverse employment action."  *Dahlia*, 735 F.3d at 1079.  The court in *Dahlia* did not hold, as *Mosunic* arguably contended and as Davis would read it, that (1) a suspension that ultimately lasted less than a fortnight and (2) some imagined stigma, the only things that Davis has brought to this Court's attention, were enough.  In fact, despite its undeniably unambiguous statement as to the adverse nature of a suspension, not even *Mosunic* went as far as Davis believes: suspension, plus the loss of experience and a coterie of other repercussions that it engendered, none of which Davis has either evidenced or alleged, was seen as "adverse."  *Mosunic*, 274 F. Supp. 3d at 27, n.3.  Lastly, this Court is persuaded by

15

the numerous decisions in the Eleventh Circuit where courts have held that suspensions with pay during an investigation do not constitute an adverse employment action because they do not constitute a *serious and material change* in the terms, conditions or privileges of employment. This Court further finds that no distinction should be drawn simply because an affected employee is a higher-level employee, such as an executive director, rather than a lower level employee. *See Brown*, 2016 WL 4925792 at *9 (dean of college); *Stephen*, 259 F. Supp. 3d at 1337-38 (physician). To draw such a distinction would require this Court to engage in rank speculation and conjecture as to the mindset of future unknown employers at unspecified future points in time regarding unknown future employment positions, and traffics in possibilities rather than in probabilities and verities.

In sum, Davis has not demonstrated that his suspension, considering the attendant circumstances that neither party denies, was materially adverse to meet his burden to establish a prima facie case.

While Davis also vaguely alleges that he was constructively discharged, Davis' failure to address the Defendants' argument that there can be no constructive discharge as a matter of law because of Davis' admission that he voluntarily resigned, (Doc. 40 at 10), is an abandonment of the claim. *See*, *e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (affirming that a claim is abandoned where presented in the complaint but not raised in a party's response to

16

a motion for summary judgment or in the party's own motion for summary judgment); *Adams v. Bank of Am., N.A.*, 237 F. Supp. 3d 1189, 1203 (N.D. Ala. 2017) ("A party that fails to defend a claim that is targeted by a summary judgment motion is deemed to have abandoned that claim."). As such, the Court concludes that Davis has abandoned this claim to the extent he pleaded it in his Complaint.

But even if Davis has not abandoned this claim, the Defendants nevertheless would be entitled to summary judgment. The reason is as clear as Davis' abandonment: a Title VII constructive discharge claim generally cannot be based upon an employee's resignation under the subjective belief that an investigation would be unfair or unjust. *See Soloski v. Adams*, 600 F. Supp. 2d 1276, 1347 (N.D. Ga. 2009) ("[T]he mere fact that the choice is between comparably unpleasant alternatives . . . does not of itself establish that a resignation was induced by duress or coercion, hence was involuntary.") (citing *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995)). Resignations made in situations where an employee is faced with unpleasant alternatives, certainly if not exacerbated or facilitated by the employer, are nevertheless voluntary, and therefore do not constitute constructive discharge, because the employee has a choice. *Id.* As the Eleventh Circuit wrote, "[a] resignation will be considered voluntary even where the only alternative to resignation is possible termination for cause, criminal charges, or other unpleasant alternatives." *Hargray*, 57 F.3d at 1568. By his own account, rather than

choosing "[to] stand pat and fight," *id.*, Davis expressly "chose resignation rather than a protracted fight to regain authority." (Doc. 41-4 at 59-62.)   By his own admission, where the law requires a fight, he declined to do so.

While there is no bright line rule, Davis certainly has provided no evidence or legal argument supporting any inference that a reasonable person in Davis' position would have felt compelled to resign under the circumstances.  *Cf. Joseph*, 465 F.3d at 91 ("[A]n employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner.").  All that Davis has offered is his own subjective belief that the investigation by Judge Boyd, an African American and former federal judge, would have been unfair. That proposition, as speculative and subjective as it is, simply comes nowhere close to supporting a constructive discharge claim.  *See Doe*, 145 F.3d at 1448-50 (adopting an objective standard). Rather, within this Circuit, a court must presume that a resignation is voluntary unless the employee "comes forward with sufficient evidence to establish that the resignation was involuntarily extracted." *Hargray*, 57 F.3d at 1568.

Arguably, it seems that Davis may be attempting to allege the "involuntary extracted" element through his contention that LSA would have made a finding that there was validation to the subordinates' allegations. To the extent Davis contends the decision not to account for the high-profile nature of his position shows that LSA

involuntarily extracted his resignation, (Doc. 44 at 14), the Court rejects the contention because it is the employee's obligation in such instances "not to assume the worst, and not to jump to conclusions too fast." *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987).  Generally speaking, "constructive discharge will . . . not be found if the employer is not given sufficient time to remedy the situation." *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996).

Such is precisely the case presented here.  After discovery, the record shows the following: within five days of being notified of the investigation into the staff complaints, Davis resigned.  Davis did not allow the investigation to run its course, and he did not stay and offer a defense, as courts have long expected.  Instead, he resorted to giving press statements and publishing op-ed articles. "Neither life nor the law favor quitters—particularly quitters who do not give their employer a chance to remedy the perceived wrong."  *Russell v. Sealing Equip. Prods. Co.,* No. 2:11-CV-04330-RDP, 2013 WL 6145333 (N.D. Ala. Nov. 20, 2013).   Accordingly, Davis' resignation before Judge Boyd could finish her investigation defeats any claim by Davis that he was constructively discharged.

## B.   Motivating Factor and Pretext

Aside from arguing that his suspension constitutes an adverse employment action, Davis also maintains that there is ample evidence that race was a motivating

19

factor in his suspension.  (Doc. 44 at 17.)  As Davis puts it, "LSA's sudden decision to remove Davis as ED was at least partially influenced by the fact that two key members of the Executive Committee, Board Chair Battle and Personnel Chair Saxon, both African Americans, put an unfair weight on weak or unsubstantiated complaints from three black employees. . .  and that the heart of the grievance was that Davis somehow favored whites that he had brought into the program over the interests of these three black employees." (*Id.* at 12.)   This claim is actionable, Davis insists, because, while he was suspended with pay due to false accusations of a hostile work environment by African American co-workers, former Operations Director Eileen Harris, who is white, was never suspended with pay even though she had been accused of creating a hostile work environment by bullying, insults and intimidation. (*Id.* at 18.)

As to this contention, what is good for the goose is good for the gander.  Since the Defendants did not raise this factor in their summary judgment motion, nor in reply to Davis' brief in opposition, the Court need not address this issue for purposes of determining whether summary judgment should be granted.  Instead, the Court will confine its inquiry, outlined above, strictly to whether there was an actionable adverse employment action.

## C.     The Retaliation Claim

In response to the Defendants' attack on Davis' retaliation claims (Counts II and IV), itself based on the simple argument of lack of an actionable adverse employment action, Davis proffers that under the *McDonnell Douglas* framework there is sufficient evidence of retaliation. In Davis' telling, he engaged in protected activity when he notified the Board of LSA by email that he was filing an EEOC charge; therefore, the Defendants retaliated against him when they (1) hired a political operative with a history of animosity toward Davis, (2) conducted a flawed and one-sided investigation, and (3) refused to allow Davis to collect payment for his unused leave. (Doc. 44 at 29.) Understandably enough, the Defendants aver that these actions do not constitute actionable adverse employment actions under a claim of retaliation.

With the Defendants, the Court agrees. A *prima facie* case of retaliation under Title VII requires a plaintiff to show that: (1) he engaged in an activity protected under Title VII; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). An adverse employment action under Title VII's anti-retaliation provision is an action "that a reasonable employee would have found . . . materially adverse." *Burgos v. Napolitano*, 330 F. App'x 187, 189 (11th Cir. 2009) (quoting *Burlington N. & Sante*

21

*Fe Ry. v. White*, 548 U.S. 53, 68 (2006)).[6]  For a retaliatory act to qualify as an adverse employment action, it must be materially adverse such that it might well have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).[7]  Actions that reasonably lead to consequences such as reduced pay, a smaller raise than the employee would otherwise receive, or suspension of incentives are generally considered materially adverse.  *Edwards v. Nat'l Vision, Inc.*, 568 F. App'x 854, 862 (11th Cir. 2014).

Here, the Defendants make a quick reply.  They do not dispute that Davis' email constituted protected activity.  Instead, they challenge Davis' general assertion that he was retaliated against in the three ways outlined above.  For its purposes, the Court can easily narrow this field further to one item and that is the unpaid leave allegation, for there can be no real dispute that, standing alone, hiring an operative or conducting an investigation does not constitute a materially adverse employment action.  *See Brush v. Sears Holdings Corp.*, 466 F. App'x 781, 786 (11th Cir. 2012)

---

[6] The same standard governs retaliation claims based on race under Title VII and § 1981 in this Circuit. *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

[7] As previously noted, *see supra* note 1, Davis filed a supplemental brief, (Doc. 48), in light of the Eleventh Circuit's recent decision in *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 862 (11th Cir. 2020), which held that the governing Title VII retaliation standard in this Circuit is that discussed in *Burlington N. and Santa Fe Ry. Co* and *Crawford*, and not the standard used in *Gowski v. Peak*e, 682 F.3d 1299 (11th Cir. 2012).  While relevant, the *Monaghan* decision changes nothing in the Court's analysis.

(internal investigations alone do not constitute discriminatory practices); *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1304 (11th Cir. 2007) (detailing type of investigative procedures acceptable under Title VII); *Entrekin v. City of Panama City, Fla.*, 376 F. App'x 987, 994 (11th Cir. 2010) (per curiam) ("Title VII does not … establish requirements for an employer's internal procedures for receiving … complaints, or even require that employers must have an internal procedure for receiving such complaints."). Unfortunately, as to this unpaid leave issue, Davis does little more than briefly mention it. He does not explain or provide any basis for a right to payment for unpaid leave other than that other employees on other occasions were compensated for unused leave. For example, he does not state whether there was a legitimate basis for his claim such as through a provision in his employment contract or an LSA employment manual, or whether payment for unpaid leave was promised to him upon his initial hiring. Nor does he assert or set forth the amount of pay he was entitled to receive or whether he even asked for it. In fact, in his deposition, Davis acknowledged that he did not know if he even asked for payment for his unused leave when he left his employment at LSA. (Doc. 43-1 at 22.)

The failure to develop this claim is problematic for Davis for a rather obvious cause: the basis for not receiving compensation for unpaid leave can derive from any number of legitimate reasons. For example, some employer policies provide that

terminated employees are entitled to be paid for unused leave, while voluntarily departing employees are not. Other employer policies may turn on whether the employee is exempt or nonexempt.  Yet other employers may require that an employee work at least twelve months before qualifying for an unused leave payout.

The only evidence in the record here is that, even though Davis resigned on August 22, 2017, he was paid out through September 23, 2017, but received no payment for unused leave.  Davis makes no effort to present evidence that he was treated any less favorably from any white employees who departed from LSA; he simply states that he "knew from [his] tenure as ED that it was LSA's regular practice to issue a check upon departure for any unused personal leave time." (Doc. 43-22 at 9.)  While the Court acknowledges that the failure to pay for unused leave could, under the appropriate circumstances, constitute an adverse employment action under a retaliation claim, Davis' failure to present evidence of this claim requires the Court to dismiss it.

### D.    The State Law Claims for Defamation

Counts VI, VII and VIII are state law claims for defamation, which assert in general that Battle and Smith, individually, and the LSA, generally, defamed Davis by publishing allegedly false statements about his leadership, compliance with rules and guidelines, treatment of employees, and financial mismanagement. As to the LSA, Davis argues that LSA published a defamatory suspension notice and

24

resolution to an outside political consultant.  (Doc. 14 at 24-25.)  Citing the Alabama Supreme Court's decision in *Brackin v. Trimmier Law Firm* ("*Brackin*"), 897 So. 2d 207 (Ala. 2004), the Defendants move for summary judgment on the basis that there has been no publication; that is, there is "no evidence that anyone . . . shared any information about the allegations or the investigation beyond those who were acting on behalf of LSA."  (Doc. 40 at 14.)

In response, Davis focuses his attention on, and draws this Court's to, two documents: the "Executive Committee's resolution of suspension and the accompanying letter to Davis outlining the grounds of the suspension."  (Doc. 44 at 31.)  According to Davis, the intra-corporate doctrine does not apply because these two documents, (Doc. 41-2 at 81-90), contained false allegations that LSA maliciously published to an outside, independent consultant.  (Doc. 44 at 32-33.)

Since the parties focus on the issue of publication, so too will the Court.  First and foremost, the only alleged publication is that of the details of Davis' suspension to the outside consultant.  There is no evidence that any information or details of Davis' suspension were published or disseminated to anyone else by LSA or by the political consultant to anyone else.  While Davis surmises that the information given to the consultant will be used against him by future political opponents, Davis provides no evidence rebutting LSA's stated purpose for hiring the consultant: to give advice and consultation on how best to deal with the publicity associated with

Davis' departure.  (Docs. 40 at 13-14; 46 at 4.)  That it was Davis, himself, who actually "went public" and gave statements to the press and published an article in an on-line media platform about his suspension underscores the wisdom of LSA in recognizing the need for such a consultant.  Indeed, no evidence is presented that LSA published any information or statement responsive to that which Davis disseminated himself.

Putting this point aside, the legal issue before the Court concerns whether giving the suspension notice and letter to an outside consultant constitutes publication, a question controlled by Alabama law.  While Davis says it cannot, and LSA says it can, *Brackin* says it must.  *Brackin*, when distilled to its essentials, held among others that statements made to one's agent, which are both authorized and invited by the principal, are not deemed to have been "published," and without "publication," there can be no defamation. *See Brackin*, 897 So. 2d at 222. *See also McDaniel v. Crescent Motors, Inc*., 31 So. 2d 343 (1947); *Dixon v. Economy Co*., 477 So. 2d 353 (Ala. 1985); *Mims v. Metro. Life Ins. Co*., 200 F. 2d 800 (5th Cir. 1952).[8]

The rationale for this rule is simple – because the requisite element of publication is not met if the allegedly defamatory words (whether written or oral)

---

[8] Decisions of the Fifth Circuit issued prior to October 1, 1981 are binding precedent on this Court. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

are made only to the complaining party by the offending party, *such words also are not published when made to one who stands in an agency relationship with the offending party,* if the agent represents the offending (or principal) in the matter discussed and the words are invited by the offender. *See Brackin*, 897 So. 2d at 220 (citing *Prins v. Holland-N. Am. Mortg. Co*., 181 P. 680, 680–81 (Wash. 1919) ("For a corporation, therefore, acting through one of its agents or representatives, to send a libelous communication to another of its agents or representatives, cannot be a publication of the libel on the part of the corporation. It is but communicating with itself.")).  Stated otherwise, statements made to an agent, under these circumstances, are the legal equivalent of statements made directly to oneself.  Consequently, as logic commands, no publication has taken place, and without publication no actionable claim for defamation can exist.

Applied to this case, the statements at issue (the resolution and suspension letter authored by the Board and given to the consultant hired by the Board during the investigation) fall within the "no publication" rule.  No evidence that these documents were shared or disseminated with anyone else, or that they were given to the consultant for any purpose other than addressing the current issues at LSA, has been provided by Davis or found by this Court.  As elsewhere, Davis' argument that the information *may* be shared with his future political opponents is speculative, conjectural and lacking any evidentiary support.

In short, this Court fails to see how the facts of this case are materially distinct from those other circumstances where courts have concluded that there has been no publication of communications between a corporation and its outside retained consultants, whether that is an investigator, an auditor, an attorney, or a public relations consultant.[9]  *See Watters v. Louisiana Pacific Corp.*, 156 F. App'x 177, 179 (11th Cir. 2005) (holding that, under Alabama law, "communications made to employees in the course of investigating the plaintiff's employment behavior do not constitute third-party publication for defamation purposes"); *Redman v. Massey Auto*, 2:13CV313-SRW, 2014 WL 4855023 (M.D. Ala. Sept. 29, 2014) (concluding there had been no publication of communications between an auto dealer and its outside attorney concerning an investigation into alleged sexual harassment by the plaintiff); *Harris*, 2008 WL 11380165, at *22 ("[C]ommunications between an attorney and his client clearly are privileged and do not constitute publication[.]").

As one last desperate heave, Davis argues there is an exception when the statement was communicated with malice.  However, as the Alabama Supreme Court has noted, "[w]e do not reach the matter of privilege, malice or any other question until there is a publication." *Brackin*, 897 So. 2d at 221 (quoting *McDaniel*,

---

[9] While the Defendants do not raise this issue in their Motion, it appears the allegedly defamatory statements made to the retained consultant are conditionally privileged since the documents shared with the consultant are ones in which the consultant had a corresponding interest if made in good faith and without actual malice.

31 So. 2d at 345).  While malice may have relevance when it comes to an assertion of a conditional privilege, the Defendants advance no such notion in their Motion.

## E.    The State Law Conspiracy Claim

One last claim remains.  In their final point, the Defendants ask for the dismissal of Davis' conspiracy claim for two reasons. First, since summary judgment is due on the underlying claims, or "wrongful acts", then Davis' conspiracy claim founded on those claims or acts must fail as a matter of law.  *See Thompson Props. 119 AA 370, Ltd. v. Birmingham Hide & Tallow Co.,* 897 So. 2d 248, 267 (Ala. 2004) (In Alabama, if "the underlying cause of action is not viable, the conspiracy claim must also fail.").  Second, since the alleged co-conspirators are all co-directors and employees of LSA, the conspiracy claim is affirmatively barred by the intra-corporate conspiracy doctrine.  *M&F Bank v. First Am. Title Ins. Co*., 144 So. 3d 222, 234 (Ala. 2013). The Court concludes that both arguments support dismissal of Davis' conspiracy claim.

Furthermore, because Davis does not address these arguments in his responsive brief, the Court must assume that Davis concedes these points and has abandoned this claim.  *Jones v. Bank of Am., N.A*., 564 F. App'x 432, 434 (11th Cir. 2014).

## VI.   CONCLUSION

Accordingly, for the foregoing reasons, it is

**ORDERED** as follows**:**

(1) The Plaintiff's Motion to Supplement Memorandum Brief, (Doc. 48), is

GRANTED.

(2) The Defendants' Motion for Summary Judgment, (Doc. 39), is

GRANTED.

A separate judgment shall issue.

DONE, this 16th day of July, 2020.

_____/s/ R. Austin Huffaker, Jr._____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE